# IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

CALIFORNIA COMMUNITIES AGAINST TOXICS, DOWNWINDERS AT RISK, ENVIRONMENTAL DEFENSE FUND, ENVIRONMENTAL INTEGRITY PROJECT, HOOSIER ENVIRONMENTAL COUNCIL, LOUISIANA BUCKET BRIGADE, NATURAL RESOURCES DEFENSE COUNCIL, OHIO CITIZEN ACTION, SIERRA CLUB, and TEXAS ENVIRONMENTAL JUSTICE ADVOCACY SERVICES,

|  |  |
|---|---|
|  | Case No. ___20-1024___ |

*Petitioners*,

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY and ANDREW R. WHEELER, in his official capacity as Administrator of the United States Environmental Protection Agency,

*Respondents*.

## PETITION FOR REVIEW

Pursuant section 307(b)(1) of the Clean Air Act, 42 U.S.C. § 7607(b)(1), Rule 15 of the Federal Rules of Appellate Procedure, and

D.C. Circuit Rule 15, California Communities Against Toxics,

Downwinders at Risk, Environmental Defense Fund, Environmental Integrity Project, Hoosier Environmental Council, Louisiana Bucket Brigade, Natural Resources Defense Council, Ohio Citizen Action, Sierra Club, and Texas Environmental Justice Advocacy Services hereby petition for review of United States Environmental Protection Agency's final action titled "Reclassification of Major Sources as Area Sources Under Section 112 of the Clean Air Act," and published at 85 Fed. Reg. 73,854 (Nov. 19, 2020) (attached).

Respectfully submitted,

*/s/ Sanjay Narayan*
Sanjay Narayan
Sierra Club Environmental Law
   Program
2101 Webster St., Ste. 1300
Oakland, CA 94612
(415) 977-5769
sanjay.narayan@sierraclub.org

Counsel for Sierra Club

*/s/ Vickie L. Patton*
Vickie L. Patton
Benjamin M. Levitan
Environmental Defense Fund
2060 Broadway, Ste. 300
Boulder, CO 80302
(303) 447-7214
vpatton@edf.org
blevitan@edf.org

Counsel for Environmental
Defense Fund

*/s/ James Pew*
James Pew
Kathleen Riley
Earthjustice
1001 G. St., NW, Ste. 1000
Washington, D.C. 20001
(202) 667-4500
jpew@earthjustice.org
kriley@earthjustice.org

Counsel for California
Communities Against Toxics,
Downwinders At Risk,
Environmental Integrity
Project, Hoosier Environmental
Council, Louisiana Bucket
Brigade, Ohio Citizen Action,
Sierra Club, and Texas
Environmental Justice
Advocacy Services

*/s/ John Walke*
John Walke
Emily Davis
Natural Resources Defense
Council
1152 15th St., NW, Ste. 300
Washington, D.C. 20005
(202) 289-6868
jwalke@nrdc.org
edavis@nrdc.org

Counsel for Natural Resources
Defense Council

*/s/ Keri N. Powell*
Keri N. Powell
Powell Environmental Law
315 W. Ponce de Leon Ave., Ste.
842
Decatur, GA 30030
(678) 902-4450
kpowell@powellenvironmentallaw
.com

Counsel for Environmental
Defense Fund

January 15, 2021

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| CALIFORNIA COMMUNITIES AGAINST TOXICS, DOWNWINDERS AT RISK, ENVIRONMENTAL DEFENSE FUND, ENVIRONMENTAL INTEGRITY PROJECT, HOOSIER ENVIRONMENTAL COUNCIL, LOUISIANA BUCKET BRIGADE, NATURAL RESOURCES DEFENSE COUNCIL, OHIO CITIZEN ACTION, SIERRA CLUB, and TEXAS ENVIRONMENTAL JUSTICE ADVOCACY SERVICES, | Case No. _____ |

                                              *Petitioners*,

        v.

U.S. ENVIRONMENTAL PROTECTION
AGENCY and ANDREW R. WHEELER,
in his official capacity as Administrator of
the United States Environmental
Protection Agency,

                                              *Respondents*.

## RULE 26.1 DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C.

Circuit Rule 26.1, Petitioners California Communities Against Toxics,

Downwinders at Risk, Environmental Defense Fund, Environmental

1

Integrity Project, Hoosier Environmental Council, Louisiana Bucket Brigade, Natural Resources Defense Council, Ohio Citizen Action, Sierra Club, and Texas Environmental Justice Advocacy Services make the following disclosures:

## California Communities Against Toxics

California Communities Against Toxics is a non-profit organization that is a project of a non-profit corporation (Del Amo Action Committee) that is organized and existing under the laws of the State of California. It is an environmental justice network that aims to reduce exposure to pollution, to expand knowledge about the effects of toxic chemicals on human health and the environment, and to protect the most vulnerable people from harm. California Communities Against Toxics does not have any parent corporations, and no publicly held corporation has a ten percent or greater ownership interest in it.

## Downwinders at Risk

Downwinders at Risk, a non-profit corporation organized and existing under the laws of the State of Texas, is a diverse grassroots citizens group dedicated to protecting public health and the

2

environment from air pollution in North Texas. Downwinders at Risk does not have any parent corporations, and no publicly held corporation has a ten percent or greater ownership interest in it.

## Environmental Defense Fund

Environmental Defense Fund is a national non-profit organization, organized under the laws of the State of New York, that links science, economics, and law to create innovative, equitable, and cost-effective solutions to urgent environmental problems.

Environmental Defense Fund does not have any parent corporations, and no publicly held corporation has a ten percent or greater ownership interest in it.

## Environmental Integrity Project

Environmental Integrity Project, a corporation organized and existing under the laws of the District of Columbia, is a national non-profit organization that advocates for more effective enforcement of environmental laws.

Environmental Integrity Project does not have any parent corporations, and no publicly held corporation has a ten percent or greater ownership interest in it.

## Hoosier Environmental Council

HEC is a non-profit corporation organized and existing under the laws of the state of Indiana. HEC is Indiana's largest environmental public policy organization, working to improve our health, economy, and environment for thirty-five years, through education, technical assistance, and advocacy.

HEC does not have any parent corporations, and no publicly held corporation has a ten percent or greater ownership interest in it.

## Louisiana Bucket Brigade

The Louisiana Bucket Brigade is a non-profit environmental health and justice organization organized and existing under the laws of the state of Louisiana.  LABB works with communities that neighbor Louisiana's oil refineries and chemical plants and uses grassroots action to create an informed, healthy society with a culture that holds the petrochemical industry and government accountable for the true costs

of pollution to create a healthy, prosperous, pollution-free, and just state where people and the environment are valued over profit.

LABB does not have any parent corporations, and no publicly held corporation has a ten percent or greater ownership interest in it.

### Natural Resources Defense Council

Natural Resources Defense Council, a corporation organized and existing under the laws of the State of New York, is a national nonprofit organization dedicated to improving the quality of the human environment and protecting the nation's endangered natural resources.

Natural Resources Defense Council does not have any parent corporations and no publicly held corporation has a ten percent or greater ownership in it.

### Ohio Citizen Action

Ohio Citizen Action is a nonprofit organization existing under the laws of the State of Ohio dedicated to preventing and reducing exposure to pollution and strengthening public health and environmental protections.

Ohio Citizen Action does not have any parent corporations and no publicly held corporation has a ten percent or greater ownership in it.

## Sierra Club

Sierra Club is a non-profit corporation organized under the laws of the State of California. Sierra Club's mission is to explore, enjoy, and protect the wild places of the Earth; to practice and promote the responsible use of the Earth's resources and ecosystems; to educate and enlist humanity to protect and restore the quality of the natural and human environment; and to use all lawful means to carry out these objectives.

Sierra Club does not have any parent corporations, and no publicly held corporation has a ten percent or greater ownership interest in Sierra Club.

## Texas Environmental Justice Advocacy Services

TEJAS is a non-profit corporation organized and existing under the laws of the state of Texas. TEJAS promotes environmental protection through education, policy development, community awareness, and

6

legal action to ensure that everyone, regardless of race or income, is entitled to live in a clean environment.

TEJAS does not have any parent corporations and no publicly held corporation has a ten percent or greater ownership in it.

Respectfully submitted,

*/s/ Sanjay Narayan*
Sanjay Narayan
Sierra Club Environmental Law
    Program
2101 Webster St., Ste. 1300
Oakland, CA 94612
(415) 977-5769
sanjay.narayan@sierraclub.org

Counsel for Sierra Club

*/s/ Vickie L. Patton*
Vickie L. Patton
Benjamin M. Levitan
Environmental Defense Fund
2060 Broadway, Ste. 300
Boulder, CO 80302
(303) 447-7214
vpatton@edf.org
blevitan@edf.org

Counsel for Environmental
Defense Fund

7

*/s/ James Pew*
James Pew
Kathleen Riley
Earthjustice
1001 G. St., NW, Ste. 1000
Washington, D.C. 20001
(202) 667-4500
jpew@earthjustice.org
kriley@earthjustice.org

Counsel for California
Communities Against Toxics,
Downwinders At Risk,
Environmental Integrity
Project, Hoosier Environmental
Council, Louisiana Bucket
Brigade, Ohio Citizen Action,
Sierra Club, and Texas
Environmental Justice
Advocacy Services

*/s/ John Walke*
John Walke
Emily Davis
Natural Resources Defense
Council
1152 15th St., NW, Ste. 300
Washington, D.C. 20005
(202) 289-6868
jwalke@nrdc.org
edavis@nrdc.org

Counsel for Natural Resources
Defense Council

*/s/ Keri N. Powell*
Keri N. Powell
Powell Environmental Law
315 W. Ponce de Leon Ave., Ste.
842
Decatur, GA 30030
(678) 902-4450
kpowell@powellenvironmentallaw
.com

Counsel for Environmental
Defense Fund

January 15, 2021

## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of January, 2021, the foregoing Petition for Review and Rule 26.1 Disclosure Statement were served on Respondents by sending a copy via First Class Mail to each of the following addresses:

Andrew Wheeler, Administrator
U.S. Environmental Protection Agency
Office of the Administrator (1101A)
William Jefferson Clinton Building
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

Jeffrey A. Rosen, Acting Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530

Correspondence Control Unit
U.S. Environmental Protection Agency
Office of General Counsel (2310A)
William Jefferson Clinton Building
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

*/s/ Sanjay Narayan*
Sanjay Narayan
SIERRA CLUB

# ATTACHMENT

## ENVIRONMENTAL PROTECTION AGENCY

### 40 CFR Part 63

**[EPA–HQ–OAR–2019–0282; FRL–10014–50–OAR]**

**RIN 2060–AM75**

### Reclassification of Major Sources as Area Sources Under Section 112 of the Clean Air Act

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Final rule.

**SUMMARY:** This rule finalizes amendments to the General Provisions that apply to National Emission Standards for Hazardous Air Pollutants (NESHAP). These amendments implement the plain language reading of the ''major source'' and ''area source'' definitions of section 112 of the Clean Air Act (CAA) and provide that a major source can be reclassified to area source status at any time upon reducing its potential to emit (PTE) hazardous air pollutants (HAP) to below the major source thresholds (MST) of 10 tons per year (tpy) of any single HAP and 25 tpy of any combination of HAP. This rule also finalizes amendments to clarify the compliance dates, notification, and recordkeeping requirements that apply to sources choosing to reclassify to area source status and to sources that revert back to major source status, including a requirement for electronic notification.

**DATES:** This final rule is effective on January 19, 2021.

**ADDRESSES:** The Environmental Protection Agency (EPA) has established a docket for this action under Docket ID No. EPA–HQ–OAR–2019–0282. All documents in the docket are listed on the *https://www.regulations.gov/* website. Although listed, some information is not publicly available, *e.g.*, Confidential Business Information or other information whose disclosure is restricted by statute. Certain other material, such as copyrighted material, is not placed on the internet and will be publicly available only in hard copy form. Publicly available docket materials are available electronically through *https://www.regulations.gov/*. Out of an abundance of caution for members of the public and our staff, the EPA Docket Center and Reading Room was closed to the public, with limited exceptions, to reduce the risk of transmitting COVID–19. Our Docket Center staff will continue to provide remote customer service via email, phone, and webform. For further information and updates on EPA Docket Center services and the current status, please visit us online at *https://www.epa.gov/dockets.*

**FOR FURTHER INFORMATION CONTACT:** For questions about this final rule, contact Ms. Elineth Torres, Sector Policies and Programs Division (D205–02), Office of Air Quality Planning and Standards, U.S. Environmental Protection Agency, Research Triangle Park, North Carolina 27711; telephone number: (919) 541–4347; fax number: (919) 541–4991; and email address: *torres.elineth@epa.gov*. Questions concerning specific reclassifications should be directed to the appropriate Regional office.

**SUPPLEMENTARY INFORMATION:**

*Preamble acronyms and abbreviations.* We use multiple acronyms and terms in this preamble. While this list may not be exhaustive, to ease the reading of this preamble and for reference purposes, the EPA defines the following terms and acronyms here:

CAA   Clean Air Act
CEDRI   Compliance and Emissions Data Reporting Interface
CFR   Code of Federal Regulations
D.C. Cir.   the United States Court of Appeals for the District of Columbia Circuit
EAV   equivalent annualized value
EIA   economic impact analysis
EPA   Environmental Protection Agency
FIP   Federal Implementation Plan
HAP   hazardous air pollutant(s)
MACT   maximum achievable control technology
MM2A   Major MACT to Area
MRR   monitoring, recordkeeping, and reporting
MST   major source thresholds
NESHAP   national emission standards for hazardous air pollutants
NMA   National Mining Association
NSPS   new source performance standards
NSR   New Source Review
NTTAA   National Technology Transfer and Advancement Act
OIAI   Once In, Always In
OMB   Office of Management and Budget
PRA   Paperwork Reduction Act
PSD   prevention of significant deterioration
PTE   potential to emit
PV   present value
RTO   regenerative thermal oxidizers
RFA   Regulatory Flexibility Act
RIA   Regulatory Impact Analysis
RTR   residual risk and technology review
SIP   State Implementation Plan
TIP   Tribal Implementation Plan
TSM   technical support memorandum
tpy   tons per year
UMRA   Unfunded Mandates Reform Act
VOC   volatile organic compound(s)

*Background information.* On July 26, 2019, the EPA proposed revisions to the General Provisions that apply to the NESHAP to implement the plain language reading of the ''major source'' and ''area source'' definitions of CAA section 112 and provide that a major source can be reclassified to area source status at any time upon limiting its potential to emit HAP to below the MST of 10 tpy of any single HAP and 25 tpy of any combination of HAP (also referred to herein as Major Maximum Achievable Control Technology (MACT) to Area or ''MM2A proposal'') (see 84 FR 36304). In this rule, we are taking final action on some of the amendments as proposed, and we are taking final action on other amendments as modified based on the public comments to clarify the requirements that apply to sources choosing to reclassify to area source status at any time, including reclassification that occurs after the first substantive compliance date of applicable major source NESHAP requirements and the requirements that apply to sources that reclassify from major to area source status and then revert back to their previous major source status. Regarding the proposed amendments to the PTE definition, we are not finalizing the definition of ''legally and practicably enforceable'' PTE limits or the effectiveness criteria for those limits in this action. We are, however, promulgating a ministerial amendment to the regulatory definition of ''potential to emit'' in the interim. We are also finalizing revisions to the General Provisions tables and initial notification requirements within most NESHAP subparts to account for the regulatory provisions we are finalizing in this rule. We summarize some of the more significant public comments we received regarding the proposed rule and our responses to those comments in this preamble. A summary of all other public comments on the proposal and the EPA's responses to those comments is available in the Response to Comments document available in the docket No. EPA–HQ–OAR–2019–0282. A ''track changes'' version of the regulatory language that incorporates the changes finalized in this rule is also available in the docket.

*Organization of this document.* The information in this preamble is organized as follows:

I. Executive Summary
   A. Purpose of the Regulatory Action
   B. Summary of the Major Provisions of the Regulatory Action
   C. Impacts of the Final Regulatory Action
II. General Information
   A. Does this rule apply to me?
   B. Where can I get a copy of this document and other related information?
   C. Judicial Review and Administrative Reconsideration
III. Background
IV. Statutory Authority
V. Summary of Final Amendments
   A. Final Amendments to 40 CFR Part 63, Subpart A: General Provisions

B. Amendments to Individual NESHAP
General Provisions Applicability Tables
C. Amendments to Individual NESHAP
VI. Other Considerations
A. PTE Determination
B. Reclassification Process and Permitting
VII. Interim Ministerial Revision of 40 CFR Part 63 PTE Definition
VIII. Summary of Cost, Environmental, and Economic Impacts
A. Analytical Scenarios
B. Cost Analysis
C. Environmental Analysis
D. Economic Analysis
IX. Statutory and Executive Order Reviews
A. Executive Order 12866: Regulatory Planning and Review and Executive Order 13563: Improving Regulations and Regulatory Review
B. Executive Order 13771: Reducing Regulation and Controlling Regulatory Costs
C. Paperwork Reduction Act (PRA)
D. Regulatory Flexibility Act (RFA)
E. Unfunded Mandates Reform Act (UMRA)
F. Executive Order 13132: Federalism
G. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments
H. Executive Order 13045: Protection of Children From Environmental Health Risks and Safety Risks
I. Executive Order 13211: Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use
J. National Technology Transfer and Advancement Act (NTTAA)
K. Executive Order 12898: Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations
L. Determination Under CAA Section 307(d)
M. Congress Review Act (CRA)

## I. Executive Summary

### A. Purpose of the Regulatory Action

In this final rule (also referred to herein as ''final MM2A rule'' or final rule), the EPA is finalizing amendments to the General Provisions of the NESHAP regulations in 40 CFR part 63, subpart A to implement the plain language reading of the ''major source'' and ''area source'' statutory definitions of section 112 of the CAA and provide that a major source can be reclassified to area source status at any time upon reducing its emissions and PTE, as defined in 40 CFR 63.2, to below the MST of 10 tpy of any single HAP and 25 tpy of any combination of HAP. Prior to proposing these amendments, the EPA reviewed the statutory provisions that govern when a major source can reclassify to area source status, including after being subject to major source requirements under section 112 of the CAA (also referred to herein as ''CAA section 112 requirements'' or ''requirements''). After further review of

CAA section 112 provisions and public comments received on the MM2A proposal, the EPA is finalizing its conclusion that the statutory definitions of major source and area source contain no language fixing a source's status at any particular point in time and contain no language suggesting a cutoff date after which the source's status cannot change. Accordingly, the Agency is finalizing its reading that a major source may be reclassified as an area source at any time upon reducing its HAP emissions and PTE below the applicable CAA section 112 MST. Thus, major sources that reclassify to area source status at any time, including after the first substantive compliance date of an applicable major NESHAP, will no longer be subject to CAA section 112 major source NESHAP requirements and will be subject to any applicable area source NESHAP requirements. A full discussion of the statutory authority for this final MM2A rule can be found in section IV of this preamble.

### B. Summary of the Major Provisions of the Regulatory Action

The EPA is finalizing amendments to the General Provisions of the NESHAP regulations in 40 CFR part 63, subpart A to clarify the requirements that apply to sources choosing to reclassify to area source status at any time, including after being subject to major source requirements under section 112 of the CAA. The EPA is finalizing amendments to the applicability section found in 40 CFR 63.1 by adding a new paragraph (c)(6). This paragraph specifies that a major source may become an area source at any time upon reducing its emissions and PTE HAP, as defined in this subpart, to below the major source thresholds established in 40 CFR 63.2.

The EPA is finalizing in 40 CFR 63.1(c)(6) that a major source reclassifying to area source status remains subject to any applicable major source NESHAP requirements until the reclassification becomes effective. After the reclassification becomes effective, the source is subject to any applicable area source NESHAP requirements in 40 CFR part 63. For sources that reclassify from major to area source status and then revert back to their previous major source status, the EPA is also finalizing in 40 CFR 63.1(c)(6) that the source becomes subject to the applicable major source NESHAP requirements of 40 CFR part 63 immediately upon becoming a major source again. The EPA is finalizing in 40 CFR 63.1(c)(6) regulatory text to address the interaction of the reclassification of sources with enforcement actions arising from

violations that occurred before reclassification. Specifically, we are finalizing that the reclassification of a source does not affect the source's liability or any enforcement investigations or enforcement actions for a source's past conduct that occurred prior to the source's reclassification.

To ensure that all sources that reclassify notify the EPA, the EPA is finalizing amendments clarifying the existing notification requirements in 40 CFR 63.9(b) and (j). With these amendments, the notification requirements of 40 CFR 63.9 will cover not only cases where a source switches from major to area source status, but also cases where an area source reverts to major source status. A source that reclassifies in either direction must notify the EPA of any changes in the applicability of the standards that the source was subject to per the notification requirements of 40 CFR 63.9(j). The EPA is also finalizing amendments to the notification requirements in 40 CFR 63.9(b) and (j) to require in certain circumstances that the notification be submitted electronically through the Compliance and Emissions Data Reporting Interface (CEDRI). The final rule amends the General Provisions to add 40 CFR 63.9(k) to include the CEDRI submission procedures. The EPA is finalizing amendments to remove the time limit for record retention in 40 CFR 63.10(b)(3) so sources that obtain enforceable PTE limits after the effective date of this final rule are required to keep the applicability determination records as long as they rely on the PTE limits to be area sources. The EPA is also finalizing amendments to 40 CFR 63.12(c) to clarify that a source may not be exempted from electronic reporting requirements. Further, the EPA is finalizing amendments to 40 CFR 63.13 to clarify that when required by this part, or at the request of the EPA Regional office, submitting a report or notification to CEDRI fulfills the obligation to report to the EPA Regional office.

This final action includes amendments to the General Provisions applicability tables contained within most subparts of 40 CFR part 63 to add a reference to the new provision in 63.1(c)(6) discussed above. We are also finalizing revisions to several NESHAP subparts by removing the date limitation after which a major source cannot become an area source. The provisions amended are: 40 CFR part 63, subpart HH at 63.760(a)(1); 40 CFR 63, subpart HHH at 63.1270(a); 40 CFR part 63, subpart QQQ at 63.1441; 40 CFR part 63, subpart QQQQQ at 63.9485; 40 CFR

part 63, subpart RRRRR at 63.9581; and Table 2 of 40 CFR part 63, subpart WWWW. The final rule also includes amendments to the initial notification requirements of most NESHAP subparts because the date that was specified in the regulations has passed.

The EPA is still considering the proposed effectiveness criteria for HAP PTE limits and the proposed changes to the definition of "potential to emit" in 40 CFR 63.2 and is not taking any final action on those aspects of the proposed rule at this time. Thus, this final rule does not include responses to comments on proposed effectiveness criteria for PTE limits or comments related to the proposed changes to the PTE definition. The EPA is still reviewing comments received and will respond to them in a subsequent action. In the meantime, while we continue to consider what final action to take on the proposed amendments, the EPA is making an interim ministerial revision to the PTE definition to address the court decision in *National Mining Association (NMA)* v. *EPA,* 59 F.3d 1351, 1363–1365 (D.C. Cir. 1995). Specifically, this revision removes the word "federally" from the phrase "federally enforceable" in the PTE definition. This interim ministerial revision is also consistent with the EPA's long-standing policy [1] that allows for any physical or operational limitation on the capacity of the stationary source to emit a pollutant to be treated as part of the source's design if the limitation or the effect it would have on emissions is, first, either federally enforceable or legally enforceable by a state or local permitting authority and, second, practicably enforceable.

## C. Impacts of the Final Regulatory Action

The final rule does not require any source to reclassify to area source status. An evaluation of the potential to reclassify from major source to area source status involves many source-specific considerations. Each source will assess its own circumstances to determine whether it is feasible and advantageous to undergo the reclassification process. The unique nature of each source's decision process makes it difficult for the EPA to determine the number and type of sources that may choose to reclassify under this rule. Because of this, the EPA is limited to presenting illustrative analyses concerning the impacts of this final rule. The illustrative assessment of impacts includes the potential net cost savings and potential emissions changes that may result from this final action. The illustrative impacts are estimated for the three analytical scenarios established for the rule and are estimated in relation to a baseline in which sources remain subject to major source NESHAP requirements after the first substantive compliance date of such standards. The potential impacts presented in the preamble reflect the results of the illustrative analysis of the primary scenario, which, for analytical purposes, is defined as including those facilities whose actual emissions are below 75 percent of the MST (*i.e.,* 7.5 tpy for a single HAP and 18.75 tpy for all HAP). This scenario is further described in section VIII of this preamble, in the technical support memorandums (TSM),[2] and the Regulatory Impact Analysis (RIA) that is available in the docket for this action. The memorandums and RIA also

present an analysis of two alternative scenarios to provide a range of estimated potential cost impacts.[3]

The EPA estimates that this final action may result in substantial annual cost savings of $90.6 million (2017$) based on illustrative estimates of its potential reduction in administrative burden if sources reclassify to area source status.[4] The voluntary actions taken by sources to reclassify will be carried out over a period of time, but once a source reclassifies, the cost savings will accrue for as long as the source continues to operate as an area source. While cost savings will accrue for the life of the facility, we present a 5-year outlook of potential cost savings from this action to provide insight into the cost distribution over time. Results are also presented as the present value (PV) and equivalent annualized value (EAV) of the cost savings of the final MM2A rule in 2017 dollars. The PV is the one-time value of a stream of impacts over time, discounted to the current (or nearly current) day. The EAV is a measure of the annual cost that is calculated consistent with the PV. The illustrative cost savings of the final MM2A rule in 2017 dollars are presented in detail later in section VIII of this preamble and in the RIA.

Table 1 presents a summary of key results from the RIA for the final MM2A rule. This table presents the PV and EAV, estimated in 2017 dollars using discount rates of 7 and 3 percent and discounted to 2020, of the illustrative net cost savings of the final MM2A rule. The EAV estimates are consistent with the PV and reflect the illustrative total net cost savings of the rule from 2021, the first year after rule promulgation, and subsequent years.

### TABLE 1—ILLUSTRATIVE NET COST SAVINGS INCREMENTAL TO THE BASELINE

[(Including following years) (Billions 2017$) *]

| | 7 Percent | | 3 Percent | |
|---|---|---|---|---|
| | Present value | Equivalent annualized value | Present value | Equivalent annualized value |
| Potential Net Cost Savings ................................................................ | $0.86 | 0.07 | $1.50 | 0.08 |

* The overall analytic timeline begins in 2021 and continues thereafter for an indefinite period. The cost savings in 2016 dollars and discounted to 2016, as defined as a present value, are $0.654 billion at 7 percent and $1.13 billion at 3 percent. As equivalent annualized values, the cost savings are $52 million at 7 percent and $58 million at 3 percent.

---

[1] See January 25, 1995, memorandum titled "*Options for Limiting the Potential to Emit (PTE) of a Stationary Source Under Section 112 and Title V of the Clean Air Act)*" and December 20, 1999, memorandum titled "*Third Extension of January 25, 1995 Potential to Emit Transition Policy.*" Available at *https://www.epa.gov/guidance/guidance-documents-managed-office-air-and-radiation* and in the docket of this rule.

[2] See "*Documentation of the Data for Analytical Evaluations and Summary of Industries Potentially*

Impacted by the Final Rule titled Reclassification of Major Sources as Area Sources Under Section 112 of the Clean Air Act,*" and "*Analysis of Illustrative 125% Scenario for MM2A Final—Potential Cost Impacts from HAP Major Sources Reducing Emissions as part of Reclassifying to HAP Area Sources.*"

[3] Alternative scenario 1 analyzes those facilities whose actual emissions are below 50 percent of the MST (5 tpy for a single HAP and 12.5 tpy for all HAP). Alternative scenario 2 analyzes that sources

below 125 percent of the MST (12.5 tpy for a single HAP and 31.25 tpy for all HAP). Discussions of these scenarios and results can be found in the RIA for this final action.

[4] Annual cost savings reflect impacts in Year 2 of the reclassification process for all sources that choose to reclassify under the primary scenario. All cost savings are net of any additional permitting and recordkeeping costs to state regulatory agencies and sources. These annual cost savings are those for 2025 and subsequent years.

Impacts in Table 1 reflect the potential impacts of the final MM2A rule for the year in which all reclassifications are expected to have taken place (2025) and beyond.

To assess the potential changes in emissions that may result from the reclassification of major sources to area sources under this rule, we reviewed the permits and other information from 69 sources that have reclassified since January 2018, consistent with the EPA's plain language reading of the CAA section 112 definitions of ''major'' and ''area'' source, and also perform an illustrative analysis of 72 source categories in detail. Because we do not have information on the major sources that may choose to reclassify to area source status in the future and the enforceable conditions they will take in order to reclassify, we are not able to provide an assessment of the emissions impacts for actual reclassifications beyond the 69 sources that have already reclassified.[5] Therefore, we conducted a detailed illustrative analysis of 72 source categories to provide a broad characterization of the potential changes in emissions for all NESHAP source categories that could be impacted by this action. The assessment of the 69 reclassifications shows that 68 facilities have requirements in their operating permits that would continue to implement the compliance methods used to comply with the major source NESHAP requirements and prevent emissions increases. However, the EPA found that one of the 69 reclassified sources will not continue to employ the same compliance methods that it used to meet the major source NESHAP and thus it may increase its emissions. For the illustrative analysis of emissions impacts conducted, we find that 65 source categories in the major source NESHAP program will either not be impacted or will not increase emissions as a result of the rule. Based on the broad assumptions applied in the analysis, we found a potential for emissions increases for some facilities in seven source categories. While a majority of facilities are not anticipated to change emissions, approximately 3.1 percent of the facilities in the MM2A database that we were able to analyze could increase emissions if sources: (1) Voluntarily opt to reclassify and (2) were allowed to reduce operation of adjustable add-on controls. We also found a potential for emissions decreases in cases where sources choose to reduce emissions from above the

MST to below the MST to reclassify. The facilities that we were able to assess for emission increases and decreases are located across the United States (*i.e.,* in more than 10 states and in every region of the United States) and are not clustered in close proximity to each other. Further discussion of the impacts of the final rule are presented in section VIII of this preamble and presented in detail in the technical support memorandums, titled *Documentation of the Emissions Analysis for the Final Rule ''Reclassification of Major Sources as Area Sources Under Section 112 of the Clean Air Act''* and the *Analysis of the Illustrative 125% Scenario for MM2A Rule—Potential Cost Impacts from HAP Major Sources Reducing Emissions as part of Reclassifying to HAP Area Sources,* and the RIA for the final rule, all of which are available in the docket for this action.

## II. General Information

### A. Does this rule apply to me?

Categories and entities potentially impacted by this rule include sources subject to NESHAP requirements under section 112 of the CAA.

The final amendments are applicable to sources that reclassify from major source to area source status under section 112 of the CAA and sources that revert from their reclassified area source status to their previous major source status.

Federal, state, local, and tribal governments may be affected by this rule if they own or operate sources that choose to request reclassification from major source status to area source status or if reclassified sources choose to revert to their previous major source status at some time in the future. The EPA is the permitting authority for issuing, rescinding, and amending permits for sources that request reclassification in Indian country, with four exceptions.[6] State, local, or tribal regulatory authorities[7] may receive requests to

issue new permits or make changes to existing permits for sources in their jurisdiction to address reclassification-related activities (*e.g.,* title V, synthetic minor permits, establishing limits on a source's PTE).

### B. Where can I get a copy of this document and other related information?

In addition to being available in the docket, an electronic copy of the final MM2A rule is available on the internet. Following signature by the EPA Administrator, the EPA will post a copy of this final action at *https://www.epa.gov/stationary-sources-air-pollution/reclassification-major-sources-area-sources-under-section-112-clean.* Following publication in the **Federal Register**, the EPA will post the **Federal Register** version and key technical documents at this same website.

A redline version of the regulatory language that incorporates the amendments finalized in this rule is available in the docket for this action (Docket ID No. EPA–HQ–OAR–2019–0282).

### C. Judicial Review and Administrative Reconsideration

Under CAA section 307(b)(1), judicial review of this final rule is available only by filing a petition for review in the United States Court of Appeals for the District of Columbia Circuit (DCCir.) by January 19, 2021. Under CAA section 307(b)(2), the requirements established by this final rule may not be challenged separately in any civil or criminal proceedings brought by the EPA to enforce the requirements.

Section 307(d)(7)(B) of the CAA further provides that only an objection to a rule or procedure that was raised with reasonable specificity during the period for public comment (including any public hearing) may be raised during judicial review. This section also provides a mechanism for the EPA to reconsider the rule if the person raising an objection can demonstrate to the Administrator that it was impracticable to raise such objection within the period for public comment or if the grounds for such objection arose after the period for public comment (but within the time specified for judicial review) and if such objection is of central relevance to the outcome of the rule. Any person seeking to make such a demonstration should submit a Petition for Reconsideration to the Office of the Administrator, U.S. EPA, Room 3000, WJC South Building,

---

[5] Of the 69 sources, 68 have already reclassified and one was undergoing the process of reclassification.

[6] Two tribes have approved title V programs or delegation of 40 CFR part 71. The tribes may have sources that request to no longer be covered by title V. Neither of these two tribes have approved minor source permitting programs but may in the future. In the meantime, the tribes will need to coordinate with the EPA, who is the permitting authority in Indian country for these requests. In addition, two other tribes have approved Tribal Implementation Plans (TIPs) authorizing the issuance of minor source permits. Only one of these tribes has a major source that would be eligible to request reclassification. If that source requests a new permit, the tribe may issue the minor source permit, but the EPA would need to be made aware of the request, as the EPA is the permitting authority for title V.

[7] The term regulatory authority is intended to be inclusive of the federal, state, tribal, or local air pollution control agency with authority to process

reclassification requests and issuance of enforceable PTE limits.

1200 Pennsylvania Ave. NW, Washington, DC 20460, with a copy to both the person(s) listed in the preceding **FOR FURTHER INFORMATION CONTACT** section, and the Associate General Counsel for the Air and Radiation Law Office, Office of General Counsel (Mail Code 2344A), U.S. EPA, 1200 Pennsylvania Ave. NW, Washington, DC 20460.

## III. Background

Shortly after the EPA began implementing individual NESHAP resulting from the 1990 CAA Amendments, the Agency received multiple requests to clarify when a major source of HAP could avoid CAA section 112 requirements applicable to major sources by taking enforceable limits on its PTE below the major source thresholds. In response, the EPA issued, on May 16, 1995, a memorandum from John Seitz, Director of the Office of Air Quality Planning and Standards, to the EPA Regional Air Division Directors (the May 1995 Seitz Memorandum).[8] The May 1995 Seitz Memorandum provided guidance on three timing issues related to avoidance of CAA section 112 requirements for major sources:

• ''By what date must a facility limit its PTE if it wishes to avoid major source requirements of a MACT standard?''

• ''Is a facility that is required to comply with a MACT standard permanently subject to that standard?''

• ''In the case of facilities with two or more sources in different source categories: If such a facility is a major source for purposes of one MACT standard, is the facility necessarily a major source for purposes of subsequently promulgated MACT standards?''

In the May 1995 Seitz Memorandum, the EPA stated its interpretation of the relevant statutory language that facilities that are major sources of HAP may switch to area source status at any time until the ''first compliance date'' of the standard.[9] Under this interpretation, facilities that are major sources on the first substantive compliance date of an applicable major source NESHAP were required to comply permanently with that major source standard even if the source was subsequently to become an area source by limiting its PTE. This position was commonly referred to as the ''Once In, Always In'' (OIAI) policy. The May 1995 Seitz Memorandum provided that a source that is major for one NESHAP would not be considered major for a subsequent NESHAP if the source's potential to emit HAP emissions was reduced to below major source levels by complying with the first major source NESHAP. In the May 1995 Seitz Memorandum, the EPA set forth transitional policy guidance that was intended to remain in effect only until the Agency proposed and promulgated amendments to the 40 CFR part 63 General Provisions.

After issuing the May 1995 Seitz Memorandum, the EPA twice proposed regulatory amendments that would have altered the OIAI policy. In 2003, the EPA proposed amendments that focused on HAP emissions reductions resulting from pollution prevention (P2) activities. Apart from certain provisions associated with the EPA's National Environmental Performance Track Program—a national voluntary program designed to recognize and encourage top environmental performers whose program participants go beyond compliance with regulatory requirements to attain levels of environmental performance that benefit people, communities, and the environment—that proposal was never finalized. See 68 FR 26249 (May 15, 2003); 69 FR 21737 (April 22, 2004). In 2007, the EPA issued a proposed rule to replace the OIAI policy set forth in the May 1995 Seitz Memorandum. See 72 FR 69 (January 3, 2007). In that proposal, the EPA reviewed the provisions in CAA section 112 relevant to the OIAI policy interpretation, applicable regulatory language, stakeholder concerns, and potential implications. *Id.* at 71–74. Based on that review, the EPA proposed an interpretation of the relevant statutory language that a major source that is subject to a major source NESHAP would no longer be subject to that major source standard if the source were to become an area source through enforceable limitations on its PTE HAP emissions. *Id.* at 72–73. Under the 2007 proposal, major sources could take such limits on their PTE and obtain ''area source'' status at any time and would not be limited to doing so only before the ''first substantive compliance date,'' as the OIAI policy provided. *Id.* at 70.

The EPA did not take final action on this 2007 proposal.

In 2017, the EPA received public comments pursuant to Executive Order 13777, Enforcing the Regulatory Reform Agenda (February 24, 2017), and the Presidential Memorandum on Streamlining Permitting and Reducing Regulatory Burdens for Domestic Manufacturing (January 24, 2017) supporting the withdrawal of the OIAI policy.[10] Per these comments, the OIAI policy imposed an artificial time limit on major sources obtaining area source status not found in the definitions of ''major source'' and ''area source'' in CAA sections 112(a)(1) and (2). Commenters further stated that the temporal limitation imposed by the OIAI policy was inconsistent with the CAA and created an arbitrary date by which sources must determine whether their HAP PTE will exceed either of the major source thresholds.

On January 25, 2018, the EPA issued a guidance memorandum from William L. Wehrum, Assistant Administrator of the Office of Air and Radiation, to the EPA Regional Air Division Directors titled ''*Reclassification of Major Sources as Area Sources Under Section 112 of the Clean Air Act*'' (MM2A Memorandum).[11] The MM2A Memorandum discussed the statutory provisions that govern when a source subject to major source NESHAP requirements under section 112 of the CAA may be reclassified as an area source and thereby avoid being subject thereafter to major source NESHAP requirements and other requirements applicable to major sources under CAA section 112. In the MM2A Memorandum, the EPA discussed the plain language of CAA section 112(a) stating Congress's definitions of ''major source'' and ''area source'' and determined that the OIAI policy articulated in the 1995 Seitz Memorandum was contrary to the plain language of the CAA and, therefore, must be withdrawn. In the MM2A Memorandum, the EPA announced the future publication of a proposed rule to receive input from the public on adding regulatory text consistent with the plain reading of the statute as described in the MM2A Memorandum.

On July 26, 2019, the EPA proposed regulatory text to implement the plain

---

[8] See ''*Potential to Emit for MACT Standards-Guidance on Timing Issues.*'' From John Seitz, Director, Office of Air Quality Planning and Standards, to the EPA Regional Air Division Directors. May 16, 1995, *https://www.epa.gov/sites/production/files/2018-02/documents/pteguid.pdf.* Also available in the docket of this rule.

[9] The ''first substantive compliance date'' is defined as the first date a source must comply with an emissions limitation or other substantive regulatory requirement (*i.e.,* leak detection and repair programs, work practice measures, etc . . . , but not a notice requirement) in the applicable standard.

[10] See Executive Order 13777 at 82 FR 12285 (February 24, 2017) and request for comment at 82 FR 17793 (April 13, 2017), Docket ID No. EPA–HQ–OAR–2017–0190. See Presidential Memorandum at 82 FR 8667 (January 24, 2017) and request for information at 82 FR 12786 (March 7, 2017), Docket ID No. DOC–2017–0001.

[11] See notice of issuance of this guidance memorandum at 83 FR 5543 (February 8, 2018).

language reading of the statute as discussed in the MM2A Memorandum. See 84 FR 36304. The 2019 MM2A proposal superseded the 2007 proposal. See 72 FR 69 (January 3, 2007). The EPA solicited comment on all aspects of the MM2A proposal, including the EPA's position that the withdrawal of the OIAI policy and the proposed approach gives proper effect to the statutory definitions of ''major source'' and ''area source'' in CAA section 112(a) and is consistent with the plain language and structure of the CAA as well as the impacts of the proposal on costs, benefits, and emissions impacts. Publication of the MM2A proposal in the **Federal Register** opened comment on the proposal for an initial 60-day public comment period. The EPA held a public hearing on August 15, 2019, in Washington, DC. In response to requests for an extension of the comment period, the EPA reopened the public comment period for an additional 30 days through November 1, 2019. The EPA received more than 16,000 comments on the MM2A proposal. After review and consideration of public comments, the EPA is finalizing the implementation of the plain language reading of the definitions of major source and area source under CAA section 112. Per CAA section 307(d)(6)(B), the EPA is providing a response to the to the most significant comments received on the MM2A proposal in this preamble, and responses to the other comments in the Response to Comments document available in the docket.

## IV. Statutory Authority

As discussed in the preamble of the MM2A proposal at 84 FR 36304, 36309–36313 (July 26, 2019), CAA section 112 distinguishes between major and area sources of HAP emissions. Indeed, the very first provisions in CAA section 112 are the major source definition in CAA section 112(a)(1) and area source definition in CAA section 112(a)(2)) that create the major/area distinction. Major sources emit more HAP than area sources and, generally, different requirements apply to major sources and area sources. For some section 112 source categories, the EPA has promulgated requirements for only major sources, and HAP emissions from area sources are not regulated under the NESHAP program.

Whether a source is a ''major source'' or an ''area source'' depends on the amount of HAP emitted by the source based on its actual and potential emissions. Congress defined ''major source'' to mean a source that emits or has the potential to emit at or above

either of the statutory thresholds of 10 tpy of any one HAP or 25 tpy of total HAP. CAA section 112(a)(1). An ''area source'' is defined as any source of HAP that is not a major source. CAA section 112(a)(2). If a source does not emit or does not have the potential to emit at or above either of the major source thresholds, then it is an ''area source.'' The statutory definitions of ''major source'' and ''area source'' do not contain any language that fixes a source's status as a major source or area source at any particular point in time, nor do they otherwise contain any language suggesting that there is a cutoff date after which a source's status cannot change.

Congress did, however, create a distinction based on timing in CAA section 112 in defining and creating provisions related to ''new sources'' and ''existing sources.'' Specifically, Congress defined ''new source'' to mean a source that is constructed or reconstructed after the EPA first proposes regulations covering the source. CAA section 112(a)(4). An ''existing source'' is defined as any source other than a new source. CAA section 112(a)(10). A source will be subject to different requirements depending on whether it is a new source or an existing source. See, *e.g.*, CAA section 112(d)(3) (identifying different minimum levels of stringency (known as ''MACT floors'') for new and existing sources).

The emissions-based distinction (arising from the definitions of major source and area source) and the timing-based distinction (arising from the definitions of new source and existing source) are independent, and neither is tied to the other. For example, the statutory definition of ''major source'' does not provide that major source status is determined based on a source's emissions or PTE as of the date that the EPA first proposes regulations applicable to that source or any other point in time. As noted above, the plain language of the ''major source'' and ''area source'' definitions create a distinction that is based solely on amount of emissions and PTE, and not timing. Similarly, with respect to the timing-based distinction, a source is a ''new source'' or an ''existing source'' based entirely on the timing of its construction or reconstruction and without consideration of its actual emissions or PTE. The contrast between the temporal distinction in the contrasting definitions of existing and new sources on the one hand, and the absence of any temporal dimension to the contrasting definitions of major and area sources on the other, is further

evidence that Congress did not intend to place a temporal limitation on a source's ability to be classified as an area source (including a source's ability to be classified as an area source through the permitting authority's ''considering controls'' that may have been imposed after the source was initially classified as major).

Notwithstanding the independence of the two distinctions that the statute created based on amount of emissions and timing (and without addressing that independence or otherwise addressing the plain language of the statutory definitions of ''major source'' and ''area source''), the EPA issued the May 1995 Seitz Memorandum, which set forth the OIAI policy. Under the OIAI policy, a source's status as a major source for the purpose of applying a specific major source MACT standard issued under the requirements of CAA section 112 was deemed to be unalterably fixed on the first substantive compliance date of the specific applicable major source requirements. Thus, a source that was a major source on that first compliance date would continue to be subject to the major source requirements for that specific NESHAP even if the source reduced its emissions of and PTE HAP to below the statutory thresholds in the definition of ''major source,'' and, thus, fell within the definition of ''area source.''

On January 25, 2018, the EPA issued the MM2A Memorandum. The MM2A Memorandum discussed the statutory definitions of ''major source'' and ''area source'' and explained that the OIAI policy articulated in the May 1995 Seitz Memorandum was contrary to the plain language of the CAA, and, therefore, must be withdrawn.

As discussed above, Congress expressly defined the terms ''major source'' and ''area source'' in CAA section 112(a) in unambiguous language. Nonetheless, under the OIAI policy, a source that reduced its emissions of and PTE HAP to below the statutory thresholds for major source status after the relevant compliance date would continue to be subject to the requirements applicable to major sources. This policy was applied notwithstanding that the statutory definitions of ''major source'' and ''area source'' lack any reference to the compliance date of major source requirements or any other text that indicates a time limit for changing between major source status and area source status. In short, Congress placed no temporal limitations on the determination of whether a source emits or has the potential to emit HAP in sufficient quantity to be a major source

under CAA section 112. Because the OIAI policy imposed such a temporal limitation (before the "first compliance date"), the EPA had no authority for the OIAI policy under the plain language of the CAA. Under the plain language of the statute, a major source that takes enforceable limits on its PTE to bring its HAP emissions below the CAA section 112 major source thresholds, no matter when it may choose to do so, becomes an area source under Congress's definition in CAA section 112(a)(2). In this final action, we are implementing the plain language of CAA section 112 and making clear that such a source can reclassify to area source status at any time, and after reclassification, will no longer be subject to the CAA section 112 requirements applicable to the source as a major source under CAA section 112— so long as the source's actual and PTE HAP emissions remain below the CAA section 112 thresholds—and will instead be subject to any applicable area source requirements.

A discussion of the statutory definitions of "new source" and "existing source" in CAA section 112(a)(4) and (10) further demonstrates that the OIAI policy was inconsistent with the language of the statute. As discussed above, the major source/area source distinction and the new source/ existing source distinction are two separate and independent features of the statute. Significantly, the statutory definitions of "new source" and "existing source" dictate that the new source/existing source distinction is determined by when a source commences construction or reconstruction and says nothing about the source's volume of emissions. No one can reasonably suggest that this silence concerning volume of emissions indicates that Congress intended to give the EPA the discretion to conclude that sources should be classified as new or existing based, in part, on how much they emit. For example, if the EPA were to say that a source is only a new source if it both (1) commences construction after regulations are first proposed (as stated in CAA section 112(a)(4)), and (2) emits more than 20 tpy of any single HAP (which is not stated anywhere in the statute), that second element would be contrary to the plain language of the statute. Similarly, the OIAI policy of considering timing as part of the major source/area source distinction is contrary to the plain language of the statute, because it interjects timing into the major/area distinction when Congress provided that such distinction would be based only on the source's actual and potential emissions. In short,

Congress's creation of the timing distinction in the new source and existing source definitions shows that Congress was explicit when it wanted to classify sources based on timing, and it did not do so in creating the major/area source distinction.

Some commenters have argued that the EPA's plain language reading cannot be correct in light of various provisions in CAA section 112. The EPA has considered these comments and concluded that the EPA's plain language reading is the correct reading, for the reasons discussed below, in the Response to Comments document and elsewhere in the record.

CAA section 112(i)(3)(A)—Some commenters assert that the EPA's plain language reading of the definitions of "major source" and "area source" is contradicted by CAA section 112(i)(3)(A). Specifically, they contend that the first phrase in CAA section 112(i)(3)(A) precludes a major source from reclassifying to area source status after the source has become subject to a major source standard and that this statutory text compels the OIAI policy. The EPA disagrees with this contention. The first phrase in CAA section 112(i)(3)(A) states: "After the effective date of any emissions standard, limitation or regulation promulgated under this section and applicable to a source, no person may operate such source in violation of such standard, limitation or regulation . . . ." As discussed in the proposal (84 FR 36311), the EPA reads this phrase to have the same meaning as similar "effective date" provisions in the CAA, such as CAA section 111(e), notwithstanding that CAA section 112(i)(3)(A) has somewhat different phrasing. In short, this text simply provides that, after the effective date of a CAA section 112 rule, sources to which a standard is applicable must comply with that standard. This text is not reasonably read to say that, once a standard is applicable to a source, that standard continues to be applicable to the source for all time, even if the source's potential to emit changes such that it no longer meets the applicability criteria for the standard. Such a reading would produce some results that are clearly incorrect. For example, if the first phrase in CAA section 112(i)(3)(A) were read to say that a source's applicable requirements are determined at the point in time that a source first becomes subject to CAA section 112 requirements, then an area source would continue to be subject to area source requirements even if that source increased its potential to emit above either of the major source thresholds.

Such a result would be contrary to the EPA regulations, which provide that an area source that increases its emissions or PTE above the MST becomes subject to the applicable major source requirements. 40 CFR 63.6(a)(2), 63.6(b)(7), 63.6(c)(5).

Further, reliance on CAA 112(i)(3)(A) to argue against the EPA's plain language reading and for a return to the OIAI policy ignores that the "effective date" of a CAA section 112 standard is not the same as the "compliance date." CAA section 112(i)(3)(A) expressly provides that the EPA may set the "compliance date" for existing sources up to 3 years after the "effective date." Similarly, CAA section 112(i)(5) (which is applicable in certain circumstances for sources that make early reductions in HAP emissions) provides for a delayed compliance date that will be after the effective date. This is significant because the cutoff deadline for reclassification that the commenters say is required under CAA section 112(i)(3)(A) is not the effective date. Under the OIAI policy, the cutoff date for reclassification was the first substantive compliance date, which (as just discussed) is clearly distinguished from the effective date in CAA section 112(i)(3)(A) in the statute. Thus, commenters' reading of CAA section 112(i)(3)(A) would not only be contrary to the EPA's plain language reading but would also be contrary to the OIAI policy under which sources could reclassify after the effective date as long as they did so before the first substantive compliance date.

In sum, the EPA has concluded that the CAA section 112 definitions of "major source" and "area source" and the "effective date" provision in CAA section 112(i)(3)(A) are properly read together to say that sources must comply with the applicable requirements corresponding to their major source or area source status, and that if this status changes, then the source becomes subject to the requirements corresponding to its status after the change.

CAA sections 112(c)(3) and (6)—Some commenters argue that CAA sections 112(c)(3) and (6) reflect a Congressional intent that sources are subject to continuous, permanent compliance with major source standards and that these provisions are, therefore, inconsistent with the EPA's plain language reading. But there is no inconsistency here. Those provisions required the EPA to ensure that sources accounting for 90 percent of the emissions of specific pollutants were listed and regulated by November 2000. The premise of the commenters' argument based on CAA

sections 112(c)(3) and (6) is that these provisions do not simply require the EPA to list and regulate sufficient source categories to meet the 90-percent requirement at a given point in time; rather, they require that the EPA's regulations ensure that 90 percent of emissions are subject to regulation on an ongoing basis. This is not a reasonable reading of CAA sections 112(c)(3) and (6) because, as explained in greater detail in the proposed rule preamble at 84 FR 36311, the requirements of the statute and subsequent standards will result in the emissions from the listed source categories falling below the 90-percent threshold once those source categories are regulated. If commenters' interpretation were correct, CAA sections 112(c)(3) and (6) would create a never-ending cycle of listing and regulation in order to achieve an unattainable goal of ensuring that 90 percent of emissions are regulated. See 84 FR 36311.

In response to the EPA's discussion in the proposed rule preamble, commenters have stated that the statutory text in CAA sections 112(c)(3) and (6) is properly read not to focus on the source categories that those provisions require to be listed but on the individual sources that are within those categories—specifically, that these provisions require the EPA to regulate the sources that produced those emissions. But if the listing and regulation required pursuant to CAA sections (c)(3) and (6) were read to apply to the sources that produced the emissions as of the time of the listing of the categories, then that would mean that new sources within the listed source categories would not be regulated. The EPA does not think this is a reasonable reading of those provisions. Instead, the proper reading of these provisions is that the EPA is to list and regulate source categories, and then a source is regulated pursuant to the standard applicable to a given source category to the extent that, and as long as, the source remains within the source category. Thus, under a proper reading of CAA sections 112(c)(3) and (6), those provisions do not prevent reclassification, so there is no conflict between the EPA's plain language reading of CAA sections 112(a)(1)–(2) and the requirements of CAA sections 112(c)(3) and (6).

CAA section 112(f)(2)—Commenters also point to CAA section 112(f)(2) (commonly referred to as the residual risk provision) and contend that the EPA's plain language reading allows reclassified sources to avoid the review required under that provision. But this argument fails to refute the discussion

that the EPA provided in the proposed rule preamble (at 84 FR 36311–36312). First, as a general matter, Congress in CAA section 112 plainly distinguished between major sources emitting above the MST and area sources emitting below the MST and subjected them to different requirements. Second, with regard to CAA section 112(f), CAA section 112(f)(5) contains an express exemption from the CAA section (f)(2) review for area sources, and there is no statutory basis or logical reason for treating an area source differently just because it is a former major source. For these reasons, CAA section 112(f) is not inconsistent with the EPA's plain language reading.

CAA section 112(d)—Some commenters have pointed to the requirements of CAA section 112(d) as requiring sources that are at any point subjected to major source standards must continue to be subject to major source standards permanently. These commenters have argued that the EPA's plain language reading undermines the emissions reductions required by these CAA section 112 standards. Section 112(d)—and in particular, sections 112(d)(2) and (3) of the CAA—addresses how the EPA sets MACT standards for major sources (based on the maximum degree of emissions reduction the EPA determines is achievable, which may be a complete prohibition on emissions). But the question of what standard is applicable to major sources in a source category—whether MACT floor standards or otherwise—logically cannot determine which sources are major sources . Instead, the text and structure of CAA section 112 demonstrate that whether a source is classified as a major source or an area source is the threshold question under CAA section 112, and what requirements apply to the source flows from how the source is classified, with major sources and area sources facing significantly different regulation.

As noted above, the very first provisions in CAA section 112 are the major source definition in CAA section 112(a)(1) and area source definition in CAA section 112(a)(2) that create the major/area distinction. Following from this threshold distinction, CAA section 112 treats major sources and area sources differently in fundamental ways. To state a few examples that illustrate this:

(1) The EPA must list all categories of major sources of HAP pursuant to CAA section 112(c)(1), but only has to list categories of area sources representing 90 percent of HAP under CAA section 112(c)(3). This distinction is then carried over to what sources are

regulated, as provided in CAA section 112(d)(1), which provides that the EPA will regulate those categories listed under CAA section 112(c).

(2) Major sources are subject to MACT standards under CAA section 112(d)(2) and (3), but area sources may be subject to generally available control technology (GACT) standards under CAA section 112(d)(5).

(3) Area source categories and subcategories listed under CAA section 112(c)(3) and for which standards are set under CAA section 112(d)(5) are not subject to residual risk review under CAA section 112(f)(2), pursuant to CAA section 112(f)(5).

In short, to the extent that major sources become area sources by reducing their emissions of and PTE HAP below the MST, and, thus, are no longer subject to major source requirements, that is not a "loophole" or an "end-run" around the major source requirements. That is simply the result of the provisions and structure of CAA section 112 that Congress enacted and reflects the fundamental distinction between how CAA section 112 addresses major sources and area sources.

Further, allowing a major source to take a PTE limit below the major source threshold and thereby avoid having to comply with major source requirements is not a new concept under MM2A. Indeed, that is precisely what happened under the OIAI policy. The only change under MM2A is one of timing. Under the OIAI policy, major sources could reclassify if they took the PTE limit before the first substantive compliance date. Under MM2A, sources can reclassify at any time. Nothing in the statute says, and there is no logical reason why, a major source that could reclassify to area source status on the day before its first substantive compliance date (as allowed under the OIAI policy) is foreclosed from doing so on the day after its first substantive compliance date.

Similarly, having a source reclassify after the first substantive compliance date is not a new concept under MM2A. During the time that the OIAI policy was in effect, area sources were reclassified to major source status at any time that they increased emissions or their PTE above the major source threshold, even if the increase occurred after the first substantive compliance date under the applicable area source rule.

For these reasons, the EPA concludes that the standard-setting provisions in CAA sections 112(d)(2) and (3) do not contradict the plain language of the major source and area source definitions

on the issue of whether a source can reclassify at any time.

Parties opposed to the EPA's plain language reading also suggest that the EPA's reading is inconsistent with the purpose and provisions of CAA section 112 because it will lead major sources that reclassify to area source status to increase their emissions above what they could emit if they continued to be major sources. The EPA disagrees with the suggestion that a source's reclassification from major source to area source will necessarily lead to an increase in emissions from the source above what would have been allowed to emit under the major source standard. As discussed in section VIII of the preamble, there are a number of reasons why reclassified sources are generally not expected to increase their emissions. The EPA's analysis of the sources that have reclassified to date and sources that might reclassify from various source categories shows that in 68 out of 69 operating permits for sources that have already reclassified to area source status since January 2018, sources achieved and maintain area source status by operating the emission controls or continuing to implement the practices they used to comply with the major source NESHAP requirements. However, the EPA found that one of the 69 reclassified sources will not continue to employ the same compliance method that it used to meet the major source standard, and thus may increase its emissions. In addition to this review of actual reclassification actions since January 2018, the EPA also prepared an illustrative analysis for 72 source categories in the major source NESHAP program (114 total) to evaluate the potential emissions impacts. After considering the information and data available for the illustrative emissions analysis, we found that 65 source categories will not change emissions as a result of the rule. For the other seven, there was a potential for (but not a certainty of) emissions increases based on conservative assumptions that are likely to overstate the change in emissions at some facilities. Sources in these in seven source categories assessed in the primary scenario could increase emissions if those facilities (1) opted to reclassify and (2) were permitted to change the operation of adjustable add-on controls. Further details of this illustrative analysis and the results are provided below in section VIII.

Further, allowing major sources to reclassify to area source status after the first substantive compliance date may create an incentive for sources to evaluate their operations and consider changes that can further reduce their HAP emissions to below the MST if the source views those changes as an opportunity to reduce costs of production, increase productivity, or reduce the costs of complying with major source NESHAP requirements. For example, sources using surface coatings may see the opportunity to become an area source as an extra incentive to invest in the development of new low- or no-HAP content coatings, inks, and binders. Similarly, sources with boilers and engines may benefit from replacing old boilers and engines with new, more efficient, and clean technologies. Such a replacement not only could help a source reduce HAP to below the MST but could also reduce fuel use and associated costs. To assess the opportunity for such emission decreases, we looked at an alternative scenario and determined that some sources operating between 75 and 125 percent of the MST could decrease emissions if those sources were to reclassify. Further details of this illustrative analysis and the results are provided below in section VIII.

In the MM2A proposal, the EPA took comment on whether it can and should promulgate regulatory provisions that would prevent a source that has reclassified from major to area source status from increasing emissions above what the source was allowed to emit when it was a major source. See 84 FR 36312–36313. Upon further consideration of this issue and the comments received, the EPA has concluded that the plain language of CAA section 112 precludes the promulgation of such provisions. As discussed above, the plain language of CAA section 112 provides that a source is an area source if its emissions and PTE are below the thresholds of 10 tpy of any one HAP and 25 tpy of any combination of HAP. Just as there is nothing in the statutory definitions in CAA sections 112(a)(1) and (2) or elsewhere in CAA section 112 that sets, or gives the EPA the authority to set, a cut-off date after which a major source cannot classify to area source status, there is nothing in CAA section 112 that imposes, or gives the EPA the authority to impose, a requirement that a source can only be an area source if it limits its emissions to some level below the MST. Congress clearly identified the thresholds of 10 tpy of any one HAP and 25 tpy of all combined HAP as the dividing line between major source status and area source status. The EPA cannot impose a different dividing line from what Congress wrote into CAA section 112. See *Utility Air Regulatory Group* v. *EPA,* 573 U.S. 302, 325–326 (2014) (where Congress created precise numerical thresholds in the statute, the EPA's rewriting of the statutory thresholds is impermissible).

Further, even if there were some ambiguity in the text and structure of CAA section 112 that gave the EPA the discretion to impose such a requirement, the EPA's conclusion in light of both the statute and policy considerations is that such a requirement should not be imposed. As discussed above, whether a source is classified as a major source or an area source is the threshold question under CAA section 112, and what requirements apply to the source flows from how the source is classified, with major sources and area sources facing significantly different statutory requirements. If the EPA were to mandate that a reclassified area source maintain its emissions below the level that the source was subject to as a major source, that would be contrary to the fundamental structure that Congress created in CAA section 112. Further, as discussed below in section VIII, even in the absence of any provisions preventing emissions above what a reclassified source was allowed to emit as a major source, most sources are not expected to increase emissions and those that do would have only modest increases. Thus, as a matter of policy judgment, the EPA would not interpret any ambiguity in the statute to allow the imposition of a new limit on reclassified area sources more stringent than the limit applied to other area sources.

For these reasons, the EPA is not promulgating provisions that would prevent a source that has reclassified from major to area source status from increasing emissions above what the source was allowed to emit when it was a major source.

## V. Summary of Final Amendments

To implement the plain language reading of the statute as discussed in section IV above, the EPA is finalizing amendments to the General Provisions of 40 CFR part 63, subpart A. The EPA is also finalizing amendments to the General Provisions tables contained within most subparts of 40 CFR part 63 to account for the regulatory provisions we are finalizing in the General Provisions of 40 CFR part 63, subpart A. Finally, the EPA is finalizing changes to several individual NESHAP intended to remove rule-specific OIAI provisions. For all comments not discussed in this preamble, comment summaries and the EPA's responses can be found in the Response to Comments document available in the docket.

*A. Final Amendments to 40 CFR Part 63, Subpart A: General Provisions*

1. Applicability

The EPA is finalizing amendments to the applicability section of the General Provisions of 40 CFR part 63.1 by adding a new provision 40 CFR 63.1(c)(6) to implement the plain language reading of the "major source" and "area source" statutory definitions of section 112 of the CAA and provide that a major source can be reclassified to area source status at any time upon reducing its actual emissions of and potential to emit HAP to below the MST of 10 tpy of any single HAP and 25 tpy of any combination of HAP. At proposal, this new applicability provision also included regulatory language addressing the compliance date with applicable NESHAP requirements for reclassification and interactions with enforcement actions. We received comments on all aspects of the new applicability provision. Below we discuss each aspect of the proposed MM2A applicability provision and what we are finalizing after considering public comments.

a. Reclassification Provision

The EPA proposed to amend 40 CFR 63.1 by adding a new paragraph (c)(6). As proposed, this paragraph specifies that a major source can become an area source at any time by limiting its PTE HAP to below the major source thresholds established in 40 CFR 63.2, provided certain conditions are met. We received comments in support of and against the proposed text in 40 CFR 63.1(c)(6) and comments requesting changes to or clarification on the proposed provision. Comments against the proposed reclassification provision based on the statutory text or other legal issues (such as legal comments opposing the EPA's plain language reading of CAA section 112 definitions of major and area sources allowing sources to reclassify at any time) are addressed in section IV of this preamble and in the Response to Comments document available in the docket. The comments requesting changes to or clarification on the new provision are summarized below.

Some commenters recommended that the EPA add language to the new provision in 40 CFR 63.1(c)(6) to specify that the provision applies to sources that reclassify to area source status after being subject to major source NESHAP requirements. The EPA disagrees that the language only applies to reclassification by a major source after the source has been subject to major source NESHAP requirements. The

regulatory language in this provision implements the EPA's plain language reading of the definition of major and area sources in section 112 of the CAA, as discussed in length in section IV of this preamble, allowing sources to reclassify at any time. This provision allows for reclassification to area source status regardless of whether the reclassification occurs before or after the first substantive compliance date of a major source NESHAP.

Other commenters stated that the proposed provision in 40 CFR 63.1(c)(6) could be read to require all types of sources to obtain PTE limits in order to be reclassified to area source status. These commenters stated that this could be problematic for sources that were major at the first substantive compliance date of a particular NESHAP but are no longer within the definition of "major source" at the time of reclassification because the source's emissions of and PTE HAP are below the MST even in the absence of a governmental restriction on emissions in a PTE limit. The EPA agrees with the commenters that the language in the proposed provision can be clarified and has amended the language of 40 CFR 63.1(c)(6) in the final rule to read: "A major source may become an area source at any time upon reducing its emissions of and potential to emit (PTE) hazardous air pollutants, as defined in this subpart, to below the major source thresholds established in 40 CFR 63.2, subject to the provisions in paragraphs (c)(6)(i) and (ii) of this section." The provisions in 40 CFR 63.1(c)(6)(i) and (ii) as finalized in this action are discussed later in this preamble.

In the final regulatory language of 40 CFR 63.1(c)(6), the EPA replaced the phrase "limiting its potential to emit (PTE) hazardous air pollutants . . ." with the phrase "reducing its emissions of and potential to emit (PTE) hazardous air pollutants . . .". This updated language removes the ambiguity in the proposed language and makes it clear that PTE limits would be needed for area source reclassification for sources with PTE HAP at or above the MST. In contrast, consistent with the statutory definitions of "major source" and "area source" and the regulatory definition of PTE in 40 CFR 63.2, so called "true" area sources,[12] which in this preamble means sources that do not have the capacity to emit HAP at major source levels under their physical and

operational design (even if the source owner and regulatory agency disregard any enforceable limitations), are not within the definition of "major source." These "true" area sources do not need to obtain enforceable PTE limits to be reclassified to area source status. Accordingly, sources that have permanently removed equipment, changed their processes, or by other means currently do not have a maximum capacity to emit HAP at major source levels are "true" area sources (*i.e.*, enforceable limits are not needed on the source's physical or operational design to restrict the source's PTE HAP below MST) and do not need to adopt PTE limits to be reclassified. Any source that adopts a physical or operational limit on its maximum capacity to emit (including requirements for the use of air pollution control equipment or restrictions on the hours of operations or on the type or amount of material combusted, stored, or processed) to limit its PTE HAP below the MST is not a true area source. These are often referred to as "synthetic" area sources.[13]

Relatedly, commenters claimed that the MM2A proposal did not appear to explain that the definition of "potential to emit" does not require enforceable limitations for restrictions on HAP emissions that are inherent in the physical or operational design of the production process. Note that the EPA recognizes that, on a case-by-case basis, a situation may warrant an assessment of whether a given device or strategy should be considered as air pollution control equipment or as an inherent part of the process.[14] That said, the final rule is not revising the EPA's view on how to determine "the maximum capacity of a stationary source to emit a pollutant under its physical and operational design." Sources with questions about the proper way to determine PTE HAP or whether they should obtain PTE limits for reclassification to area source

---

[12] This preamble follows the convention about the meaning of these terms adopted in an EPA memorandum titled "*Potential to Emit (PTE) Guidance for Specific Source Categories*" (April 14, 1998), available at *https://www.epa.gov/sites/production/files/2015-07/documents/lowmarch.pdf.*

[13] We note that in the Oil and Natural Gas Federal Implementation Plan (O&NG FIP) in Indian Country, "true area sources" include the reductions due to compliance with various NESHAP and new source performance standards (NSPS) standards, which are applicable requirements of the O&NG FIP. True minor sources in the oil and natural gas production and natural gas processing segments of the oil and natural gas sector are required to comply with the O&NG FIP instead of obtaining a source-specific minor source permit, unless a source chooses to opt out of the FIP and to obtain a source-specific minor New Source Review (NSR) permit instead under the "Federal Minor New Source Review (NSR) Program in Indian Country." See FIP for True Minor Sources in Indian Country in the Oil and Natural Gas Production and Natural Gas Processing Segments of the Oil and Natural Gas Sector. 81 FR 35944 (June 3, 2016).

[14] See *https://www.epa.gov/sites/production/files/2015-07/documents/readymix2.pdf.*

status are encouraged to consult applicable program permitting regulations and work with their corresponding regulatory authorities on a determination that considers their situation. See also, 40 CFR 63.10(b)(3), which explains in detail the analysis and contents of the records to be kept for applicability determinations made by a source for purposes of 40 CFR part 63.

Multiple commenters objected to the EPA's proposed viewpoint that a major source that had been complying with a NESHAP as of the first substantive compliance date of the standard, but reduced its PTE HAP below the MST by complying with non-section 112 CAA requirements, would be required to obtain HAP PTE limits to ensure that HAP emissions remain below the MST. These commenters argued the EPA should make clear in the final rule that a limitation on another pollutant or parameter can be recognized as a limitation on the source's potential to emit HAP if the limitation on the other pollutant emissions or parameter results, as a practical matter, in a restriction on the source's HAP emissions. The commenters noted that limits that qualify to reduce a source's PTE HAP emissions do not need to be "HAP PTE limits," *i.e.*, a requirement need not place limits directly on a HAP to have the effect of limiting a HAP. The commenters cited as example that volatile organic compound (VOC) limits could reduce HAP emissions and further stated that the EPA provided no explanation why requiring the source to obtain HAP PTE limits is essential to ensure that the area source's HAP emissions are effectively limited. The EPA recognizes that the proposal may have caused confusion about whether the EPA recognizes HAP reductions due to surrogate criteria pollutant controls for purposes of reclassifying to area source status.[15] That said, the EPA has concluded that it does not need to revise the regulatory text to make this specific point because the definition of PTE (as revised in this final rule) allows for the effect of such limitations to count toward limiting the PTE HAP. A source relying on the effect of non-HAP enforceable limitation to constrain its

PTE HAP below the MST may need to show the regulatory authority processing the reclassification the effect of such limitation on the source's PTE HAP to confirm that such source has a PTE HAP that allows it to reclassify to area source status.[16] As explained before, the determination of a source's PTE HAP under the PTE definition in 40 CFR 63.2 requires consideration of any enforceable controls, including "nested" HAP usage limits in permits intended as enforceable VOC limits, and other enforceable non-HAP limitations within a permit that have the effect of reducing HAP emissions. To the extent that a source's PTE considering controls exceeds the MST, a source would need to obtain enforceable limitations constraining its PTE HAP below the MST in order to be reclassified to area source status. Finally, the revised language in 40 CFR 63.1(c)(6) that now states "reducing emissions and its potential to emit (PTE) hazardous air pollutants . . ." (as opposed to the proposed language stating "limiting its potential to emit (PTE) hazardous air pollutants . . .") supports the EPA's conclusion that the PTE regulatory definition means that enforceable limits on other pollutants can have the effect of reducing PTE HAP and can be the basis for reclassification. See also 40 CFR 63.10(b)(3) about the analysis and record contents.

Finally, some commenters asked the EPA to clarify what requirements apply to sources that reclassified before the effective date of this final rule. These commenters asked the EPA to state in the final rule that sources that reclassified to area source status prior to the MM2A final rule would not be required to undertake any additional actions. To the extent that sources have reclassified before the effective date of this final rule, their ability to reclassify is governed by the plain language reading of the statute. We discuss the notification and recordkeeping requirements for sources that reclassified before the effective date of this final rule later in this preamble. In contrast, sources that reclassify after the effective date of this final rule are governed by the plain language reading of the statute and by the provisions being finalized in this final rule. In either case, a reclassification is not a

safe harbor for the source if the limits taken do not effectively limit the HAP emissions and the source emits HAP in excess of the MST.

b. Compliance Dates for Applicable Standards

In the proposed language of 40 CFR 63.1(c)(6), the EPA included regulatory text addressing applicability of standards and other requirements under 40 CFR part 63 for sources that reclassify to area source status, including dates for compliance with standards and notifications requirements. Because sources must comply with requirements corresponding to their status, the proposed provision in 40 CFR 63.1(c)(6) specified, "Until the PTE limitations become effective, the source remains subject to major source requirements. After the PTE limitations become effective, the source is subject to any applicable requirements for area sources." In response to comments and to clarify the requirements associated with applicability of NESHAP requirements and the compliance dates for sources reclassifying to area source status, both before and after compliance with applicable major source NESHAP requirements, and for reclassified area sources that subsequently become major sources again, the EPA is consolidating these requirements in the final regulatory text at 40 CFR 63.1(c)(6)(i). The final provision also addresses the notification requirements for these sources. We discuss notification requirements below in section V.A.2 of the preamble.

The final regulatory text in 40 CFR 63.1(c)(6)(i)(A) addresses the applicability of standards and compliance dates for sources reclassifying to area source status either before or after being subject to major source requirements under 40 CFR part 63. The final regulatory text in 40 CFR 63.1(c)(6)(i)(B) addresses the applicability of standards and compliance dates for reclassified area sources that subsequently become major sources again. These final provisions are discussed below.

In this final rule, the EPA is updating the regulatory language in 40 CFR 63.1(c)(6)(i)(A) to include the applicability of standards and compliance dates for sources reclassifying to area source status. The final amended text in 40 CFR 63.1(c)(6)(i)(A) reads as follows: "A major source reclassifying to area source status under this part remains subject to any applicable major source requirements established under this part until the reclassification becomes

---

[15] See, *e.g.*, January 25, 1995, memorandum titled "*Options for Limiting the Potential to Emit (PTE) of a Stationary Source Under Section 112 and Title V of the Clean Air Act (Act)*," also, memorandum, "*Crediting of Maximum Achievable Control Technology (MACT) Emission Reductions for New Source Review (NSR) Netting and Offsets*," available at *https://www.epa.gov/sites/production/files/2015-07/documents/netnoff.pdf. See,* also, 81 FR 35944, explaining that HAP compliance reductions of volatile organic HAP to meet MACT may also result in emissions reductions of VOC.

[16] The EPA expects that state and local and tribal agencies will exercise care when drafting enforceable permit conditions in the situation where the "effect" of criteria pollutant limits will not be straight forward. See January 25, 1995, memorandum titled "*Options for Limiting the Potential to Emit (PTE) of a Stationary Source Under Section 112 and Title V of the Clean Air Act (Act)*."

effective. After the reclassification becomes effective, the source must comply with any applicable area source requirements established under this part immediately, provided the compliance date for the area source requirements has passed. The owner or operator of a major source that becomes an area source subject to newly applicable area source requirements under this part must comply with the initial notification pursuant to § 63.9(b). The owner or operator of a reclassified source must also provide to the Administrator notification of the change in the information already provided under § 63.9(b) per § 63.9(j).''

As stated in this provision, sources remain subject to any applicable major source requirements under 40 CFR part 63 ''until the reclassification becomes effective'' instead of the proposed language ''until the PTE limitations become effective.'' In the MM2A proposal, the EPA explained that reclassification to area source status is a voluntary action on the part of a source, and sources are required to apply with their corresponding regulatory authority and follow the corresponding authority's procedures to be reclassified to area source status. This includes sources that, at the time of reclassification, are no longer within the definition of ''major source'' because they are true area sources (as described above in the preamble), because they had already obtained PTE limits below the MST, or due to other enforceable compliance obligations under a permit, permit by rule, or State Implementation Plan (SIP). As explained elsewhere in this preamble, such sources are area sources under the CAA section 112 definition, but as a result of our previous policy they may continue to have enforceable permit conditions, including major source NESHAP requirements, for example, until their title V permit is revised or revoked in agreement with their permitting authority procedures.

Because reclassification to area source status currently occurs under a regulatory authority's area or minor source program, the reclassification of a source to area source status is effective when the corresponding regulatory authority grants a source's request to be considered an area source via a permit registration, permit by rule, applicability determination, etc. (As explained in this preamble, 40 CFR part 63 separately requires notification of the applicability of a standard and recordkeeping of information on the applicability determination decision.) We expect that the process for sources to reclassify to area source status for

HAP will rely on existing programs (*e.g.*, minor source programs, title V permitting procedures, and/or approved programs for issuing PTE limits under CAA section 112(l)). Consistent with how regulation of area sources is currently implemented under CAA programs, the EPA expects that determinations of area source status or major source status, as requested by a source for reclassification, will occur in a single action or concurrently with permitting actions needed to reconcile the revised requirements for the source under the newly acquired status or as appropriate for permit closure or revocation. (A permitting authority program may have simpler, less burdensome processes for specific groups of sources.) The language finalized about the effective date of reclassification equitably considers the current implementation mechanisms and sources situation.

As proposed, the regulatory language in 40 CFR 63.1(c)(6)(i) stated that ''[a] major source that becomes an area source must meet all applicable area source requirements promulgated under this part immediately upon becoming an area source, provided the first substantive compliance date for the area source standard has passed, . . .'' Some commenters requested that the EPA include language in the final rule providing that sources reclassifying to area source status may meet the major source NESHAP requirements as a means of complying with newly applicable area source NESHAP requirements. The EPA is not including such language in the final rule. Any source that reclassifies to area source status is no longer subject to major source NESHAP requirements and is subject to area source NESHAP requirements instead. That said, the area source is not precluded from streamlining the applicable area source NESHAP requirements with permit terms from a previously applicable major source NESHAP standard if compliance with applicable area source NESHAP requirements is assured. Because the reclassification to area source status is a voluntary action on the part of the source, the source must evaluate the area source NESHAP requirements that will become applicable to the source at the time of the reclassification to area source status and be in a position to meet such requirements at the time it reclassifies.

In the regulatory language of 40 CFR 63.1(c)(6)(i)(A), the EPA is finalizing the proposed immediate compliance rule for major sources that reclassify to area source status. These sources will be subject to applicable area source

NESHAP requirements in 40 CFR part 63 immediately upon reclassification to area source status, provided the compliance date for the area source requirements has passed. In the MM2A proposal, the EPA proposed to allow for additional time for compliance with applicable area source NESHAP requirements for particular situations. For reclassifications from major source to area source status, the EPA proposed that additional time (not to exceed 3 years) may be granted by the EPA (or a delegated authority) in a compliance schedule where an area source standard would apply to an existing source upon reclassification and different emission points would need controls or different emission controls would be necessary to comply with the area source standard or other physical changes would be needed to comply with the standard.

The EPA received many comments on the proposed immediate compliance rule, compliance extension provisions, and the process for obtaining a compliance extension. Some commenters agreed with the proposed immediate compliance rule for sources that reclassify to area source status, while others opposed the immediate compliance rule if the EPA did not include provisions to obtain a compliance extension. Commenters supporting the immediate compliance rule without compliance extension provisions argued that sources should be aware of applicable requirements and plan for timely compliance at the time they request reclassification. These commenters opposed the proposed compliance extension provision, noting that any provision to allow compliance at periods later than 3 years from a standard's effective date was unlawful and unnecessary. The commenters argued that CAA section 112(i)(3)(A) requires that compliance must be within 3 years of the effective date of the standard; furthermore, CAA section 112(i)(3)(A) requires compliance ''as expeditiously as practicable.'' The commenters argued that just because physical changes may be required for a source to comply with newly applicable area source NESHAP requirements, it does not mean that compliance cannot be achieved immediately upon reclassification. The commenters emphasized that CAA section 112(i)(3) is clear on the compliance schedule for existing sources; that the schedule is determined by the effective date of any emission standard, limitation, or regulation promulgated under CAA section 112; and that compliance has to be as expeditious as practicable, but in no event later than 3 years after the

effective date of such standard. On the other hand, some commenters stated that there may be a short period of time when a stationary source needs to discontinue compliance with a major source NESHAP requirement before complying with the area source NESHAP requirements to conduct testing and verify monitoring protocols or to physically install emission controls. These commenters argued that the rule should recognize the need for such exceptions to the requirement to comply immediately with the area source NESHAP requirements and that the regulatory authority must be able to consider all the relevant factors in allowing for a compliance extension. While the commenters stated that a stationary source would want an exception to discontinue compliance with major source NESHAP requirements for a short period of time in order to come into compliance with the new area source NESHAP requirements to which they will be subject immediately after reclassification, the commenters did not provide supporting evidence or concrete examples showing that there are real situations where such compliance exception is needed.

The EPA agrees with the commenters that the statutory language in CAA section 112(i)(3)(A) precludes the compliance extension as proposed. For this reason, the EPA is not finalizing the proposed compliance extension for sources reclassifying to area source status. If a source reclassifies to area source status in a source category for which there are applicable area source NESHAP requirements, and the effective date of such requirements has passed, the source must comply immediately upon reclassification. If the compliance date of the applicable area source NESHAP requirements is in the future, the source must comply by the future compliance date specified in the individual subpart. Because reclassification is a voluntary action on the part of the source, the immediate compliance requirement does not represent a compliance issue because a source could delay their reclassification until such time as they are able and equipped to meet the applicable area source NESHAP requirements.

In the MM2A proposal, the EPA included in the proposed provision at 40 CFR 63.1(c)(6)(ii) regulatory language addressing the compliance schedule for sources that reclassify between major and area source status more than once. The EPA proposed that ''A major source subject to standards under part 63 that subsequently becomes an area source, and then later becomes a major source

again by increasing its emissions to at or above the major source thresholds, must comply with the previous applicable major source requirements of this part immediately upon becoming a major source again . . .'' The EPA also proposed a compliance extension provision for these sources: If the previously applicable standard has been revised since the source was last subject to the standard and, in order to comply, the source must undergo a physical change, install additional emission controls, and/or implement new control measures, the source will have up to the same amount of time to comply as the amount of time allowed for existing sources subject to the revised standard. The EPA received multiple comments on the proposed compliance schedule and compliance extension provision for reclassified area sources reverting to major source status.

Some commenters argued that there was no need for the EPA to address compliance timelines in the context of the MM2A rulemaking for sources that reclassify to area source status and then revert back to major source status. These commenters noted that the existing General Provisions in 40 CFR 63.6(c)(5) already include compliance dates for area sources that become major sources, and that by including compliance dates within the provision in 40 CFR 63.1(c)(6), the EPA was creating disparate compliance schedule requirements. Several other commenters agreed with the proposed immediate compliance rule for area sources reverting to major source status, stating that sources should be aware of applicable requirements and plan for timely compliance at the time they request reclassification. These commenters opposed the proposed compliance extension provision, noting that any provision to allow compliance at periods later than 3 years from a standard's effective date is unlawful and unnecessary. The commenters argued that CAA section 112(i)(3)(A) requires that compliance must be within 3 years of the effective date of the standard. In addition, the commenters pointed out that CAA section 112(i)(3)(A) does not allow additional time for a source that reverts to major source status when the applicable major source NESHAP has increased in stringency; thus, there is no reason for the proposed extension. The commenters noted that CAA section 112(g)(2) requires that any entity that modifies or constructs a major source first secure a determination that applicable maximum-achievable standards will be met. The commenters argued that any source that proposes to

increase its emissions to exceed the MST should be required to plan sufficiently to comply with the applicable major source NESHAP requirements before it increases its emissions. These commenters stressed that it would be inappropriate to allow stationary sources to prolong compliance with applicable standards, and that allowing sources additional time for compliance could incentivize sources to continually shift stationary source applicability status to avoid complying with applicable NESHAP requirements. These commenters objected to any compliance extension, stating that any extension or consideration of special conditions would remove the protections in existing rules, allowing the public and environment to be exposed to increased HAP emissions.

Other commenters argued that the proposed immediate compliance provisions for sources that revert back to their previous major source status are onerous and seem to be designed to discourage sources from opting to become area sources. These commenters supported the proposed compliance extension provisions but noted that there is no justification for conditioning any extension to the immediate compliance requirement for these sources on an intervening change to the major source standard. They argued that this appeared to be a backdoor attempt to force sources opting to become area sources to continue using major NESHAP add-on controls in case they might need to become a major source again, and that this is something for which the EPA lacks authority. Some commenters supported the immediate compliance rule if appropriate exceptions are made in the final rule and it includes a reasonable process for requesting an extension. The commenters recommended that the compliance extensions be left to the air pollution control agencies and that the EPA should not try to define what changes would be eligible for a longer compliance period, thus, eliminating unnecessary EPA oversight of the process for area sources and simplifying the procedures for acquiring additional compliance time. Finally, the commenters stated that a source that once was a major source may, for example, maintain its area source status for 20 years before seeking to become a major source again; for this source, many things may have changed while it was an area source, including process changes that render the previous compliance approach inapplicable or

require the source to comply in different ways.

The EPA agrees with the commenters that stated that the statutory language in CAA section 112(i)(3)(A) is properly read to preclude the proposed compliance extension for sources that revert back to their previous major source status and are subject to major source requirements for which the compliance date of such requirements has passed. These sources must comply with the major source requirements immediately, even if faced with the circumstances listed in the proposal (needing to ''undergo a physical change, install additional emissions controls and/or implement new control measures'' in order to meet the applicable NESHAP requirements). In the circumstance where a source is reverting back to major source status for which there are applicable major source NESHAP requirements and the compliance date of such requirements at the time of reclassification is still in the future, the source needs to comply with such requirements by the future compliance date specified in the individual subpart. In sum, a source should not reclassify (in either direction) until it is ready to meet the requirements that are imposed by the new classification.

For the reasons explained above, the final regulatory text included in 40 CFR 63.1(c)(6)(i)(B) addresses the applicability of standards and compliance dates for reclassified area sources that subsequently become major sources again. In this provision, the EPA is finalizing the proposed immediate compliance rule for area sources that become major sources again, if they were previously major sources under 40 CFR part 63. The EPA has amended the language to read as follows: ''An area source that previously was a major source under this part and that becomes a major source again must comply with the applicable major source requirements established under this part immediately upon becoming a major source again, provided the compliance date for the major source requirements has passed, notwithstanding any other provision within the applicable subparts. The owner or operator of a source that becomes a major source again must comply with the initial notification pursuant to § 63.9(b). The owner or operator must also provide to the Administrator any change in the information already provided under § 63.9(b) per § 63.9(j).'' This updated final provision in 40 CFR 63.1(c)(6)(i)(B) for reclassified area sources that subsequently become major sources again covers both situations of sources

that reclassify back to major source status: (1) Major sources that reclassify to area source status prior to being subject to major NESHAP requirements (including sources that reclassified under the OIAI policy) and then return to major source status and (2) major sources that reclassify to area source status after being subject to major NESHAP requirements and then return to major source status. On the other hand, the compliance dates for area sources that never operated as major sources previously (including sources constructed with enforceable controls or other type of enforceable PTE limits) but that increase emissions or PTE and become major sources for the first time are governed by the provisions in the individual NESHAP (which are not being amended in this rule) and not the provisions applicable to reclassified area sources that return to major source status that are being finalized in this action. The EPA is also finalizing amendments to 40 CFR 63.6(c)(1) to account for the immediate compliance rule as included in the final revisions to 40 CFR 63.1(c)(6)(i)(A) and (B) as discussed above.

Finally, while some commenters requested assurance that if sources revert back to their previous major source status, sources will not be considered new sources, others argued the EPA should expressly provide that relaxation or elimination of a PTE limit that results in the source becoming a major source requires that the source comply with CAA section 112 NESHAP requirements for a new source. These commenters asserted that as a result of a loophole in the existing 40 CFR part 63 regulations, some sources and states are currently under the impression that a source can have its original PTE limit taken at the time of construction relaxed or eliminated without triggering the requirement to comply with major source NESHAP requirements that would have otherwise applied to the source when it was built. This confusion could have arisen from the text in 40 CFR 63.6(c)(5) stating that ''the owner or operator of an area source that increases its emissions of (or its potential to emit) hazardous air pollutants such that the source becomes a major source shall be subject to relevant standards for existing sources.'' As explained in section IV of this preamble, the CAA section 112 definitions of ''new source'' and ''existing source'' dictate that the new source/existing source distinction is determined by when the affected source commences construction or reconstruction with respect to the date

of proposal of the standard and say nothing about the source's volume of emissions. For this reason, the EPA disagrees that a source reclassifying to major source status after having previously been subject to the major source standards would necessarily be classified as an existing source. The EPA also disagrees with commenters that a reclassifying source would necessarily be a new source for purposes of determining which standard applies. Whether an affected source is new or existing for purposes of compliance with an applicable NESHAP is dictated by when the source commenced construction or reconstruction in relation to when the applicable NESHAP was proposed and not whether the status of the source is major or area.

Moreover, the regulatory text at 40 CFR 63.6(c)—Compliance dates for existing sources—applies only to ''existing sources.'' Therefore, the regulatory language at 40 CFR 63.6(c)(5) states that ''the owner or operator of an [existing] area source that increases its emissions . . . shall be subject to relevant standards for existing sources.'' The intent of 40 CFR 63.6(b)(7) and (c)(5) was further explained in the preamble for the March 23, 2001, rule that proposed revisions to 40 CFR 63.6(b)(7) and (c)(5) (66 FR 16328),[17] ''[w]e are proposing to revise 63.6(b)(7) and (c)(5) to require new source MACT only on affected sources that commenced construction or reconstruction after the proposal date of the NESHAP . . . Affected sources at former area sources that become major that have not constructed or reconstructed *after the proposal date of the NESHAP* (emphasis added) would be subject only to existing source MACT . . . .'' Again, each NESHAP provides the dates that determine whether a source is a new source or an existing source. A source's status of new or existing is determined by dates given in each individual NESHAP, and that does not change when a source reclassifies. If a major source reclassifies to area source status after being subject to new major source NESHAP requirements and then returns back to major source status, the sources that were originally subject to new source requirements would once again be subject to new source requirements. In light of these comments, the EPA is including in the final rule amendments to 40 CFR 63.6(b)(7) and (c)(5) to reflect the new or existing status of sources that become major sources as being determined by

[17] These provisions were finalized on April 5, 2002 (See 67 FR 16582).

the dates provided in the applicable subparts and to also reflect the immediate compliance rule as finalized in 40 CFR 63.1(c)(6)(i)(B) for reclassified area sources that revert back to major source status. The amendments to 40 CFR 63.6(b)(7) read as follows: "When an area source increases its emissions of (or its potential to emit) hazardous air pollutants such that the source becomes a major source, the portion of the facility that meets the definition of a new affected source must comply with all requirements of that standard applicable to new sources. The source owner or operator must comply with the relevant standard upon startup." The amendments to 40 CFR 63.6c(5) read as follows: "Except as provided in paragraph (b)(7) of this section, the owner or operator of an area source that increases its emissions of (or its potential to emit) hazardous air pollutants such that the source becomes a major source and meets the definition of an existing source in the applicable major source standard shall be subject to relevant standards for existing sources. Except as provided in § 63.1(c)(6)(i)(B), such sources must comply by the date specified in the standards for existing area sources that become major sources. If no such compliance date is specified in the standards, the source shall have a period of time to comply with the relevant emission standard that is equivalent to the compliance period specified in the relevant standard for existing sources in existence at the time the standard becomes effective."

c. Reclassifications and Enforcement Actions

In the MM2A proposal, the EPA included regulatory language in the MM2A applicability provision in 40 CFR 63.1(c) to address the interaction of the reclassification of sources and potential enforcement actions. Specifically, we noted reclassification of a source from major to area source status would not absolve a source of prior liability for noncompliance. Although sources that are the subject of an investigation or enforcement action may still seek area source status for purposes of future applicability, such sources remain liable for any previous or pending violations of the CAA that occurred prior to the reclassification. Enforcement of major source requirements could include penalties, mitigation for illegal emissions, and/or other remedies to address noncompliance. Accordingly, a source cannot use its new area source status as a defense for major source NESHAP violations that occurred prior to its reclassification. Similarly, becoming a

major source does not absolve a source subject to an enforcement action or investigation for area source violations from the consequences of any actions occurring when the source was an area source.

Multiple commenters agreed with the premise that a major source that reclassifies should not be absolved from potential enforcement actions that occurred prior to the reclassification. However, some commenters argued that if a major source is rightfully an area source at the time of an alleged violation, then the source should not be subject to enforcement as a major source. Other commenters argued that it is also appropriate for the EPA to consider the misclassification of a major source instead of the appropriate area source classification, and the requirements for major sources versus area sources, and to examine a past violation to determine if the source actually violated the requirements of the classification under which the firm should have been registered.

One commenter recommended that the EPA add language to 40 CFR 63.1(c)(6) that would allow for modification of an enforcement order affecting a reclassified source if the enforcement order was based on the enforcement authority's finding that the source was a major source or based on the application of the OIAI policy. The commenter argued that the EPA's proposed new language in 40 CFR 63.1(c)(6) would leave unclear whether it is the EPA's intent that: (1) Such a source can never apply to the enforcement authority for relief from such obligations (which often include obligations imposed pursuant to a court's equity jurisdiction or that otherwise fall outside the universe of obligations specified in the NESHAP) in exchange for accepting restrictions on its PTE in order to become a synthetic HAP area source; or (2) the enforcement authority can never enter into a modification of the order, settlement, or decree that grants such relief. The commenter argued that this lack of clarity could result in foreclosure of such relief in future proceedings that are informed by the final rules, depending on the EPA's posture at the time and the deference that is sometimes given to agencies' interpretations of their own regulations.

The commenter argued that because the EPA has withdrawn the OIAI policy on the grounds that it was inconsistent with "the plain language reading of the 'major source' and 'area source' definitions of section 112" of the CAA, then it stands to reason that: (1) No historical application of the OIAI policy

in the formulation of enforcement orders and negotiation of settlement agreements and consent decrees was ever lawful or appropriate; and (2) orders, agreements, and decrees that were imposed or negotiated based materially on the OIAI policy ought to be subject to retroactive review, on a case-by-case basis and subject to the needs of the particular case, upon application by the respondent for a modification of the instrument. Finally, a commenter argued that the EPA should explicitly state in its regulations that the consequence of violating PTE limitations is the requirement to comply with the applicable major source NESHAP requirements—in addition to an appropriate penalty for violating the PTE limitations.

In the MM2A proposal, the EPA included regulatory language in the proposed MM2A applicability provision in 40 CFR 63.1(c)(6) stating that reclassification from major source to area source does not affect a source's liability or any enforcement investigations or enforcement actions for a source's past conduct or violations of major source requirements that occurred prior to the effective date of the source's enforceable limitations (*i.e.,* the reclassification). This rule revision underscores the importance of a source's PTE in determining NESHAP, 40 CFR part 63, applicability. The plain language reading of the definitions of "major" and "area" source in section 112 of the CAA as explained in the 2018 MM2A Memorandum and implemented through this rulemaking does not change the Agency's position that a source may take enforceable production and/or operational limits to effectively constrain its PTE and, thereby, avoid applicability. Rather, it eliminates the timing constraint imposed by the OIAI policy as to when a source may take such limits to avoid applicability. If, before taking such limits to avoid applicability, a source emitted a single HAP in an amount of 10 tpy or greater, or emitted any collection of HAP in an amount of 25 tpy or greater, or it is determined that the source has (or had) a PTE that meets or exceeds these amounts, the source would be considered a major source and subject to the requirements of 40 CFR part 63 (as applicable) up and until the effectiveness of the limits. The same holds true after taking such limits to avoid applicability. That is, even after taking such limits, if a source emits a single HAP in an amount of 10 tpy or greater, or emits any collection of HAP in an amount of 25 tpy or greater, or it is determined that the source has (or

had) a PTE that meets or exceeds these amounts, the source would be considered a major source and subject to the requirements of 40 CFR part 63 (as applicable). Now, as before, any time a source operates as a major source, it must meet the applicable major source requirements in 40 CFR part 63. Neither this rule, nor the 2018 MM2A Memorandum, intends to allow a source that emits (or has the PTE) greater than the MST to avoid compliance with applicable requirements for major sources. Any source that operates without complying with the applicable requirements is subject to enforcement. The revision proposed at 40 CFR 63.1(c)(6) underscores the EPA's position that unless, and until, a source has enforceable production and/or operational limits that effectively limit a source's PTE (and are not just chimeras that do not really restrain an operator from emitting pollution in amounts equal to or exceeding the major source thresholds), the source is a major source and must comply with the major source requirements (as applicable). The D.C. Cir. said as much in its review of the 2018 MM2A Memorandum, *California Communities Against Toxics, et al.* v. *EPA,* 934 F.3d. 627, 638–639 (D.C. Cir. 2019), ("Major sources must obtain a permit in order to operate, and unless and until that permit is amended or set aside, the stringent requirements set forth therein must be complied with while that equipment is operational. The [MM2A Memorandum]itself does not revoke or amend a single permit.")

Any order, settlement, or decree (collectively, agreements) issued or entered into addressing a source's compliance with the requirements of NESHAP, 40 CFR part 63, is not affected by this rule or the 2018 MM2A Memorandum. Those agreements were entered into based on the specifics of each case. Reopening or modification of settlements approved by, or orders issued by, federal courts is governed by the Federal Rules of Civil Procedure (F. R. Civ. P. Rule 60). Nothing in this final rule is intended to suggest that any of the prerequisites for reopening any judicial or administrative settlement or modifying a prior order of a court (including orders approving settlements) have been met. There is no additional clarification needed regarding these authorities. While the OIAI policy may have informed the contours of those agreements, it did not (and, in fact, could not) change the statutory basis for those enforcement actions. These agreements reflect a mutual understanding of the parties that settlement is in the interest of all

involved after taking into account the legal and factual circumstances at the time of the settlement. Accordingly, the EPA is finalizing the regulatory language in 40 CFR 63.1(c)(6)(ii) addressing the interaction of the reclassification of sources with enforcement actions as proposed.

d. Reclassifications and Operation of Add-On Pollution Control Equipment

After the issuance of the MM2A Memorandum, some stakeholders were concerned that if sources were to reclassify to area source status, they could stop using the add-on emission control equipment or emission reduction practices implemented for major source NESHAP compliance or no longer maintain the same level of control efficiency as before. At proposal, the EPA requested comments on whether facility owners or operators of sources that reclassify will cease to properly operate their add-on control devices where the operation of the add-on control device is needed to restrict the PTE and appropriate monitoring, recordkeeping, and reporting (MRR) are established as enforceable conditions.

In the proposal, the EPA explained that a source seeking reclassification because it has reduced its HAP emissions to below the MST through use of add-on control devices or emission reduction practices implemented for compliance with major source NESHAP requirements will need to demonstrate to the regulatory authority issuing the PTE limits the degree to which the add-on control devices and emission reduction practices are needed to restrict the source's PTE. In the absence of the applicability of the major source NESHAP requirements, if the source relies on its existing NESHAP add-on control devices and/or emission reduction practices to limit its HAP PTE below the MST, the use of these control devices and/or emission reduction practices must be made enforceable under a permitting authority's legal mechanism. Alternatively, if a source intends to stop using the add-on control device equipment or emission reduction practices used to comply with a previously applicable major source NESHAP requirement, the source must demonstrate that other physical controls or operational limits that the source adopts will restrict the source's actual emissions and maximum capacity to emit HAP below the MST and that these limits are or can be made enforceable to ensure that the source will not emit or have the potential to emit HAP at or above the MST.

Some commenters argued that there is no reason to believe that facility owners or operators would cease to properly operate their add-on control devices where the operation of the control is needed to restrict the PTE and appropriate MRR are established as enforceable conditions. Similarly, some commenters asserted that sources that achieve area source status through compliance with MACT have significant disincentives to alter their control measures to increase emissions thereafter. They argued that HAP emissions control devices are not designed to achieve partial emissions reductions; rather, they are designed to reduce emissions by a specified efficiency rate and a source that already has invested in controls for the purpose of major source MACT compliance is unlikely to cease using them or remove them in favor of less-effective measures to limit its HAP emissions—especially if the source's reclassification to area source status is contingent upon compliance with an enforceable PTE limit.

On the other hand, other commenters expressed concern with the EPA statement in the proposal saying that "it has no reason to believe, and does not anticipate" that sources will cease operating their control devices and hence increase emissions as a result of the MM2A action. One commenter argued that the EPA has collected insufficient data and included no explanation to support what the commenter called an "economically irrational conclusion." The commenter argued that the EPA has not acknowledged the financial incentives to reduce usage of expensive control devices.

Commenters arguing that sources will reduce control device operation and emission monitoring if the major source NESHAP requirements no longer apply stated the EPA must include in the final rule conditions requiring the continued use of add-on controls and conditions ensuring that monitoring and parametric limits are adequate to meet the required destruction efficiencies needed for sources to constrain their PTE and emissions at area source levels. These commenters argued that without such requirements, sources that reclassify are likely to operate the control device only part of the year. They claim sources will make cost-saving business decisions to turn off controls for several months a year or use less-effective controls to remain just below the MST. Some commenters summarized, as an example, the information collected by the EPA to justify the monitoring requirements for flares in the NESHAP

for Petroleum Refineries and described how, without rigorous monitoring, flare efficiency could be highly variable and substantially lower than 98 percent. The commenters also argued that the EPA cannot assume that other control devices, such as fabric filter baghouses and electrostatic precipitators, would be as effective once the major source NESHAP operating limits or monitoring requirements no longer apply. The commenters argued that the EPA must require the facility to periodically perform source tests to verify that the restriction actually correlates with emissions that are below the MST. The commenters further argued that without requirements ensuring proper operation, maintenance, and monitoring of add-on controls, sources will stop consistently operating the control devices that limit the release of HAP and allow the sources to reclassify to area source status.

The EPA sees these comments as pertaining to the proposed effectiveness criteria of PTE limits. In particular, the EPA may consider provisions concerning the operation and monitoring of add-on controls in the context of the criteria for ensuring that a PTE limit used to reclassify from major source to area source status is practicably enforceable. As discussed later in section VII of the preamble, the EPA is not taking action on the proposed amendments to 40 CFR 63.2 at this time and is continuing to consider the comments received on this aspect of the MM2A proposal. The EPA intends to take final action on this aspect of the MM2A proposal in a separate final action at a later date.

### 2. 40 CFR 63.9 Notification Requirements

In the MM2A proposal, the EPA included language in the reclassification provision in 40 CFR 63.1(c)(6) specifying that sources reclassifying must comply with the notification requirements of 40 CFR 63.9(b) and (j). The EPA also proposed to clarify the notification requirements for sources reclassifying by amending 40 CFR 63.9(b) so that an owner or operator of a facility must notify the Administrator of any standards to which it becomes subject. The proposed amendment covers situations where a source reclassifies from major to area source status and where a source reclassifies from major to area and subsequently reverts back to major source status. The EPA also proposed to clarify that a source that reclassifies must notify the EPA of any changes in the applicability of the standards to which the source

was subject per the notification requirements of 40 CFR 63.9(j).

Most of the commenters supported the proposed amendments to the notification provisions in 40 CFR 63.9(b) and (j), but a few disagreed that the established General Provisions require notification when going from being subject to not being subject. Other commenters requested that the EPA reduce the number of duplicative notifications and simplify the regulatory authorities that must review 40 CFR 63.9(j). Other commenters requested clarification between notification provisions within individual NESHAP that allow for 120 days for notification versus the 15-day notification in the General Provisions in 40 CFR 63.9(b) and (j). These commenters asked the EPA to clarify the differences between these requirements, harmonize the reporting requirements, and minimize duplicative requirements. The EPA disagrees that the General Provisions do not require a notification when a source is no longer subject to a standard. The provisions of 40 CFR 63.9(j) are applicable to a change in information already provided. The change in a source's status from major to area (or vice versa) is a change in the information provided that determined the initial status of the source as subject to the major or area source standards. This is different from the initial notification required by 40 CFR 63.9(b), as that provides the relevant information to the Administrator of the newly governed provisions and is required to be submitted, per 40 CFR 63.9(b)(2), no later than 120 days after the source becomes subject. The notification of a change in information already required within 15 days is a result of the previously applicable standard. There are cases for which there is no applicable area source standard; the notification required by 40 CFR 63.9(j) is the only notification that would be submitted in those cases. These requirements in two provisions do not require harmonizing, as they are due to different NESHAP subparts being applicable and are not duplicative.

The EPA is finalizing the reclassification provision in 40 CFR 63.1(c)(6) notification requirements as proposed for both major sources that reclassify to area source status and area sources that revert back to major source status. The EPA is also finalizing the proposed amendments to 40 CFR 63.9(b) so that an owner or operator of a facility must notify the Administrator of any standards to which it becomes subject. Further, for clarity, the EPA has finalized at 40 CFR 63.9(j)(i)–(iv) the data elements that a reclassifying source

must provide in the notification of a "change in information already provided" required under 40 CFR 63.9(j). Finally, the EPA is clarifying that the notification requirement of 40 CFR 63.9(j) is an existing requirement. Thus, the EPA requires any source that reclassified after January 2018 (issuance of the 2018 MM2A Memorandum) and before the effective date of this final rule that has not yet provided the notification of a change in information per 40 CFR 63.9(j) to provide such notification within 15 calendar days after the effective date of this final rule.

For the notification requirements in 40 CFR 63.9(b) and (j), the EPA also proposed to require sources that reclassify to submit the notification electronically through CEDRI. The EPA proposed amending the General Provisions to add 40 CFR 63.9(k) to include the CEDRI submission procedures. Several commenters support using CEDRI for notification of status changes. Some commenters requested the EPA to clarify that the new requirements in 40 CFR 63.9(k) only apply when a facility is reclassifying from a major source to an area source or from an area source to a major source, so regulatory authorities could not conclude that all notifications or reports should be done using CEDRI. Some commenters strongly supported the Agency providing this information to the public. While the EPA agrees that the provisions of 40 CFR 63.9(k) only apply when specifically directed there from another provision, as stated in 40 CFR 63.9(k), "[i]f you are required to submit notifications or reports *following the procedures specified in this paragraph (k),*" (emphasis added), we do not believe that further clarification within the regulatory language is necessary. We are finalizing this provision as proposed requiring sources that reclassify to submit the notification electronically through CEDRI. Additionally, the EPA has clarified that sources that reclassify between January 25, 2018, and the effective date of this final rule also must submit the notification through CEDRI. The EPA acknowledges the support for the public availability of the notifications and notes that the submitted notifications, along with any other notifications and reports submitted through CEDRI, become available to the public through the WebFIRE database (*https://www.epa.gov/electronic-reporting-air-emissions/webfire*) after time for review and approval by the regulatory agencies.

Multiple commenters recommended that the EPA should clarify CEDRI reporting. One commenter indicated that notification is not delegable and

needs to adjust the language in 40 CFR 63.13 that requires submittal of information to Regional offices at specific addresses. The commenter pointed out that the proposed CEDRI reporting makes this requirement excessive and the regulatory text should be fixed to remedy the requirement of reporting in triplicate (Regional offices, CEDRI, Administrator/state). The commenter noted that the last sentence of 40 CFR 63.12(c) does not address this issue and should be deleted/altered to avoid reporting in triplicate. Another commenter indicated that a separate notification to state agencies should be sent directly to the permitting agency. The commenter requested that the following paragraph be added to 40 CFR 63.9(k):

"If a state or local permitting agency has received delegation for a Part 63 standard that requires you to submit notifications or reports and that permitting agency requires, by way of statute, rule, policy, guidance, permit, or other mechanism, that such notifications or reports must be submitted also to the permitting agency, then such notifications and reports must be submitted to the permitting agency as well as to CEDRI."

The EPA agrees with the commenters that the language at 40 CFR 63.13 and 63.12(c) was not clear that submission to CEDRI, when required by regulation, fulfills the obligation of submittal to the EPA Regional office. Therefore, the EPA is finalizing at 40 CFR 63.13 a clarifying statement that when required by 40 CFR part 63, the submission of a report or notification to CEDRI fulfills the obligation of reporting to the EPA Regional office. The EPA does not agree that additional language to reflect that reporting to a delegated agency is required in addition to reporting to CEDRI, as that is implicit in 40 CFR 63.12(c), which requires that all information required to be submitted to the EPA be submitted to the delegated authority. The manner of submission is at the discretion of the delegated authority, but the reports and notifications that are required to be submitted to the EPA electronically through CEDRI must be delivered to the EPA through CEDRI. However, delegated authorities have the discretion to consider the submission to CEDRI as meeting the requirement to submit the report to them.

In the MM2A proposal, the EPA identified two broad circumstances in which extensions of the timeframe for electronic submittal may be provided. In both circumstances, the decision to accept the claim of needing additional time to submit is within the discretion of the Administrator, and submittal should occur as soon as possible. The EPA provided these potential extensions to protect owners or operators from noncompliance in cases where they cannot successfully submit a notification by the submittal deadline for reasons outside of their control. The situation where an extension may be warranted due to outages of the EPA's Central Data Exchange or CEDRI that preclude an owner or operator from accessing the system and submitting a required notification is addressed in 40 CFR 63.9(k)(1). The situation where an extension may be warranted due to a *force majeure* event, which is defined as an event that will be or has been caused by circumstances beyond the control of the affected facility, its contractors, or any entity controlled by the affected facility that prevents an owner or operator from complying with the requirement to submit electronically as required by this rule, is addressed in 40 CFR 63.9(k)(2). Examples of such events are acts of nature, acts of war or terrorism, or equipment failure or safety hazards beyond the control of the facility. Finally, the EPA also proposed to amend 40 CFR 63.12(c) to specify that a delegated authority may not exempt sources from reporting electronically to the EPA when stipulated by this part.

One commenter recommended that the CEDRI late-notification language in proposed 40 CFR 63.9(k)(1) and (2) should be stricken because air pollution control agencies already have experience in using enforcement discretion for addressing late notifications and that discretion should not be codified or limited by regulation. The commenter also argued that the full range of circumstances that could legitimately cause a late notification cannot be covered by the regulation, and the discretion to grant an extension should not be solely within the discretion of the Administrator. Another commenter did not support the proposed additional requirements detailing when late notifications are forgiven for a *force majeure* event or federal EPA computer glitch but not in other meritorious situations. Another commenter suggested that time extensions for electronic reporting should be allowed for circumstances other than CEDRI outage and *force majeure* events, which allow for other situation-specific reasons that may impact the reasonable ability of a facility to achieve timely electronic reporting.

The EPA disagrees with the commenter that the reporting extension allowance for *force majeure* and CEDRI outage should be stricken. Granting an extension is at the discretion of the Administrator, which is defined in 40 CFR 63.2 to be "the Administrator of the United States Environmental Protection Agency or his or her authorized representative (*e.g.,* a State that has been delegated authority to implement the provisions of this part)." The extension provision does not remove the authority of an air pollution control agency to grant an extension for those subparts for which they have been delegated authority. Further, the EPA disagrees with the commenters that other situations that are not included in these provisions are excluded from obtaining an extension to their reporting deadline. The extension provisions as proposed and finalized are limited to those circumstances out of control of the facility and provide clear direction on the process for requesting an extension. Facilities may still engage with the Administrator on any delays in submittal not specifically covered under the CEDRI outage or *force majeure* provisions. After consideration of public comments, the EPA is finalizing the extension provisions as proposed.

The electronic submittal of the notifications addressed in this rulemaking will increase the usefulness of the notification; is in keeping with current trends in data availability and transparency; will further assist in the protection of public health and the environment; will improve compliance by facilitating the ability of delegated state, local, tribal, and territorial air agencies and the EPA to assess and determine compliance and the applicability of major and area source standards to a facility; and will ultimately reduce burden on regulated facilities, delegated air agencies, and the EPA. Electronic submittal also eliminates paper-based, manual processes, thereby saving time and resources and providing data quickly and accurately to the affected facilities, air agencies, the EPA, and the public. Moreover, electronic reporting is consistent with the EPA's plan [18] to implement Executive Order 13563 and is in keeping with the EPA's Agency-wide policy [19] developed in response to the White House's Digital Government Strategy.[20] For more information on the

[18] The EPA's "*Final Plan for Periodic Retrospective Reviews,*" August 2011. Available at: *https://www.regulations.gov/document?D=EPA-HQ-OA-2011-0156-0154.*

[19] "*E-Reporting Policy Statement for EPA Regulations,*" September 2013. Available at: *https://www.epa.gov/sites/production/files/2016-03/documents/epa-ereporting-policy-statement-2013-09-30.pdf.*

[20] "*Digital Government: Building a 21st Century Platform to Better Serve the American People,*" May 2012. Available at: *https://*

Continued

benefits of electronic reporting, see the memorandum, ''*Electronic Reporting Requirements for New Source Performance Standards (NSPS) and National Emission Standards for Hazardous Air Pollutants (NESHAP) Rules,*'' available in Docket ID No. EPA–HQ–OAR–2019–0282.

### 3. 40 CFR 63.10   Recordkeeping and Reporting Requirements

In the MM2A proposal, the EPA proposed to amend the recordkeeping requirements for applicability determinations in 40 CFR 63.10(b)(3) by adding text to clarify that this requirement applies to an owner or operator with an existing or new stationary source that is in a source category regulated by a standard established pursuant to CAA section 112 but that is not subject to the relevant standard because of enforceable limitations on the source's PTE. Specifically, the EPA proposed removing the time limit for record retention in 40 CFR 63.10(b)(3) and requiring that the records be maintained until the source becomes an affected major source subject to major source requirements under 40 CFR part 63.

Many commenters supported the proposed amendment to remove the time limit for record retention such that sources that obtain new enforceable PTE limits are required to keep the required record of the applicability determinations for as long as the source continues to be an area source based on PTE limitations. While many commenters agreed with the removal of time limit in 40 CFR 63.10(b)(3), some commenters argued that major sources that reclassify to area sources should not be subject to additional recordkeeping requirements that do not apply to other area sources. These commenters argued that the EPA should not revise the 5-year record requirement for the applicability determinations because the EPA has not provided a proper justification for adding this requirement for ''reclassified'' area sources. The commenter noted that the EPA has not described any issue with respect to compliance of PTE limits and emission-standard applicability that arose from the existing 5-year recordkeeping requirement, nor has the EPA explained why area source recordkeeping requirements should differ based on temporal considerations. The commenters noted that title V major sources are subject to a 5-year records requirement for all applicability determinations used to support identification of applicable requirements and application of the title V permit shield, and this is consistent with the statute of limitations that generally allows only a 5-year period to enforce against alleged violations. The commenter argued that the EPA has not explained why area sources should be subject to more stringent recordkeeping requirements. These commenters stated that the change in the requirement would impose a burden on the facility without additional environmental protection, because 5 years is sufficient time considering that sources still need to report annually that they are in compliance. Some commenters also noted that if the EPA or an air pollution control agency has reason to doubt any source's exempt status, they can take action under CAA sections 113 and 114 or state/local/tribal ''Open Records'' analogs to obtain the necessary information.

The EPA disagrees that the extended recordkeeping requirement as proposed applies disproportionately to reclassifying area sources or has any temporal consideration. The requirement to retain the applicability determination applies to all area sources that require an enforceable limitation on the source's potential to emit to not be subject to a relevant standard or other requirement established pursuant to CAA section 112. The requirement for an applicability determination is only relevant to these sources; the applicability determination itself, rather than the recordkeeping requirement, is the determining factor. The extension of the recordkeeping requirement is in the best interest of the source relying on an applicability determination to avoid CAA section 112 major source requirements, as many sources will rely on such determination for an extended period of time that can last beyond the 5 years. The EPA disagrees with the commenters that the revised record retention requirements are unnecessary due to annual reporting requirements. While many sources may have annual or semiannual reporting requirements after reclassifying into an area source rule, there are some major source NESHAP that do not have a corresponding area source standard. For these sources, the retention of the applicability determination enables the source to easily demonstrate that the major source standard does not apply without the potential additional burden of re-creating the applicability determination. The EPA agrees with the commenter that the EPA under CAA sections 113 or 114, and air pollution control agencies under their analogs, have the authority to request the necessary information; however, the retention of the applicability determination while the source continues to be an area source based upon that PTE limit and applicability determination provides a lesser burden to facilities compared to potentially re-creating the applicability determination. For the reasons presented above, the EPA is finalizing removing the time limit for record retention in 40 CFR 63.10(b)(3) and requiring that the records be maintained for as long as the source continues to be an area source based on PTE limitations.

Other commenters requested clarification as to whether the amended recordkeeping requirement applies to sources that became area sources prior to the first substantive compliance date of a NESHAP standard or that reclassified after the 2018 MM2A Memorandum. In the preamble of the MM2A proposal, the EPA stated that this amendment was directed to sources that obtain new enforceable PTE limits. The EPA agrees that the proposed language was unclear as to the applicability of the recordkeeping provisions on sources with applicability determinations preceding the date of proposal. We have amended the regulatory text in 40 CFR 63.10(b)(3) clarifying that the owner or operator must keep a record of the applicability determination on site at the source for a period of 5 years or until the source changes its operation to become an affected source subject to the relevant standard or other requirement established under this part, whichever comes first if the determination is made prior to January 19, 2021. For a determination made on or after January 19, 2021, the owner or operator must keep a record of the applicability determination until the source changes its operations to become an affected source subject to the relevant standard or other requirement established under this part. The EPA does, however, strongly recommend that all facilities retain their applicability determination for the time that the source continues to be an area source based upon that PTE limit and such applicability determination.

In addition to the removal of the time limit for record retention, the proposal amended the text that describes the record of the applicability determination. In particular, the proposal clarified that the record must include an ''emissions'' analysis (or other information) that demonstrates the owner or operator's conclusion that the source is not subject to major source requirements. The analysis (or other

*obamawhitehouse.archives.gov/sites/default/files/omb/egov/digital-government/digital-government.html.*

information) must be sufficiently detailed to allow the Administrator to make an ''applicability'' finding for the source with regard to the relevant standard or other requirements.

With regard to the analysis for applicability determinations, some commenters expressed concern with the language that the applicability determinations ''should be performed in accordance with EPA guidance materials.'' The commenters stated that the language is vague and could create binding requirements that are not legislative rules and have not gone through required notice-and-comment rulemaking. The commenter suggested that the EPA should indicate that this is a recommendation rather than a requirement by stating: ''EPA recommends that the analysis be performed in accordance with EPA guidance materials . . . .'' The EPA disagrees that further clarification is necessary regarding the use of guidance documents in this context, as the use of EPA guidance materials was an element of the existing provisions of 40 CFR 63.10(b)(3). However, to avoid creating the impression of additional requirements being imposed due to the proposed edits to the language, the EPA is retaining the sentence of 40 CFR 63.10(b)(3), which states: ''If relevant, the analysis should be performed in accordance with EPA guidance materials published to assist sources in making applicability determinations under CAA section 112, if any,'' as currently exists in the existing provision without finalizing the changes proposed to it.

The commenters also suggested that the EPA clarify the applicability determination analysis for specific situations, and others advised that additional guidance could be incorporated into the regulation or the preamble to the final rule to recognize that sources often need to use best engineering judgment to estimate emissions from minor sources when assessing the PTE of a whole facility. The commenters then recommended that the EPA indicate that the level of detail and precision for potential to emit calculations can be lower for operations that contribute a relatively small amount to total facility HAP emissions. The wording in the proposed amendments are intended to clarify and to promote better understanding of the current recordkeeping requirements. The EPA did not propose a new view on how to estimate PTE and, relatedly, on how to do major source applicability determinations. In section VII of this preamble, we include references to our PTE guidance that may be of help to

parties with questions about the EPA's views on these issues.

The EPA also proposed to amend the recordkeeping requirements for records submitted through CEDRI by adding 40 CFR 63.10(g) to clarify that the records submitted through CEDRI may be maintained in electronic format. As proposed, this provision does not remove the requirement for facilities to make records, data, and reports available upon request by a delegated air agency or the EPA. We are not finalizing the proposed addition of 40 CFR 63.10(g) because the provision is redundant with 40 CFR 63.10(b)(1), which allows for storage of records on computer.

*B. Amendments to Individual NESHAP General Provisions Applicability Tables*

The EPA proposed to amend the General Provisions applicability tables contained within most subparts of 40 CFR part 63 to add a reference to a new reclassification provision contained in 40 CFR 63.1(c)(6) discussed in the section V.A of this preamble and add a reference to reflect the proposed CEDRI submission procedures of 40 CFR 63.9(k) discussed above in section V.A of this preamble. We are finalizing the amendments to the General Provisions applicability tables as proposed. Additionally, the EPA identified four subparts containing the General Provision applicability requirements which did not properly reference the notification provisions. These subparts are 40 CFR part 63 subparts G, H, II, and YY. Accordingly, we are also finalizing revisions to these applicability requirements of 40 CFR part 63 subparts G, H, II, and YY to account for the final amendments to the General Provisions as described above in section V.A.

*C. Amendments to Individual NESHAP*

At proposal, the EPA identified one general category of regulatory provisions in several NESHAP subparts that reflect the 1995 OIAI policy that requires revision pursuant to this action. This category of provisions addresses the date by which a major source can become an area source. We proposed to revise the following provisions: 40 CFR part 63, subpart QQQ at 63.1441; 40 CFR part 63, subpart QQQQQ at 63.9485; 40 CFR part 63, subpart RRRRR at 63.9581; and Table 2 of 40 CFR part 63, subpart WWWW. We solicited comment on whether there are any other regulatory provisions in any of the individual subparts that include OIAI provisions that should be revised pursuant to this action. The EPA received comments regarding multiple provisions in 40 CFR part 63, subpart F

at 63.100(b)(4); subpart I at 63.190(b)(7); subpart HH at 63.760(a)(1); and subpart HHH at 63.1270. The EPA reviewed the provisions raised by commenters in these subparts and is including in this final rule revisions to the provisions in subpart HH at 63.760(a)(1) and subpart HHH at 63.1270(a). The EPA is not making changes with respect to the identified provisions in subparts F and I at 63.100(b)(4) and 63.190(b)(7). The EPA sees these provisions as expired exclusion provisions, not OIAI provisions, that do not prevent a source from reclassifying to area source status.

At proposal, we also identified several area source NESHAP containing notification provisions (*i.e.,* initial notification) applicable to existing sources for which the dates have passed. We proposed to amend the following area source NESHAP that contain notification requirements for existing sources with specific deadlines that are in the past: 40 CFR part 63, subpart HHHHHH at 63.11175; 40 CFR part 63, subpart XXXXXX at 63.11519; 40 CFR part 63, subpart YYYYYY at 63.11529; 40 CFR part 63, subpart AAAAAAA at 63.11564; 40 CFR part 63, subpart BBBBBBB at 63.11585; and 40 CFR part 63, subpart CCCCCCC at 63.11603. Consistent with other area source NESHAP notification requirements, we proposed that, for an existing source that reclassifies from major to area source status, the notification shall be submitted no later than 120 calendar days after the source becomes subject to the relevant area source NESHAP requirements. Regarding whether there are any other individual subparts that would warrant modification because initial notification requirements are in the past, commenters pointed at the initial notification requirements in many of the major source NESHAP subparts. They stated that if an area source were to revert back to major source status, these initial notification requirements would have been in the past. The EPA reviewed the initial notification provisions of all NESHAP subparts and is including in this final rule amendments to the initial notification requirements within most NESHAP subparts to include additional language so that the notification shall be submitted no later than 120 calendar days after the source becomes subject to the relevant NESHAP requirements. The EPA is amending the initial notification requirements in the following subparts: 40 CFR part 63, subpart G at 63.151(b)(2) (i), (ii) and (ii); subpart H at 63.182(b)(2)(i), (ii), and (iii); subpart L at 63.311(a); subpart M at 63.324(g); subpart N at 63.347(c)(1); subpart Q at

USCA Case #21-1024    Document #1881431    Filed: 01/15/2021    Page 34 of 82

63.405(a)(1) and (2); subpart S at 63.455(a); subpart T at 63.468(a), (b), (c), and (3); subpart Y at 63.567(b)(2) and (3); subpart DD at 63.697(a)(1); subpart EE Table 1; subpart HH at 63.77(c)(1); subpart JJ Table 1; subpart KK at 63.830(b)(1)(i), subpart CCC at 63.1163(a)(3); subpart PPP at 63.1434(d) and (e), and at 63.1439(e)(3)(ii)(B) and (C); subpart QQQ at 63.1454(b); subpart UUU at 63.1574(b); subpart VVV at 63.1591(a)(1) and (2); subpart DDDD at 63.2280(b); subpart EEEE at 63.2382(b)(1) and (2); subpart FFFF at 63.2515(b); subpart GGGG at 63.2860(a); subpart IIII at 63.3110(b); subpart JJJJ at 63.3400(b)(1); subpart KKKK at 63.3510(b); subpart MMMM at 63.3910(b); subpart NNNN at 63.4110(a)(1); subpart OOOO at 63.4310(b); subpart PPPP at 63.4510(b); subpart QQQQ at 63.4710(b); subpart RRRR at 63.4910(b); subpart SSSS at 63.5180(b)(1); subpart TTTT at 63.5415(b); subpart UUUU, Table 7; subpart XXXX at 63.6009(b); subpart YYYY at 63.6145(b); subpart ZZZZ at 63.6645(b) and (d), subpart AAAAA at 63.7130(b) and (c); subpart BBBBB at 63.7189(b); subpart CCCCC at 63.7340; subpart DDDDD at 63.7545(b) and (c), subpart EEEEE at 63.7750(b); subpart FFFFF at 63.7840(b); subpart GGGGG at 63.7950(b) and (c); subpart HHHHH at 63.8070(b)(1); subpart IIIII at 63.8252(b); subpart JJJJJ, Table 8; subpart KKKKK, Table 9; subpart LLLLL at 63.8692(b), subpart MMMMM at 63.8816(b); subpart NNNNN at 63.9045(b), subpart PPPPP at 63.9345(b)(1); subpart QQQQQ at 63.9535(c); subpart RRRRR at 63.9640(b); subpart SSSSS at 63.9812(b); subpart TTTTT at 63.9930(b); subpart BBBBBB at 63.11086(e) and Table 3; subpart CCCCCC at 63.11124(a)(1), (b)(1), and Table 3; subpart HHHHHH at 63.11175(a); subpart PPPPPP at 63.11425(b) and (c); subpart QQQQQQ at 63.11432(b) and (c); subpart RRRRRR at 63.11441(a); subpart TTTTTT at 63.11469(a); subpart WWWWWW at 63.11509(a)(3); subpart XXXXXX at 63.11519(a)(1); subpart YYYYYY at 63.11529 (a); subpart AAAAAAA at 63.11564(a)(2); subpart BBBBBBB at 63.11585(b)(1); and subpart CCCCCCC at 63.11603(a)(1).

## VI. Other Considerations

### A. PTE Determination

In the MM2A proposal, the EPA included a background discussion associated with the HAP PTE determination. The discussion was intended to provide context for evaluating whether the EPA should include in the General Provisions to 40 CFR part 63 certain elements of the Federal Minor New Source Review Program in Indian Country, which included application content requirements in those rules as well as the proposed hierarchy of acceptable data and methods a source seeking reclassification would use to calculate and determine the source PTE. We received many comments regarding PTE determinations, including suggestions for clarification on how to do these calculations, which are already addressed in guidance. See section VII of this preamble for additional information regarding implementation of PTE limits and the EPA guidance addressing related topics. Importantly, at this time, the EPA is not taking final action on whether to include in the General Provisions a hierarchy of data and methods for calculating PTE. The EPA will continue to evaluate whether there is a need to issue guidance or rulemaking for such hierarchy and methods in the future.

In the MM2A proposal, the EPA requested comments on whether it would be appropriate to include in the General Provisions of 40 CFR part 63 the minimum requirements for the information that a major source of HAP must submit to its regulatory authority when seeking to obtain PTE limitations to reclassify as area sources under section 112 of the CAA, similar to the information included in a synthetic minor source permit application under Tribal Minor New Source Review. Most of the industry and state commenters asserted that regulatory authorities should retain authority to determine what a major source must submit to reclassify. They argued that these requirements already exist in federal, state, and local rules, and asking state and local governments to add new regulatory requirements onto programs that already provide for the creation and enforcement of synthetic minor limits would be an unnecessarily burdensome administrative resource drain. The EPA agrees with commenters that the addition of minimum requirements for the information that a major source of HAP must submit to its regulatory authority when seeking to obtain PTE limitations to reclassify as area sources under section 112 of the CAA ignores that permitting authorities already have permit application requirements under their programs. Also, the EPA has reconsidered that permit application requirements for PTE programs would be more appropriate under 40 CFR part 63, subpart E and is not including such requirements in the final rule. See section VII of this preamble. This position does not, however, alter how the EPA will apply the policy that the Agency has been following since 1995, which allows for any physical or operational limitation on the capacity of the stationary source to emit a pollutant (such as air pollution control equipment and restrictions on hours of operation or on the type or amount of material combusted, stored, or processed), to be treated as part of its design if the limitation or the effect it would have on emissions is federally enforceable or legally enforceable by a state or local permitting authority and practicably enforceable.

### B. Reclassification Process and Permitting

The proposal addressed questions from sources and permitting authorities regarding permit process, mechanisms, and the requirements for reclassifying to area source status for 40 CFR part 70 sources. These questions were brought to our attention per our request in the MM2A Memorandum about specific situations that may need to be considered at proposal. The purpose of the discussion was to inform stakeholders about our expectations on how the reclassification process will work in those specific circumstances. The EPA did not propose changes to any of the rules for the permitting programs or to their interpretation. Below, we clarify the related proposal preamble discussion, since it may have introduced ambiguity about our interpretation of the regulations.

Stakeholders asked the EPA to clarify whether a reclassified source continues to have an obligation to comply with the major source requirements in their title V permit that were included solely to comply with the OIAI policy. These scenarios consisted of sources that no longer have the maximum capacity to emit HAP in amounts that exceed major source thresholds because of physical or operational limitations but whose title V permit still includes major source NESHAP requirements. (Often, the operational limitations are enforceable limitations the source has taken to avoid major source requirements in the future, in agreement with the OIAI policy.) The proposal's preamble acknowledged that in that case the source is an area source under the CAA section 112 definition, but it still must comply with its title V permit terms and conditions until the permit is revised or revoked in agreement with the title V permitting authority that issued the permit. The proposal's preamble advised that sources must follow the permitting authority's procedures for permit modification or closure. We continue to stand by our view that the permitting

authority will be in the best position to help a source decide on the appropriate procedures under the specific program rules to reconcile permitting obligations.

The preamble illustrated, with examples, how situations may differ and that we expect those differences to require different procedures. The proposal concluded that in a hypothetical situation when the major source NESHAP permit terms are relied upon to demonstrate compliance with some other applicable requirement (*e.g.,* in the case of streamlining the permit conditions), concurrently with their removal, the permitting authority may need to reevaluate the MRR for applicable requirements remaining in the permit and that the regulations in 40 CFR part 71 would require a significant modification to add these requirements to a title V permit. With regard to this advice, commenters argued that the EPA misspoke in the proposal as to the appropriate process for 40 CFR part 71 sources. The commenters argued that revising the 40 CFR part 71 permit to reflect a change in applicable requirements may not always require a significant modification to a title V permit, and the EPA provided no explanation in the proposal for this cursory conclusion relative to 40 CFR part 71. The EPA first clarifies that the explanation in the proposal about the procedures that apply to the changes in the scenarios presented reflect the EPA's current view regarding the 40 CFR part 71 permitting authority for a general case and does not imply that a particular situation may not merit a different treatment based on the facts and the 40 CFR part 71 regulations. The basis for the EPA conclusion in the preamble is that removing non-applicable NESHAP requirements would almost always involve significant changes to monitoring, recordkeeping, and/or reporting, and, thus, the modification would not qualify as a minor modification under 40 CFR 71.7(e)(1)(i)(2). This is especially true if revised monitoring requirements must be added to substitute for removed NESHAP monitoring requirements. However, we recognize that the procedures will generally depend on the program regulations and the facts of the situation. While the commenter does not provide a compelling argument to change our view on the permit modification procedures that would most likely apply for removing no-longer-applicable requirements from a 40 CFR part 71 permit, a source is free to show that in its situation the changes to existing monitoring, reporting, or recordkeeping, etc., due to the removal

of the no-longer-applicable requirements are not significant. Importantly, the EPA did not propose changes to, and this final rule does not make any changes to, the 40 CFR part 70 or 71 rules and is not prejudging any future proposed process for modifying any 40 CFR part 71 permits.

The EPA received multiple comments regarding the public notice and comment procedures associated with reclassification. As discussed below in section VII, the EPA is not taking action on the proposed effectiveness criteria for PTE limits at this time and is continuing to consider the comments received on this aspect of the MM2A proposal. The EPA intends to take final action on this aspect of the MM2A proposal in a separate final action at a later date. Notwithstanding this, on the issue of public notice and comment procedures currently in use for reclassifications, the EPA reiterates that, consistent with our long-standing policy, regulatory agencies implement public notice and comment procedures for state, local, and tribal programs as required under their regulations and statutes. The authority under which the PTE limits are issued contain issuance procedures, including any procedures for public notice and comment. Importantly, regulatory authorities use different issuing mechanisms depending on the complexity of the PTE limits required for the situation and the pollutants addressed. Typically, states issue enforceable PTE limits for individual sources in a SIP construction permit or a synthetic minor type of operating permit (*e.g.,* operating permits other than title V permit). States can also utilize less burdensome mechanisms for limiting PTE, such as general permits for source categories, permits by rule, or registration programs, as appropriate. Regardless of the mechanism used to issue an enforceable PTE limit, the regulatory agency must follow the applicable procedures for that mechanism, including providing for public notice and comment when required.

Some commenters on the proposal asserted that the EPA had failed to analyze federalism implications of the proposal. According to the commenters, states also rely on title V permitting fees to support permitting, monitoring, and enforcement of title V sources, and the EPA had not considered how states will do so with the loss of title V funds since area sources are frequently exempted from title V. The commenters stated that the EPA had a duty to consult with state and local governments for proposed rules with federalism implications and substantial compliance costs. The EPA

disagrees that this action imposes substantial compliance costs to state and local governments. As the EPA explained in section IV of this preamble, the OIAI policy imposed a time constraint on the ability of a source to change its status for purposes of applicability with CAA section 112 standards that is not found in the statute. This action simply implements the plain language reading of the statutory definitions of major source and area source which contain no language fixing a source's status at any particular point in time and contain no language suggesting a cutoff date after which the source's status cannot change. This rule explains what sources must do if and when they elect to reclassify and does not change the standards established under CAA section 112 nor it changes the permitting authority programs that are used for processing reclassifications.

## VII. Interim Ministerial Revision of 40 CFR Part 63 PTE Definition

The definition of PTE in 40 CFR 63.2 interprets the statutory term "potential to emit" found in the definition of a major source in section 112 of the CAA and provides a legal mechanism for sources that wish to restrain their emissions to avoid triggering major source requirements. Under the PTE definition in 40 CFR 63.2 promulgated in 1994, any physical or operational limitation on the capacity of the stationary source to emit a pollutant, including air pollution control equipment and restrictions on hours of operation or on the type or amount of material combusted, stored, or processed, shall be treated as part of its design if the limitation or the effect it would have on emissions is federally enforceable.[21] In *National Mining Association (NMA)* v. *EPA,* 59 F.3d 1351 (D.C. Cir. 1995), the D.C. Cir. remanded the definition of "potential to emit" found in 40 CFR 63.2 to the EPA to justify the requirement that physical or operational limits be "federally enforceable." The *NMA* decision confirmed that the EPA has an obligation to ensure that limits considered in determining a source's PTE are effective, but it stated that the Agency had not adequately explained how "federal enforceability" furthered effectiveness. 59 F.3d at 1363–1365.

In the MM2A proposal, the EPA proposed specific criteria that PTE limits must meet for these limits to be effective. The EPA also proposed to amend the definition of "potential to

---

[21] See 40 CFR 63.2 definition of "federally enforceable" available at *https://ecfr.io/Title-40/se40.11.63_12.*

emit'' in 40 CFR 63.2 accordingly by removing the requirement for federally enforceable PTE limits and requiring instead that HAP PTE limits meet the effectiveness criteria of being both legally enforceable and practicably enforceable. The EPA also proposed to amend 40 CFR 63.2 to include the definitions of ''legally enforceable'' and ''practicably enforceable'' described in the MM2A proposal. The EPA then took comment on the effectiveness criteria and the proposed amendments to 40 CFR 63.2.

The EPA received significant comments from many stakeholders on the proposed effectiveness criteria and proposed amendments to 40 CFR 63.2. One of the main concerns raised by stakeholders in their comments is the interactions and effects of the proposed amendments with other CAA programs, including prevention of significant deterioration (PSD), NSR, SIP, and title V, and the impacts of the proposed amendments to existing state, local, and tribal agency rules. The EPA is not taking action on the proposed amendments to 40 CFR 63.2 at this time and is continuing to consider the comments received on this aspect of the MM2A proposal. The EPA intends to take final action on this aspect of the MM2A proposal in a separate final action at a later date.

In the meantime, the EPA is making an interim ministerial revision to the definition of ''potential to emit'' in 40 CFR 63.2. Specifically, the Agency is removing the word ''federally'' from the phrase ''federally enforceable'' in the definition of ''potential to emit.'' A few points need to be made to explain what this interim ministerial revision is and what it is not. First, this revision is not the EPA's final decision and should not be read to suggest that the EPA is leaning towards or away from any particular final action on this aspect of the proposal. This revision is simply an interim revision to cover the period of time while the EPA continues to consider the comments on this aspect of the proposal and until the Agency takes final action with respect to the proposed amendments concerning the proposed effectiveness criteria and proposed amendments to 40 CFR 63.2. Second, this revision is ministerial because it merely reflects the *NMA* decision, which held that the EPA had not explained why a PTE limit had to be ''federally enforceable'' to be considered as the basis for reclassifying a major source to area source status. See *NMA* v. *EPA*, 59 F.3d at 1363–1365.[22] Again,

this revision does not represent a final decision by the EPA or signal any direction that the EPA is intending to take in a future final action. It simply makes a ministerial change to the regulatory text that appears in the CFR to reflect the *NMA* decision.

Further, this interim ministerial revision does not alter any rights or legal consequences and simply preserves the status quo that has been in effect since the late 1990s. This revision will not change how the EPA will apply the transitional policy that the Agency has been following since 1995. By removing the word ''federally,'' the EPA hopes to avoid any ongoing confusion about how the transitional policy is applied. This transitional policy allows for any physical or operational limitation on the capacity of the stationary source to emit a pollutant (such as air pollution control equipment and restrictions on hours of operation or on the type or amount of material combusted, stored, or processed) to be treated as part of its design if the limitation or the effect it would have on emissions is federally enforceable or legally enforceable by a state or local permitting authority and practicably enforceable.

For implementing reclassifications in the interim, state programs may use PTE guidance they have developed for their programs and/or may also continue to rely on the EPA PTE guidance. As noted in the proposal preamble, there is a substantial body of EPA guidance and administrative decisions relating to PTE and PTE limits.[23]

[22] The EPA notes that in two subsequent decisions, the D.C. Cir. relied on the *NMA* decision

and presented no additional legal analysis. In *Chemical Manufacturers Assoc,* v. *EPA,* 70 F.3d 637 (D.C. Cir. 1995), the D.C. Cir. reviewed a ''federally enforceable'' limitation in the PTE definition in the PSD and NSR regulations and both vacated and remanded the federal enforceability requirement in those provisions with a three sentence decision that provided no additional analysis and simply referenced the *NMA* decision: ''Petitioners challenge regulations of the Environmental Protection Agency that define the term ''potential to emit'' to exclude controls and limitations on a source's maximum emissions capacity unless those controls are federally enforceable. We recently decided a similar challenge in *National Mining Association* v. *EPA,* 313 U.S. App. D.C. 363, 59 F.3d 1351 (D.C. Cir. 1995). Accordingly, it is *ordered* and *adjudged* that the regulations are vacated and the case is remanded to the Environmental Protection Agency for reconsideration in light of *National Mining Association*.'' In *Clean Air Implementation Project* v. *EPA,* No 96–1224 1996 WL 393118 (D.C. Cir.. Jun. 28, 1996) (*CAIP*), the D.C. Cir. also vacated and remanded the federal enforceability requirement in the title V (40 CFR part 70) regulations.

[23] There is a substantial body of EPA guidance and administrative decisions relating to PTE and PTE limits. *E.g.,* see generally, Terrell E. Hunt and John S. Seitz, ''*Limiting Potential to Emit in New Source Permitting*'' (June 13, 1989); John S. Seitz, ''*Options for Limiting the Potential to Emit (PTE) of a Stationary Source Under Section 112 and Title V*

## VIII. Summary of Cost, Environmental, and Economic Impacts

In this section, the EPA summarizes the findings of several analyses that we conducted to assess the cost, environmental, and economic impacts of the final rule. It is important to restate that the final rule does not *require* any source to reclassify to area source status. Each source must assess its own circumstances to determine whether it is feasible and advantageous to undergo the reclassification process. The unique nature of each source's decision process makes it difficult for the EPA to determine the number and type of sources that may choose to reclassify under this rule. Because of this, the EPA can only present illustrative analyses concerning the impacts of this final rule.

For the final rule analyses, based on comments received on the data used for the overall analyses for the MM2A proposal, the EPA updated the MM2A database, removed double counting of facilities, and expanded the number of source categories evaluated for cost, environmental, and economic impacts. The updated MM2A database contains data from the 2017 National Emissions Inventory (NEI), data collected to conduct residual risk and technology reviews (RTR) under sections 112(d)(6) and 112(f) of the CAA (henceforth referred to as RTR modeling file data), and data from the EPA's Enforcement and Compliance History On-line (ECHO) database. The EPA used the RTR modeling file data and NEI data to estimate the number of facilities in each of 74 source categories and the number of sources within those facilities that could be eligible to reclassify from major to area source status. We used the ECHO data to estimate the number of facilities in 27 additional source categories for which we did not have RTR modeling file data, and we then used an extrapolation methodology to approximate the number of facilities within these 27 source categories that could be eligible to reclassify from major to area source status.[24]

*of the Clean Air Act*'' (January 25, 1995); Kathie Stein, ''*Guidance on Enforceability Requirements for Limiting Potential to Emit through SIP and § 112 Rules and General Permits*'' (January 25, 1995); John Seitz and Robert Van Heuvelen, ''*Release of Interim Policy on Federal Enforceability of Limitations on Potential to Emit*'' (January 22, 1996); ''*In the Matter of Orange Recycling and Ethanol Production Facility, Pencor-Masada Oxynol, LLC,*'' Order on Petition No. II–2001–05 (April 8, 2002) at 4–7.

[24] There are about 114 major source categories subject to NESHAP. The EPA determined that 13 source categories are not impacted by this rule and did not include these categories in the costs or impacts analyses. For the remaining categories, 74 were analyzed using RTR modeling file data while 27 were analyzed using an extrapolation approach.

As a result of updates to the MM2A database, the number of facilities estimated to be subject to major source NESHAP has been reduced from 7,920 at proposal to 7,187. The detailed methods applied to update the MM2A database and estimate the number of facilities subject to major source NESHAP for purposes of the final rule analyses are described in the TSM titled "*Documentation of the Data for Analytical Evaluations and Summary of Industries Potentially Impacted by the Final Rule titled Reclassification of Major Sources as Area Sources Under Section 112 of the Clean Air Act,*" which is included in the docket for this action.

*A. Analytical Scenarios*

The potential costs and cost savings presented in the final cost memorandum and RIA are the result of an illustrative assessment. It is unknown how many major sources would choose to take enforceable PTE limits to levels below the MST and reclassify to area source status. If a source voluntarily chooses to reclassify to area source status, it will no longer be subject to previously applicable major source NESHAP, which may result in compliance cost savings for the source. However, the source will be required to comply with any applicable area source NESHAP in response to reclassification, which could result in some compliance costs. Facilities will also have costs associated with applying to modify the facility's operating permit when they reclassify from major to area source status. Regulatory agencies will also have costs to process those applications. Overall, the sum of costs and cost savings of all actions taken to reclassify under this rule is expected to be a net annual cost savings.

To illustrate the potential emissions changes, costs, and economic impacts of the final rule, we analyzed the same three illustrative analytical scenarios as at proposal. The primary analytical scenario analyzes the sources with actual emissions below 75 percent of the MST (7.5 tpy of a single HAP or 18.75 tpy of all combined HAP). Alternative scenario 1 analyzes facilities with actual emissions below 50 percent of the MST (5 tpy for a single HAP and 12.5 tpy for all HAP). Alternative scenario 2 analyzes sources with actual emissions between 75 percent and 125 percent of the MST (12.5 tpy for a single HAP and 31.25 tpy for all HAP).

The primary analytical scenario considers that sources will normally build a compliance margin into their operations to ensure that their emissions remain below the MST and they do not revert to major source status. Some commenters suggested that the EPA should conduct its analyses based on the assumption that all sources will emit up to the MST, or the Agency should analyze a scenario with a smaller compliance margin (*i.e.,* at 90 percent of the MST). The appropriate compliance margin to apply is specific to each facility and its operating experience. Some reclassified sources may choose to operate 10 percent below the MST while others may choose to maintain a larger compliance margin to ensure they do not jeopardize their area source status. In addition, some facilities operating slightly above the MST may opt for reclassification to area source status by taking PTE limitations and reducing emissions to a level below the MST. Therefore, we provide illustrative analyses of potential changes in costs and emissions at various compliance margins. The level of actual emissions relative to the MST at which facilities may consider participating in the MM2A reclassification process is actually a continuous line from some level below the MST to a reasonable level above the MST, and our illustrative analyses include three points on this continuous line to estimate the potential impacts of different compliance margins on participation under this final rule. In this section, we present the primary illustrative scenario and two alternative scenarios, one above and one below the primary scenario.

While different compliance margins could be evaluated, the EPA has greater confidence in the primary illustrative scenario where sources at or below 75 percent of the MST can maintain emissions below the MST and thus may be more likely to opt for reclassification. Sources in the MM2A database operating between 50 and 75 percent of the MST, and those operating between 75 and 125 percent of the MST, are also addressed in our analyses, in the first and second alternative scenarios, respectively. These alternative scenarios address the impacts of sources at alternative compliance margins as suggested by commenters. In addition to these analytical scenarios, the updates to the MM2A database detailed in the TSM titled "*Documentation of the Data for Analytical Evaluations and Summary of Industries Potentially Impacted by the Final Rule titled Reclassification of Major Sources as Area Sources Under Section 112 of the Clean Air Act*" presents the incremental count of facilities at 90 and 100 percent of the MST to illustrate a comparison of the difference between the number of facilities in the database operating in the primary scenario and these alternative views suggested by commenters.[25]

*B. Cost Analysis*

For the illustrative cost analysis conducted for the final rule, the EPA analyzed: (1) Facilities with actual emissions below each analytical threshold, (2) the costs that we estimated to be incurred by the facilities associated with permitting actions necessary to obtain area source status, (3) the costs that we estimated to be incurred by permitting authorities associated with permitting actions necessary to process permit applications for facilities requesting reclassification, and (4) cost-savings estimates based solely on estimated reductions in labor burden related to MRR requirements that would either no longer apply or would change based on the specific requirements in the major source NESHAP rules and any area source NESHAP rules that apply to a particular source category. As part of the overall analysis of the 125-percent alternative scenario, we examined the potential control costs for major sources in eight source categories that may opt to further reduce HAP emissions in order to reclassify to area source status. Details of this potential control cost analysis are presented in the TSM titled "*Analysis of Illustrative 125% Scenario for MM2A Final—Potential Cost Impacts from HAP Major Sources Reducing Emissions as part of Reclassifying to HAP Area Sources*" which is available in the docket for this action. The details of the cost analysis are presented in the TSM titled "*Documentation of the Compliance Cost Savings Analysis for the Final Rulemaking Reclassification of Major Sources as Area Sources Under Section 112 of the Clean Air Act*" and also are summarized in the RIA. All of these documents are available in the docket for this action.

The illustrative cost analysis presents estimates of the final rule's net costs (or savings) over two time periods. The first estimate assumes that all potential reclassifications that might occur as a result of this rulemaking with take place within 1 year of promulgation (*i.e.,* by 2021). The second estimate assumes that not all the reclassifications will occur within 1 year after the MM2A rule is finalized, and instead are assumed to occur over a more extended period of time.

---

[25] See the Response to Comments document for a detailed rationale for the selection of analytical scenarios for the final rule and the EPA's reasoning for not evaluating impacts at 90 percent of the MST.

For the first illustrative cost analysis, Year 1 costs include the cost for each facility to apply for and obtain an area source or synthetic minor permit or a title V permit modification and for the regulatory agencies to review and approve those applications and issue the permits. These permitting costs to the facilities and state agencies are one-time costs and occur only in Year 1 when a facility reclassifies. Then, in Year 2 and beyond, facilities do not incur the cost to process a reclassification and the net costs (or savings) are the sum of the projected annual cost savings from not having to comply with the major source NESHAP MRR requirements and the estimated cost of compliance with applicable area source NESHAP requirements. These projected savings are expected to continue for each reclassified facility each year beyond the second year, for there is no time specified for review of reclassifications under the CAA. The permitting costs to the facilities and the permitting costs to the regulatory agencies are not included in the second year because it is assumed the permitting changes are all completed in the year the source submits an application for reclassification and no action is needed in subsequent years in relation to this action.

However, based on the number of potential reclassifications discussed in this analysis, we can confidently conclude that not all of the reclassifications will occur in the first year after the rule is issued. The timing of a reclassification is influenced by several considerations, including time for facilities to determine whether it is in their best interest to reclassify, time to prepare applications for reclassification, and time for permitting authorities to review applications and process reclassification requests. There is also time allotted for the EPA to review determinations by permitting authorities and for public participation in the process. Therefore, it is reasonable to assume that not all the reclassifications will occur within 1 year after the MM2A rule is finalized, and instead the reclassifications assessed in the cost analysis are assumed to occur over a more extended period of time. To illustrate the spread of costs over time, the EPA also presents a 5-year outlook of costs and cost savings.

A summary of the results of the potential costs and cost savings across different types of source categories from the illustrative cost analysis for Year 1 and Year 2 and beyond is presented in Table 2. Results are presented for the 74 source categories evaluated using RTR modeling data and the 27 source categories that were evaluated using the extrapolation approach.

### TABLE 2—ILLUSTRATIVE NET COSTS (OR COST SAVINGS) OF FINAL MM2A RULE FOR THE PRIMARY ANALYTICAL SCENARIO

| Source category coverage | Total number of facilities subject to major source NESHAP | Facilities with actual emissions below 75 percent of the MST [1] | Potential net annual costs (or cost savings) in 2017$ for Year 1 [2 4] and Year 2 [3 4] and beyond |
|---|---|---|---|
| Source categories with RTR data (74 categories) ....................................... | 4,068 | 1,614 | $10,147,526 (56,137,515) |
| Extrapolated source categories (24 categories) [5] ....................................... | 1,294 | 266 | 1,680,049 (9,030,684) |
| Industrial, commercial, and institutional boilers and process heaters (3 categories) [5] ......................................................................................................... | 1,821 | 687 | 4,319,300 (25,456,533) |
| Total (101 source categories) ........................................................................... | 7,183 | 2,567 | 16,146,875 (90,624,732) |

[1] Results are for sources with actual emissions below 75 percent of the MST (*i.e.*, 7.5 tpy for one HAP and 18.75 tpy for combined HAP).
[2] Costs incurred by sources and permitting authority assumed in year 1.
[3] Year 2 impacts are also representative of annual impacts to all reclassified major sources in all subsequent years in the future. Numbers in parenthesis are negative and reflect cost savings.
[4] The analytic timeline begins in 2021 and continues thereafter for an indefinite period. Year 1 impacts are those for 1 year after reclassification of a major source with reclassifications beginning in 2021, and year 2 impacts are those for the second year after reclassification of a major source and annually afterwards.
[5] Extrapolated using the EPA's ECHO data.

Table 3 presents the illustrative potential cost (or cost savings) impact of the final rule over time for the primary analytical scenario. We present the impacts over a 5-year outlook that assumes all sources in our analysis will reclassify over that timeframe and that the reclassifications will be evenly distributed over that period.

### TABLE 3—ILLUSTRATIVE NET COSTS (OR COST SAVINGS) OF THE FINAL MM2A RULE OVER TIME FOR THE PRIMARY ANALYTICAL SCENARIO *

| Source category coverage | Distribution of costs (or cost savings) over a 5-year period ($2017) | | | | |
|---|---|---|---|---|---|
| | 2021 | 2022 | 2023 | 2024 | 2025+ |
| Source categories with RTR data (74 categories) ........................................... | $2,536,882 | $(11,497,497) | $(25,531,875) | $(39,566,254) | $(56,137,515) |
| Extrapolated Source Categories (24 categories) ........................................... | 420,012 | (1,837,658) | (4,095,329) | (6,353,000) | (9,030,684) |

TABLE 3—ILLUSTRATIVE NET COSTS (OR COST SAVINGS) OF THE FINAL MM2A RULE OVER TIME FOR THE PRIMARY ANALYTICAL SCENARIO *—Continued

| Source category coverage | Distribution of costs (or cost savings) over a 5-year period ($2017) | | | | |
| --- | --- | --- | --- | --- | --- |
| | 2021 | 2022 | 2023 | 2024 | 2025+ |
| Industrial, Commercial, and Institutional Boilers and Process Heaters (3 categories) ............ | 1,079,825 | (5,284,308) | (11,648,441) | (18,012,574) | (25,456,533) |
| Total (101 Source categories) ........ | 4,036,719 | (18,619,464) | (41,275,647) | (63,931,830) | (90,624,732) |

\* These results reflect the aggregate of costs and cost savings for all facilities by year of impact.
Estimates for 2025 are also representative of all subsequent years.

The EPA also calculated the PV of the illustrative cost savings for the main illustrative scenario. The PV is the value of a stream of impacts over time, discounted to the current (or nearly current) year. The PV of the cost savings for the primary illustrative scenario is $0.86 billion (in 2017 dollars) at a discount rate of 7 percent, which is discounted to 2020. At a discount rate of 3 percent, the PV is $1.50 billion (in 2017 dollars), again discounted to 2020. Another measure of the annual cost savings to complement the estimates in Table 2 is the EAV. This annual impact estimate is calculated consistent with the PV. The EAV is $67 million (2017 dollars) at a 7-percent discount rate for the primary scenario. At a 3-percent discount rate, the EAV is $75 million (2017 dollars). The PVs and EAVs for each alternative scenario and discount rate in 2017 and 2016 dollars can be found in the RIA for the final rule.

*C. Environmental Analysis*

At proposal, to assess the potential environmental emissions impacts associated with the reclassification of sources, the EPA reviewed permits and other information for 34 sources that had reclassified to area source status consistent with the EPA's plain language reading of the CAA section 112 definitions of "major" and "area" source since January 2018. The review of these reclassifications provided a representation of the potential real-world impacts on emissions by looking at the facts and circumstances of actual reclassification actions. In addition to the evaluation of the reclassification actions, at proposal the EPA also performed an illustrative assessment for six source categories: Wood Furniture Manufacturing Operations, Surface Coating of Metal Cans, Surface Coating of Miscellaneous Metal Parts and Products, Wet-Formed Fiberglass Mat Production, Hydrochloric Acid Production, and Non-Gasoline Organic Liquids Distribution. The analysis of these six source categories was informative in some respects but was only illustrative and speculative in nature and only presented a range of possible outcomes dependent on the assumptions that we made in the assessment. The EPA received numerous comments on the emissions analyses presented at proposal. Many commenters argued that the EPA had failed to adequately assess the effects of the rule on HAP emissions and did not perform any health impact analysis. These commenters argued the EPA did not include enough source categories in the emissions analysis at proposal to draw reasonable conclusions. Commenters also opined that the analysis of the actual reclassifications relied on a small sample, and a few speculated that we had "cherry picked" permits to review.

For the final rule, the EPA expanded the emissions impact analysis in several ways to address these comments. We enhanced the MM2A database to include more source categories with detailed data and improved the methodology for analysis based on public comments. We also expanded the review of reclassification actions to include the review of 35 additional reclassifications received from March 2019 through February 2020.[26] This allowed us to more than double the number of reclassifications reviewed for the final rule. The details and results of the analysis of 69 reclassification actions are summarized here and presented in detail in the Review of Reclassification Actions TSM for the final rule, which is available in the docket for this action.[27] The EPA received several comments on the permit reviews completed for the proposal; we have considered the input

from commenters in the review of the reclassifications included in the final analysis. Finally, we also expanded the illustrative analysis of impacts on the program from the six source categories reviewed at proposal to 72 source categories. The 72 source categories included in the illustrative analysis represent a broad array of the sources subject to major source NESHAP requirements and the types of sources that could seek reclassification to area source status under this final rule. We discuss the reclassification actions reviewed and the illustrative analyses of source categories in detail below. Our analysis indicates that 68 of the 69 sources that have reclassified will not increase emissions. In addition to this review of actual reclassification actions, the EPA also prepared an illustrative analysis for 72 source categories in the major source NESHAP program (114 total) to evaluate the potential emissions impacts. After consideration of the information and data available for the illustrative emissions analysis, we found that 65 source categories will not change emissions as a result of the rule. For the other seven source categories, there was a potential for (but not a certainty of) emissions increases based on conservative assumptions that are likely to overstate the change in emissions at some facilities. As is discussed throughout this preamble and in the TSMs and RIA, any analysis of impacts includes uncertainties, and each subsequent level of analysis compounds the uncertainties to a much greater level. Given the compounding of uncertainty and illustrative nature of the analysis, further quantification of effects of these emissions increases would not be reliable or informative. Instead, we present a qualitative discussion of benefits and disbenefits in the *benefits/ disbenefits* subsection of impacts below. Further information of the analyses and findings are presented below.

To assess the potential for emissions impacts for the 69 reclassified sources, the EPA focused its review on the

---

[26] The EPA obtained information about these reclassifications through the normal course of business with the permitting authorities that notify us of permitting actions within their jurisdictions.

[27] See TSM titled "*Review of Reclassification Actions for the Final Rulemaking "Reclassification of Major Sources as Area Sources under Section 112 of the Clean Air Act*" available in the docket of this rulemaking.

enforceable conditions associated with the PTE limitations applicable to the emission units previously subject to major source NESHAP requirements. The EPA review focused on whether these emission units at these facilities continue to have enforceable conditions that are either the same as or consistent with the previous applicable major source NESHAP compliance obligations. Summaries of the permit reviews and emissions evaluations are presented in the Review of Reclassification Actions TSM, which is available in the docket for this action.

The EPA's findings from its review of permits for the reclassifications indicate that of the 69 sources that reclassified to area source status, 68 achieved and maintain area source status by operating the emission controls or continuing to implement the practices they used to comply with the major source NESHAP requirements; we expect no emissions increases due to reclassification for these sources. While permitting authorities could allow for changes in the enforceable conditions or practices that the sources used to comply with major source NESHAP requirements that could lead to emissions increases, this happened for only one source out of the 69 actual reclassifications. Below is an overview of the EPA's findings from the permit reviews for these 69 reclassifications.[28]

Of the 69 sources that have reclassified, 45 sources are in a coating type source category; 11 are chemical sources; six are fuel combustion/boiler sources; five are oil and gas sources and two are heavy industry sources. (See Tables 3 and 4 of Review of Reclassification Actions TSM available in the docket for this action). Of the 69 reclassifications reviewed, 14 sources are classified as true area sources because these sources are no longer physically or operationally able to emit HAP above the MST. Of the 55 sources with enforceable PTE limitations, 15

sources had obtained those enforceable PTE limitations before January 2018 (pre-existing PTE limitations) while 40 obtained the PTE limitations after January 2018 in order to reclassify to area source status (new PTE limitations).

Of the 45 coating sources reviewed, 39 used compliant materials (low-HAP/no-HAP) to meet applicable major source requirements before reclassification, and their continued use of compliant materials is an enforceable condition after reclassification. Five sources relied on the use of regenerative thermal oxidizers (RTOs) to meet applicable major source requirements and maintain enforceable conditions requiring the operation of the RTOs after reclassification. As described in detail in the TSM, the EPA does not expect emissions increases from these sources due to reclassification to area source status. Finally, one source used compliant materials to meet applicable major source requirements, but after reclassification requested a change to use a HAP-containing formulation with accompanying process limitations to maintain area source status. Had the change in formulation happened while the source was a major source, the source would have had to use an add-on control device to comply with the applicable NESHAP. For this source, the change in formulation after reclassification could lead to emissions increases of 4.3 tpy of xylene or 18.75 tpy of combined HAP.

Of the 11 chemical sources reviewed, four sources are miscellaneous organic chemical manufacturing facilities; these relied on a variety of control technologies (including RTOs, scrubbers, and flares) and work practices to maintain compliance before reclassifying and continue to have enforceable conditions requiring the control technologies after reclassification. Three sources are gasoline distribution sources that relied on vapor collection and vapor flare/vapor combustion to meet applicable major source requirements before reclassification, and these controls are enforceable conditions to maintain compliance after reclassification. Three sources are off-site waste recovery facilities that relied on control technologies such as vapor balance/recovery systems, condensers, and scrubbers to meet applicable major source requirements before reclassification. All these sources continue to rely on the same (or additional) requirements as enforceable conditions to maintain compliance after reclassification and the EPA does not expect emissions increases due to

reclassification to area source status. Finally, one source is a former hazardous waste combustor and cement facility that until 2015 fueled its cement kiln using collected hazardous and non-hazardous waste, using various control technologies to maintain compliance. This facility permanently removed all equipment associated with Portland cement manufacturing and took on a new primary role as a hazardous waste storage/transfer facility, using throughput limits and a carbon adsorption system to maintain compliance.

Of the six combustion/boiler sources reviewed, four made permanent operational changes (ceased combustion of coal and/or ceased operation of boilers) allowing the sources to reclassify to area source status. Another source had material and operational limitations prior to reclassification, both of which continue to be enforceable conditions after reclassification, and one source took additional operational restrictions on the usage of natural gas as the mechanism to constrain their emissions and PTE and reclassify to area source status. Three of these sources had emissions above MST before reclassifying; the reclassification of these three sources resulted in a HAP reduction of 56.9 tpy single HAP and 78.8 tpy total HAP.

All five oil and gas production and transmission sources reviewed relied on the use of control technologies (oxidation catalyst [enclosed combustion device] and flares) to meet applicable major source requirements before reclassification, and their continued use is an enforceable condition to maintain compliance after reclassification. One of these sources took additional restrictions on the amount of gas vented to the atmosphere to reclassify to area source status. Also, the reclassification of this facility prevented additional emissions that would have occurred if the source had remained a major source. As described in detail in the TSM, the EPA does not expect emissions increases from these sources due to reclassification to area source status.

Of the two heavy industry sources reviewed, one is a lime manufacturing plant and the other is a flexible polyurethane foam fabrication facility. The lime manufacturing facility, after reclassification, remains subject to other regulatory requirements, including PM emission limitations, the use of a baghouse, and monitored opacity as an operating limit via operation of a continuous opacity monitoring system. The flexible polyurethane foam fabrication facility relied on compliant

---

[28] The analysis of the actual reclassifications includes representation of some of the source categories subject to major source NESHAP requirements. While the actual reclassifications demonstrate a cross-section of the types of industries that have reclassified, we are unable to determine if this cross-section of industries is representative of all types of sources that may seek reclassification in the future. The illustrative emissions analysis includes a broader selection of source categories across similar sectors of the economy as these actual reclassifications (*i.e.*, chemical, energy, combustion, coatings, and heavy industry/manufacturing). While the illustrative analysis is representative with respect to a broader selection of industries in the major source program, we are unable to definitively determine whether the sources within those categories will seek reclassification. Thus, we cannot make a determination of the representativeness of the actual reclassifications.

materials, control technology (carbon adsorption systems), work practices, and operational limitations to meet applicable major source standards before reclassification and continues to rely on these as enforceable conditions to maintain compliance after reclassification. See the Review of Reclassification Actions TSM available in the docket for the detailed permit reviews and emissions evaluations.

In response to comments, for the final rule's illustrative emissions impact analysis, we have also updated the assessment conducted at proposal for six source categories and expanded our assessment to numerous additional source categories. We identified several source categories that are unlikely to experience a change in emissions as a result of MM2A. We also conducted an in-depth analysis of potential changes in emissions upon reclassification for many source categories where we have information. We also reviewed the updated operating permits for a variety of industrial processes to interpret likely response to the final MM2A rule. The details and results of the emissions analysis are summarized below and presented in detail in the illustrative emissions impact analysis TSM titled, "*Documentation of the Emissions Analysis for the Final Rule Reclassification of Major Sources as Area Sources Under Section 112 of the Clean Air Act,*" which is available in the docket for this action.[29]

The EPA considered many factors in assessing the potential emissions impacts from the various NESHAP source categories if facilities in these source categories were to reclassify to area source status. These factors include backstop measures from regulatory and technological limits, as well as limitations on growth for economic reasons. As for regulatory reasons, the EPA assessed, if sources were to reclassify, whether they would be subject to the same NESHAP requirements as before reclassification (which would be the case where the area source requirements are the same as the major source requirements), whether new area source NESHAP requirements will be applicable and how they impact emissions, whether there are NSPS requirements that apply to the source and control emissions at the same levels as the major source NESHAP requirements, and whether there are PSD/NSR/SIP requirements the effect of which will continue to control

HAP emissions to the same extent. As for the technological and economic reasons, the EPA reviewed whether the measures used by the source to reduce emissions could be reversed or discontinued if sources were to reclassify to area source status. This includes, but is not limited to, changes in coating/adhesive formulations, fuel combustion technologies, and some level of backstop for emissions from add-on control technologies. Commenters stated that there are also other factors that will prevent emissions increases, including environmental management systems with which sources are engaged that require them to identify environmental impacts, set performance objectives, implement of standards for training and work practices, audit implementation of such standards, and take corrective action when deviations occur. Other commenters also mentioned that many sources are also required to meet Leadership in Energy and Environmental Design standards that incentivize efficient operations to minimize waste and energy usage, Occupational Safety and Health Administration requirements that protect workers from exposures to HAP and other pollutants, and toxics release inventory requirements. The commenters pointed out that these regulatory requirements continue to apply even if the source reclassifies, providing additional incentives for sources to not increase emissions. The EPA agrees with the commenters in that environmental management systems, even though they are voluntary and not regulatory in nature, will also provide additional incentive for some sources to maintain compliance with environmental legal obligations and not increase emissions.

Based on the EPA's illustrative analysis of potential emissions impacts from the 72 source categories, 65 source categories will either not be impacted by MM2A or are unlikely to experience any emissions changes for the reasons discussed in the above paragraph. After considering the information available for this illustrative analysis, we found that some facilities in seven source categories represented by detailed information from RTR modeling files in the MM2A database could increase emissions if they were to reclassify and were allowed to reduce operation of adjustable add-on controls. These facilities represent 7.9 percent of the facilities illustrated in the primary analytical scenario (*i.e.,* 128 facilities out of a total of 1,614 facilities in the primary analytical scenario), and 3.1

percent of all the facilities included in the analysis of the 72 source categories (*i.e.,* 128 facilities out of a total of 4,068 facilities operating in 72 source categories). Several of the source categories have only one or two facilities impacted, while three source categories have several facilities impacted. The facilities that we were able to assess are located in several states and are not clustered in close proximity to each other. The EPA was unable to evaluate the source categories included in the extrapolated approach used for the cost assessment due to insufficient information. Under alternative scenario 2, we determined that some facilities operating between 75 and 125 percent of the MST might opt to decrease emissions to reclassify to area source status as a result of the MM2A rule.

The EPA made several conservative assumptions when estimating the potential effect on emissions resulting from sources reclassifying from area to major source status. By "conservative," we mean that these assumptions are likely to result in an overestimate of emissions changes. We detail these assumptions in the TSM referenced above.[30] Based on these conservative assumptions, the potential change in emissions in the illustrative analyses for seven source categories could be an increase ranging from 919 tpy to 956 tpy of HAP across the NESHAP program under the primary scenario.[31] In

---

[29] See TSM, "*Documentation of the Illustrative Emissions Analysis for the Final Rule Reclassification of Major Sources as Area Sources Under Section 112 of the Clean Air Act,*" available in the docket of this rulemaking.

[30] In general, the change in emissions is measured as the difference between PTE with compliance with the major source NESHAP and 75 percent of the MST (the maximum emissions assumed with a compliance margin for the primary scenario). Where the EPA does not have information on the PTE, we estimated the potential change in emissions as the difference between actual emissions and 75 percent of the MST. However, in some cases it is inappropriate to assume changes from minimal amounts of HAP (*i.e.* less than 1 tpy) up 75 percent of the MST as it represents a 100 times to 1,000 times increase in emissions (and production to the extent that production and emissions correlate). Given the production capacities at existing facilities along with economic constraints on growth, it is highly unlikely a facility would seek to increase emissions (and hence production) by 100-times to 1,000-times. Most mature industries will not experience tremendous economic growth, and some may experience a declining rate of production that impacts growth. Therefore, we assume a conservative measure of increase for facilities operating at very low levels of HAP of 10 times (*e.g.,* a facility operating at 0.5 tpy with not information on PTE would increase to 5 tpy). The measure for emission change in these instances could be higher or lower, but we selected 10 times to demonstrate a conservatively high level of potential emissions increase.

[31] The EPA also identified some facilities in the primary scenario that have an estimated PTE that is above the MST, yet their actual emissions are well below 75 percent of the MST. If these facilities opt to reclassify by taking a limit on PTE down to a level below the MST, they will forego allowable
Continued

addition, we also include an alternative set of assumptions in the coatings sector to reflect the findings from the review of reclassification permits that shows one facility could increase emissions. For this alternative coating scenario, we extrapolate those findings to other facilities in the coatings sector using a percentage that represents the portion of the reclassified facilities that might increase emissions (*i.e.,* 2.3 percent of the reclassified coatings facilities are assumed to increase emissions). Using this alternative assumption, we estimate a potential emissions increase of 302 tpy of combined HAP. The total range of potential emissions increases is, therefore, 919 tpy to 1258 tpy. Again, it is important to note that this is likely an overestimate of actual emissions increases, as we explain in more detail in the technical support memorandum. Under the alternative scenario 2, we estimate a potential reduction in HAP emissions of 183 tpy.

In addition to approximating the response to the MM2A rule, we present information regarding the magnitude of potential changes in HAP emissions and discuss changes in health impacts for benefit categories of criteria pollutants. The combination of these evaluations represents our assessment of benefits as defined in Office of Management and Budget (OMB) Circular A–4. Based on the results of the EPA's analysis of the reclassifications of 69 sources and the illustrative emissions analysis of 72 source categories, this final rule may potentially result in both emission reductions and increases from a broad array of affected sources. For the 69 sources that have already reclassified, we conclude there are no potential emissions increases (except for one source as discussed in section VIII above) and, therefore, no health impacts associated with nearly all of the known reclassification actions. For the one facility with a potential for an emissions increase, the change in emissions would be modest and is not likely to result in significant health impacts. Because the sources that the EPA has identified as having a potential for some level of emissions change (given the uncertainties stated throughout this preamble) are located across the United States, we do not observe a

concentration of emissions changes in any particular location. However, to understand the potential impact of this rulemaking on tribal and environmental justice communities, we conducted two analyses on the 69 sources that have reclassified to area source status as described above (from which we found only one facility that could increase emissions).

In the first analysis, we looked at sources that were within 50 miles of an area of Indian country. Of the 69 sources that we analyzed, 30 are within 50 miles of at least one area of Indian country. Eleven of these are within 10 miles of an area of Indian country and three are in Indian country. However, after reviewing the reclassification of these sources, only one of these sources could have an increase in emissions. The potential increase will be minimal because the source has limited its emissions of and PTE HAP below the MST. Therefore, the EPA expects there will be no additional impact from reclassification to most areas of Indian country.

Second, we conducted a demographic analysis of the populations within 5 miles of these same 69 sources. We then compared the average concentrations of low-income and minority populations within that 5-mile radius and compared them to the national average to determine if these populations will be disproportionality impacted. In this analysis, we found that the 5-mile radius around 13 of the 69 sources has a minority population above the national average, and the area surrounding 39 sources has a low-income population above the national average. Although these results would suggest that low-income populations may be more impacted by this rule, as stated above, only one of these sources could have an increase in emissions. Therefore, the EPA expects there will be no additional impact to most of these communities.

Based on the results of the EPA's analysis of the reclassifications of 69 sources and the illustrative emissions impact analysis of 72 source categories, this final rule could result in both emissions reductions and increases from a broad array of sources located in different geographic areas. Uncertainties in estimating the number of sources that will seek reclassification, and the resulting permit conditions that will impact emissions are discussed at length in this section of this preamble. Therefore, we illustrate impacts using certain assumptions to allow readers to better understand the potential impacts of the MM2A rule associated with HAP pollutants. However, changes in HAP

emissions may also impact other pollutants as well.

*Benefits/disbenefits.* Although the illustrative emissions analysis suggests that there may be both emissions increases and decreases, we are uncertain of the magnitude and geographic distribution of the changes in emissions resulting from this rulemaking across the broad array of sources that could reclassify. As discussed in the docket of this final rule, the emissions from different sources will be impacted in different ways, and small changes in certain non-HAP pollutants, such as fine particulate matter, can lead to significant changes in monetized benefits/disbenefits. Due to the voluntary nature of this action, we are unable to quantify changes in non-HAP emissions across these sources. In place of quantitative estimates of the number and economic value of the non-HAP pollutant changes, we instead discuss potential impacts in qualitative terms. Similar uncertainties related to the potential distribution of changes in HAP emissions resulting from this rulemaking also exist. As such, we also present a qualitative assessment of the potential impacts to human health and the environment from changes in selected HAP emissions. For more information on the qualitative characterization of benefits/disbenefits, please refer to the benefits analysis included in the RIA for this final action.

### D. Economic Analysis

The economic impact analysis (EIA), an analysis that is included in the RIA, focuses on impacts at an industry level, and impacts are only calculated for the scenario that includes facilities with actual emissions below 75 percent of the MST. As part of the EIA, the EPA considered the impact of this rulemaking on small entities (small businesses, governments, and nonprofit organizations). Impacts are calculated as compliance costs (savings, in this instance) as a percentage of sales for businesses, and of budgets for other organizations. For informational purposes, the RIA includes the Small Business Administration's definition of small entities by affected industry categories (defined as North American Industry Classification System) and potential burden reductions from title V and other permitting programs. Since this rule significantly lessens the regulatory burden that resulted from the OIAI policy, no compliance costs are directly imposed upon industry categories as a result of this rule. We do, however, consider the potential costs some sources may incur to show

---

emissions under the major source program (*i.e.,* the reduction in PTE that the facility must take to modify their PTE to down to 18.75 tpy). This reduction in emissions can be viewed as foregone emissions under PTE. For the facilities analyzed where PTE (or allowable emissions) were identified, the foregone allowable emissions totals a reduction of about –227 tpy. Therefore, the potential change in emissions for the seven source categories with potential increases is a net change in emissions of 692–729 tpy.

compliance with applicable area source NESHAP after they reclassify to area source status. These avoided costs accrue because some reclassified sources will not be required to obtain or maintain a title V permit or continue meeting major source administrative requirements under section 112 of the CAA. Some of the facilities benefitting from this action are owned by small entities, and these entities may experience a more beneficial impact than the large entities that will also experience a reduction in costs from the burden reductions that would take place as a result of this rule.

The results of the EIA for the primary scenario show that the annual cost savings per sales for all affected industries is around 0.05 percent, using the median of these annual cost savings per sales estimates calculated by industry, with sales averaging approximately $9.3 billion per affected industry, to determine average impact. The details of the EIA and impacts on employment, as well as results of the EIA for the other two alternative scenarios, are presented in the RIA of the final rule, which is available in the docket for this action.

## IX. Statutory and Executive Order Reviews

Additional information about these statutes and Executive Orders can be found at *https://www.epa.gov/laws-regulations/laws-and-executive-orders.*

### A. Executive Order 12866: Regulatory Planning and Review and Executive Order and 13563: Improving Regulation and Regulatory Review

This action is an economically significant regulatory action that was submitted to OMB for review. Any changes made in response to OMB recommendations have been documented in the docket. The EPA prepared an analysis of the potential costs and benefits associated with this action. This analysis, the RIA for the final MM2A rule, is available in the docket and is summarized in section I of this preamble.

### B. Executive Order 13771: Reducing Regulations and Controlling Regulatory Costs

This action is considered an Executive Order 13771 deregulatory action. Details on the estimated potential net cost savings of this final rule can be found in the EPA's analysis of the potential costs and benefits associated with this action (see the RIA for the final rule, which is in the docket for this action).

### C. Paperwork Reduction Act (PRA)

This action does not impose any new information-collection burden under the PRA. Specifically, this rule requires the electronic reporting of the one-time notification already required in 40 CFR 63.9(j) in the case where the facility is notifying of a change in major source status. OMB has previously approved the information collection activities contained in the existing regulations. These amendments would neither require additional reports nor require that additional content be added to already required reports. Therefore, this action would not impose any new information-collection burden. Furthermore, approval of an Information Collection Request (ICR) is not required in connection with these final amendments. This is because the General Provisions do not themselves require any reporting and recordkeeping activities, and no ICR was submitted in connection with their original promulgation or their subsequent amendment. Any recordkeeping and reporting requirements are imposed only through the incorporation of specific elements of the General Provisions in the individual NESHAP, which are promulgated for particular source categories that have their own ICRs.

### D. Regulatory Flexibility Act (RFA)

I certify that this action will not have a significant economic impact on a substantial number of small entities under the RFA. In making this determination, the impact of concern is any significant adverse economic impact on small entities. An agency may certify that a rule will not have a significant economic impact on a substantial number of small entities if the rule relieves regulatory burden, has no net burden, or otherwise has a positive economic effect on the small entities subject to the rule.

Small entities that are subject to major source NESHAP requirements would not be required to take any action under this final rule; any action a source takes to reclassify as an area source would be voluntary. We expect that sources that reclassify will experience cost savings that will outweigh any additional cost of achieving area source status. The only cost that would be incurred by regulatory authorities would be the cost of reviewing a sources' application for area source status and issuing enforceable PTE limits, as appropriate. No small government jurisdictions operate their own air pollution control permitting agencies, so none would be required to incur costs under the final rule. In addition, any costs associated with the reclassification of major sources as area sources (*i.e.,* application reviews and PTE issuance) are expected to be offset by reduced reporting and recordkeeping obligations for sources that no longer must meet major source NESHAP requirements.

Based on the considerations above, we have, therefore, concluded that this action will relieve regulatory burden for all regulated small entities that reclassify to area source status. We also note that a small-entity analysis, prepared at the discretion of the EPA and reflecting the relief in regulatory burden, was prepared for this final rule and is included in the RIA, which is available in the public docket for this rulemaking. The results of this small-entity analysis show relatively small reductions in burden estimate annual costs (about 0.10 percent) as a percentage of sales using the median estimate as the average of impacts.

### E. Unfunded Mandates Reform Act (UMRA)

This action does not contain an unfunded mandate of $100 million or more as described in UMRA, 2 U.S.C. 1531–1538, and does not significantly or uniquely affect small governments. This action imposes no enforceable duty on any state, local, or tribal governments or the private sector. Since the impacts of this action are merely illustrative of potential outcomes, it precludes identifying additional costs to states as an unfunded mandate.

### F. Executive Order 13132: Federalism

This action does not have federalism implications. It will not have substantial direct effects on the states, on the relationship between the federal government and the states, or on the distribution of power and responsibilities among the various levels of government.

### G. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments

This action has tribal implications. However, it will neither impose substantial direct compliance costs on federally recognized tribal governments, nor preempt tribal law. There are two tribes that currently implement title V permit programs and one that implements an approved TIP for minor source permitting, the latter of which also has a major source. As a result, these tribes may have additional permit actions if sources in their jurisdiction seek reclassification to area source status. Any tribal government that owns or operates a source subject to major

source NESHAP requirements would not be required to take action under this final rule; the reclassification provisions in the final rule would be strictly voluntary. In addition, achieving area source status would result in reduced burden on any source that no longer must meet major source NESHAP requirements. Under the final rule, a tribal government with an air pollution control agency to which we have delegated CAA section 112 authority would be required to review permit applications and to modify permits as necessary. However, any burden associated with the review and modification of permits will be offset by reduced Agency oversight obligations for sources no longer required to meet major source requirements.

For sources located within Indian country, where the EPA is the reviewing authority, unless the EPA has approved a non-federal minor source permitting program or a delegation of the Federal Indian Country Minor NSR Rule, the Federal Indian Country Minor NSR Rule at 40 CFR 49.151 through 49.165 provides a mechanism for an otherwise major source to voluntarily accept restrictions on its PTE to become a synthetic source, among other provisions. The Federal Indian Country Minor NSR Rule applies to sources located within the exterior boundaries of an Indian reservation or other lands as specified in 40 CFR part 49, collectively referred to as "Indian country." See 40 CFR 49.151(c) and 49.152(d). This mechanism may also be used by an otherwise major source of HAP to voluntarily accept restrictions on its PTE to become a synthetic area HAP source. The EPA's FIP program, which includes the Federal Indian Country Minor NSR Rule, provides additional options for particular situations, such as general permits for specific source categories, to facilitate minor source emissions management in Indian country. Existing sources in Indian country may have PTE limits that preceded the EPA's FIP for minor sources and, for that reason, were issued in a 40 CFR part 71 permit or FIP permitting provision applicable to the Indian reservation.

At proposal, the EPA specifically solicited comment from tribal officials and, consistent with EPA policy, offered to consult with the potentially impacted tribes and other tribes upon their request. On June 27, 2019, the EPA sent consultation letters to four tribes that may be impacted by this action. The EPA also gave an overview of the proposed action on a call with the National Tribal Air Association on June 27, 2019, and held an informational

webinar for tribes on July 24, 2019. In addition, we sent consultation letters to the 573 federally recognized tribes on September 27, 2019, and held an informational call with one tribe on October 21, 2019. The EPA did not receive any requests for tribal consultation on this action.

### H. Executive Order 13045: Protection of Children From Environmental Health Risks and Safety Risks

The EPA interprets Executive Order 13045 as applying only to those regulatory actions that concern environmental health or safety risks that the EPA has reason to believe may disproportionately affect children, per the definition of "covered regulatory action" in section 2–202 of the Executive Order. This action is not subject to Executive Order 13045 because it implements the plain reading of the definitions of major source and area source as established by Congress in section 112 of the CAA.

### I. Executive Order 13211: Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use

This action is not a "significant energy action" because it is not likely to have a significant adverse effect on the supply, distribution, or use of energy. We have concluded that this final action is not likely to have any adverse energy effects.

### J. National Technology Transfer and Advancement Act (NTTAA)

This rulemaking does not involve technical standards.

### K. Executive Order 12898: Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations

The EPA believes that this action does not have disproportionately high and adverse human health or environmental effects on minority populations, low-income populations, and/or indigenous peoples, as specified in Executive Order 12898 (59 FR 7629, February 16, 1994) because it does not establish an environmental health or safety standard. The final amendments to the General Provisions are procedural changes and do not impact the technology performance nor level of control of the NESHAP governed by the General Provisions.

### L. Determination Under CAA Section 307(d)

Pursuant to CAA section 307(d)(1)(V), the Administrator determines that this action is subject to the provisions of

CAA section 307(d). Section 307(d)(1)(V) of the CAA provides that the provisions of CAA section 307(d) apply to "such other actions as the Administrator may determine."

### M. Congressional Review Act (CRA)

This action is subject to the CRA, and the EPA will submit a rule report to each House of the Congress and to the Comptroller General of the United States. This action is a "major rule" as defined by 5 U.S.C. 804(2).

### List of Subjects in 40 CFR Part 63

Environmental protection, Area sources, General provisions, Hazardous air pollutants, Major sources, Potential to emit.

**Andrew Wheeler,**
*Administrator.*

For the reasons set forth in the preamble, the EPA amends 40 CFR part 63 as follows:

## PART 63—NATIONAL EMISSION STANDARDS FOR HAZARDOUS AIR POLLUTANTS FOR SOURCE CATEGORIES

■ 1. The authority citation part 63 continues to read as follows:

**Authority:** 42 U.S.C. 7401 *et seq.*

### Subpart A—General Provisions

■ 2. Amend § 63.1 by adding paragraph (c)(6) to read as follows:

### § 63.1  Applicability.

\*      \*      \*      \*      \*

(c) \* \* \*

(6) A major source may become an area source at any time upon reducing its emissions of and potential to emit hazardous air pollutants, as defined in this subpart, to below the major source thresholds established in § 63.2, subject to the provisions in paragraphs (c)(6)(i) and (ii) of this section.

(i) A major source reclassifying to area source status is subject to the applicability of standards, compliance dates and notification requirements specified in (c)(6)(i)(A) of this section. An area source that previously was a major source and becomes a major source again is subject to the applicability of standards, compliance dates, and notification requirements specified in (c)(6)(i)(B) of this section:

(A) A major source reclassifying to area source status under this part remains subject to any applicable major source requirements established under this part until the reclassification becomes effective. After the reclassification becomes effective, the source is subject to any applicable area

source requirements established under this part immediately, provided the compliance date for the area source requirements has passed. The owner or operator of a major source that becomes an area source subject to newly applicable area source requirements under this part must comply with the initial notification requirements pursuant to § 63.9(b). The owner or operator of a major source that becomes an area source must also provide to the Administrator any change in the information already provided under § 63.9(b) per § 63.9(j).

(B) An area source that previously was a major source under this part and that becomes a major source again is subject to the applicable major source requirements established under this part immediately upon becoming a major source again, provided the compliance date for the major source requirements has passed, notwithstanding any provision within the applicable subparts. The owner or operator of an area source that becomes a major source again must comply with the initial notification pursuant to § 63.9(b). The owner or operator must also provide to the Administrator any change in the information already provided under § 63.9(b) per § 63.9(j).

(ii) Becoming an area source does not absolve a source subject to an enforcement action or investigation for major source violations or infractions from the consequences of any actions occurring when the source was major. Becoming a major source does not absolve a source subject to an enforcement action or investigation for area source violations or infractions from the consequences of any actions occurring when the source was an area source.

*    *    *    *    *

■ 3. Amend § 63.2 by revising the definition ''Potential to emit'' to read as follows:

**§ 63.2    Definitions.**

*    *    *    *    *

*Potential to emit* means the maximum capacity of a stationary source to emit a pollutant under its physical and operational design. Any physical or operational limitation on the capacity of the stationary source to emit a pollutant, including air pollution control equipment and restrictions on hours of operation or on the type or amount of material combusted, stored, or processed, shall be treated as part of its design if the limitation or the effect it would have on emissions is enforceable.

*    *    *    *    *

■ 4. Amend § 63.6 by revising paragraphs (b)(7) and (c)(1) and (5) to read as follows:

**§ 63.6    Compliance with standards and maintenance requirements.**

*    *    *    *    *

(b) *    *    *

(7) When an area source increases its emissions of (or its potential to emit) hazardous air pollutants such that the source becomes a major source, the portion of the facility that meets the definition of a new affected source must comply with all requirements of that standard applicable to new sources. The source owner or operator must comply with the relevant standard upon startup.

*    *    *    *    *

(c) *    *    *

(1) After the effective date of a relevant standard established under this part pursuant to section 112(d) or 112(h) of the Act, the owner or operator of an existing source shall comply with such standard by the compliance date established by the Administrator in the applicable subpart(s) of this part, except as provided in § 63.1(c)(6)(i). Except as otherwise provided for in section 112 of the Act, in no case will the compliance date established for an existing source in an applicable subpart of this part exceed 3 years after the effective date of such standard.

*    *    *    *    *

(5) Except as provided in paragraph (b)(7) of this section, the owner or operator of an area source that increases its emissions of (or its potential to emit) hazardous air pollutants such that the source becomes a major source and meets the definition of an existing source in the applicable major source standard shall be subject to relevant standards for existing sources. Except as provided in paragraph § 63.1(c)(6)(i)(B), such sources must comply by the date specified in the standards for existing area sources that become major sources. If no such compliance date is specified in the standards, the source shall have a period of time to comply with the relevant emission standard that is equivalent to the compliance period specified in the relevant standard for existing sources in existence at the time the standard becomes effective.

*    *    *    *    *

■ 5. Amend § 63.9 by revising paragraphs (b)(1)(ii) and (j) and adding paragraph (k) to read as follows:

**§ 63.9    Notification requirements.**

*    *    *    *    *

(b) *    *    *

(1) *    *    *

(ii) If an area source subsequently becomes a major source that is subject to the emission standard or other requirement, such source shall be subject to the notification requirements of this section. Area sources previously subject to major source requirements that become major sources again are also subject to the notification requirements of this paragraph and must submit the notification according to the requirements of paragraph (k) of this section.

*    *    *    *    *

(j) *Change in information already provided.* Any change in the information already provided under this section shall be provided to the Administrator within 15 calendar days after the change. The owner or operator of a major source that reclassifies to area source status is also subject to the notification requirements of this paragraph. The owner or operator may use the application for reclassification with the regulatory authority (*e.g.*, permit application) to fulfill the requirements of this paragraph. A source which reclassified after January 25, 2018, and before January 19, 2021, and has not yet provided the notification of a change in information is required to provide such notification no later than February 2, 2021, according to the requirements of paragraph (k) of this section. Beginning January 19, 2021, the owner or operator of a major source that reclassifies to area source status must submit the notification according to the requirements of paragraph (k) of this section. A notification of reclassification must contain the following information:

(1) The name and address of the owner or operator;

(2) The address (*i.e.*, physical location) of the affected source;

(3) An identification of the standard being reclassified from and to (if applicable); and

(4) Date of effectiveness of the reclassification.

(k) *Electronic submission of notifications or reports.* If you are required to submit notifications or reports following the procedure specified in this paragraph (k), you must submit notifications or reports to the EPA via CEDRI, which can be accessed through the EPA's Central Data Exchange (CDX) (*https://cdx.epa.gov/*). The notification or report must be submitted by the deadline specified. The EPA will make all the information submitted through CEDRI available to the public without further notice to you. Do not use CEDRI to submit information you claim as confidential business information (CBI). Anything submitted using CEDRI cannot later be claimed to

be CBI. Although we do not expect persons to assert a claim of CBI, if persons wish to assert a CBI, submit a complete notification or report, including information claimed to be CBI, to the EPA. Submit the file on a compact disc, flash drive, or other commonly used electronic storage medium and clearly mark the medium as CBI. Mail the electronic medium to U.S. EPA/OAQPS/CORE CBI Office, Attention: Group Leader, Measurement Policy Group, MD C404–02, 4930 Old Page Rd., Durham, NC 27703. The same file with the CBI omitted must be submitted to the EPA via the EPA's CDX as described earlier in this paragraph (k). All CBI claims must be asserted at the time of submission. Furthermore, under section 114(c) of the Act emissions data is not entitled to confidential treatment and requires EPA to make emissions data available to the public. Thus, emissions data will not be protected as CBI and will be made publicly available.

(1) If you are required to electronically submit a notification or report by this paragraph (k) through CEDRI in the EPA's CDX, you may assert a claim of EPA system outage for failure to timely comply with the electronic submittal requirement. To assert a claim of EPA system outage, you must meet the requirements outlined in paragraphs (k)(1)(i) through (vii) of this section.

(i) You must have been or will be precluded from accessing CEDRI and submitting a required notification or report within the time prescribed due to an outage of either the EPA's CEDRI or CDX systems.

(ii) The outage must have occurred within the period of time beginning 5 business days prior to the date that the notification or report is due.

(iii) The outage may be planned or unplanned.

(iv) You must submit notification to the Administrator in writing as soon as possible following the date you first knew, or through due diligence should have known, that the event may cause or has caused a delay in reporting.

(v) You must provide to the Administrator a written description identifying:

(A) The date(s) and time(s) when CDX or CEDRI was accessed and the system was unavailable;

(B) A rationale for attributing the delay in submitting beyond the regulatory deadline to EPA system outage;

(C) Measures taken or to be taken to minimize the delay in submitting; and

(D) The date by which you propose to submit, or if you have already met the electronic submittal requirement in this paragraph (k) at the time of the notification, the date you submitted the notification or report.

(vi) The decision to accept the claim of EPA system outage and allow an extension to the reporting deadline is solely within the discretion of the Administrator.

(vii) In any circumstance, the notification or report must be submitted electronically as soon as possible after the outage is resolved.

(2) If you are required to electronically submit a notification or report by this paragraph (k) through CEDRI in the EPA's CDX, you may assert a claim of force majeure for failure to timely comply with the electronic submittal requirement. To assert a claim of force majeure, you must meet the requirements outlined in paragraphs (k)(2)(i) through (v) of this section.

(i) You may submit a claim if a force majeure event is about to occur, occurs, or has occurred or there are lingering effects from such an event within the period of time beginning five business days prior to the date the submission is due. For the purposes of this section, a force majeure event is defined as an event that will be or has been caused by circumstances beyond the control of the affected facility, its contractors, or any entity controlled by the affected facility that prevents you from complying with the requirement to submit a notification or report electronically within the time period prescribed. Examples of such events are acts of nature (*e.g.,* hurricanes, earthquakes, or floods), acts of war or terrorism, or equipment failure or safety hazard beyond the control of the affected facility (*e.g.,* large scale power outage).

(ii) You must submit notification to the Administrator in writing as soon as possible following the date you first knew, or through due diligence should have known, that the event may cause or has caused a delay in submitting through CEDRI.

(iii) You must provide to the Administrator:

(A) A written description of the force majeure event;

(B) A rationale for attributing the delay in reporting beyond the regulatory deadline to the force majeure event;

(C) Measures taken or to be taken to minimize the delay in reporting; and

(D) The date by which you propose to submit the notification or report, or if you have already met the electronic submittal requirement in this paragraph (k) at the time of the notification, the date you submitted the notification or report.

(iv) The decision to accept the claim of force majeure and allow an extension to the submittal deadline is solely within the discretion of the Administrator.

(v) In any circumstance, the reporting must occur as soon as possible after the force majeure event occurs.

■ 6. Amend § 63.10 by revising paragraph (b)(3) to read as follows:

**§ 63.10   Recordkeeping and reporting requirements.**

\*    \*    \*    \*    \*

(b)  \*  \*  \*

(3) If an owner or operator determines that his or her existing or new stationary source is in the source category regulated by a standard established pursuant to section 112 of the Act, but that source is not subject to the relevant standard (or other requirement established under this part) because of enforceable limitations on the source's potential to emit, or the source otherwise qualifies for an exclusion, the owner or operator must keep a record of the applicability determination. The applicability determination must be kept on site at the source for a period of 5 years after the determination, or until the source changes its operations to become an affected source subject to the relevant standard (or other requirement established under this part), whichever comes first if the determination is made prior to January 19, 2021. The applicability determination must be kept until the source changes its operations to become an affected source subject to the relevant standard (or other requirement established under this part) if the determination was made on or after January 19, 2021. The record of the applicability determination must be signed by the person making the determination and include an emissions analysis (or other information) that demonstrates the owner or operator's conclusion that the source is unaffected (*e.g.,* because the source is an area source). The analysis (or other information) must be sufficiently detailed to allow the Administrator to make an applicability finding for the source with regard to the relevant standard or other requirement. If applicable, the analysis must be performed in accordance with requirements established in relevant subparts of this part for this purpose for particular categories of stationary sources. If relevant, the analysis should be performed in accordance with EPA guidance materials published to assist sources in making applicability determinations under section 112 of the Act, if any. The requirements to

determine applicability of a standard under § 63.1(b)(3) and to record the results of that determination under this paragraph (b)(3) of this section shall not by themselves create an obligation for the owner or operator to obtain a title V permit.

\* \* \* \* \*

■ 7. Amend § 63.12 by revising paragraph (c) to read as follows:

**§ 63.12 State authority and delegations.**

\* \* \* \* \*

(c) All information required to be submitted to the EPA under this part also shall be submitted to the appropriate state agency of any state to which authority has been delegated under section 112(l) of the Act, provided that each specific delegation may exempt sources from a certain federal or state reporting requirement. Any information required to be submitted electronically by this part via the EPA's CEDRI may, at the discretion of the delegated authority, satisfy the requirements of this paragraph. The Administrator may permit all or some of the information to be submitted to the appropriate state agency only, instead of to the EPA and the state agency with the exception of federal electronic reporting requirements under this part. Sources may not be exempted from federal electronic reporting requirements.

■ 8. Amend § 63.13 by revising paragraph (a) introductory text to read as follows:

**§ 63.13 Addresses of State air pollution control agencies and EPA Regional Offices.**

(a) All requests, reports, applications, submittals, and other communications to the Administrator pursuant to this part shall be submitted to the appropriate Regional Office of the U.S. Environmental Protection Agency indicated in the following list of EPA Regional offices. If a request, report, application, submittal, or other communication is required by this part to be submitted electronically via the EPA's CEDRI then such submission satisfies the requirements of this paragraph (a).

\* \* \* \* \*

## Subpart F—National Emission Standards for Organic Hazardous Air Pollutants From the Synthetic Organic Chemical Manufacturing Industry

■ 9. Amend table 3 to subpart F of part 63 by adding in numerical order an entry for § 63.1(c)(6), revising the entry for § 63.9(j), and adding in numerical order an entry for § 63.9(k) to read as follows:

TABLE 3 TO SUBPART F OF PART 63—GENERAL PROVISIONS APPLICABILITY TO SUBPARTS F, G, AND H[a] TO SUBPART F

| Reference | Applies to subparts F, G, and H | Comment |
|---|---|---|
| \* | \* | \* \* \* \* \* |
| 63.1(c)(6) ............................. | Yes. | |
| \* | \* | \* \* \* \* \* |
| 63.9(j) ................................... | Yes ................................. | Only as related to change to major source status. |
| 63.9(k) .................................. | Yes ................................. | Only as specified in § 63.9(j). |
| \* | \* | \* \* \* \* \* |

[a] Wherever subpart A specifies "postmark" dates, submittals may be sent by methods other than the U.S. Mail (*e.g.*, by fax or courier). Submittals shall be sent by the specified dates, but a postmark is not necessarily required.

\* \* \* \* \*

## Subpart G—National Emission Standards for Organic Hazardous Air Pollutants From the Synthetic Organic Chemical Manufacturing Industry for Process Vents, Storage Vessels, Transfer Operations, and Wastewater

■ 10. Amend § 63.151 by revising paragraphs (b)(2)(i) through (iii) to read as follows:

**§ 63.151 Initial notification.**

\* \* \* \* \*

(b) \* \* \*
(2) \* \* \*
(i) For an existing source, the Initial Notification shall be submitted within 120 calendar days after the date of promulgation, or no later than 120 days after the source becomes subject to this subpart, whichever is later.

(ii) For a new source that has an initial start-up 90 calendar days after the date of promulgation of this subpart or later, the application for approval of construction or reconstruction required by § 63.5(d) of subpart A shall be submitted in lieu of the Initial Notification. The application shall be submitted as soon as practicable before construction or reconstruction is planned to commence (but it need not be sooner than 90 calendar days after the date of promulgation of this subpart). For a new source that reclassifies to major source status after January 19, 2021 and greater than 90 days after the initial start-up, the source shall submit the initial notification required by § 63.9(b) no later than 120 days after the source becomes subject to this subpart.

(iii) For a new source that has an initial start-up prior to 90 calendar days after the date of promulgation, the Initial Notification shall be submitted within 90 calendar days after the date of promulgation of this subpart, or no later than 120 days after the source becomes subject to this subpart, whichever is later. The application for approval of construction or reconstruction described in § 63.5(d) of subpart A is not required for these sources.

\* \* \* \* \*

■ 11. Amend table 1A to subpart G by revising the entry for § 63.9 to read as follows:

TABLE 1A TO SUBPART G OF PART 63—APPLICABLE 40 CFR PART 63 GENERAL PROVISIONS

| 40 CFR part 63, subpart A, provisions applicable to subpart G |
|---|
| \* \* \* \* \* \* \* |
| § 63.9(a)(2), (b)(4)(i),[a] (b)(4)(ii), (b)(4)(iii), (b)(5),[a] (c), (d), (j), and (k). |

TABLE 1A TO SUBPART G OF PART 63—APPLICABLE 40 CFR PART 63 GENERAL PROVISIONS—Continued

| 40 CFR part 63, subpart A, provisions applicable to subpart G | | | | | | | |
|---|---|---|---|---|---|---|---|
| * | * | * | * | * | * | * | * |

ᵃ The notifications specified in § 63.9(b)(4)(i) and (b)(5) shall be submitted at the times specified in 40 CFR part 65.

*    *    *    *    *

## Subpart H—National Emission Standards for Organic Hazardous Air Pollutants for Equipment Leaks

■ 12. Amend § 63.182 by revising paragraphs (b)(2)(i) through (iii) to read as follows:

### § 63.182  Reporting requirements.

*    *    *    *    *

(b) * * *
(2) * * *

(i) For an existing source, the Initial Notification shall be submitted within 120 calendar days after the date of promulgation or no later than 120 calendar days after the source becomes subject to this subpart, whichever is later.
(ii) For a new source that has an initial start-up 90 days after the date of promulgation of this subpart or later, the application for approval of construction or reconstruction required by § 63.5(d) of subpart A of this part shall be submitted in lieu of the Initial Notification. The application shall be submitted as soon as practicable before the construction or reconstruction is planned to commence (but it need not be sooner than 90 days after the date of promulgation of the subpart that references this subpart). For a new source that reclassifies to major source status after January 19, 2021 and greater than 90 days after the initial start-up, the source shall submit the initial notification required by § 63.9(b) no later than 120 days after the source becomes subject to this subpart.

(iii) For a new source that has an initial start-up prior to 90 days after the date of promulgation of the applicable subpart, the Initial Notification shall be submitted within 90 days after the date of promulgation of the subpart that references this subpart, or no later than 120 calendar days after the source becomes subject to this subpart, whichever is later.

*    *    *    *    *

■ 13. Amend table 4 to subpart H by revising entry for § 63.9 to read as follows:

TABLE 4 TO SUBPART H OF PART 63—APPLICABLE 40 CFR PART 63 GENERAL PROVISIONS

| 40 CFR part 63, subpart A, provisions applicable to subpart H | | | | | | | |
|---|---|---|---|---|---|---|---|
| | * | * | * | * | * | * | * |
| § 63.9(a)(2), (b)(4)(i),ᵃ (b)(4)(ii), (b)(4)(iii), (b)(5),ᵃ (c), (d), (j) and (k). | | | | | | | |
| | * | * | * | * | * | * | * |

ᵃ The notifications specified in § 63.9(b)(4)(i) and (b)(5) shall be submitted at the times specified in 40 CFR part 65.

## Subpart J—National Emission Standards for Hazardous Air Pollutants for Polyvinyl Chloride and Copolymers Production

■ 14. Amend § 63.215 by revising paragraph (b) introductory text and adding paragraph (b)(4) to read as follows:

### § 63.215  What General Provisions apply to me?

*    *    *    *    *

(b) The provisions in subpart A of this part also apply to this subpart as specified in paragraphs (b)(1) through (4) of this section.

*    *    *    *    *

(4) The specific notification procedure of § 63.9(j) and (k) relating to a change in major source status.

## Subpart L—National Emission Standards for Coke Oven Batteries

■ 15. Amend § 63.311 by revising paragraph (a) to read as follows:

### § 63.311  Reporting and recordkeeping requirements.

(a) *General requirements.* After the effective date of an approved permit in a state under part 70 of this chapter, the owner or operator shall submit all notifications and reports required by this subpart to the state permitting authority except a source that reclassifies to an area source must follow the notification procedures of § 63.9(j) and (k). Use of information provided by the certified observer shall be a sufficient basis for notifications required under § 70.5(c)(9) of this chapter and the reasonable inquiry requirement of § 70.5(d) of this chapter.

*    *    *    *    *

## Subpart M—National Perchloroethylene Air Emission Standards for Dry Cleaning Facilities

■ 16. Amend § 63.324 by adding paragraph (g) to read as follows:

### § 63.324  Reporting and recordkeeping requirements.

*    *    *    *    *

(g) Each owner or operator of a dry cleaning facility that reclassifies from a major source to an area source must follow the procedures of § 63.9(j) and (k) to provide notification of the change in status.

## Subpart N—National Emission Standards for Chromium Emissions From Hard and Decorative Chromium Electroplating and Chromium Anodizing Tanks

■ 17. Amend § 63.347 by revising paragraph (c)(1) introductory text to read as follows:

### § 63.347  Reporting requirements.

*    *    *    *    *

(c) * * *

(1) The owner or operator of an affected source that has an initial startup before January 25, 1995, shall notify the Administrator in writing that the source is subject to this subpart. The notification shall be submitted no later than 180 calendar days after January 25, 1995, or no later than 120 days after the source becomes subject to this subpart,

whichever is later, and shall contain the following information:

\* \* \* \* \* \*

■ 18. Amend table 1 to subpart N of part 63 by adding in numerical order entries

for §§ 63.1(c)(6) and 63.9(k) to read as follows:

### TABLE 1 TO SUBPART N OF PART 63—GENERAL PROVISIONS APPLICABILITY TO SUBPART N

| General provisions reference | Applies to subpart N | Comment |
|---|---|---|
| \* \* \* | \* \* | \* \* |
| 63.1(c)(6) ........................... | Yes. | |
| \* \* \* | \* \* | \* \* |
| 63.9(k) ................................ | Yes ................................. | Only as specified in § 63.9(j). |
| \* \* \* | \* \* | \* \* |

### Subpart O—Ethylene Oxide Emissions Standards for Sterilization Facilities

■ 19. Amend § 63.360 in table 1 of § 63.360 by adding in numerical order

entries for §§ 63.1(c)(6) and 63.9(k) to read as follows:

### § 63.360 Applicability.

\* \* \* \* \* \*

### TABLE 1 OF § 63.360—GENERAL PROVISIONS APPLICABILITY TO SUBPART O

| Reference | Applies to sources using 10 tons in subpart O[a] | Applies to sources using 1 to 10 tons in subpart O[a] | Comment |
|---|---|---|---|
| \* \* \* | \* \* | \* \* | \* \* |
| 63.1(c)(6) ................................... | | Yes | |
| \* \* \* | \* \* | \* \* | \* \* |
| 63.9(k) .......................................... | | Yes | Only as specified in § 63.9(j). |
| \* \* \* | \* \* | \* \* | \* \* |

[a] See definition.

\* \* \* \* \* \*

### Subpart Q—National Emission Standards for Hazardous Air Pollutants for Industrial Process Cooling Towers

■ 20. Amend § 63.405 by revising paragraphs (a)(1) introductory text, (a)(2), and (b)(1) to read as follows:

### § 63.405 Notification requirements.

(a) \* \* \*

(1) In accordance with § 63.9(b) of subpart A, owners or operators of all affected IPCT's that have an initial startup before September 8, 1994, shall notify the Administrator in writing. The notification, which shall be submitted not later than 12 months after September 8, 1994, or no later than 120 days after the source becomes subject to this subpart, whichever is later, shall provide the following information:

\* \* \* \* \* \*

(2) In accordance with § 63.9(b) of subpart A, owners or operators of all affected IPCT's that have an initial startup on or after September 8, 1994, shall notify the Administrator in writing that the source is subject to the relevant standard no later than 12 months after initial startup or no later than 120 days after the source becomes subject to this subpart, whichever is later. The notification shall provide all the information required in paragraphs (a)(1)(i) through (iv) of this section.

(b) \* \* \*

(1) In accordance with § 63.9(h) of subpart A, owners or operators of affected IPCT's shall submit to the Administrator a notification of compliance status within 60 days of the date on which the IPCT is brought into compliance with § 63.402 of this subpart and not later than 18 months after September 8, 1994, or no later than 120 days after the source becomes subject to this subpart, whichever is later.

\* \* \* \* \* \*

■ 21. Amend table 1 to subpart Q of part 63 by revising the entry for § 63.9 to read as follows:

### TABLE 1 TO SUBPART Q OF PART 63—GENERAL PROVISIONS APPLICABILITY TO SUBPART Q

| Reference | Applies to subpart Q | Comment |
|---|---|---|
| \* \* \* | \* \* | \* \* |
| 63.9(a), (b)(1), (b)(3), (c), (h)(1), (h)(3), (h)(6), (j), and (k). | Yes ................................. | § 63.9(k) only as specified in 63.9(j). |
| \* \* \* | \* \* | \* \* |

## Subpart R—National Emission Standards for Gasoline Distribution Facilities (Bulk Gasoline Terminals and Pipeline Breakout Stations)

■ 22. Amend table 1 to subpart R of part 63 by adding in numerical order entries for §§ 63.1(c)(6) and 63.9(k) to read as follows:

### TABLE 1 TO SUBPART R OF PART 63—GENERAL PROVISIONS APPLICABILITY TO SUBPART R

| Reference | Applies to subpart R | Comment |
|---|---|---|
| * | * | * | * | * | * | * |
| 63.1(c)(6) ............................... | Yes. | |
| * | * | * | * | * | * | * |
| 63.9(k) ................................... | Yes ................................... | Only as specified in § 63.9(j). |
| * | * | * | * | * | * | * |

## Subpart S—National Emission Standards for Hazardous Air Pollutants From the Pulp and Paper Industry

■ 23. Amend § 63.455 by revising paragraph (a) to read as follows:

### § 63.455   Reporting requirements.

(a) Each owner or operator of a source subject to this subpart shall comply with the reporting requirements of subpart A of this part as specified in Table 1 to subpart S of part 63 and all the following requirements in this section. The initial notification report specified under § 63.9(b)(2) of subpart A of this part shall be submitted by April 15, 1999, or no later than 120 days after the source becomes subject to this subpart, whichever is later.

* * * * *

■ 24. Amend table 1 to subpart S of part 63 by adding in numerical order entries for §§ 63.1(c)(6) and 63.9(k) to read as follows:

### TABLE 1 TO SUBPART S OF PART 63—GENERAL PROVISIONS APPLICABILITY TO SUBPART S [a]

| Reference | Applies to subpart S | Comment |
|---|---|---|
| * | * | * | * | * | * | * |
| 63.1(c)(6) ............................... | Yes. | |
| * | * | * | * | * | * | * |
| 63.9(k) ................................... | Yes ................................... | Only as specified in § 63.9(j). |
| * | * | * | * | * | * | * |

[a] Wherever subpart A specifies "postmark" dates, submittals may be sent by methods other than the U.S. Mail (*e.g.,* by fax or courier). Submittals shall be sent by the specified dates, but a postmark is not required.

## Subpart T—National Emission Standards for Halogenated Solvent Cleaning

■ 25. Amend § 63.468 by revising the introductory text of paragraphs (a), (b), (c), and (d) to read as follows:

### § 63.468   Reporting requirements.

(a) Each owner or operator of an existing solvent cleaning machine subject to the provisions of this subpart shall submit an initial notification report to the Administrator no later than August 29, 1995, or no later than 120 days after the source becomes subject to this subpart, whichever is later. This report shall include the information specified in paragraphs (a)(1) through (6) of this section.

* * * * *

(b) Each owner or operator of a new solvent cleaning machine subject to the provisions of this subpart shall submit an initial notification report to the Administrator. New sources for which construction or reconstruction had commenced and initial startup had not occurred before December 2, 1994, shall submit this report as soon as practicable before startup but no later than January 31, 1995, or no later than 120 days after the source becomes subject to this subpart, whichever is later. New sources for which the construction or reconstruction commenced after December 2, 1994, shall submit this report as soon as practicable before the construction or reconstruction is planned to commence or for sources which reclassify to major source status, no later than 120 days after the source becomes subject to this subpart. This report shall include all of the information required in § 63.5(d)(1) of subpart A (General Provisions), with the revisions and additions in paragraphs (b)(1) through (b)(3) of this section.

* * * * *

(c) Each owner or operator of a batch cold solvent cleaning machine subject to the provisions of this subpart shall submit a compliance report to the Administrator. For existing sources, this report shall be submitted to the Administrator no later than 150 days after the compliance date specified in § 63.460(d), or no later than 120 days after the source becomes subject to this subpart, whichever is later. For new sources, this report shall be submitted to the Administrator no later than 150 days after startup or May 1, 1995, or no later than 120 days after the source becomes subject to this subpart, whichever is

later. This report shall include the requirements specified in paragraphs (c)(1) through (4) of this section.

\*    \*    \*    \*    \*

(d) Each owner or operator of a batch vapor or in-line solvent cleaning machine complying with the provisions of § 63.463 shall submit to the Administrator an initial statement of compliance for each solvent cleaning machine. For existing sources, this report shall be submitted to the Administrator no later than 150 days after the compliance date specified in § 63.460(d), or no later than 120 days after the source becomes subject to this subpart, whichever is later. For new sources, this report shall be submitted to the Administrator no later than 150 days after startup or May 1, 1995, or no later than 120 days after the source becomes subject to this subpart, whichever is later. This statement shall include the requirements specified in paragraphs (d)(1) through (6) of this section.

\*    \*    \*    \*    \*

■ 26. Amend appendix B to subpart T of part 63 by adding in numerical order entries for §§ 63.1(c)(6) and 63.9(k) to read as follows:

### APPENDIX B TO SUBPART T OF PART 63—GENERAL PROVISIONS APPLICABILITY TO SUBPART T

| Reference | Applies to subpart T | | Comments |
|---|---|---|---|
| | BCC | BVI | |
| * | * | * | * | * | * |
| 63.1(c)(6) ........................ | Yes ................................ | Yes. | |
| * | * | * | * | * | * |
| 63.9(k) ........................... | Yes ................................ | Yes ................................ | Only as specified in § 63.9(j). |
| * | * | * | * | * | * |

\*    \*    \*    \*    \*

## Subpart U—National Emission Standards for Hazardous Air Pollutant Emissions: Group I Polymers and Resins

■ 27. Amend table 1 to subpart U of part 63 by adding in numerical order an entry for § 63.1(c)(6), revising the entry for § 63.9(j), and adding in numerical order an entry for § 63.9(k) to read as follows:

### TABLE 1 TO SUBPART U OF PART 63—APPLICABILITY OF GENERAL PROVISIONS TO SUBPART U AFFECTED SOURCES

| Reference | Applies to subpart U | Explanation |
|---|---|---|
| * | * | * | * | * |
| § 63.1(c)(6) ... | Yes. | |
| * | * | * | * | * |
| § 63.9(j) ........ | Yes ............... | For change in major source status only. |
| § 63.9(k) ....... | Yes ............... | Only as specified in § 63.9(j). |

### TABLE 1 TO SUBPART U OF PART 63—APPLICABILITY OF GENERAL PROVISIONS TO SUBPART U AFFECTED SOURCES—Continued

| Reference | Applies to subpart U | Explanation |
|---|---|---|
| * | * | * | * | * |

## Subpart W—National Emission Standards for Hazardous Air Pollutants for Epoxy Resins Production and Non-Nylon Polyamides Production

■ 28. Amend table 1 to subpart W of part 63 by adding in numerical order entries for §§ 63.1(c)(6) and 63.9(k) to read as follows:

### TABLE 1 TO SUBPART W OF PART 63—GENERAL PROVISIONS APPLICABILITY TO SUBPART W

| Reference | Applies to subpart W | | | Comment |
|---|---|---|---|---|
| | BLR | WSR | WSR alternative standard, and BLR equipment leak standard (40 CFR part 63, subpart H) | |
| * | * | * | * | * | * |
| § 63.1(c)(6) ........................ | Yes ..................................... | Yes ..................................... | Yes. | |
| * | * | * | * | * | * |
| § 63.9(k) ............................. | Yes ..................................... | Yes ..................................... | Yes ................................. | Only as specified in § 63.9(j). |
| * | * | * | * | * | * |

## Subpart X—National Emission Standards for Hazardous Air Pollutants From Secondary Lead Smelting

■ 29. Amend table 1 to subpart X of part 63 by adding in numerical order an entry for § 63.9(k) to read as follows:

TABLE 1 TO SUBPART X OF PART 63—GENERAL PROVISIONS APPLICABILITY TO SUBPART X

| Reference | | Applies to subpart X | | Comment |
|---|---|---|---|---|
| * | * | * | * | * |
| 63.9(k) .......... | Yes ............... | | | Only as specified in 63.9(j). |
| * | * | * | * | * |

* * * * *

## Subpart Y–National Emission Standards for Marine Tank Vessel Loading Operations

■ 30.Amend § 63.567 by revising paragraphs (b)(2) introductory text and (b)(3) to read as follows:

### § 63.567 Recordkeeping and reporting requirements.

* * * * *

(b) * * *

(2) *Initial notification for sources with startup before the effective date.* The owner or operator of a source with initial startup before the effective date shall notify the Administrator in writing that the source is subject to the relevant standard. The notification shall be submitted not later than 365 days after the effective date of the emissions standards or no later than 120 days after the source becomes subject to this subpart, whichever is later, and shall provide the following information:

* * * * *

(3) *Initial notification for sources with startup after the effective date.* The owner or operator of a new or reconstructed source or a source that has been reconstructed such that it is subject to the emissions standards that has an initial startup after the effective date but before the compliance date, and for which an application for approval of construction or reconstruction is not required under § 63.5(d) of subpart A of this part and § 63.566 of this subpart, or a sources which reclassifies to major source status after the effective date, shall notify the Administrator in writing that the source is subject to the standard no later than 365 days, 120 days after initial startup, or no later than 120 days after the source becomes subject to this subpart, whichever occurs before notification of the initial performance test in § 63.9(e) of subpart A of this part. The notification shall provide all the information required in paragraph (b)(2) of this section, delivered or postmarked with the notification required in paragraph (b)(4) of this section.

* * * * *

■ 31. Amend table 1 of § 63.560 by adding in numerical order entries for §§ 63.1(c)(6) and 63.9(k) to read as follows:

### § 63.560  Applicability and designation of affected sources.

* * * * *

TABLE 1 TO § 63.560—GENERAL PROVISIONS APPLICABILITY TO SUBPART Y

| Reference | | Applies to affected sources in subpart Y | | Comment |
|---|---|---|---|---|
| * | * | * | * | * |
| 63.1(c)(6) ...... | Yes. | | | |
| * | * | * | * | * |
| 63.9(k) .......... | Yes ............... | | | Only as specified in § 63.9(j). |
| * | * | * | * | * |

## Subpart AA—National Emission Standards for Hazardous Air Pollutants From Phosphoric Acid Manufacturing Plants

■ 32. Amend appendix A to subpart AA of part 63 by adding in numerical order entries for §§ 63.1(c)(6) and 63.9(k) to read as follows:

APPENDIX A TO SUBPART AA OF PART 63—APPLICABILITY OF GENERAL PROVISIONS (40 CFR PART 63, SUBPART A) TO SUBPART AA

| 40 CFR citation | | Requirement | | Applies to subpart AA | | Comment | |
|---|---|---|---|---|---|---|---|
| * | * | * | * | * | * | * | * |
| § 63.1(c)(6) .......................................... | | .......................................... | | Yes ....................................... | | None. | |
| * | * | * | * | * | * | * | * |
| § 63.9(k) .......................................... | | .......................................... | | Yes ....................................... | | Only as specified in § 63.9(j). | |
| * | * | * | * | * | * | * | * |

## Subpart BB—National Emission Standards for Hazardous Air Pollutants From Phosphate Fertilizers Production Plants

■ 33. Amend appendix A to subpart BB of part 63 by adding in numerical order entries for §§ 63.1(c)(6) and 63.9(k) to read as follows:

APPENDIX A TO SUBPART BB OF PART 63—APPLICABILITY OF GENERAL PROVISIONS (40 CFR PART 63, SUBPART A) TO SUBPART BB

| 40 CFR citation | | Requirement | | Applies to subpart BB | | Comment | |
|---|---|---|---|---|---|---|---|
| * | * | * | * | * | * | * | * |
| §63.1(c)(6) ....................................... | | ......................................... | | Yes ................................................. | | None. | |
| * | * | * | * | * | * | * | * |
| §63.9(k) .......................................... | | ......................................... | | Yes ................................................. | | Only as specified in §63.9(j). | |
| * | * | * | * | * | * | * | * |

## Subpart CC–National Emission Standards for Hazardous Air Pollutants From Petroleum Refineries

■ 34. Amend appendix to subpart CC of part 63 in table 6 by adding in numerical order an entry for §63.1(c)(6) revising the entry for §63.9(j), and adding in numerical order an entry for §63.9(k) to read as follows:

## Appendix to Subpart CC of Part 63–Tables

\*     \*     \*     \*     \*

TABLE 6—GENERAL PROVISIONS APPLICABILITY TO SUBPART CC [a]

| Reference | | Applies to subpart CC | | Comment | | |
|---|---|---|---|---|---|---|
| * | * | * | * | * | * | * |
| 63.1(c)(6) ........................................ | | Yes. | | | | |
| * | * | * | * | * | * | * |
| 63.9(j) ............................................. | | Yes ................................................. | | | | |
| 63.9(k) ............................................ | | Yes ................................................. | | Only as specified in §63.9(j). | | |
| * | * | * | * | * | * | * |

[a] Wherever subpart A specifies ''postmark'' dates, submittals may be sent by methods other than the U.S. Mail (*e.g.*, by fax or courier). Submittals shall be sent by the specified dates, but a postmark is not required.

\*     \*     \*     \*     \*

## Subpart DD—National Emission Standards for Hazardous Air Pollutants From Off-Site Waste and Recovery Operations

■ 35. Amend §63.697 by revising paragraph (a)(1) introductory text to read as follows:

### §63.697    Reporting requirements.

(a) * * *

(1) The owner or operator of an affected source must submit notices to the Administrator in accordance with the applicable notification requirements in 40 CFR 63.9 as specified in Table 2 of this subpart. For the purpose of this subpart, an owner or operator subject to the initial notification requirements under 40 CFR 63.9(b)(2) must submit the required notification on or before October 19, 1999, or no later than 120 days after the source becomes subject to this subpart, whichever is later.

\*     \*     \*     \*     \*

■ 36. Amend table 2 to subpart DD of part 63 by adding in numerical order an entry for §63.1(c)(6) in numerical order, revising the entry for §63.9(j), and adding in numerical order an entry for §63.9(k) to read as follows:

TABLE 2 TO SUBPART DD OF PART 63—APPLICABILITY OF PARAGRAPHS IN SUBPART A OF THIS PART 63—GENERAL PROVISIONS TO SUBPART DD

| Subpart A reference | | Applies to subpart DD | | Explanation | | |
|---|---|---|---|---|---|---|
| * | * | * | * | * | * | * |
| 63.1(c)(6) ........................................ | | Yes. | | | | |
| * | * | * | * | * | * | * |
| 63.9(j) ............................................. | | Yes ................................................. | | For change in major source status only. | | |
| 63.9(k) ............................................ | | Yes ................................................. | | Only as specified in §63.9(j). | | |
| * | * | * | * | * | * | * |

\* \* \* \* \*

**Subpart EE–National Emission Standards for Magnetic Tape Manufacturing Operations**

■ 37. Amend table 1 to subpart EE of part 63 by revising the entry for 63.9(b)(2) and adding in numerical order entries for §§ 63.1(c)(6) and 63.9(k) to read as follows:

TABLE 1 TO SUBPART EE OF PART 63—APPLICABILITY OF GENERAL PROVISIONS TO SUBPART EE

| Reference | Applies to subpart EE | Comment |
|---|---|---|
| * | * | * | * | * | * | * |
| 63.1(c)(6) .......................................... | Yes. | |
| * | * | * | * | * | * | * |
| 63.9(b)(2) .......................................... | Yes ................................................ | § 63.753(a)(1) requires submittal of the initial notification at least 1 year prior to the compliance date or as specified in § 63.9(b)(2); § 63.753(a)(2) allows a title V or part 70 permit application to be substituted for the initial notification in certain circumstances. |
| * | * | * | * | * | * | * |
| 63.9(k) ............................................... | Yes ................................................ | Only as specified in § 63.9(j). |
| * | * | * | * | * | * | * |

**Subpart GG–National Emission Standards for Aerospace Manufacturing and Rework Facilities**

■ 38. Amend table 1 to subpart GG of part 63 by adding in numerical order entries for §§ 63.1(c)(6) and 63.9(k) to read as follows:

TABLE 1 TO SUBPART GG OF PART 63—GENERAL PROVISIONS APPLICABILITY TO SUBPART GG

| Reference | Applies to affected sources in subpart GG | Comment |
|---|---|---|
| * | * | * | * | * | * | * |
| 63.1(c)(6) .......................................... | Yes. | |
| * | * | * | * | * | * | * |
| 63.9(k) ............................................... | Yes ................................................ | Only as specified in § 63.9(j). |
| * | * | * | * | * | * | * |

**Subpart HH—National Emission Standards for Hazardous Air Pollutants From Oil and Natural Gas Production Facilities**

■ 39. Amend § 63.760 by revising paragraph (a)(1) introductory text to read as follows:

**§ 63.760 Applicability and designation of affected source.**

(a) \* \* \*

(1) Facilities that are major or area sources of hazardous air pollutants (HAP) as defined in § 63.761. Emissions for major source determination purposes can be estimated using the maximum natural gas or hydrocarbon liquid throughput, as appropriate, calculated in paragraphs (a)(1)(i) through (iii) of this section. As an alternative to calculating the maximum natural gas or hydrocarbon liquid throughput, the owner or operator of a new or existing source may use the facility's design maximum natural gas or hydrocarbon liquid throughput to estimate the maximum potential emissions. Other means to determine the facility's major source status are allowed, provided the information is documented and recorded to the Administrator's satisfaction in accordance with § 63.10(b)(3). A facility that is determined to be an area source, but subsequently increases its emissions or its potential to emit above the major source levels, and becomes a major source, must comply with all provisions of this subpart applicable to a major source starting on the applicable compliance date specified in paragraph (f) of this section. Nothing in this paragraph is intended to preclude a source from limiting its potential to emit through other appropriate mechanisms that may be available through the permitting authority.

\* \* \* \* \*

■ 40. Amend § 63.775 by revising paragraph (c)(1) to read as follows:

**§ 63.775 Reporting requirements.**

\* \* \* \* \*

(c) \* \* \*

(1) The initial notifications required under § 63.9(b)(2) not later than January 3, 2008, or no later than 120 days after the source becomes subject to this subpart, whichever is later. In addition to submitting your initial notification to the addressees specified under § 63.9(a), you must also submit a copy of the initial notification to the EPA's Office of Air Quality Planning and Standards. Send your notification via email to *Oil*

*and Gas Sector@epa.gov* or via U.S. mail or other mail delivery service to U.S. EPA, Sector Policies and Programs Division/Fuels and Incineration Group (E143–01), Attn: Oil and Gas Project Leader, Research Triangle Park, NC 27711.

\* \* \* \* \*

■ 41. Amend appendix to subpart HH of part 63 in table 2 by adding in numerical order entries for §§ 63.1(c)(6) and 63.9(k) to read as follows:

**Appendix to Subpart HH of Part 63—Tables**

\* \* \* \* \*

TABLE 2 TO SUBPART HH OF PART 63—APPLICABILITY OF 40 CFR PART 63 GENERAL PROVISIONS TO SUBPART HH

| General provisions reference | Applicable to subpart HH | Explanation |
|---|---|---|
| \* | \* | \* \* \* |
| § 63.1(c)(6) ... | Yes. | |
| \* | \* | \* \* \* |
| § 63.9(k) ....... | Yes ............... | Only as specified in § 63.9(j). |
| \* | \* | \* \* \* |

**Subpart II—National Emission Standards for Shipbuilding and Ship Repair (Surface Coating)**

■ 42. Amend table 1 to subpart II of part 63 by removing the entry for § 63.9(i)–(j) and adding in its place § 63.9(i)–(k).

The addition reads as follows:

TABLE 1 TO SUBPART II OF PART 63—GENERAL PROVISIONS OF APPLICABILITY TO SUBPART II

| Reference | Applies to subpart II | Comment |
|---|---|---|
| \* \* | \* \* | \* \* |
| 63.9(i)–(k) ........................................ | Yes ............................................... | § 63.9(k) only as specified in § 63.9(j). |
| \* \* | \* \* | \* \* |

**Subpart JJ—National Emission Standards for Wood Furniture Manufacturing Operations**

■ 43. Amend table 1 to subpart JJ of part 63 by revising the entry for § 63.9(b) and adding in numerical order entries for §§ 63.1(c)(6) and 63.9(k) to read as follows:

TABLE 1 TO SUBPART JJ OF PART 63—GENERAL PROVISIONS APPLICABILITY TO SUBPART JJ

| Reference | Applies to subpart JJ | Comment |
|---|---|---|
| \* \* | \* \* | \* \* \* |
| 63.1(c)(6) ........................................ | Yes. | |
| \* | \* | \* \* \* |
| 63.9(b) ............................................ | Yes | Existing sources are required to submit initial notification report within 270 days of the effective date or no later than 120 days after the source becomes subject to this subpart, whichever is later. |
| \* \* | \* \* | \* \* |
| 63.9(k) ............................................ | Yes ................................................. | Only as specified in 63.9(j). |
| \* | \* | \* \* \* |

**Subpart KK—National Emission Standards for the Printing and Publishing Industry**

■ 44. Amend § 63.830 by revising (b)(1)(i) to read as follows:

**§ 63.830  Reporting requirements.**

\* \* \* \* \*

(b) \* \* \*

(1) \* \* \*

(i) Initial notifications for existing sources shall be submitted no later than one year before the compliance date specified in § 63.826(a), or no later than 120 days after the source becomes subject to this subpart, whichever is later.

\* \* \* \* \*

■ 45. Amend table 1 to subpart KK of part 63 by adding in numerical order entries for §§ 63.1(c)(6) and 63.9(k) to read as follows:

TABLE 1 TO SUBPART KK OF PART 63—APPLICABILITY OF GENERAL PROVISIONS TO SUBPART KK

| General provisions reference | Applicable to subpart KK | Comment |
|---|---|---|
| * | * | * | * | * | * | * |
| §63.1(c)(6) ...................................... Yes. | | |
| * | * | * | * | * | * | * |
| §63.9(k) .......................................... Yes ................................................ Only as specified in 63.9(j). | | |
| * | * | * | * | * | * | * |

**Subpart LL—National Emission Standards for Hazardous Air Pollutants for Primary Aluminum Reduction Plants**

■ 46. Amend appendix A to subpart LL of part 63 adding in numerical order entries for §§ 63.1(c)(6) and 63.9(k) to read as follows:

APPENDIX A TO SUBPART LL OF PART 63—APPLICABILITY OF GENERAL PROVISIONS

| Reference sections(s) | Requirement | Applies to subpart LL | Comment |
|---|---|---|---|
| * | * | * | * | * |
| 63.1(c)(6) ......................... Reclassification .......................... Yes. | | | |
| * | * | * | * | * |
| 63.9(k) ............................ Electronic reporting procedures .... Yes ................................................. Only as specified in § 63.9(j). | | | |
| * | * | * | * | * |

**Subpart MM—National Emission Standards for Hazardous Air Pollutants for Chemical Recovery Combustion Sources at Kraft, Soda, Sulfite, and Stand-Alone Semichemical Pulp Mills**

■ 47. Amend table 1 to subpart MM of part 63 by adding in numerical order entries for §§ 63.1(c)(6) and 63.9(k) to read as follows:

TABLE 1 TO SUBPART MM OF PART 63—GENERAL PROVISIONS APPLICABILITY TO SUBPART MM

| General provisions reference | Summary of requirements | Applies to subpart MM | Explanation |
|---|---|---|---|
| * | * | * | * | * |
| 63.1(c)(6) ......................... Reclassification .......................... Yes. | | | |
| * | * | * | * | * |
| 63.9(k) ............................ Electronic reporting procedures .... Yes ................................................. Only as specified in § 63.9(j). | | | |
| * | * | * | * | * |

**Subpart YY—National Emission Standards for Hazardous Air Pollutants for Source Categories: Generic Maximum Achievable Control Technology Standards**

■ 48. Amend § 63.1100 by revising paragraph (b) to read as follows:

**§ 63.1100   Applicability.**

*     *     *     *     *

(b) *Subpart A requirements.* The following provisions of subpart A of this part (General Provisions), §§ 63.1 through 63.5, and §§ 63.12 through 63.15, apply to owners or operators of affected sources subject to this subpart. For sources that reclassify from major source to area source status, the applicable provisions of § 63.9(j) and (k) apply. Beginning no later than the compliance dates specified in § 63.1102(c), for ethylene production affected sources, §§ 63.7(a)(4), (c), (e)(4), and (g)(2) and 63.10(b)(2)(vi) also apply.

*     *     *     *     *

## Subpart CCC—National Emission Standards for Hazardous Air Pollutants for Steel Pickling—HCl Process Facilities and Hydrochloric Acid Regeneration Plants

■ 49. Amend § 63.1163 by revising paragraph (a)(3) to read as follows:

### § 63.1163   Notification requirements.

(a) * * *

(3) As required by § 63.9(b)(3) of subpart A of this part, the owner or operator of a new or reconstructed affected source, or a source that has been reconstructed such that it is an affected source, that has an initial startup after the effective date and for which an application for approval of construction or reconstruction is not required under § 63.5(d) of subpart A of this part, shall notify the Administrator in writing that the source is subject to the standards no later than 120 days after initial startup, or no later than 120 days after the source becomes subject to this subpart, whichever is later. The notification shall contain the information specified in §§ 63.9(b)(2)(i) through (v) of subpart A of this part, delivered or postmarked with the notification required in § 63.9(b)(5) of subpart A of this part.

\*      \*      \*      \*      \*

■ 50. Amend table 1 to subpart CCC of part 63 by adding in numerical order entries for §§ 63.9(j) and 63.9(k) to read as follows:

TABLE 1 TO SUBPART CCC OF PART 63—APPLICABILITY OF GENERAL PROVISIONS (40 CFR PART 63, SUBPART A) TO SUBPART CCC

| Reference | Applies to subpart CCC | Explanation |
|---|---|---|
| \* | \* | \* |

TABLE 1 TO SUBPART CCC OF PART 63—APPLICABILITY OF GENERAL PROVISIONS (40 CFR PART 63, SUBPART A) TO SUBPART CCC—Continued

| Reference | Applies to subpart CCC | Explanation |
|---|---|---|
| \* | \* | \* |
| 63.9(j) .......... | Yes. | |
| 63.9(k) .......... | Yes ............... | Only as specified in § 63.9(j). |
| \* | \* | \* |

## Subpart DDD—National Emission Standards for Hazardous Air Pollutants for Mineral Wool Production

■ 51. Amend table 1 to subpart DDD of part 63 by adding in numerical order entries for §§ 63.1(c)(6) and 63.9(k) to read as follows:

TABLE 1 TO SUBPART DDD OF PART 63—APPLICABILITY OF GENERAL PROVISIONS (40 CFR PART 63, SUBPART A) TO SUBPART DDD OF PART 63

| General provisions citation | Requirement | Applies to subpart DDD? | Explanation |
|---|---|---|---|
| \* | \* | \* | \* |
| § 63.1(c)(6) .................................... | Reclassification ............................ | Yes. | |
| \* | \* | \* | \* |
| § 63.9(k) | | Yes .............................................. | Only as specified in § 63.9(j). |
| \* | \* | \* | \* |

## Subpart EEE—National Emission Standards for Hazardous Air Pollutants from Hazardous Waste Combustors

■ 52. Amend table 1 to subpart EEE of part 63 by adding in numerical order an entry for § 63.9(k) to read as follows:

TABLE 1 TO SUBPART EEE OF PART 63—GENERAL PROVISIONS APPLICABLE TO SUBPART EEE

| Reference | Applies to subpart EEE | Explanation |
|---|---|---|
| \* | \* | \* |
| 63.9(k) .......... | Yes ............... | Only as specified in § 63.9(j). |
| \* | \* | \* |

## Subpart GGG—National Emission Standards for Pharmaceuticals Production

■ 53. Amend table 1 to subpart GGG of part 63 is amended by adding in numerical order an entry for § 63.1(c)(6), revising the entry for § 63.9(j), and adding in numerical order an entry for § 63.9(k) to read as follows:

TABLE 1 TO SUBPART GGG OF PART 63—GENERAL PROVISIONS APPLICABILITY TO SUBPART GGG

| General provisions reference | Summary of requirements | Applies to subpart GGG | Comments |
|---|---|---|---|
| \* | \* | \* | \* |
| 63.1(c)(6) .................................... | Reclassification ............................ | Yes. | |
| \* | \* | \* | \* |
| 63.9(j) ............................................ | Change in information provided .... | Yes .............................................. | For change in major source status only. |
| 63.9(k) ............................................ | Electronic reporting procedures .... | Yes .............................................. | Only as specified in § 63.9(j). |
| \* | \* | \* | \* |

## Subpart HHH—National Emission Standards for Hazardous Air Pollutants From Natural Gas Transmission and Storage Facilities

■ 54. Amend § 63.1270 by revising paragraph (a) introductory text to read as follows:

### § 63.1270 Applicability and designation of affected source.

(a) This subpart applies to owners and operators of natural gas transmission and storage facilities that transport or store natural gas prior to entering the pipeline to a local distribution company or to a final end user (if there is no local distribution company), and that are major sources of hazardous air pollutants (HAP) emissions as defined in § 63.1271. Emissions for major source determination purposes can be estimated using the maximum natural gas throughput calculated in either paragraph (a)(1) or (2) of this section and paragraphs (a)(3) and (4) of this section. As an alternative to calculating the maximum natural gas throughput, the owner or operator of a new or existing source may use the facility design maximum natural gas throughput to estimate the maximum potential emissions. Other means to determine the facility's major source status are allowed, provided the information is documented and recorded to the Administrator's satisfaction in accordance with § 63.10(b)(3). A compressor station that transports natural gas prior to the point of custody transfer or to a natural gas processing plant (if present) is not considered a part of the natural gas transmission and storage source category. A facility that is determined to be an area source, but subsequently increases its emissions or its potential to emit above the major source levels (without obtaining and complying with other limitations that keep its potential to emit HAP below major source levels), and becomes a major source, must comply with all applicable provisions of this subpart starting on the applicable compliance date specified in paragraph (d) of this section. Nothing in this paragraph is intended to preclude a source from limiting its potential to emit through other appropriate mechanisms that may be available through the permitting authority.

\*      \*      \*      \*      \*

■ 55. Amend table 2 to subpart HHH of part 63 by adding in numerical order entries for §§ 63.1(c)(6) and 63.9(k) to read as follows:

APPENDIX: TABLE 2 TO SUBPART HHH OF PART 63-APPLICABILITY OF 40 CFR PART 63 GENERAL PROVISIONS TO SUBPART HHH

| General provisions Reference | Applicable to subpart HHH | Explanation |
|---|---|---|
| \*      \* | \*      \* | \* |
| § 63.1(c)(6) ... | Yes. | |
| \*      \* | \*      \* | \* |
| § 63.9(k) ....... | Yes ............... | Only as specified in § 63.9(j). |
| \*      \* | \*      \* | \* |

## Subpart III—National Emission Standards for Hazardous Air Pollutants for Flexible Polyurethane Foam Production

■ 56. Amend table 1 to subpart III of part 63 by adding in numerical order an entry for § 63.9(k) to read as follows:

TABLE 1 TO SUBPART III OF PART 63—APPLICABILITY GENERAL PROVISIONS (40 CFR PART 63, SUBPART A) TO SUBPART III

| Subpart A reference | Applies to Subpart III | Comment |
|---|---|---|
| \*      \* | \*      \* | \* |
| § 63.9(k) ....... | Yes ............... | Only as specified in § 63.9(j). |
| \*      \* | \*      \* | \* |

## Subpart JJJ—National Emission Standards for Hazardous Air Pollutant Emissions: Group IV Polymers and Resins

■ 57. Amend table 1 to subpart JJJ of part 63 is amended by adding in numerical order an entry for § 63.1(c)(6), revising the entry for § 63.9(j), and adding in numerical order an entry for § 63.9(k) to read as follows:

TABLE 1 TO SUBPART JJJ OF PART 63—APPLICABILITY OF GENERAL PROVISIONS TO SUBPART JJJ AFFECTED SOURCES

| Reference | Applies to Subpart JJJ | Explanation |
|---|---|---|
| \*      \* | \*      \* | \*      \* |
| § 63.1(c)(6) ................................................................. | Yes. | |
| \*      \* | \*      \* | \*      \* |
| § 63.9(j) ..................................................................... | Yes ................................................................. | For change in major source status only. |
| § 63.9(k) ..................................................................... | Yes ................................................................. | Only as specified in § 63.9(j). |
| \*      \* | \*      \* | \*      \* |

## Subpart LLL—National Emission Standards for Hazardous Air Pollutants From the Portland Cement Manufacturing Industry

■ 58. Amend table 1 to subpart LLL of part 63 by adding in numerical order entries for §§ 63.1(c)(6) and 63.9(k) to read as follows:

TABLE 1 TO SUBPART LLL OF PART 63—APPLICABILITY OF GENERAL PROVISIONS

| Citation | Requirement | Applies to subpart LLL | Explanation |
|---|---|---|---|
| * | * | * | * | * | * | * |
| 63.1(c)(6) ............................... | Reclassification ............................ | Yes. | |
| * | * | * | * | * | * | * |
| 63.9(k) ............................... | Electronic reporting procedures .... | Yes ............................... | Only as specified in § 63.9(j). |
| * | * | * | * | * | * | * |

**Subpart MMM—National Emission Standards for Hazardous Air Pollutants for Pesticide Active Ingredient Production**

■ 59. Amend table 1 to subpart MMM of part 63 by adding in numerical order an entry for § 63.1(c)(6), revising the entry for § 63.9(j), and adding in numerical order an entry for § 63.9(k) to read as follows:

TABLE 1 TO SUBPART MMM OF PART 63—GENERAL PROVISIONS APPLICABILITY TO SUBPART MMM

| Reference to subpart A | Applies to subpart MMM | Explanation |
|---|---|---|
| * | * | * | * | * | * | * |
| § 63.1(c)(6) ............................... | Yes. | |
| * | * | * | * | * | * | * |
| § 63.9(j) ............................... | Yes ............................... | For change in major source status only, § 63.1368(h) specifies procedures for other notification of changes. |
| § 63.9(k) ............................... | Yes ............................... | Only as specified in § 63.9(j). |
| * | * | * | * | * | * | * |

**Subpart NNN—National Emission Standards for Hazardous Air Pollutants for Wool Fiberglass Manufacturing**

■ 60. Amend table 1 to subpart NNN of part 63 by adding in numerical order entries for §§ 63.1(c)(6) and 63.9(k) to read as follows:

TABLE 1 TO SUBPART NNN OF PART 63—APPLICABILITY OF GENERAL PROVISIONS (40 CFR PART 63, SUBPART A) TO SUBPART NNN

| General provisions citation | Requirement | Applies to subpart NNN? | Explanation |
|---|---|---|---|
| * | * | * | * | * | * | * |
| § 63.1(c)(6) ............................... | * | Yes. | |
| * | * | * | * | * | * | * |
| § 63.9(k) ............................... | Yes ............................... | Only as specified in § 63.9(j). | |
| * | * | * | * | * | * | * |

**Subpart OOO—National Emission Standards for Hazardous Air Pollutant Emissions: Manufacture of Amino/ Phenolic Resins**

■ 61. Amend table 1 to subpart OOO of part 63 by adding in numerical order an entry for § 63.1(c)(6), revising the entry for § 63.9(j), and adding in numerical order an entry for § 63.9(k) to read as follows:

TABLE 1 TO SUBPART OOO OF PART 63—APPLICABILITY OF GENERAL PROVISIONS TO SUBPART OOO AFFECTED SOURCES

| Reference | Applies to subpart OOO | Explanation |
|---|---|---|
| * * * * * * * |  |  |
| 63.1(c)(6) ............... | Yes. |  |
| * * * * * * * |  |  |
| 63.9(j) .................. | Yes ................... | For change in major source status only. |
| 63.9(k) .................. | Yes ................... | Only as specified in § 63.9(j). |
| * * * * * * * |  |  |

## Subpart PPP—National Emission Standards for Hazardous Air Pollutant Emissions for Polyether Polyols Production

■ 62. Amend § 63.1434 by revising paragraphs (d) and (e) to read as follows:

### § 63.1434  Equipment leak provisions.

* * * * *

(d) When the HON equipment leak Initial Notification requirements contained in §§ 63.182(a)(1) and 63.182(b) are referred to in 40 CFR part 63, subpart H, the owner or operator shall comply with the Initial Notification requirements contained in § 63.1439(e)(3), for the purposes of this subpart. The Initial Notification shall be submitted no later than June 1, 2000, or no later than 120 days after the source becomes subject to this subpart, whichever is later, for existing sources.

(e) The HON equipment leak Notification of Compliance Status required by §§ 63.182(a)(2) and 63.182(c) shall be submitted within 150 days (rather than 90 days) of the applicable compliance date specified in § 63.1422 for the equipment leak provisions. The Initial Notification shall be submitted no later than June 1, 2000, or no later than 120 days after the source becomes subject to this subpart, whichever is later, for existing sources.

* * * * *

■ 63. Amend § 63.1439 by revising paragraphs (e)(3)(ii)(B) and (C) to read as follows:

### § 63.1439  General recordkeeping and reporting provisions.

* * * * *

(e) * * *

(3) * * *

(ii) * * *

(B) For a new source that has an initial start-up on or after August 30, 1999, the application for approval of construction or reconstruction required by the General Provisions in § 63.5(d) shall be submitted in lieu of the Initial Notification. The application shall be submitted as soon as practical before construction or reconstruction is planned to commence (but it need not be sooner than August 30, 1999). For a new source that reclassifies to major source status after January 19, 2021, and greater than 90 days after the initial start-up, the source shall submit the initial notification required by 63.9(b) no later than 120 days after the source becomes subject to this subpart.

(C) For a new source that has an initial start-up prior to August 30, 1999, the Initial Notification shall be submitted no later than August 30, 1999, or no later than 120 days after the source becomes subject to this subpart, whichever is later. The application for approval of construction or reconstruction described in the General Provisions' requirements in § 63.5(d) is not required for these sources.

* * * * *

■ 64. Amend table 1 to subpart PPP of part 63 by adding in numerical order an entry for § 63.1(c)(6), revising the entry for § 63.9(j), and adding in numerical order an entry for § 63.9(k) to read as follows:

TABLE 1 TO SUBPART PPP OF PART 63—APPLICABILITY OF GENERAL PROVISIONS TO SUBPART PPP AFFECTED SOURCES

| Reference | Applies to subpart PPP | Explanation |
|---|---|---|
| * * * * * * * |  |  |
| 63.1(c)(6) ............... | Yes. |  |
| * * * * * * * |  |  |
| 63.9(j) .................. | Yes ................... | For change in major source status only. |
| 63.9(k) .................. | Yes ................... | Only as specified in § 63.9(j). |
| * * * * * * * |  |  |

## Subpart QQQ—National Emission Standards for Hazardous Air Pollutants for Primary Copper Smelting

■ 65. Revise § 63.1441 to read as follows:

### § 63.1441  Am I subject to this subpart?

You are subject to this subpart if you own or operate a primary copper smelter that is (or is part of) a major source of hazardous air pollutant (HAP) emissions and your primary copper smelter uses batch copper converters as defined in § 63.1459. Your primary copper smelter is a major source of HAP if it emits or has the potential to emit any single HAP at the rate of 10 tons or more per year or any combination of HAP at a rate of 25 tons or more per year.

■ 66. Amend § 63.1454 by revising paragraph (b) to read as follows:

### § 63.1454  What notifications must I submit and when?

* * * * *

(b) As specified in § 63.9(b)(2), if you start your affected source before June 12,

2002, you must submit your initial notification not later than October 10, 2002, or no later than 120 days after the source becomes subject to this subpart, whichever is later.

\*    \*    \*    \*    \*

### Subpart RRR—National Emission Standards for Hazardous Air Pollutants for Secondary Aluminum Production

■ 67. Amend appendix A to subpart RRR of part 63 by adding in numerical order entries for §§ 63.1(c)(6) and 63.9(k) to read as follows:

APPENDIX A TO SUBPART RRR OF PART 63—GENERAL PROVISIONS APPLICABILITY TO SUBPART RRR

| Citation | Requirement | Applies to subpart RRR | Comment |
|---|---|---|---|
| \* | \* | \* | \* | \* | \* | \* |
| § 63.1(c)(6) ...................................... | Reclassification .............................. | Yes. | |
| § 63.9(k) .......................................... | Electronic reporting procedures .... | Yes ................................................ | Only as specified in § 63.9(j). |
| \* | \* | \* | \* | \* | \* | \* |

### Subpart TTT—National Emission Standards for Hazardous Air Pollutants for Primary Lead Smelting

■ 68. Amend table 1 to subpart TTT of part 63 by adding in numerical order an entry for § 63.9(k) to read as follows:

TABLE 1 TO SUBPART TTT OF PART 63—GENERAL PROVISIONS APPLICABILITY TO SUBPART TTT

| Reference | Applies to subpart TTT | Comment |
|---|---|---|
| \* | \* | \* | \* | \* | \* |
| 63.9(k) ............................................................. | Yes | Only as specified in 63.9(j). |
| \* | \* | \* | \* | \* | \* |

### Subpart UUU—National Emission Standards for Hazardous Air Pollutants for Petroleum Refineries: Catalytic Cracking Units, Catalytic Reforming Units, and Sulfur Recovery Units

■ 69. Amend § 63.1574 by revising paragraph (b) to read as follows:

### § 63.1574 What notifications must I submit and when?

\*    \*    \*    \*    \*

(b) As specified in § 63.9(b)(2), if you startup your new affected source before April 11, 2002, you must submit the initial notification no later than August 9, 2002, or no later than 120 days after the source becomes subject to this subpart, whichever is later.

\*    \*    \*    \*    \*

■ 70. Amend table 44 to subpart UUU of part 63 by adding in numerical order entries for §§ 63.1(c)(6) and 63.9(k) to read as follows:

\*    \*    \*    \*    \*

TABLE 44 TO SUBPART UUU OF PART 63—APPLICABILITY OF NESHAP GENERAL PROVISIONS TO SUBPART UUU

| Citation | Subject | Applies to subpart UUU | Explanation |
|---|---|---|---|
| \* | \* | \* | \* | \* | \* | \* |
| \* | \* | \* | \* | \* | \* | \* |
| § 63.1(c)(6) ...................................... | Reclassification .............................. | Yes. | |
| \* | \* | \* | \* | \* | \* | \* |
| § 63.9(k) .......................................... | Electronic reporting procedures .... | Yes ................................................ | Only as specified in § 63.9(j). |
| \* | \* | \* | \* | \* | \* | \* |

## Subpart VVV—National Emission Standards for Hazardous Air Pollutants: Publicly Owned Treatment Works

■ 71. Amend §63.1591 by revising paragraphs (a)(1) and (2) to read as follows:

### §63.1591  What are my notification requirements?

(a) * * *

(1) If you have an existing Group 1 or Group 2 POTW treatment plant, you must submit an initial notification by October 26, 2018, or no later than 120 days after the source becomes subject to this subpart, whichever is later.

(2) If you have a new Group 1 or Group 2 POTW treatment plant, you must submit an initial notification upon startup, or when the source becomes subject to this subpart, whichever is later.

*    *    *    *    *

■ 72. Amend table 1 to subpart VVV of part 63 by adding in numerical order entries for §§ 63.1(c)(6) and 63.9(k) to read as follows:

TABLE 1 TO SUBPART VVV OF PART 63—APPLICABILITY OF 40 CFR PART 63 GENERAL PROVISIONS TO SUBPART VVV

| General provisions reference | Applicable to subpart VVV | Explanation |
|---|---|---|
| * * * | * | * |
| §63.1(c)(6) ........................................................ Yes. | | |
| * * * | * | * |
| §63.9(k) ................................................................ Yes | | Only as specified in §63.9(j). |
| * * * | * | * |

## Subpart XXX—National Emission Standards for Hazardous Air Pollutants for Ferroalloys Production: Ferromanganese and Silicomanganese

■ 73. Amend table 1 to subpart XXX of part 63 by adding in numerical order an entry for § 63.9(k) to read as follows:

TABLE 1 TO SUBPART XXX OF PART 63—GENERAL PROVISIONS APPLICABILITY TO SUBPART XXX

| Reference | Applies to subpart XXX | Comment |
|---|---|---|
| * * * | * | * |
| §63.9(k) ................................................................ Yes | | Only as specified in §63.9(j). |
| * * * | * | * |

## Subpart DDDD—National Emission Standards for Hazardous Air Pollutants: Plywood and Composite Wood Products

■ 74. Amend § 63.2280 by revising paragraph (b) to read as follows:

### §63.2280  What notifications must I submit and when?

*    *    *    *    *

(b) You must submit an Initial Notification no later than 120 calendar days after September 28, 2004, 120 calendar days after initial startup, or no later than 120 days after the source becomes subject to this subpart, whichever is later, as specified in §63.9(b)(2). Initial Notifications required to be submitted after August 13, 2020, for affected sources that commence construction or reconstruction after September 6, 2019, and on and after August 13, 2021, for all other affected sources submitting initial notifications required in §63.9(b) must be submitted following the procedure specified in §63.2281(h), (k), and (l).

*    *    *    *    *

■ 75. Amend table 10 to subpart DDDD of part 63 by adding in numerical order an entry for §63.9(k) to read as follows:

TABLE 10 TO SUBPART DDDD OF PART 63—APPLICABILITY OF GENERAL PROVISIONS TO SUBPART DDDD

| Citation | Subject | Brief description | Applies to this subpart before August 13, 2021, except as noted in footnote "1" to this table | Applies to this subpart on and after August 13, 2021, except as noted in footnote "1" to this table |
|---|---|---|---|---|
| * | * | * | * | * |
| §63.9(k) ...................... | Electronic reporting procedures. | Electronic reporting procedures. | Yes, only as specified in §63.9(j). | Yes, only as specified in §63.9(j). |

TABLE 10 TO SUBPART DDDD OF PART 63—APPLICABILITY OF GENERAL PROVISIONS TO SUBPART DDDD—Continued

| Citation | Subject | Brief description | Applies to this subpart before August 13, 2021, except as noted in footnote "1" to this table | Applies to this subpart on and after August 13, 2021, except as noted in footnote "1" to this table |
|---|---|---|---|---|
| * | * | * | * | * | * | * |

**Subpart EEEE—National Emission Standards for Hazardous Air Pollutants: Organic Liquids Distribution (Non-Gasoline)**

■ 76. Amend § 63.2382 by revising paragraphs (b)(1) and (2) to read as follows:

**§ 63.2382   What notifications must I submit and when and what information should be submitted?**

\*     \*     \*     \*     \*

(b) *Initial Notification.* (1) If you startup your affected source before February 3, 2004, you must submit the Initial Notification no later than 120 calendar days after February 3, 2004, or no later than 120 days after the source becomes subject to this subpart, whichever is later.

(2) If you startup your new or reconstructed affected source on or after February 3, 2004, you must submit the Initial Notification no later than 120 days after initial startup, or no later than 120 days after the source becomes subject to this subpart, whichever is later.

\*     \*     \*     \*     \*

■ 77. Amend table 12 to subpart EEEE of part 63 by revising the entry for § 63.9(j) and adding in numerical order an entry for § 63.9(k) to read as follows:

TABLE 12 TO SUBPART EEEE OF PART 63—APPLICABILITY OF GENERAL PROVISIONS TO SUBPART EEEE

| Citation | Subject | Brief description | Applies to subpart EEEE |
|---|---|---|---|
| * | * | * | * | * |
| § 63.9(j) ............. | Change in Previous Information ............. | Must submit within 15 days after the change. | Yes for change to major source status, other changes are reported in the first and subsequent compliance reports. |
| § 63.9(k) ............ | Electronic reporting procedures ............. | Procedure to report electronically for notification in § 63.9(j). | Yes, only as specified in § 63.9(j). |
| * | * | * | * | * |

**Subpart FFFF—National Emission Standards for Hazardous Air Pollutants: Miscellaneous Organic Chemical Manufacturing**

■ 78. Amend § 63.2515 by designating the text of paragraph (b) introductory text after the subject heading as paragraph (b)(1) and revising newly designated paragraph (b)(1) to read as follows:

**§ 63.2515   What notifications must I submit and when?**

\*     \*     \*     \*     \*

(b) \* \* \*

(1) As specified in § 63.9(b)(2), if you startup your affected source before November 10, 2003, you must submit an initial notification not later than 120 calendar days after November 10, 2003, or no later than 120 days after the source becomes subject to this subpart, whichever is later.

\*     \*     \*     \*     \*

■ 79. Amend table 12 to subpart FFFF of part 63 by revising the entry for § 63.9(j) and adding in numerical order an entry for § 63.9(k) to read as follows:

TABLE 12 TO SUBPART FFFF OF PART 63—APPLICABILITY OF GENERAL PROVISIONS TO SUBPART FFFF

| Citation | Subject | Explanation |
|---|---|---|
| * | * | * | * | * |
| § 63.9(j) ............. | Change in previous information ............. | Yes, for change in major source status, otherwise § 63.2520(e) specifies reporting requirements for process changes. |
| § 63.9(k) ............ | Electronic reporting procedures ............. | Yes, as specified in § 63.9(j). |
| * | * | * | * | * |

## Subpart GGGG—National Emission Standards for Hazardous Air Pollutants: Solvent Extraction for Vegetable Oil Production

■ 80. Amend § 63.2860 by revising paragraph (a) introductory text to read as follows:

### § 63.2860  What notifications must I submit and when?

\*      \*      \*      \*      \*

(a) *Initial notification for existing sources.* For an existing source, submit an initial notification to the agency responsible for these NESHAP no later than 120 days after the effective date of this subpart, or no later than 120 days after the source becomes subject to this subpart, whichever is later. In the notification, include the items in paragraphs (a)(1) through (5) of this section:

\*      \*      \*      \*      \*

■ 81. Amend § 63.2870 in table 1 to § 63.2870 by adding in numerical order entries for § 63.9(j) and (k) to read as follows:

### § 63.2870  What Parts of the General Provisions apply to me?

\*      \*      \*      \*      \*

TABLE 1 TO § 63.2870—APPLICABILITY OF 40 CFR PART 63, SUBPART A, TO 40 CFR PART 63, SUBPART GGGG

| General provisions citation | Subject of citation | Brief description of requirement | Applies to subpart | Explanation |
|---|---|---|---|---|
| \* | \* | | \* | \* | \* |
| § 63.9(j) ............. | Notification requirements ...... | Change in previous information. | Yes. | |
| § 63.9(k) ............. | Notification requirements ...... | Electronic reporting procedures. | Yes ........................................ | Only as specified in § 63.9(j). |
| \* | \* | \* | \* | \* | \* |

## Subpart HHHH—National Emission Standards for Hazardous Air Pollutants for Wet-Formed Fiberglass Mat Production

■ 82. Amend table 2 to subpart HHHH of part 63 by adding in numerical order entries for §§ 63.1(c)(6) and 63.9(k) to read as follows:

TABLE 2 TO SUBPART HHHH OF PART 63—APPLICABILITY OF GENERAL PROVISIONS (40 CFR PART 63, SUBPART A) TO SUBPART HHHH

| Citation | Requirement | Applies to subpart HHHH | Explanation |
|---|---|---|---|
| \* | \* | \* | \* | \* | \* |
| § 63.1(c)(6) ..................................... | Reclassification ............................. | Yes. | |
| \* | \* | \* | \* | \* | \* |
| § 63.9(k) ......................................... | Electronic reporting procedures .... | Yes ................................................. | Only as specified in § 63.9(j). |
| \* | \* | \* | \* | \* | \* |

## Subpart IIII—National Emission Standards for Hazardous Air Pollutants: Surface Coating of Automobiles and Light-Duty Trucks

■ 83. Amend § 63.3110 by revising paragraph (b) to read as follows:

### § 63.3110  What notifications must I submit?

\*      \*      \*      \*      \*

(b) You must submit the Initial Notification required by § 63.9(b) for a new or reconstructed affected source no later than 120 days after initial startup, 120 days after the source becomes subject to this subpart, or 120 days after June 25, 2004, whichever is later. For an existing affected source, you must submit the Initial Notification no later than 1 year after April 26, 2004, or no later than 120 days after the source becomes subject to this subpart, whichever is later. Existing sources that have previously submitted notifications of applicability of this rule pursuant to section 112(j) of the CAA are not required to submit an Initial Notification under § 63.9(b) except to identify and describe all additions to the affected source made pursuant to § 63.3082(c). If you elect to include the surface coating of new other motor vehicle bodies, body parts for new other motor vehicles, parts for new other motor vehicles, or aftermarket repair or replacement parts for other motor vehicles in your affected source pursuant to § 63.3082(c) and your affected source has an initial startup before February 20, 2007, then you must submit an Initial Notification of this election no later than 120 days after initial startup or February 20, 2007, or no later than 120 days after the source becomes subject to this subpart, whichever is later.

\*      \*      \*      \*      \*

■ 84. Amend table 2 to subpart IIII of part 63 by adding in numerical order entries for §§ 63.1(c)(6) and 63.9(k) to read as follows:

TABLE 2 TO SUBPART IIII OF PART 63—APPLICABILITY OF GENERAL PROVISIONS TO SUBPART IIII OF PART 63

| Citation | | Subject | | Applicable to subpart IIII | | Explanation | |
|---|---|---|---|---|---|---|---|
| * | * | * | * | * | * | * | * |
| § 63.1(c)(6) ..................................... | | Reclassification ............................. | | Yes. | | | |
| * | * | * | * | * | * | * | * |
| § 63.9(k) ........................................ | | Electronic reporting procedures .... | | Yes ................................................. | | Only as specified in § 63.9(j). | |
| * | * | * | * | * | * | * | * |

## Subpart JJJJ—National Emission Standards for Hazardous Air Pollutants: Paper and Other Web Coating

■ 85. Amend § 63.3400 by revising paragraph (b)(1) to read as follows:

### § 63.3400   What notifications and reports must I submit?

* * * * *

(b) * * *

(1) Initial notification for existing affected sources must be submitted no later than 1 year before the compliance date specified in § 63.3330(a), or no later than 120 days after the source becomes subject to this subpart, whichever is later.

* * * * *

■ 86. Amend table 2 to subpart JJJJ of part 63 by adding in numerical order entries for §§ 63.1(c)(6) and 63.9(k) to read as follows:

TABLE 2 TO SUBPART JJJJ OF PART 63—APPLICABILITY OF 40 CFR PART 63 GENERAL PROVISIONS TO SUBPART JJJJ

| General provisions reference | | Applicable to subpart JJJJ | | Explanation | | |
|---|---|---|---|---|---|---|
| * | * | * | * | * | * | * |
| § 63.1(c)(6) ..................................... | | Yes. | | | | |
| * | * | * | * | * | * | * |
| § 63.9(k) ........................................ | | Yes .................................................. | | Only as specified in § 63.9(j). | | |
| * | * | * | * | * | * | * |

## Subpart KKKK—National Emission Standards for Hazardous Air Pollutants: Surface Coating of Metal Cans

■ 87. Amend § 63.3510 by revising paragraph (b) to read as follows:

### § 63.3510   What notifications must I submit?

* * * * *

(b) *Initial Notification.* You must submit the Initial Notification required by § 63.9(b) for a new or reconstructed affected source no later than 120 days after initial startup, no later than 120 days after the source becomes subject to this subpart, or 120 days after November 13, 2003, whichever is later. For an existing affected source, you must submit the Initial Notification no later than November 13, 2004, or no later than 120 days after the source becomes subject to this subpart, whichever is later.

* * * * *

■ 88. Amend table 5 to subpart KKKK of part 63 by adding in numerical order entries for §§ 63.1(c)(6) and 63.9(k) to read as follows:

TABLE 5 TO SUBPART KKKK OF PART 63—APPLICABILITY OF GENERAL PROVISIONS TO SUBPART KKKK

| Citation | | Subject | | Applicable to subpart KKKK | | Explanation | |
|---|---|---|---|---|---|---|---|
| * | * | * | * | * | * | * | * |
| § 63.1(c)(6) ..................................... | | Reclassification ............................. | | Yes. | | | |
| * | * | * | * | * | * | * | * |
| § 63.9(k) ........................................ | | Electronic reporting procedures .... | | Yes ................................................. | | Only as specified in § 63.9(j). | |
| * | * | * | * | * | * | * | * |

## Subpart MMMM—National Emission Standards for Hazardous Air Pollutants for Surface Coating of Miscellaneous Metal Parts and Products

■ 89. Amend § 63.3910 by revising paragraph (b) to read as follows:

### § 63.3910 What notifications must I submit?

\* \* \* \* \*

(b) *Initial notification.* You must submit the initial notification required by § 63.9(b) for a new or reconstructed affected source no later than 120 days after initial startup, 120 days after January 2, 2004, or no later than 120 days after the source becomes subject to this subpart, whichever is later. For an existing affected source, you must submit the initial notification no later than 1 year after January 2, 2004, or no later than 120 days after the source becomes subject to this subpart, whichever is later. If you are using compliance with the Surface Coating of Automobiles and Light-Duty Trucks NESHAP (subpart IIII of this part) as provided for under § 63.3881(d) to constitute compliance with this subpart for any or all of your metal parts coating operations, then you must include a statement to this effect in your initial notification, and no other notifications are required under this subpart in regard to those metal parts coating operations. If you are complying with another NESHAP that constitutes the predominant activity at your facility under § 63.3881(e)(2) to constitute compliance with this subpart for your metal parts coating operations, then you must include a statement to this effect in your initial notification, and no other notifications are required under this subpart in regard to those metal parts coating operations. If you own or operate an existing loop slitter or flame lamination affected source, submit an initial notification no later than 120 days after April 14, 2003, or no later than 120 days after the source becomes subject to this subpart.

\* \* \* \* \*

■ 90. Amend table 2 to subpart MMMM of part 63 by adding in numerical order entries for §§ 63.1(c)(6) and 63.9(k) to read as follows:

TABLE 2 TO SUBPART MMMM OF PART 63—APPLICABILITY OF GENERAL PROVISIONS TO SUBPART MMMM OF PART 63

| | | | | |
|---|---|---|---|---|
| \* | \* | \* | \* | \* |

| Citation | Subject | Applicable to subpart MMMM | Explanation |
|---|---|---|---|
| \* | \* | \* | \* |
| § 63.1(c)(6) ..................................... | Reclassification ............................ | Yes. | |
| \* | \* | \* | \* |
| § 63.9(k) ......................................... | Electronic reporting procedures .... | Yes ................................................ | Only as specified in § 63.9(j). |
| \* | \* | \* | \* |

## Subpart NNNN—National Emission Standards for Hazardous Air Pollutants: Surface Coating of Large Appliances

■ 91. Amend § 63.4110 by revising paragraph (a)(1) to read as follows:

### § 63.4110 What notifications must I submit.

(a) \* \* \*

(1) You must submit the Initial Notification required by § 63.9(b) for an existing affected source no later than July 23, 2003, or no later than 120 days after the source becomes subject to this subpart. For a new or reconstructed affected source, you must submit the Initial Notification no later than 120 days after initial startup, November 20, 2002, or no later than 120 days after the source becomes subject to this subpart, whichever is later.

\* \* \* \* \*

■ 92. Amend table 2 to subpart NNNN of part 63 by adding in numerical order entries for §§ 63.1(c)(6) and 63.9(k) to read as follows:

TABLE 2 TO SUBPART NNNN OF PART 63—APPLICABILITY OF GENERAL PROVISIONS TO SUBPART NNNN

| | | | | |
|---|---|---|---|---|
| \* | \* | \* | \* | \* |

| Citation | Subject | Applicable to subpart NNNN | Explanation |
|---|---|---|---|
| \* | \* | \* | \* |
| § 63.1(c)(6) ..................................... | Reclassification ............................ | Yes. | |
| \* | \* | \* | \* |
| § 63.9(k) ......................................... | Electronic reporting procedures .... | Yes ................................................ | Only as specified in § 63.9(j). |
| \* | \* | \* | \* |

## Subpart OOOO—National Emission Standards for Hazardous Air Pollutants: Printing, Coating, and Dyeing of Fabrics and Other Textiles

■ 93. Amend § 63.4310 by revising paragraph (b) to read as follows:

### § 63.4310 What notifications must I submit?

\* \* \* \* \*

(b) *Initial Notification.* You must submit the Initial Notification required by § 63.9(b) for a new or reconstructed affected source no later than 120 days after initial startup, 120 days after May 29, 2003, or no later than 120 days after the source becomes subject to this subpart, whichever is later. For an existing affected source, you must submit the Initial Notification no later

than 1 year after May 29, 2003, or no later than 120 days after the source becomes subject to this subpart, whichever is later.

\* \* \* \* \*

■ 94. Amend table 3 to subpart OOOO of part 63 by adding in numerical order entries for §§ 63.1(c)(6) and 63.9(k) to read as follows:

TABLE 3 TO SUBPART OOOO OF PART 63—APPLICABILITY OF GENERAL PROVISIONS TO SUBPART OOOO

| Citation | Subject | Applicable to subpart OOOO | Explanation |
|---|---|---|---|
| \* | \* | \* | \* |
| § 63.1(c)(6) ..................................... | Reclassification ............................. | Yes. | |
| \* | \* | \* | \* |
| § 63.9(k) ........................................ | Electronic reporting procedures .... | Yes ................................................. | Only as specified in § 63.9(j). |
| \* | \* | \* | \* |

## Subpart PPPP—National Emission Standards for Hazardous Air Pollutants for Surface Coating of Plastic Parts and Products

■ 95. Amend § 63.4510 by revising paragraph (b) to read as follows:

### § 63.4510 What notifications must I submit?

\* \* \* \* \*

(b) *Initial notification.* You must submit the initial notification required by § 63.9(b) for a new or reconstructed affected source no later than 120 days after initial startup, 120 days after April 19, 2004, or no later than 120 days after the source becomes subject to this

subpart, whichever is later. For an existing affected source, you must submit the initial notification no later than 1 year after April 19, 2004, or no later than 120 days after the source becomes subject to this subpart, whichever is later. If you are using compliance with the Surface Coating of Automobiles and Light-Duty Trucks NESHAP (subpart IIII of this part) as provided for under § 63.4481(d) to constitute compliance with this subpart for any or all of your plastic parts coating operations, then you must include a statement to this effect in your initial notification, and no other notifications are required under this

subpart in regard to those plastic parts coating operations. If you are complying with another NESHAP that constitutes the predominant activity at your facility under § 63.4481(e)(2) to constitute compliance with this subpart for your plastic parts coating operations, then you must include a statement to this effect in your initial notification, and no other notifications are required under this subpart in regard to those plastic parts coating operations.

\* \* \* \* \*

■ 96. Amend table 2 to subpart PPPP of part 63 by adding in numerical order entries for §§ 63.1(c)(6) and 63.9(k) to read as follows:

TABLE 2 TO SUBPART PPPP OF PART 63—APPLICABILITY OF GENERAL PROVISIONS TO SUBPART PPPP OF PART 63

| Citation | Subject | Applicable to subpart PPPP | Explanation |
|---|---|---|---|
| \* | \* | \* | \* |
| § 63.1(c)(6) ..................................... | Reclassification ............................. | Yes. | |
| \* | \* | \* | \* |
| § 63.9(k) ........................................ | Electronic reporting procedures .... | Yes ................................................. | Only as specified in § 63.9(j). |
| \* | \* | \* | \* |

## Subpart QQQQ—National Emission Standards for Hazardous Air Pollutants: Surface Coating of Wood Building Products

■ 97. Amend § 63.4710 by revising paragraph (b) to read as follows:

### § 63.4710 What notifications must I submit?

\* \* \* \* \*

(b) *Initial Notification.* You must submit the Initial Notification required by § 63.9(b) for a new or reconstructed affected source no later than 120 days

after initial startup, 120 days after May 28, 2003, or no later than 120 days after the source becomes subject to this subpart, whichever is later. For an existing affected source, you must submit the Initial Notification no later than 120 days after May 28, 2003, or no

later than 120 days after the source

becomes subject to this subpart, whichever is later.

\* \* \* \* \*

■ 98. Amend table 4 to subpart QQQQ of part 63 by adding in numerical order entries for §§ 63.1(c)(6) and 63.9(k) to read as follows:

TABLE 4 TO SUBPART QQQQ OF PART 63—APPLICABILITY OF GENERAL PROVISIONS TO SUBPART QQQQ OF PART 63

| Citation | Subject | Applicable to subpart QQQQ | Explanation |
|---|---|---|---|
| \* | \* | \* | \* | \* | \* |
| § 63.1(c)(6) ...................................... | Reclassification ............................ | Yes. | |
| \* | \* | \* | \* | \* | \* |
| § 63.9(k) ........................................ | Electronic reporting procedures .... | Yes ................................................ | Only as specified in § 63.9(j). |
| \* | \* | \* | \* | \* | \* |

**Subpart RRRR—National Emission Standards for Hazardous Air Pollutants: Surface Coating of Metal Furniture**

■ 99. Amend § 63.4910 by revising paragraph (b) to read as follows:

**§ 63.4910   What notifications must I submit?**

\* \* \* \* \*

(b) *Initial Notification.* You must submit the Initial Notification required by § 63.9(b) for a new or reconstructed affected source no later than 120 days after initial startup, 120 days after May 23, 2003, or no later than 120 days after the source becomes subject to this subpart, whichever is later. For an existing affected source, you must submit the Initial Notification no later

than 1 year after May 23, 2003, or no later than 120 days after the source becomes subject to this subpart, whichever is later.

\* \* \* \* \*

■ 100. Amend table 2 to subpart RRRR of part 63 by adding in numerical order entries for §§ 63.1(c)(6) and 63.9(k) to read as follows:

TABLE 2 TO SUBPART RRRR OF PART 63—APPLICABILITY OF GENERAL PROVISIONS TO SUBPART RRRR

| Citation | Subject | Applicable to subpart | Explanation |
|---|---|---|---|
| \* | \* | \* | \* | \* | \* |
| § 63.1(c)(6) ...................................... | Reclassification ............................ | Yes. | |
| \* | \* | \* | \* | \* | \* |
| § 63.9(k) ........................................ | Electronic reporting procedures .... | Yes ................................................ | Only as specified in § 63.9(j). |
| \* | \* | \* | \* | \* | \* |

**Subpart SSSS—National Emission Standards for Hazardous Air Pollutants: Surface Coating of Metal Coil**

■ 101. Amend § 63.5180 by revising paragraph (b)(1) to read as follows:

**§ 63.5180   What reports must I submit**

\* \* \* \* \*

(b) \* \* \*

(1) Submit an initial notification for an existing source no later than 2 years after June 10, 2002, or no later than 120

days after the source becomes subject to this subpart, whichever is later.

\* \* \* \* \*

■ 102. Amend table 2 to subpart SSSS of part 63 by adding in numerical order entries for §§ 63.1(c)(6) and 63.9(k) to read as follows:

TABLE 2 TO SUBPART SSSS OF PART 63—APPLICABILITY OF GENERAL PROVISIONS TO SUBPART SSSS

| General provisions reference | Applicable to subpart SSSS | Explanation |
|---|---|---|
| \* | \* | \* | \* | \* |
| § 63.1(c)(6) ............................................................ | Yes. | |
| \* | \* | \* | \* | \* |
| § 63.9(k) ............................................................ | Yes ............................................................ | Only as specified in § 63.9(j). |

TABLE 2 TO SUBPART SSSS OF PART 63—APPLICABILITY OF GENERAL PROVISIONS TO SUBPART SSSS—Continued

| General provisions reference | Applicable to subpart SSSS | Explanation |
|---|---|---|
| * | * | * |

**Subpart TTTT—National Emission Standards for Hazardous Air Pollutants for Leather Finishing Operations**

■ 103. Amend § 63.5415 by revising paragraph (b) to read as follows:

**§ 63.5415   What notifications must I submit and when?**

*      *      *      *      *

(b) As specified in § 63.9(b)(2), if you start up your affected source before February 27, 2002, you must submit an Initial Notification not later than June 27, 2002, or no later than 120 days after the source becomes subject to this subpart, whichever is later.

*      *      *      *      *

■ 104. Amend table 2 to subpart TTTT of part 63 by adding in numerical order entries for §§ 63.9(j) and (k) to read as follows:

TABLE 2 TO SUBPART TTTT OF PART 63—APPLICABILITY OF GENERAL PROVISIONS TO SUBPART TTTT

| General provisions citation | Subject of citation | Brief description of requirement | Applies to subpart | Explanation |
|---|---|---|---|---|
| * | * | * | * | * |
| § 63.9(j) .............................. | Notification requirements .. | Change in previous information. | Yes. | |
| § 63.9(k) .............................. | Notification requirements .. | Electronic reporting procedures. | Yes ...................................... | Only as specified in § 63.9(j). |
| * | * | * | * | * |

**Subpart UUUU—National Emission Standards for Hazardous Air Pollutants for Cellulose Products Manufacturing**

■ 105. Amend table 7 to subpart UUUU of part 63 by revising entry 4 to read as follows:

TABLE 7 TO SUBPART UUUU OF PART 63—NOTIFICATIONS

| If you . . . | then you must . . . |
|---|---|
| * | * |
| 4. start up your affected source before June 11, 2002 ........................... | submit an initial notification no later than 120 days after June 11, 2002, or no later than 120 after the source becomes subject to this subpart, whichever is later, as specified in § 63.9(b)(2). |
| * | * |

■ 106. Amend table 8 to subpart UUUU of part 63 by revising entry 7 to read as follows:

### TABLE 8 TO SUBPART UUUU OF PART 63—REPORTING REQUIREMENTS

| * | * | * | * | * | * | * |
|---|---|---|---|---|---|---|

| You must submit a compliance report, which must contain the following information . . . | and you must submit the report . . . |
|---|---|
| *    *    *    *    *    *    * | |
| 7. the report must contain any changes in information already provided, as specified in §63.9(j), except changes in major source status must be reported per §63.9(j); | |
| *    *    *    *    *    *    * | |

■ 107. Table 10 to subpart UUUU of part 63 is amended by revising the entry for §63.9(j) and adding an entry for §63.9(k), in numerical order, to read as follows:

### TABLE 10 TO SUBPART UUUU OF PART 63—APPLICABILITY OF GENERAL PROVISIONS TO SUBPART UUUU

| Citation | Subject | Brief description | Applies to subpart UUUU |
|---|---|---|---|
| * | * | * | * |
| §63.9(j) ......................................... | Change in previous information .... | Must submit within 15 days of the change. | Yes, except the notification for all but change in major source status must be submitted as part of the next semiannual compliance report, as specified in Table 8 to this subpart. |
| §63.9(k) ......................................... | Electronic reporting procedures .... | Procedure for electronically reporting the notification required by §63.9(j). | Yes, as specified in §63.9(j). |
| * | * | * | * |

**Subpart VVVV—National Emission Standards for Hazardous Air Pollutants for Boat Manufacturing**

■ 108. Amend table 8 to subpart VVVV of part 63 by adding in numerical order entries for §§63.1(c)(6) and 63.9(k) to read as follows:

### TABLE 8 TO SUBPART VVVV OF PART 63—APPLICABILITY OF GENERAL PROVISIONS (40 CFR PART 63, SUBPART A) TO SUBPART VVVV

| Citation | Requirement | Applies to subpart VVVV | Explanation |
|---|---|---|---|
| * | * | * | * |
| §63.1(c)(6) ................................... | Reclassification ............................. | Yes. | |
| * | * | * | * |
| §63.9(k) ......................................... | Electronic reporting procedures .... | Yes ................................................. | Only as specified in §63.9(j). |
| * | * | * | * |

**Subpart WWWW—National Emissions Standards for Hazardous Air Pollutants: Reinforced Plastic Composites Production**

■ 109. Amend table 2 to subpart WWWW of part 63 by revising entry 1 to read as follows:

TABLE 2 TO SUBPART WWWW OF PART 63—COMPLIANCE DATES FOR NEW AND EXISTING REINFORCED PLASTIC COMPOSITES FACILITIES

| * | * | * | * | * | * |
|---|---|---|---|---|---|
| If your facility is . . . | | And . . . | | | Then you must comply by this date . . . |
| 1. An existing source ..................... | | a. Is a major source on or before the publication date of this subpart | | | April 21, 2006. |
| * | * | * | * | * | * |

■ 110. Amend table 15 to subpart WWWW of part 63 by adding in numerical order entries for §§ 63.1(c)(6) and 63.9(k) to read as follows:

TABLE 15 TO SUBPART WWWW OF PART 63—APPLICABILITY OF GENERAL PROVISIONS (SUBPART A) TO SUBPART WWWW OF PART 63

| The general provisions reference | | That addresses | And applies to subpart WWWW of part 63 | | Subject to the following additional information |
|---|---|---|---|---|---|
| * | * | * | * | * | * |
| § 63.1(c)(6) ...................................... | | Reclassification ............................. | Yes ................................................... | | |
| * | * | * | * | * | * |
| § 63.9(k) ......................................... | | Electronic reporting procedures .... | Yes ................................................... | | Only as specified in § 63.9(j). |
| * | * | * | * | * | * |

## Subpart XXXX—National Emissions Standards for Hazardous Air Pollutants: Rubber Tire Manufacturing

■ 111. Amend § 63.6009 by revising paragraph (b) to read as follows:

**§ 63.6009  What notifications must I submit and when?**

\* \* \* \* \*

(b) As specified in § 63.9(b)(2), if you startup your affected source before July 9, 2002, you must submit an Initial Notification not later than November 6, 2002, or no later than 120 days after the source becomes subject to this subpart, whichever is later.

\* \* \* \* \*

■ 112. Amend table 17 to subpart XXXX of part 63 by adding in numerical order an entry for § 63.9(k) to read as follows:

TABLE 17 TO SUBPART XXXX OF PART 63—APPLICABILITY OF GENERAL PROVISIONS TO THIS SUBPART XXXX

| Citation | | Subject | Brief description of applicable sections | Applicable to subpart XXXX? | |
|---|---|---|---|---|---|
| | | | | Using a control device | Not using a control device |
| * | * | * | * | * | * |
| § 63.9(k) .............................. | | Notification ........................ | Electronic reporting procedures. | Yes, as specified in § 63.9(j). | Yes, as specified in § 63.9(j). |
| * | * | * | * | * | * |

## Subpart YYYY—National Emission Standards for Hazardous Air Pollutants for Stationary Combustion Turbines

■ 113. Amend § 63.6145 by revising paragraph (b) to read as follows:

**§ 63.6145  What notifications must I submit and when?**

\* \* \* \* \*

(b) As specified in § 63.9(b)(2), if you start up your new or reconstructed stationary combustion turbine before March 5, 2004, you must submit an Initial Notification not later than 120 calendar days after March 5, 2004, or no later than 120 days after the source becomes subject to this subpart, whichever is later.

\* \* \* \* \*

■ 114. Amend table 7 to subpart YYYY of part 63 by adding in numerical order an entry for § 63.9(k) to read as follows:

TABLE 7 TO SUBPART YYYY OF PART 63—APPLICABILITY OF GENERAL PROVISIONS TO SUBPART YYYY

| Citation | Requirement | Applies to subpart YYYY | Explanation |
|---|---|---|---|
| * | * | * | * |
| §63.9(k) ......................................... | Electronic reporting procedures .... | Yes ................................................. | Only as specified in §63.9(j). |
| * | * | * | * |

## Subpart ZZZZ—National Emissions Standards for Hazardous Air Pollutants for Stationary Reciprocating Internal Combustion Engines

■ 115. Amend §63.6645 by revising paragraphs (b) and (d) to read as follows:

### §63.6645  What notifications must I submit and when?

* * * * *

(b) As specified in §63.9(b)(2), if you start up your stationary RICE with a site rating of more than 500 brake HP located at a major source of HAP emissions before the effective date of this subpart, you must submit an Initial Notification not later than December 13, 2004, or no later than 120 days after the source becomes subject to this subpart, whichever is later.

* * * * *

(d) As specified in §63.9(b)(2), if you start up your stationary RICE with a site rating of equal to or less than 500 brake HP located at a major source of HAP emissions before the effective date of this subpart and you are required to submit an initial notification, you must submit an Initial Notification not later than July 16, 2008, or no later than 120 days after the source becomes subject to this subpart, whichever is later.

* * * * *

■ 116. Amend table 8 to subpart ZZZZ of part 63 by adding in numerical order an entry for §63.9(k) to read as follows:

* * * * *

TABLE 8 TO SUBPART ZZZZ OF PART 63—APPLICABILITY OF GENERAL PROVISIONS TO SUBPART ZZZZ

| General provisions citation | Subject of citation | Applies to subpart | Explanation |
|---|---|---|---|
| * | * | * | * |
| §63.9(k) ......................................... | Electronic reporting procedures .... | Yes ................................................. | Only as specified in §63.9(j). |
| * | * | * | * |

## Subpart AAAAA—National Emission Standards for Hazardous Air Pollutants for Lime Manufacturing Plants

■ 117. Amend §63.7130 by revising paragraphs (b) and (c) to read as follows:

### §63.7130  What notifications must I submit and when?

* * * * *

(b) As specified in §63.9(b)(2), if you start up your affected source before January 5, 2004, you must submit an initial notification not later than 120 calendar days after January 5, 2004, or no later than 120 days after the source becomes subject to this subpart, whichever is later.

(c) If you startup your new or reconstructed affected source on or after January 5, 2004, you must submit an initial notification not later than 120 calendar days after you start up your affected source, or no later than 120 days after the source becomes subject to this subpart, whichever is later.

* * * * *

■ 118. Amend table 8 to subpart AAAAA of part 63 by adding in numerical order entries for §§63.1(c)(6) and 63.9(k) to read as follows:

TABLE 8 TO SUBPART AAAAA OF PART 63—APPLICABILITY OF GENERAL PROVISIONS TO SUBPART AAAAA

| Citation | Summary of requirement | Am I subject to this requirement? | Explanations |
|---|---|---|---|
| * | * | * | * |
| §63.1(c)(6) ...................................... | Reclassification ............................ | Yes. | |
| * | * | * | * |
| §63.9(k) ......................................... | Electronic reporting procedures .... | Yes ................................................. | Only as specified in §63.9(j). |
| * | * | * | * |

## Subpart BBBBB—National Emission Standards for Hazardous Air Pollutants for Semiconductor Manufacturing

■ 119. Amend § 63.7189 by revising paragraph (b) to read as follows:

### § 63.7189    What applications and notifications must I submit and when?

\*    \*    \*    \*    \*

(b) As specified in § 63.9(b)(2), if you start up your affected source before May 22, 2003, you must submit an Initial Notification not later than 120 calendar days after May 22, 2003, or no later than 120 days after the source becomes subject to this subpart, whichever is later.

\*    \*    \*    \*    \*

## Subpart CCCCC—National Emission Standards for Hazardous Air Pollutants for Coke Ovens: Pushing, Quenching, and Battery Stacks

■ 120. Amend § 63.7340 by revising paragraph (b) to read as follows:

### § 63.7340    What notifications must I submit and when?

\*    \*    \*    \*    \*

(b) As specified in § 63.9(b)(2), if you startup your affected source before April 14, 2003, you must submit your initial notification no later than August 12, 2003, or no later than 120 days after the source becomes subject to this subpart, whichever is later.

\*    \*    \*    \*    \*

## Subpart DDDDD—National Emission Standards for Hazardous Air Pollutants for Major Sources: Industrial, Commercial, and Institutional Boilers and Process Heaters

■ 121. Amend § 63.7545 by revising paragraphs (b) and (c) to read as follows:

### § 63.7189    What notifications must I submit and when?

\*    \*    \*    \*    \*

(b) As specified in § 63.9(b)(2), if you startup your affected source before January 31, 2013, you must submit an Initial Notification not later than 120 days after January 31, 2013, or no later than 120 days after the source becomes subject to this subpart, whichever is later.

(c) As specified in § 63.9(b)(4) and (5), if you startup your new or reconstructed affected source on or after January 31, 2013, you must submit an Initial Notification not later than 15 days after the actual date of startup of the affected source. For a new or reconstructed affected source that has reclassified to major source status, you must submit an Initial Notification not later 120 days after the source becomes subject to this subpart.

## Subpart EEEEE—National Emission Standards for Hazardous Air Pollutants for Iron and Steel Foundries

■ 122. Amend § 63.7750 by revising paragraph (b) to read as follows:

### § 63.7750    What notifications must I submit and when?

\*    \*    \*    \*    \*

(b) As specified in § 63.9(b)(2), if you start up your iron and steel foundry before April 22, 2004, you must submit your initial notification no later than August 20, 2004, or no later than 120 days after the source becomes subject to this subpart, whichever is later.

\*    \*    \*    \*    \*

## Subpart FFFFF—National Emission Standards for Hazardous Air Pollutants for Integrated Iron and Steel Manufacturing Facilities

■ 123. Amend § 63.7840 by revising paragraph (b) to read as follows:

### § 63.7840    What notifications must I submit and when?

\*    \*    \*    \*    \*

(b) As specified in § 63.9(b)(2), if you startup your affected source before May 20, 2003, you must submit your initial notification no later than September 17, 2003, or no later than 120 days after the source becomes subject to this subpart, whichever is later.

\*    \*    \*    \*    \*

## Subpart GGGGG—National Emission Standards for Hazardous Air Pollutants: Site Remediation

■ 124. Amend § 63.7950 by revising paragraphs (b) and (c) to read as follows:

### § 63.7950    What notifications must I submit and when?

\*    \*    \*    \*    \*

(b) As specified in § 63.9(b)(2), if you start up your affected source before October 8, 2003, you must submit an Initial Notification not later than 120 calendar days after October 8, 2003, or no later than 120 calendar days after the source becomes subject to this subpart, whichever is later.

(c) As specified in § 63.9(b)(3), if you start up your new or reconstructed affected source on or after the effective date, you must submit an Initial Notification no later than 120 calendar days after initial startup, or no later than 120 calendar days after the source becomes subject to this subpart, whichever is later.

■ 125. Amend table 3 to subpart GGGGG of part 63 by adding in numerical order an entry for § 63.9(k) to read as follows:

TABLE 3 TO SUBPART GGGGG OF PART 63—APPLICABILITY OF GENERAL PROVISIONS TO SUBPART GGGGG

| Citation | Subject | Brief description | Applies to subpart GGGGG |
|---|---|---|---|
| \* | \* | \* | \* |
| § 63.9(k) ......................................... | Electronic reporting procedures .... | Electronic reporting procedures for notifications per § 63.9(j). | Yes. |
| \* | \* | \* | \* |

## Subpart HHHHH—National Emission Standards for Hazardous Air Pollutants: Miscellaneous Coating Manufacturing

■ 126. Amend § 63.8070 by revising paragraph (b)(1) to read as follows:

**§ 63.8070   What notifications must I submit and when?**

\*    \*    \*    \*    \*

(b) \* \* \*

(1) As specified in § 63.9(b)(2), if you have an existing affected source on December 11, 2003, you must submit an initial notification not later than 120 calendar days after December 11, 2003,

or no later than 120 calendar days after the source becomes subject to this subpart, whichever is later.

\*    \*    \*    \*    \*

■ 127. Amend table 10 to subpart HHHHH of part 63 by revising the entry for § 63.9(j) and adding in numerical order an entry for § 63.9(k) to read as follows:

TABLE 10 TO SUBPART HHHHH OF PART 63—APPLICABILITY OF GENERAL PROVISIONS TO SUBPART HHHHH

|  |  |  |
|---|---|---|
| \* | \* | \* | \* | \* | \* | \* |

| Citation | Subject | Explanation |
|---|---|---|
| \* | \* | \* | \* | \* | \* | \* |
| § 63.9(j)  ......................................... | Change in previous information ..... | Yes, for change in major source status, otherwise § 63.8075(e)(8) specifies reporting requirements for process changes. |
| § 63.9(k)  ......................................... | Electronic reporting procedures ..... | Yes, as specified in § 63.9(j). |
| \* | \* | \* | \* | \* | \* | \* |

## Subpart IIIII—National Emission Standards for Hazardous Air Pollutants: Mercury Emissions From Mercury Cell Chlor-Alkali Plants

■ 128. Amend § 63.8252 by revising paragraph (b) to read as follows:

**§ 63.825   What notifications must I submit and when?**

\*    \*    \*    \*    \*

(b) As specified in § 63.9(b)(2), if you start up your affected source before December 19, 2003, you must submit an Initial Notification no later than 120 calendar days after December 19, 2003,

or no later than 120 days after the source becomes subject to this subpart, whichever is later.

\*    \*    \*    \*    \*

■ 129. Amend table 10 to subpart IIIII of part 63 by adding in numerical order an entry for § 63.9(k) to read as follows:

TABLE 10 TO SUBPART IIIII OF PART 63—APPLICABILITY OF GENERAL PROVISIONS TO SUBPART IIIII

|  |  |  |  |  |
|---|---|---|---|---|
| \* | \* | \* | \* | \* | \* | \* | \* |

| Citation | Subject | Applies to subpart IIIII | Explanation |
|---|---|---|---|
| \* | \* | \* | \* | \* | \* | \* | \* |
| \* | \* | \* | \* | \* | \* | \* | \* |
| § 63.9(k)  ......................................... | Electronic reporting procedures .... | Yes | Only as specified in § 63.9(j). |
| \* | \* | \* | \* | \* | \* | \* | \* |

## Subpart JJJJJ—National Emission Standards for Hazardous Air Pollutants for Brick and Structural Clay Products Manufacturing

■ 130. Amend table 8 to subpart JJJJJ of part 63 by revising entry 1 to read as follows:

TABLE 8 TO SUBPART JJJJJ OF PART 63—DEADLINES FOR SUBMITTING NOTIFICATIONS

| If you . . . | You must . . . | No later than . . . | | | | As specified in . . . | |
|---|---|---|---|---|---|---|---|
| * | * | * | * | * | * | * | |
| 1. Start up your affected source before December 28, 2015. | Submit an Initial Notification. | June 22, 2016, or no later than 120 days after the source becomes subject to this subpart, whichever is later. | | | | § 63.9(b)(2). | |
| | * | * | * | * | * | * | * |

■ 131. Amend table 10 to subpart JJJJJ of part 63 adding in numerical order an entry for § 63.9(k) to read as follows:

TABLE 10 TO SUBPART JJJJJ OF PART 63—APPLICABILITY OF GENERAL PROVISIONS TO SUBPART JJJJJ

| | Citation | | Subject | | Brief description | | Applies to subpart JJJJJ? |
|---|---|---|---|---|---|---|---|
| * | * | * | * | * | * | * | |
| § 63.9(k) ............................. | | Electronic reporting procedures. | | Electronic reporting procedures for notifications per § 63.9(j). | | Yes. | |
| | * | * | * | * | * | * | * |

**Subpart KKKKK—National Emission Standards for Hazardous Air Pollutants for Clay Ceramics Manufacturing**

■ 132. Amend table 9 to subpart KKKKK of part 63 by revising entry 1 to read as follows:

TABLE 9 TO SUBPART KKKKK OF PART 63—DEADLINES FOR SUBMITTING NOTIFICATIONS

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | * | * | * | * | * | * | * |
| **If you . . .** | **You must . . .** | | **No later than . . .** | | | **As specified in . . .** | |
| 1. Start up your affected source before December 28, 2015. | Submit an Initial Notification ......... | | June 22, 2016, or no later than 120 days after the source becomes subject to this subpart, whichever is later. | | | § 63.9(b)(2). | |
| | * | * | * | * | * | * | * |

■ 133. Amend table 11 to subpart KKKKK of part 63 adding in numerical order an entry for § 63.9(k) to read as follows:

TABLE 11 TO SUBPART KKKKK OF PART 63—APPLICABILITY OF GENERAL PROVISIONS TO SUBPART KKKKK

| | Citation | | Subject | | Brief description | | Applies to subpart KKKKK? |
|---|---|---|---|---|---|---|---|
| | * | * | * | * | * | * | * |
| § 63.9(k) ........................................ | | Electronic reporting procedures .... | | Electronic reporting procedures for notifications per § 63.9(j). | | Yes. | |
| | * | * | * | * | * | * | * |

**Subpart LLLLL—National Emission Standards for Hazardous Air Pollutants: Asphalt Processing and Asphalt Roofing Manufacturing**

■ 134. Amend § 63.8692 by revising paragraph (b) to read as follows:

**§ 63.8692   What notifications must I submit and when?**

\*    \*    \*    \*    \*

(b) As specified in § 63.9(b)(2), if you start up your affected source before April 29, 2003, you must submit an Initial Notification not later than 120 calendar days after April 29, 2003, or no later than 120 days after the source becomes subject to this subpart, whichever is later.

\*    \*    \*    \*    \*

■ 135. Amend table 7 to subpart LLLLL of part 63 by adding in numerical order an entry for § 63.9(k) to read as follows:

TABLE 7 TO SUBPART LLLLL OF PART 63—APPLICABILITY OF GENERAL PROVISIONS TO SUBPART LLLLL

| Citation | Subject | Brief description | Applies to subpart LLLLL |
|---|---|---|---|
| \* | \* | \* | \* |
| § 63.9(k) ............................. | Electronic reporting procedures. | Electronic reporting procedures for notifications per § 63.9(j). | Yes. |
| \* | \* | \* | \* |

**Subpart MMMMM—National Emission Standards for Hazardous Air Pollutants: Flexible Polyurethane Foam Fabrication Operations**

■ 136. Amend § 63.8816 by revising paragraph (b) to read as follows:

**§ 63.8816   What notifications must I submit and when?**

\*    \*    \*    \*    \*

(b) If you own or operate an existing loop slitter or flame lamination affected source, submit an initial notification no later than 120 days after April 14, 2003, or no later than 120 days after the source becomes subject to this subpart, whichever is later.

\*    \*    \*    \*    \*

■ 137. Amend table 7 to subpart MMMMM of part 63 by adding in numerical order an entry for § 63.9(k) to read as follows:

TABLE 7 TO SUBPART MMMMM OF PART 63—APPLICABILITY OF GENERAL PROVISIONS TO SUBPART MMMMM

| Citation | Requirement | Applies to subpart MMMMM | Explanation |
|---|---|---|---|
| \* | \* | \* | \* |
| § 63.9(k) ........................... | Electronic reporting procedures .... | Yes ................................. | Only as specified in § 63.9(j). |
| \* | \* | \* | \* |

**Subpart NNNNN—National Emission Standards for Hazardous Air Pollutants: Hydrochloric Acid Production**

■ 138. Amend § 63.9045 by revising paragraph (b) to read as follows:

**§ 63.9045   What notifications must I submit and when?**

\*    \*    \*    \*    \*

(b) As specified in § 63.9(b)(2), if you start up your affected source before April 17, 2003, you must submit an Initial Notification not later than 120 calendar days after April 17, 2003, or no later than 120 days after the source becomes subject to this subpart, whichever is later.

\*    \*    \*    \*    \*

■ 139. Amend table 7 to subpart NNNNN of part 63 by adding in numerical order an entry for § 63.9(k) to read as follows:

TABLE 7 TO SUBPART NNNNN OF PART 63—APPLICABILITY OF GENERAL PROVISIONS TO SUBPART NNNNN

| Citation | Requirement | Applies to subpart NNNNN | Explanation |
|---|---|---|---|
| \* | \* | \* | \* |
| § 63.9(k) ........................... | Electronic reporting procedures .... | Yes ................................. | Only as specified in § 63.9(j). |
| \* | \* | \* | \* |

## Subpart PPPPP—National Emission Standards for Hazardous Air Pollutants for Engine Test Cells/Stands

■ 140. Amend § 63.9345 by revising paragraph (b)(1) to read as follows:

### § 63.9345 What notifications must I submit and when?

\*      \*      \*      \*      \*

(b) \* \* \*

(1) As specified in § 63.9(b)(2), if you start up your new or reconstructed affected source before the effective date of this subpart, you must submit an Initial Notification not later than 120 calendar days after May 27, 2003, or no later than 120 days after the source

becomes subject to this subpart, whichever is later.

\*      \*      \*      \*      \*

■ 141. Amend table 7 to subpart PPPPP of part 63 by adding in numerical order entries for §§ 63.1(c)(6) and 63.9(k) to read as follows:

TABLE 7 TO SUBPART PPPPP OF PART 63—APPLICABILITY OF GENERAL PROVISIONS TO SUBPART PPPPP

| Citation | Subject | Brief description | Applies to subpart PPPPP |
|---|---|---|---|
| \* | \* | \* | \* |
| § 63.1(c)(6) | Applicability | Reclassification | Yes. |
| \* | \* | \* | \* |
| § 63.9(k) | Notifications | Electronic reporting procedures | Yes, only as specified in § 63.9(j). |
| \* | \* | \* | \* |

## Subpart QQQQQ—National Emission Standards for Hazardous Air Pollutants for Friction Materials Manufacturing Facilities

■ 142. Amend § 63.9485 by revising paragraph (a) to read as follows:

### § 63.9485 Am I subject to this subpart?

(a) You are subject to this subpart if you own or operate a friction materials manufacturing facility (as defined in § 63.9565) that is (or is part of) a major source of hazardous air pollutants (HAP) emissions. Your friction materials

manufacturing facility is a major source of HAP if it emits or has the potential to emit any single HAP at a rate of 9.07 megagrams (10 tons) or more per year or any combination of HAP at a rate of 22.68 megagrams (25 tons) or more per year.

\*      \*      \*      \*      \*

■ 143. Amend § 63.9535 by revising paragraph (c) to read as follows:

### § 63.9535 What notifications must I submit and when?

\*      \*      \*      \*      \*

(c) As specified in § 63.9(b)(2), if you start up your affected source before October 18, 2002, you must submit your initial notification no later than 120 calendar days after October 18, 2002, or no later than 120 days after the source becomes subject to this subpart, whichever is later.

\*      \*      \*      \*      \*

■ 144. Amend table 1 to subpart QQQQQ of part 63 by adding in numerical order an entry for § 63.9(k) to read as follows:

TABLE 1 TO SUBPART QQQQQ OF PART 63—APPLICABILITY OF GENERAL PROVISIONS TO SUBPART QQQQQ

| Citation | Subject | Applies to subpart QQQQQ? | Explanation |
|---|---|---|---|
| \* | \* | \* | \* |
| § 63.9(k) | Electronic reporting procedures | Yes | Only as specified in § 63.9(j). |
| \* | \* | \* | \* |

## Subpart RRRRR—National Emission Standards for Hazardous Air Pollutants: Taconite Iron Ore Processing

■ 145. Revise § 63.9581 to read as follows:

### § 63.9581 Am I subject to this subpart?

You are subject to this subpart if you own or operate a taconite iron ore processing plant that is (or is part of) a major source of hazardous air pollutant (HAP) emissions. Your taconite iron ore

processing plant is a major source of HAP if it emits or has the potential to emit any single HAP at a rate of 10 tons or more per year or any combination of HAP at a rate of 25 tons or more per year.

■ 146. Amend § 63.9640 by revising paragraph (b) to read as follows:

### § 63.9640 What notifications must I submit and when?

\*      \*      \*      \*      \*

(b) As specified in § 63.9(b)(2), if you start up your affected source before

October 30, 2003, you must submit your initial notification no later than 120 calendar days after October 30, 2003, or no later than 120 days after the source becomes subject to this subpart, whichever is later.

\*      \*      \*      \*      \*

■ 147. Amend table 2 to subpart RRRRR of part 63 by adding in numerical order entries for § 63.1(c)(6) and § 63.9(k) to read as follows:

\*      \*      \*      \*      \*

TABLE 2 TO SUBPART RRRRR OF PART 63—APPLICABILITY OF GENERAL PROVISIONS TO SUBPART RRRRR OF PART 63

| Citation | Subject | Applies to subpart RRRRR | Explanation |
|---|---|---|---|
| * | * | * | * |
| §63.1(c)(6) ...................................... | Reclassification ............................ | Yes. | |
| * | * | * | * |
| §63.9(k) ........................................ | Electronic reporting procedures .... | Yes ................................................ | Only as specified in §63.9(j). |
| * | * | * | * |

## Subpart SSSSS—National Emission Standards for Hazardous Air Pollutants for Refractory Products Manufacturing

■ 148. Amend §63.9812 by revising paragraph (b) to read as follows:

### §63.9812  What notifications must I submit and when?

*    *    *    *    *

(b) As specified in §63.9(b)(2), if you start up your affected source before April 16, 2003, you must submit an Initial Notification no later than 120 calendar days after April 16, 2003, or no later than 120 days after the source becomes subject to this subpart, whichever is later.

*    *    *    *    *

■ 149. Amend table 11 to subpart SSSSS of part 63 by adding in numerical order an entry for §63.9(k) to read as follows:

*    *    *    *    *

TABLE 11 TO SUBPART SSSSS OF PART 63—APPLICABILITY OF GENERAL PROVISIONS TO SUBPART SSSSS

| Citation | Subject | Brief description | Applies to subpart SSSSS |
|---|---|---|---|
| * | * | * | * |
| §63.9(k) ......................................... | Notifications .................................... | Electronic reporting procedures .... | Yes, only as specified in §63.9(j). |
| * | * | * | * |

## Subpart TTTTT—National Emissions Standards for Hazardous Air Pollutants for Primary Magnesium Refining

■ 150. Amend §63.9930 by revising paragraph (b) to read as follows:

### §63.9930  What notifications must I submit and when?

*    *    *    *    *

(b) As specified in §63.9(b)(2), if you start up your affected source before October 10, 2003, you must submit your initial notification no later than 120 calendar days after October 10, 2003, or no later than 120 days after the source becomes subject to this subpart, whichever is later.

*    *    *    *    *

## Subpart WWWWW—National Emission Standards for Hospital Ethylene Oxide Sterilizers

■ 151. Amend table 1 to subpart WWWWW of part 63 by removing the entry for §63.9(d)–(j) and adding in numerical order entries for §§63.9(d)–(i) and 63.9(j)–(k).

The additions read as follows:

*    *    *    *    *

TABLE 1 TO SUBPART WWWWW OF PART 63—APPLICABILITY OF GENERAL PROVISIONS TO SUBPART WWWWW

| Citation | Subject | Applies to subpart WWWWW | Explanation |
|---|---|---|---|
| * | * | * | * |
| §63.9(d)–(i) ................................... | Other notifications ......................... | No. | |
| §63.9(j)–(k) ................................... | Change in information already submitted Electronic reporting. | Yes. | |
| * | * | * | * |

**Subpart BBBBBB—National Emission Standards for Hazardous Air Pollutants for Source Category: Gasoline Distribution Bulk Terminals, Bulk Plants, and Pipeline Facilities**

■ 152. Amend § 63.11086 by revising paragraph (e) introductory text to read as follows:

**§ 63.11086   What requirements must I meet of my facility is a bulk gasoline plant?**

\*   \*   \*   \*   \*

(e) You must submit an Initial Notification that you are subject to this subpart by May 9, 2008, or no later than 120 days after the source becomes subject to this subpart, whichever is later unless you meet the requirements in paragraph (g) of this section. The Initial Notification must contain the information specified in paragraphs (e)(1) through (4) of this section. The notification must be submitted to the applicable EPA Regional Office and the delegated state authority, as specified in § 63.13.

\*   \*   \*   \*   \*

■ 153. Amend table 3 to subpart BBBBBB of part 63 by revising the entry for § 63.9(b) and adding in numerical order an entry for § 63.9(k) to read as follows:

TABLE 3 TO SUBPART BBBBBB OF PART 63—APPLICABILITY OF GENERAL PROVISIONS

| Citation | Subject | Brief description | Applies to subpart BBBBBB |
|---|---|---|---|
| \* | \* | \* | \* |
| § 63.9(b) (1)–(2), (4)–(5) .... | Initial Notifications .............. | Submit notification within 120 days after effective date, or no later than 120 days after the source becomes subject to this subpart, whichever is later; notification of intent to construct/reconstruct, notification of commencement of construction/reconstruction, notification of startup; contents of each. | Yes. |
| \* | \* | \* | \* |
| § 63.9(k) .............................. | Notifications ....................... | Electronic reporting procedures ...................................... | Yes, only as specified by § 63.9(j). |
| \* | \* | \* | \* |

**Subpart CCCCCC—National Emission Standards for Hazardous Air Pollutants for Source Category: Gasoline Dispensing Facilities**

■ 154. Amend § 63.11124 by revising paragraphs (a)(1) introductory text and (b)(1) introductory text to read as follows:

**§ 63.11124   What notifications must I submit and when?**

(a) \*  \*  \*

(1) You must submit an Initial Notification that you are subject to this subpart by May 9, 2008, or no later than 120 days after the source becomes subject to this subpart, whichever is later, or at the time you become subject to the control requirements in § 63.11117, unless you meet the requirements in paragraph (a)(3) of this section. If your affected source is subject to the control requirements in § 63.11117 only because it loads gasoline into fuel tanks other than those in motor vehicles, as defined in § 63.11132, you must submit the Initial Notification by May 24, 2011, or no later than 120 days after the source becomes subject to this subpart, whichever is later. The Initial Notification must contain the information specified in paragraphs (a)(1)(i) through (iii) of this section. The notification must be submitted to the applicable EPA Regional office and delegated state authority as specified in § 63.13.

\*   \*   \*   \*   \*

(b) \*  \*  \*

(1) You must submit an Initial Notification that you are subject to this subpart by May 9, 2008, or no later than 120 days after the source becomes subject to this subpart, whichever is later, or at the time you become subject to the control requirements in § 63.11118. If your affected source is subject to the control requirements in § 63.11118 only because it loads gasoline into fuel tanks other than those in motor vehicles, as defined in § 63.11132, you must submit the Initial Notification by May 24, 2011, or no later than 120 days after the source becomes subject to this subpart, whichever is later. The Initial Notification must contain the information specified in paragraphs (b)(1)(i) through (iii) of this section. The notification must be submitted to the applicable EPA Regional office and delegated state authority as specified in § 63.13.

\*   \*   \*   \*   \*

■ 155. Amend table 3 to subpart CCCCCC of part 63 by revising the entry for § 63.9(b) and adding in numerical order an entry for § 63.9(k) to read as follows:

TABLE 3 TO SUBPART CCCCCC OF PART 63—APPLICABILITY OF GENERAL PROVISIONS

| Citation | Subject | Brief description | Applies to subpart CCCCCC |
|---|---|---|---|
| \* | \* | \* | \* |
| § 63.9(b)(1)–(2), (4)–(5) ...... | Initial Notifications .............. | Submit notification within 120 days after effective date, or no later than 120 days after the source becomes subject to this subpart, whichever is later; notification of intent to construct/reconstruct, notification of commencement of construction/reconstruction, notification of startup; contents of each. | Yes. |

TABLE 3 TO SUBPART CCCCCC OF PART 63—APPLICABILITY OF GENERAL PROVISIONS—Continued

| Citation | Subject | Brief description | Applies to subpart CCCCCC |
|---|---|---|---|
| * | * | * | * |
| §63.9(k) .............................. | Notifications ...................... | Electronic reporting procedures ..................................... | Yes, only as specified in §63.9(j). |
| * | * | * | * |

## Subpart HHHHHH—National Emission Standards for Hazardous Air Pollutants: Paint Stripping and Miscellaneous Surface Coating Operations at Area Sources

■ 156. Amend §63.11175 by revising paragraph (a) introductory text to read as follows:

### §63.11175 What notifications must I submit?

(a) Initial Notification. If you are the owner or operator of a paint stripping operation using paint strippers containing MeCl and/or a surface coating operation subject to this subpart, you must submit the initial notification required by §63.9(b). For a new affected source, you must submit the Initial Notification no later than 180 days after initial startup, or no later than 120 days after the source becomes subject to this subpart, or July 7, 2008, whichever is later. For an existing affected source, you must submit the initial notification no later than January 11, 2010, or no later than 120 days after the source becomes subject to this subpart. The initial notification must provide the information specified in paragraphs (a)(1) through (8) of this section.

* * * * *

■ 157. Amend table 1 to subpart HHHHHH of part 63 by adding in numerical order an entry for §63.9(k) to read as follows:

TABLE 1 TO SUBPART HHHHHH OF PART 63—APPLICABILITY OF GENERAL PROVISIONS TO SUBPART HHHHHH OF PART 63

| Citation | Subject | Applicable to subpart HHHHHH | Explanation |
|---|---|---|---|
| * | * | * | * |
| §63.9(k) ........................... | Electronic reporting procedures .... | Yes ................................................. | Only as specified in §63.9(j). |
| * | * | * | * |

## Subpart PPPPP—National Emission Standards for Hazardous Air Pollutants for Lead Acid Battery Manufacturing Area Sources

■ 158. Amend §63.11425 by revising paragraphs (b) and (c) to read as follows:

### §63.11425 What General Provisions apply to this subpart?

* * * * *

(b) For existing sources, the initial notification required by §63.9(b) must be submitted not later than November 13, 2007, or no later than 120 days after the source becomes subject to this subpart, whichever is later.

(c) For existing sources, the initial notification of compliance required by §63.9(h) must be submitted not later than March 13, 2009, or no later than 120 days after the source becomes subject to this subpart, whichever is later.

## Subpart QQQQQQ—National Emission Standards for Hazardous Air Pollutants for Wood Preserving Area Sources

■ 159. Amend §63.11432 by revising paragraphs (b) introductory text and (c) to read as follows:

### §63.11432 What General Provisions apply to this subpart?

* * * * *

(b) If you own or operate a new or existing affected source that uses any wood preservative containing chromium, arsenic, dioxins, or methylene chloride, you must submit an initial notification of applicability required by §63.9(b)(2) no later than 90 days after the applicable compliance date specified in §63.11429, or no later than 90 days after the source becomes subject to this subpart, whichever is later. The initial notification may be combined with the notification of compliance status required in paragraph (c) of this section. The notification of applicability must include the following information:

* * * * *

(c) If you own or operate a new or existing affected source that uses any wood preservative containing chromium, arsenic, dioxins, or methylene chloride, you must submit a notification of compliance status required by §63.9(h) no later than 90 days after the applicable compliance date specified in §63.11429, or no later than 90 days after the source becomes subject to this subpart, whichever is later. Your notification of compliance status must include this certification of compliance, signed by a responsible official, for the standards in §63.11430: ''This facility complies with the management practices to minimize air emissions from the preservative treatment of wood in accordance with §63.11430.''

* * * * *

## Subpart RRRRRR—National Emission Standards for Hazardous Air Pollutants for Clay Ceramics Manufacturing Area Sources

■ 160. Amend §63.11441 by revising paragraph (a) to read as follows:

### §63.11441 What are the notification requirements?

(a) You must submit an Initial Notification required by §63.9(b)(2) no later than 120 days after the applicable compliance date specified in §63.11437, or no later than 120 days after the source becomes subject to this subpart, whichever is later. The Initial Notification must include the

information specified in §§ 63.9(b)(2)(i) through (iv) and may be combined with the Notification of Compliance Status required in paragraph (b) of this section.

\* \* \* \* \*

## Subpart TTTTTT—National Emission Standards for Hazardous Air Pollutants for Secondary Nonferrous Metals Processing Area Sources

■ 161. Amend § 63.11469 by revising paragraph (a) to read as follows:

### § 63.11469  What are the notification requirements?

(a) You must submit the Initial Notification required by § 63.9(b)(2) no later than 120 days after the applicable compliance date specified in § 63.11464, or no later than 120 days after the source becomes subject to this subpart, whichever is later. The Initial Notification must include the information specified in § 63.9(b)(2)(i) through (iv) and may be combined with the Notification of Compliance Status required in § 63.11467 and paragraph (b) of this section if you choose to submit both notifications within 120 days.

\* \* \* \* \*

## Subpart WWWWWW—National Emission Standards for Hazardous Air Pollutants: Area Source Standards for Plating and Polishing Operations

■ 162. Amend § 63.11509 by revising paragraph (a)(3) to read as follows:

### § 63.11509  What are my notification, reporting, and recordkeeping requirements?

(a) \* \* \*

(3) If you start up your affected source on or before July 1, 2008, you must submit an Initial Notification not later than 120 calendar days after July 1, 2008, or no later than 120 days after the source becomes subject to this subpart, whichever is later.

\* \* \* \* \*

## Subpart XXXXXX—National Emission Standards for Hazardous Air Pollutants Area Source Standards for Nine Metal Fabrication and Finishing Source Categories

■ 163. Amend § 63.11519 by revising paragraph (a)(1) introductory text to read as follows:

### § 63.11519  What are my notifications, recordkeeping, and reporting requirements?

(a) \* \* \*

(1) *Initial notification.* If you are the owner or operator of an area source in one of the nine metal fabrication and finishing source categories, as defined

in § 63.11514, you must submit the initial notification required by § 63.9(b), for a new affected source no later than 120 days after initial startup, or no later than 120 days after the source becomes subject to this subpart, or November 20, 2008, whichever is later. For an existing affected source, you must submit the initial notification no later than July 25, 2011, or 120 days after the source becomes subject to this subpart, whichever is later. Your initial notification must provide the information specified in paragraphs (a)(1)(i) through (iv) of this section.

\* \* \* \* \*

## Subpart YYYYYY—National Emission Standards for Hazardous Air Pollutants for Area Sources: Ferroalloys Production Facilities

■ 164. Amend § 63.11529 by revising paragraph (a) to read as follows:

### § 63.11529  What are the notification, reporting, and recordkeeping requirements?

(a) *Initial Notification.* You must submit the Initial Notification required by § 63.9(b)(2) no later than 120 days after December 23, 2008, or no later than 120 days after the source becomes subject to this subpart, whichever is later. The Initial Notification must include the information specified in § 63.9(b)(2)(i) through (iv).

\* \* \* \* \*

## Subpart AAAAAAA—National Emission Standards for Hazardous Air Pollutants for Area Sources: Asphalt Processing and Asphalt Roofing Manufacturing

■ 165. Amend § 63.11564 by revising paragraph (a)(2) to read as follows:

### § 63.11564  What are my notification, recordkeeping, and reporting requirements?

(a) \* \* \*

(2) As specified in § 63.9(b)(2), if you have an existing affected source, you must submit an Initial Notification not later than 120 calendar days after December 2, 2009, or no later than 120 days after the source becomes subject to this subpart, whichever is later.

\* \* \* \* \*

## Subpart BBBBBBB—National Emission Standards for Hazardous Air Pollutants for Area Sources: Chemical Preparations Industry

■ 166. Amend § 63.11585 by revising paragraph (b)(1) to read as follows:

### § 63.11585  What are my notification, recordkeeping, and reporting requirements?

\* \* \* \* \*

(b) \* \* \*

(1) *Initial Notification of Applicability.* If you own or operate an existing affected source, you must submit an initial notification of applicability as required by § 63.9(b)(2) no later than April 29, 2010, or no later than 120 days after the source becomes subject to this subpart, whichever is later. If you own or operate a new affected source, you must submit an initial notification of applicability required by § 63.9(b)(2) no later than 120 days after initial start-up of operation, or no later than 120 days after the source becomes subject to this subpart, or April 29, 2010, whichever is later. The initial notification of applicability must include the information specified in §§ 63.9(b)(2)(i) through (iii).

\* \* \* \* \*

## Subpart CCCCCCC—National Emission Standards for Hazardous Air Pollutants for Area Sources: Paints and Allied Products Manufacturing

■ 167. Amend § 63.11603 by revising paragraph (a)(1) introductory text to read as follows:

### § 63.11603  What are the notification, recordkeeping, and reporting requirements?

(a) \* \* \*

(1) *Initial Notification of Applicability.* If you own or operate an existing affected source, you must submit an initial notification of applicability required by § 63.9(b)(2) no later than June 1, 2010, or no later than 120 days after the source becomes subject to this subpart, whichever is later. If you own or operate a new affected source, you must submit an initial notification of applicability required by § 63.9(b)(2) no later than 180 days after initial start-up of the operations, or no later than 120 days after the source becomes subject to this subpart, or June 1, 2010, whichever is later. The notification of applicability must include the information specified in paragraphs (a)(1)(i) through (iii) of this section.

\* \* \* \* \*

## Subpart HHHHHHH—National Emission Standards for Hazardous Air Pollutant Emissions for Polyvinyl Chloride and Copolymers Production

■ 168. Amend table 4 to subpart HHHHHHH of part 63 by revising the entry for § 63.1 and adding in numerical

order an entry for § 63.9(k) to read as follows:

### Table 4 to Subpart HHHHHHH of Part 63—Applicability of General Provisions to Part 63

| Citation | Subject | Applies to subpart HHHHHHH | Comment |
|---|---|---|---|
| § 63.1(a)(1)–(a)(4), (a)(6), (a)(10)–(a)(12), (b)(1), (b)(3), (c)(1), (c)(2), (c)(5), (c)(6), (e). | Applicability ...................... | Yes. | |
| * | * | * | * | * | * | * |
| § 63.9(k) ................................................. | Electronic reporting procedures. | Yes .................................... | Only as specified in § 63.9(j). |
| * | * | * | * | * | * | * |

[FR Doc. 2020–22044 Filed 11–10–20; 4:15 pm]

**BILLING CODE P**