ORAL ARGUMENT NOT YET SCHEDULED

No. 21-1024 (consolidated with No. 21-1034)

---

**IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

CALIFORNIA COMMUNITIES AGAINST AIR TOXICS ET AL.,
*Petitioners*,

v.

ENVIRONMENTAL PROTECTION AGENCY ET AL.,
*Respondents*.

---

ON PETITIONS FOR REVIEW OF FINAL AGENCY ACTION OF THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,
85 FED. REG. 73,854 (NOV. 19, 2020)

**ENVIRONMENTAL PETITIONERS' PROOF OPENING BRIEF**


James Samuel Pew
Earthjustice
1001 G. St., NW
Washington D.C. 20001
(202) 667-4500
jpew@earthjustice.org

*Counsel for California Communities Against Air Toxics, Downwinders at Risk, Environmental Integrity Project, Hoosier Environmental Council, Louisiana Bucket Brigade, Ohio Citizen Action, and Texas Environmental Justice Advocacy Services*

Sanjay Narayan
Sierra Club Environmental
Law Program
2101 Webster St., Ste. 1300
Oakland, CA 94612
(415) 977-5769
sanjay.narayan@sierrclub.org

*Counsel for Sierra Club*


*(Complete Counsel Listing Appears on Signature Page)*

## Certificate as to Parties, Rulings, and Related Cases

Petitioners submit the following Certificate as to Parties, Rulings, and Related Cases.

A. PARTIES

The parties, amici, and entities in these consolidated proceedings are:

Petitioners

21-1024: California Communities Against Toxics, Downwinders at Risk, Environmental Defense Fund, Environmental Integrity Project, Hoosier Environmental Council, Louisiana Bucket Brigade, Natural Resources Defense Council, Ohio Citizen Action, Sierra Club, and Texas Environmental Justice Advocacy Services

21-1034: State of California, States of Delaware, Illinois, Maryland, New Jersey, New York, Oregon, Rhode Island, Washington and Wisconsin, Commonwealths of Massachusetts, Pennsylvania, and Virginia, and Cities of Chicago and New York.

Respondents

21-1024 & 21-1034: Environmental Protection Agency and Lee M. Zeldin

Intervenors

21-1024 & 21-1034: Air Permitting Forum, American Chemistry Council, American Wood Council, Auto Industry Forum, Brick Industry Association, Portland Cement Association,

Intervenor-Applicant

21-1024 & 21-1034: National Lime Association

Amici

There are presently no amici.

B. RULINGS UNDER REVIEW

Petitioners seek review of EPA's final rule titled "Reclassification of Major Sources as Area Sources Under Section 112 of the Clean Air Act," 85 Fed. Reg. at 73,854 (Nov. 19, 2020).

C. RELATED CASES

The petitions on review have not previously been before this or any other court. Counsel for petitioners are unaware of any currently

pending related cases within the meaning of D.C. Circuit Rule 28(a)(1)(C).

Respectfully Submitted,

/s
James Samuel Pew
Earthjustice
1001 G. St., NW
Washington D.C. 20001
(202) 667-4500
jpew@earthjustice.org

*Counsel for California Communities Against Air Toxics, Downwinders at Risk, Environmental Integrity Project, Hoosier Environmental Council, Louisiana Bucket Brigade, Ohio Citizen Action, and Texas Environmental Justice Advocacy Services*

Sanjay Narayan
Sierra Club Environmental Law Program
2101 Webster St., Ste. 1300
Oakland, CA 94612
(415) 977-5769
sanjay.narayan@sierrclub.org

*Counsel for Sierra Club*

Vickie L. Patton
Noha Haggag
Environmental Defense Fund
2060 Broadway, Ste. 300
Boulder CO 80302
(303) 447-7214
vpatton@edf.org
nhaggag@edf.org

*Counsel for Environmental Defense Fund*

John Walke
Emily Davis
Natural Resources Defense Council
1152 15th St., NW, Ste. 300
Washington D.C. 20005
(202) 289-6868
jwalke@nrdc.org
edavis@nrdc.org

*Counsel for Natural Resources Defense Council*

## RULE 26.1 DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, Petitioners California Communities Against Toxics, Downwinders at Risk, Environmental Defense Fund, Environmental Integrity Project, Hoosier Environmental Council, Louisiana Bucket Brigade, Natural Resources Defense Council, Ohio Citizen Action, Sierra Club, and Texas Environmental Justice Advocacy Services make the following disclosures:

**California Communities Against Toxics**

California Communities Against Toxics is a non-profit organization that is a project of a non-profit corporation (Del Amo Action Committee) that is organized and existing under the laws of the State of California. It is an environmental justice network that aims to reduce exposure to pollution, to expand knowledge about the effects of toxic chemicals on human health and the environment, and to protect the most vulnerable people from harm. California Communities Against Toxics does not have any parent corporations, and no publicly held corporation has a ten percent or greater ownership interest in it.

**Downwinders at Risk**

Downwinders at Risk, a non-profit corporation organized and existing under the laws of the State of Texas, is a diverse grassroots citizens group dedicated to protecting public health and the environment from air pollution in North Texas. Downwinders at Risk does not have any parent corporations, and no publicly held corporation has a ten percent or greater ownership interest in it.

**Environmental Defense Fund**

Environmental Defense Fund is a national non-profit organization, organized under the laws of the State of New York, that links science, economics, and law to create innovative, equitable, and cost-effective solutions to urgent environmental problems. Environmental Defense Fund does not have any parent corporations, and no publicly held corporation has a ten percent or greater ownership interest in it.

**Environmental Integrity Project**

Environmental Integrity Project, a corporation organized and existing under the laws of the District of Columbia, is a national non-profit organization that advocates for more effective enforcement of environmental laws. Environmental Integrity Project does not have any

parent corporations, and no publicly held corporation has a ten percent or greater ownership interest in it.

**Hoosier Environmental Council**

Hoosier Environmental Council is a non-profit corporation organized and existing under the laws of the state of Indiana. Hoosier Environmental Council is Indiana's largest environmental public policy organization, working to improve our health, economy, and environment for thirty-five years, through education, technical assistance, and advocacy. Hoosier Environmental Council does not have any parent corporations, and no publicly held corporation has a ten percent or greater ownership interest in it.

**Louisiana Bucket Brigade**

The Louisiana Bucket Brigade is a non-profit environmental health and justice organization organized and existing under the laws of the state of Louisiana. It works with communities that neighbor Louisiana's oil refineries and chemical plants and uses grassroots action to create an informed, healthy society with a culture that holds the petrochemical industry and government accountable for the true costs of pollution to create a healthy, prosperous, pollution-free, and just state where people

and the environment are valued over profit. LABB does not have any parent corporations, and no publicly held corporation has a ten percent or greater ownership interest in it.

**Natural Resources Defense Council**

Natural Resources Defense Council, a corporation organized and existing under the laws of the State of New York, is a national nonprofit organization dedicated to improving the quality of the human environment and protecting the nation's endangered natural resources. Natural Resources Defense Council does not have any parent corporations and no publicly held corporation has a ten percent or greater ownership in it.

**Ohio Citizen Action**

Ohio Citizen Action is a nonprofit organization existing under the laws of the State of Ohio dedicated to preventing and reducing exposure to pollution and strengthening public health and environmental protections. Ohio Citizen Action does not have any parent corporations and no publicly held corporation has a ten percent or greater ownership in it.

**Sierra Club**

Sierra Club is a non-profit corporation organized under the laws of the State of California. Sierra Club's mission is to explore, enjoy, and protect the wild places of the Earth; to practice and promote the responsible use of the Earth's resources and ecosystems; to educate and enlist humanity to protect and restore the quality of the natural and human environment; and to use all lawful means to carry out these objectives. Sierra Club does not have any parent corporations, and no publicly held corporation has a ten percent or greater ownership interest in Sierra Club.

**Texas Environmental Justice Advocacy Services ("TEJAS")**

TEJAS is a non-profit corporation organized and existing under the laws of the state of Texas. TEJAS promotes environmental protection through education, policy development, community awareness, and legal action to ensure that everyone, regardless of race or income, is entitled to live in a clean environment. TEJAS does not have any parent corporations and no publicly held corporation has a ten percent or greater ownership in it.

Respectfully submitted,

/s

James Samuel Pew
Earthjustice
1001 G. St., NW
Washington D.C. 20001
(202) 667-4500
jpew@earthjustice.org

*Counsel for California Communities Against Air Toxics, Downwinders at Risk, Environmental Integrity Project, Hoosier Environmental Council, Louisiana Bucket Brigade, Ohio Citizen Action, and Texas Environmental Justice Advocacy Services*

Sanjay Narayan
Sierra Club Environmental Law Program
2101 Webster St., Ste. 1300
Oakland, CA 94612
(415) 977-5769
sanjay.narayan@sierrclub.org

*Counsel for Sierra Club*

Vickie L. Patton
Noha Haggag
Environmental Defense Fund
2060 Broadway, Ste. 300
Boulder CO 80302
(303) 447-7214
vpatton@edf.org
nhaggag@edf.org

*Counsel for Environmental Defense Fund*

John Walke
Emily Davis
Natural Resources Defense Council
1152 15th St., NW, Ste. 300
Washington D.C. 20005
(202) 289-6868
jwalke@nrdc.org
edavis@nrdc.org

*Counsel for Natural Resources Defense Council*

## TABLE OF CONTENTS

Certificate as to Parties, Rulings, and Related Cases ..... i
Rule 26.1 Disclosure Statement ..... iv
Table of Authorities ..... xii
Glossary of Abbreviations ..... xvi
Introduction ..... 1
Jurisdiction ..... 4
Statutes and Regulations ..... 4
Issues Presented ..... 4
Statement ..... 5
A. Statutory Framework ..... 5
1. Major Sources and Listing of Categories ..... 5
2. MACT and Residual Risk Standards ..... 7
3. Compliance with Standards ..... 9
B. Action Under Review: The Reclassification Rule ..... 9
Summary ..... 13
Standing ..... 14
Standard of Review ..... 16
Argument ..... 16
I. The Reclassification Rule Conflicts with the Clean Air Act. ..... 16
A. Paragraph 112(i)(3)(A) Requires That Sources Continue to Comply with Standards After Their Effective Date. ..... 17
B. EPA's Interpretation is Not the Best Reading of the Statute. ..... 22
1. EPA's Interpretation Impermissibly Rests on Silence Within Section 112's Definitional Terms While Rewriting Its Operative Provisions ..... 22
2. EPA's Interpretation Conflicts with Section 112's Structure. ..... 28
3. Section 112's Effective Date Cutoff Produces No Absurd Results ..... 31

4. EPA's Past Interpretation Does Not Support Its Rule............33
II. EPA Has Not Explained Its Decision to Exempt "Reclassified" Sources from MACT.......................................................................34
Conclusion ....................................................................................38
Certificate of Compliance ..........................................................40
Certificate of Service ..................................................................41

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Cal. Cmtys. Against Toxics v. EPA*,
928 F.3d 1041 (D.C. Cir. 2019)........................................................................ 15

*Culbertson v. Berryhill*,
586 U.S. 53 (2019) ........................................................................................ 18

*Env't Def. Fund v. EPA*,
922 F.3d 446 (D.C. Cir. 2019) ........................................................................ 15

*Env't Def. v. Duke Energy*,
549 U.S. 561 (2007) ...................................................................................... 26

*Farhy v. Comm'r of IRS*,
100 F.4th 223 (D.C. Cir. 2024)........................................................................ 20

*FEC v. Akins*,
524 U.S. 11 (1998) ........................................................................................ 15

*Finnbin, LLC v. Consumer Prod. Safety Comm'n*,
45 F.4th 127 (D.C. Cir. 2022)......................................................................... 20

*Friends of the Earth v. Laidlaw Env't Servs.*,
528 U.S. 167 (2000) ...................................................................................... 14

*Garland v. Cargill*,
602 U.S. 406 (2024) ...................................................................................... 26

*Genus Med. Techs. v. FDA*,
994 F.3d 631 (D.C. Cir. 2021) ................................................................. 22, 30

*Henson v. Santander Consumer USA*,
582 U.S. 79 (2017) ........................................................................................ 25

*Int'l Ladies Garment Workers Union v. Donovan*,
722 F.2d 795 (D.C. Cir. 1983) ........................................................................ 36

*King v. Burwell*,
576 U.S. 473 (2015) ...................................................................................... 21

*King v. St. Vincent's Hosp.*,
502 U.S. 215 (1991) ...................................................................................... 27

*La. Env't Action Network v. EPA*,
955 F.3d 1088 (D.C. Cir. 2020)........................................................................ 7

*Lockheed Corp. v. Spink*,
517 U.S. 882 (1996) ...................................................................................... 23

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) ............................................................................... 16, 34

*Marin Audubon Soc'y v. FAA*,
129 F.4th 869 (2025)...................................................................................... 34

*Michigan v. EPA*,
576 U.S. 743 (2015) ......................................................................... 16, 31, 38

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ........................................................................................ 35

*New Jersey v. EPA*,
517 F.3d 574 (D.C. Cir. 2008) ...................................................... 6, 29, 32, 34, 35

*New York v. EPA*,
443 F.3d 880 (D.C. Cir. 2006) ........................................................................ 18

*NRDC v. EPA*,
489 F.3d 1364 (D.C. Cir. 2007)....................................................................... 14

*Pileggi v. Wash. Newspaper Publ'g Co.*,
146 F.4th 1219 (D.C. Cir. 2025) ............................................................... 22, 23

*Pugin v. Garland*,
599 U.S. 600 (2023) ...................................................................................... 20

*Pulsifer v. United States*,
601 U.S. 124 (2024) ...................................................................................... 20

*Russello v. United States*,
464 U.S. 16 (1983) ........................................................................................ 25

*Sierra Club v. EPA*,
353 F.3d 976 (D.C. Cir. 2004) ................................................................ 5, 8, 21

*Sierra Club v. EPA*,
479 F.3d 875 (D.C. Cir. 2007) .......................................................................... 7

*U.S. Sugar Corp. v. EPA*,
830 F.3d 579 (D.C. Cir. 2016) ...................................................... 8, 11, 15, 33, 35

*United States v. Yermian*,
468 U.S. 63 (1984) ........ 24

*Util. Air Regul. Grp. v. EPA*,
573 U.S. 302 (2014) ........ 2, 23

*White Stallion v. EPA*,
748 F.3d 1222 (D.C. Cir. 2014) ........ 36

**Statutes**

42 U.S.C. § 7411(e)........ 13, 24, 26

42 U.S.C. § 7412(i)(3)(A)........3, 4, 9, 12, 13, 17, 18, 19, 23, 25, 31, 32

42 U.S.C. § 7412(a)(1)........ 4, 6, 22

42 U.S.C. § 7412(a)(2)........ 6

42 U.S.C. § 7412(b)(1)........ 5

42 U.S.C. § 7412(b)(2)........ 5

42 U.S.C. § 7412(c)(1) ........ 2, 25, 29, 30

42 U.S.C. § 7412(c)(2) ........ 6

42 U.S.C. § 7412(c)(3) ........ 6

42 U.S.C. § 7412(c)(9) ........ 7, 29, 35

42 U.S.C. § 7412(d)(1)........ 7, 28, 37

42 U.S.C. § 7412(d)(2)........1, 3, 4, 7, 10, 19, 20, 22, 26, 29, 35

42 U.S.C. § 7412(d)(5)........3, 4, 8, 13, 25, 30, 35, 37

42 U.S.C. § 7412(d)(6)........ 8

42 U.S.C. § 7412(f) ........ 20

42 U.S.C. § 7412(f)(5)........ 8, 12, 21, 30

42 U.S.C. § 7607(b)(1)........ 4

42 U.S.C. § 7607(d)(9)........ 16

42 U.S.C. § 7661b(e)........ 15

**Federal Register Notices**

63 Fed. Reg. 17,838 (Apr. 10, 1998) .................... 11

64 Fed. Reg. 52,828 (Sept. 30, 1999) .................... 2

77 Fed. Reg. 9,304 (Feb. 16, 2012) .................... 36

79 Fed. Reg. 37,850 (July 2, 2014) .................... 10

85 Fed. Reg. 73,854 (Nov. 19, 2020) .... 2, 4, 9, 10, 11, 12, 13, 17, 19, 22, 23, 24, 26, 27, 28, 30, 31, 33, 34, 36, 37

**Regulations**

40 C.F.R. § 70.3(b)(2) .................... 15

40 C.F.R. § 636 (c)(1) .................... 36

**Legislative Histories**

Legislative History of the Clean Air Act Amendments of 1990 (Comm. Print 1993) .................... 1, 5, 6, 8, 20, 21, 25, 31, 32, 33

## GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| EPA | Environmental Protection Agency |
| MACT | Maximum Achievable Control Technology |

## Introduction

Section 112 of the Clean Air Act, 42 U.S.C. § 7412, addresses airborne toxics like mercury, dioxins, and arsenic—"extremely harmful air pollutants" that Congress singled out for uniquely "stringent" regulation. Legislative History of the Clean Air Act Amendments of 1990 (Comm. Print 1993) ("Leg. Hist.") 8,507 (S. Rep. No. 101-228 at 167). The statute is built around mandatory technology-based standards securing the "maximum degree of reduction" in toxic emissions from large industrial facilities, "including a prohibition on such emissions, where achievable." 42 U.S.C. § 7412(d)(2).

EPA has issued a rule that unravels section 112's statutory scheme and eviscerates the "maximum achievable control technology" (or "MACT") standards that are its "principal focus." Leg. Hist. at 8,473, 8507 (S. Rep. No. 101-228 at 133, 167). That "Reclassification Rule" allows thousands of facilities—including refineries, chemical plants, and other heavy industrial plants—to escape MACT standards and increase their toxic pollution. *Id.* at 73,878. Rather than reduce their emissions to the maximum achievable extent, the Reclassification Rule allows these facilities to increase their hazardous pollution up to 25

tons per year (or 10 tons of one pollutant)—even though the pollutants in question are, in many cases, harmful even in quantities of a gram or less. 64 Fed. Reg. 52,828, 52,861-62 (Sept. 30, 1999).

EPA rests that transformation upon "the absence of any temporal dimension" within section 112's definition of a "major source," 85 Fed. Reg. at 73,859 (citing 42 U.S.C. § 7412(a)(1))—a term section 112 uses to initially identify the large facilities that EPA must list for subsequent regulation. 42 U.S.C. § 7412(c)(1). From that absence, the Agency concludes that the quantitative threshold in the major source definition operates to exempt sources from MACT standards at any time—even after standards have taken effect—when their emissions fall below that threshold. 85 Fed. Reg. at 73,861.

That "rigid insistence" on wielding the major source definition to fundamentally restructure the regulatory regime—heedless of the text, context, and structure of section 112's operative provisions—is mistaken. *Util. Air Regul. Grp. v. EPA,* 573 U.S. 302, 320 (2014) (*UARG*). The statutory subsection addressing "[c]ompliance" specifies that "[a]fter the effective date" of any standard "promulgated under this section and applicable to a source, no person may operate such source in

violation of such standard." 42 U.S.C. § 7412(i)(3)(A). That supplies the temporal component that EPA claims to be absent: After a standard's effective date, sources must comply—even if, following compliance, their emissions drop below the major source threshold.

Context underscores the point. The technology-based standards at the heart of section 112 demand "a prohibition" on emissions "where achievable." *Id.* § 7412(d)(2). By using the major source threshold to exempt sources from those standards *after* they are promulgated, the Reclassification Rule makes that command impossible to reliably accomplish; if a MACT standard produces reductions below the threshold, the source "reclassifies" and escapes the standard.

And in any event section 112 does not exempt listed facilities from MACT merely because EPA no longer classifies them as "major." Congress gave EPA *discretion* to prescribe lesser standards for non-major sources. *Id.* § 7412(d)(5). But EPA has not explained—and could not explain—why it has exercised that discretion here. The best reading of the statute prohibits EPA's use of the major source threshold as a mechanism permitting sources to escape MACT standards after they are in place.

## Jurisdiction

This petition challenges a final EPA action under 42 U.S.C. § 7412, and was timely filed on January 15, 2020. 85 Fed. Reg. 73,854 (Nov. 19, 2020). This Court has jurisdiction under 42 U.S.C. § 7607(b)(1).

## Statutes and Regulations

An addendum contains pertinent statutes and regulations.

## Issues Presented

(1) Where the statutory provision governing compliance provides that "[a]fter the effective date of any emissions standard … promulgated under [section 112] and applicable to a source, no person may operate such source in violation of such standard," 42 U.S.C. § 7412(i)(3)(A), and the statute specifies that MACT standards should result in a "prohibition" on emissions "where achievable," *id.* § 7412(d)(2), may sources otherwise subject to MACT standards cease complying with those standards if their emissions fall below "10 tons per year" of "any one hazardous air pollutant," or "25 tons per year" of "any combination of hazardous air pollutants," *id.* § 7412(a)(1)?

(2) May EPA choose to exempt listed sources from MACT standards without explaining that exercise of statutory discretion, *id.* § 7412(d)(5)?

## Statement

### A. Statutory Framework

Section 112 of the Clean Air Act governs hazardous air pollutants—substances that, even in very small quantities, are "carcinogenic, mutagenic, teratogenic, neurotoxic" or which "cause reproductive dysfunction" or are otherwise "acutely or chronically toxic." 42 U.S.C. § 7412(b)(2). Its "principal focus" is the imposition of "technology-based standards" upon large industrial sources of such toxics, requiring the "maximum reduction in emissions which can be achieved." Leg. Hist. 8,473 (S. Rep. No. 101-228 at 133). The statute prescribes a step-wise process meant to implement those technology-based standards, then assess whether residual health and environmental risks remain warranting additional standards. *Sierra Club v. EPA*, 353 F.3d 976, 980 (D.C. Cir. 2004) (*Sierra Club I).*

#### *1. Major Sources and Listing of Categories*

The statute provides a list of hazardous air pollutants, 42 U.S.C. § 7412(b)(1), and defines a "major source" of those pollutants as "any stationary source or group of stationary sources" with the potential to emit "10 tons per year or more of any hazardous air pollutant or 25 tons

per year or more of any combination” of such pollutants. *Id.* § 7412(a)(1). An “area source” is “any stationary source of hazardous air pollutants that is not a major source,” *id.* § 7412(a)(2), a term written to encompass “small, diverse facilities” like “wood stoves, service stations, [and] dry cleaners.” Leg. Hist. at 8,490-91 (S. Rep. No. 101-228 at 150-51).

Section 112 required EPA first, to identify and list all “categories and subcategories of major sources,” and categories of area sources that “present[] a threat of adverse effects to human health or the environment.” 42 U.S.C. § 7412(c)(1) & (c)(3). It then obligated EPA to “establish emissions standards” for each of those “categories and subcategories” on an established schedule. *Id.* § 7412(c)(2) & (e). Once a category of sources is listed for regulation, the statute “unambiguously limit[s] EPA’s discretion to remove sources … from the section 112(c)(1) list.” *New Jersey v. EPA,* 517 F.3d 574, 583 (D.C. Cir. 2008). To do so EPA must find that no source in the delisted category produces pollution that creates more than a one-in-one-million lifetime cancer risk to the most-exposed individual, or exceeds levels “adequate to

protect public health with an ample margin of safety" and avoid an "adverse environmental effect." 42 U.S.C. § 7412(c)(9)(B).

*2. MACT and Residual Risk Standards*

For "each category or subcategory of major sources and area sources," *id*. § 7412(d)(1), subsection 112(d) next directs EPA to set standards which "require the maximum degree of reduction in the emissions of the hazardous air pollutants … (including a prohibition on such emissions, where achievable)" that is "achievable for new or existing sources in the category or subcategory," through "application of measures, processes, methods, systems, or techniques" of pollution control. *Id.* § 7412(d)(2). The statute includes a "floor" for these MACT standards, based on the performance of existing sources. *See Sierra Club v. EPA*, 479 F.3d 875, 876-88 (D.C. Cir. 2007) (describing different floors for new and existing sources). And MACT standards must require the maximum reduction of "every recognized hazardous pollutant that the source category is known to emit." *La. Env't Action Network v. EPA*, 955 F.3d 1088, 1090 (D.C. Cir. 2020).

For "categories and subcategories of area sources," EPA "may" instead "elect to promulgate standards" that "provide for the use of

generally available control technologies." 42 U.S.C. § 7412(d)(5). The statute does not define "generally available" control technology; the legislative history provides, as an example, an "equipment and operational standard" for "neighborhood dry clean[ers]." Leg. Hist. 8,512 (S. Rep. No. 101-228 at 172). Where EPA chooses to apply those lesser standards to a group of area sources, it must explain why they "are more appropriate than MACT standards for these sources and types of pollutants." *U.S. Sugar Corp. v. EPA,* 830 F.3d 579, 652-53 (D.C. Cir. 2016).

Because even maximum-achievable technology standards might not adequately protect human health and the environment, the final step in section 112's regulatory sequence—"which occurs within eight years" after "MACT standards are promulgated—requires EPA to consider whether residual [health and environmental] risks remain that warrant more stringent standards than achieved through MACT." *Sierra Club I,* 353 F.3d at 980. This "residual risk" review is only required for sources that EPA has subjected to MACT standards. 42 U.S.C. § 7412(f)(5).[1]

[1] EPA must also review its standards at least every 8 years. 42 U.S.C. § 7412(d)(6).

### *3. Compliance with Standards*

Subsection 112(i) establishes the "[s]chedule for compliance," and provides in relevant part: "After the effective date of any emissions standard, limitation, or regulation promulgated under this section and applicable to a source, no person may operate such source in violation of such standard, limitation, or regulation." 42 U.S.C. § 7412(i)(3)(A). That paragraph goes on to provide a limited exception for existing sources, instructing EPA to require compliance "as expeditiously as practicable, but in no event later than three years after the effective date." *Id.* § 7412(i)(3)(A)-(B) (allowing further one-year extension if necessary to install controls). New sources—defined as those whose construction begins after EPA first proposes an applicable standard—must comply immediately. *Id.* § 7412(a)(4) & (i)(3)(1)-(3).

## B. Action Under Review: The Reclassification Rule

In January 2020—after EPA had listed over 100 categories of major sources, issued MACT standards governing those sources, and thousands of plants had installed the requisite controls—EPA issued the Reclassification Rule challenged here. 85 Fed. Reg. at 73,854. *See* State Pet'rs' Brief at 11-16 (detailing history). The Rule permits sources

governed by MACT standards to cease complying with those standards by "reclassifying" as area sources if their emissions are below the major source threshold (10 tons per year of one hazardous pollutant, or 25 tons per year of combined pollutants). 85 Fed. Reg. at 73,855. It amends EPA's general air-toxics provisions to that effect, *id.* at 73,884-85; alters a series of category-specific emissions standards that imposed MACT regardless of post-compliance emissions changes, *id.* at 73,855-856 (listing six amended subparts); and amends the notification requirements of "most" prior standards to accommodate the newly permitted changes in sources' pollution-control obligations, *id.* at 73,856.

The Reclassification Rule thus allows sources that EPA listed in major source categories, and subjected to MACT standards, to escape those standards and instead only meet section 112's major source threshold. MACT standards often reduce emissions by 90% or more, in keeping with Congress' instruction to "prohibit[]" toxic emissions where possible, 42 U.S.C. § 7412(d)(2). *See, e.g.,* 79 Fed. Reg. 37,850, 37,871 (July 2, 2014) (discussing standard based on 95% control efficiency). EPA estimates that, after complying with MACT standards, over 2,500

facilities—more than one third of all sources subject to MACT—have reduced their emissions to 75% or less of the major source threshold. 85 Fed. Reg. at 73,878. Those sources include refineries, chemical plants, plastics manufacturers, and other large industrial facilities. JA__-__ (EPA-HQ-OAR-2019-0282-0651 at 5-9).

The Reclassification Rule permits all these sources (and more) to discard MACT standards in favor of a limit at the major source threshold. Such a limit places no meaningful constraint on emissions of pollutants like mercury and dioxins that are only emitted in pounds, grams, or even small fractions of a gram per year—orders of magnitude below the 10-ton threshold—yet are dangerous at these levels. *See, e.g.*, 63 Fed. Reg. 17,838, 17,847-48 (Apr. 10, 1998), JA____ (showing aggregate emissions by entire industrial categories in those small quantities).

Where EPA has promulgated relevant "generally available" standards, some reclassified sources may need to conduct, *e.g.*, a "one-time energy assessment" or occasional "tune-up." *U.S. Sugar,* 830 F.3d at 613, 653-54. For many sources no area-source standard exists, because EPA listed only a major-source category; they are subject to no

technology-based standard at all. JA__-__ (EPA-HQ-OAR-2019-0282-0651 at 12-14) (noting categories without "comparable" area source rules). And because they are no longer subject to MACT standards reclassified sources' emissions will not be included in EPA's subsequent "residual risk" standards. 42 U.S.C. § 7412(f)(5).

EPA based the Reclassification Rule on section 112's definitions:

> The statutory definitions of 'major source' and 'area source' do not contain any language that fixes a source's status as a major source or area source at any particular point in time, nor do they otherwise contain any language suggesting that there is a cutoff date after which a source's status cannot change.

85 Fed. Reg. at 73,859 (citing 42 U.S.C. § 7412(a)(1)). From that silence, EPA concluded (a) that "a source can reclassify to area source status at any time"—*and* (b) inferred that such a reclassified source is "no longer … subject" to, and may cease complying with, MACT standards. *Id.* at 73,860. EPA provided no reasons why sources that had long complied with MACT standards might be incapable of doing so, insisting instead that "the fundamental structure" of section 112 precluded imposition of "major source" requirements on any "area source." *Id.* at 73,862.

The Agency dismissed section 112's provisions providing the "[c]ompliance schedule for existing sources," 42 U.S.C. § 7412(i)(3)(A),

as irrelevant to any "temporal limitations" related to compliance. 85 Fed. Reg. at 73,859-60. It asserted instead that section 112's compliance provision has "the same meaning" as other "provisions in the [Act], such as [42 U.S.C. § 7411(e)]" (addressing compliance with the Act's New Source Performance Standards) "notwithstanding" their "different phrasing." *Id.* at 73,860.

## SUMMARY

I. The Reclassification Rule conflicts with the best reading of the Clean Air Act. Text, context and structure confirm that if a standard is applicable to a source after its effective date, the source must continue to comply even if its post-compliance emissions fall below the major source threshold. 42 U.S.C. § 7412(i)(3)(A).

II. To exempt listed area sources from MACT standards, EPA must explain why such standards are inappropriate for those sources (or delist them). 42 U.S.C. § 7412(c)(9) & (d)(5). EPA has not done so, even as the Reclassification Rule releases listed sources from MACT standards.

## STANDING

Petitioners' members and their families live, work, and recreate near sources of hazardous air pollutants that have reclassified pursuant to the Reclassification Rule, and near sources that the Rule allows to reclassify and increase their emissions. *E.g.,* Declaration of Jason Hale ("Hale Decl.") ¶¶ 4-6, 10-11; Declaration of Jeri Ann Flynn ("Flynn Decl.") ¶¶ 6, 8-9; Declaration of Dan Olinger ¶¶ 6-7; Declaration of Ana Parras ("Parras Decl.") ¶¶ 19-25; Declaration of Julie Peller ("Peller Decl.") ¶¶ 7-8; Declaration of Mark Edward Rice ("Rice Decl.") ¶¶ 7-11; Declaration of Lowell Smith ("Smith Decl.") ¶¶ 9-10; Declaration of John Stith ¶¶ 11-13; Declaration of Gina Trujillo ("Trujillo Decl.") ¶¶ 7-9; Declaration of Scott Wolff ("Wolff Decl.") ¶¶ 6-7.

Those members suffer a cognizable injury. *Friends of the Earth v. Laidlaw Env't Servs.*, 528 U.S. 167, 180, 183 (2000) (members who "use the affected area" and "for whom the aesthetic and recreational values of the area will be lessened" by action show "concrete and particularized" injury); *NRDC v. EPA*, 489 F.3d 1364, 1371 (D.C. Cir. 2007) (organizations have standing where pollution threatens to diminish members' enjoyment of activities near covered sources). Some

are, for example, understandably concerned that the Rule will permit nearby facilities to escape previously applicable standards and increase their pollution, diminishing their enjoyment of everyday activities in their homes and gardens and, in some cases, forcing them to curtail activities that they would otherwise enjoy. *E.g.,* Hale Decl. ¶¶ 12-14; Flynn Decl. ¶ 7-13; Dr. Patricia Grace Tee Lewis ("Lewis Decl.") ¶¶ 6-19; Parras Decl. ¶ 10-13; Peller Decl. ¶¶ 8-13; Rice Decl. ¶¶ 11-15; Smith Decl. ¶¶ 11-13; Wolff Decl. ¶¶ 8-12. *See Cal. Cmtys. Against Toxics v. EPA*, 928 F.3d 1041, 1048-49 (D.C. Cir. 2019) (recognizing such injuries as sufficient basis for standing).

The Reclassification Rule also allows some sources to avoid reporting requirements that would otherwise be applicable. 42 U.S.C. § 7661a(a) & 7661b(e); 40 C.F.R. § 70.3(b)(2); *see U.S. Sugar*, 830 F.3d at 647-52. That informational loss reduces petitioners' ability to disseminate accurate information about facilities' pollution. Lewis Decl. ¶¶ 19-26; Parras Decl. ¶ 28-29; Trujillo Decl. ¶ 5. *See FEC v. Akins*, 524 U.S. 11, 20 (1998); *Env't Def. Fund v. EPA,* 922 F.3d 446, 452-53 (D.C. Cir. 2019) (Loss of information is "an injury in fact 'where a statute … requires

that the information be publicly disclosed' and there 'is no reason to doubt their claim that the information would help them.'").

Vacatur of the Reclassification Rule would redress those injuries by reinstating the requirements eliminated by the Rule.

## STANDARD OF REVIEW

The Clean Air Act instructs courts to reverse any action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "in excess of statutory jurisdiction, authority, or limitations." 42 U.S.C. § 7607(d)(9). EPA's actions must reflect the "best" interpretation of the statute, "applying all relevant interpretive tools." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 373 (2024). And where a statute delegates discretion to an agency, courts ensure the Agency has "engage[d] in 'reasoned decisionmaking,'" including "consideration of the relevant factors." *Michigan v. EPA*, 576 U.S. 743, 750 (2015) (citations omitted).

## ARGUMENT

### I. The Reclassification Rule Conflicts with the Clean Air Act.

The Reclassification Rule interprets section 112 as necessarily releasing a source from MACT standards if, after those standards take

effect, the source's emissions fall below section 112's major source threshold. 85 Fed. Reg. at 73,862-3. But the statute does not give the major source threshold that function. Section 112 addresses sources' compliance obligations in its operative compliance provisions, which establish that once a standard has been "promulgated" that is "applicable to a source," the source must there*after* comply—regardless of the source's post-compliance emissions. 42 U.S.C. § 7412(i)(3)(A).

### A. Paragraph 112(i)(3)(A) Requires That Sources Continue to Comply with Standards After Their Effective Date.

*Text*: Paragraph 112(i)(3)(A) states: "*After the effective date* of any emissions standard … promulgated under this section and applicable to a source, no person may operate such source in violation of such standard …." 42 U.S.C. § 7412(i)(3)(A) (emphasis added). That provision thereby sets a cut-off—the "effective date"—"after" which compliance is required, regardless of post-compliance emissions changes. Its first phrase sets that temporal cut-off ("After the effective date" of a standard "applicable to a source"), while its second clause mandates compliance ("no person may operate such source in violation of such standard"). *Id.* § 7412(i)(3)(A). That second clause expressly prohibits operation of any "such source" in violation of "such standard," *id.*—so

that after the effective date of a standard applicable to a source, *that* source must comply with *that* standard. *See Culbertson v. Berryhill*, 586 U.S. 53, 59 (2019) (term "such" refers only to what has been "already described") (citation omitted).

Paragraph 112(i)(3)(A) thus sets two requirements: that a standard be "promulgated" and "applicable to a source." 42 U.S.C. § 7412(i)(3)(A). *See id.* § 7412(d)(10) (section 112 standards are effective upon promulgation). If those requirements are met, then "[a]fter" the standard's effective date—regardless of post-compliance emissions—"no person may operate such source in violation of such standard." *Id.* § 7412(i)(3)(A).

The statute specifies the only exceptions: EPA is to require compliance "as expeditiously as practicable," up to three years, for existing sources, *id.*; and EPA or a State may give individual sources a further year to comply if "necessary for the installation of controls," *id.* § 7412(i)(3)(B)." *See also id.* § 7412(i)(5)-(6) (providing additional compliance extensions where sources voluntarily reduce emissions). *See New York v. EPA*, 443 F.3d 880, 887 (D.C. Cir. 2006) (inclusion of

express limitations indicates statute does not include others) (citations omitted)).

*Context*: The standard-setting regime at the heart of the statute decisively reinforces that reading of paragraph 112(i)(3). Subsection 112(d) specifies that the statute's principal feature—the technology-based standards required for categories of major sources—"shall require the maximum degree of reduction in emissions" of hazardous air pollutants "including a *prohibition* on such emissions, where achievable." *Id.* § 7412(d)(2) (emphasis added). That direction cannot be fulfilled unless sources are required to comply with MACT standards after they are promulgated and applicable—even if compliance reduces their emissions below the major source threshold. *Id.* § 7412(i)(3)(A).

Under the Reclassification Rule, in contrast, MACT standards cannot reliably accomplish paragraph 112(d)(2)'s sought-for prohibition, because once the source's emissions fall below the major source threshold it can "reclassify" and escape the standard. 85 Fed. Reg. 73,884-5 ("A major source may become an area source at any time upon reducing its emissions … to below the major source thresholds" and is then subject to "area source" requirements). Under EPA's interpretation

paragraph 112(d)(2)'s command is largely "unfulfillable"—a result courts "strongly disfavor." *Finnbin, LLC v. Consumer Prod. Safety Comm'n*, 45 F.4th 127, 133 (D.C. Cir. 2022). *See Pulsifer v. United States,* 601 U.S. 124, 143 (2024) (refusing interpretation that would "negate" statutory text).

The Rule thus renders the statutory goal of the "maximum" achievable reduction—approaching zero if possible—"largely ornamental"; because MACT standards evaporate at 10 tons per year (or 25 tons of combined pollutants), section 112's technology-based standards aspire, under EPA's interpretation, only to that threshold. *Farhy v. Comm'r of IRS*, 100 F.4th 223, 232-33 (D.C. Cir. 2024). *See* Leg. Hist. at 3,351 (H. Rep. 101-490 at 327) & 8,473 (S. Rep. No. 101-228 at 133). 42 U.S.C. § 7412(d)(2). That interpretation—by making the major source threshold a *prerequisite* to compliance with MACT standards expressly meant to secure reductions far *beyond* that threshold—produces a "self-defeating statute." *Pugin v. Garland*, 599 U.S. 600, 607 (2023). That cannot be its best reading.

The Reclassification Rule also renders subsection 112(f)'s backstop residual-risk requirements unintelligible, 42 U.S.C. § 7412(f), by

disrupting the continuity of section 112's "two-phase approach." *Sierra Club I*, 353 F.3d at 980. That approach first "assure[s] that each and every source" meets MACT; then eliminates any "under-regulat[ion] in the technology-based phase" through "more stringent" standards that "reduce residual risks." Leg. Hist. at 8,510 (S. Rep. No. 101-228 at 170). The second risk-based phase only applies to categories subject to MACT standards—reflecting Congress' expectation that those categories would not radically change after the standards' promulgation. 42 U.S.C. § 7412(f)(5).

The Reclassification Rule upends that scheme. Under EPA's interpretation, sources that reclassify from "major" to "area" drop out of the residual-risk analysis, even as their emissions escape the "technology-based solutions" that are Section 112's first priority. *Sierra Club I,* 353 F.3d at 990. As a result, residual risk standards miss their target: sources under-regulated by (indeed, exempt from) section 112's technology-based standards. That EPA's interpretation thus "destabilize[s]" the statutory scheme requires its rejection. *King v. Burwell*, 576 U.S. 473, 476 (2015).

### B. EPA's Interpretation is Not the Best Reading of the Statute.

#### 1. *EPA's Interpretation Impermissibly Rests on Silence Within Section 112's Definitional Terms While Rewriting Its Operative Provisions.*

The Reclassification Rule transforms the statutory scheme from one securing the "maximum" achievable reductions in (and where possible, elimination of) emissions of each hazardous pollutant from every major source, 42 U.S.C. § 7412(d)(2), to one that aspires only to a 10/25-ton annual cap on aggregate emissions, 42 U.S.C. § 7412(a)(1). And it does so based on an extrapolation from the major source definition's "lack [of a] reference to the compliance date of major source requirements," 85 Fed. Reg. at 73,859.

To start, that interpretative rationale "presumes that the Congress dramatically" constrained section 112's scope by omitting "a phrase from a statutory definition"; but "[f]undamental changes in the scope of a statute are not typically accomplished with so subtle a move.'" *Genus Med. Techs. v. FDA*, 994 F.3d 631, 640 (D.C. Cir. 2021) (alteration in original and citation omitted). *See Pileggi v. Wash. Newspaper Publ'g Co.,* 146 F.4th 1219, 1236 (D.C. Cir. 2025) ("[C]ourts cannot put undue weight on a single omission of a word," but "must adopt 'the reading to

which the provisions of the whole law' point.") (citation omitted). The Supreme Court has rejected prior EPA interpretations that similarly relied on the absence of "limitations" in one of the Act's "definition[s]," to reach a result "inconsistent with the statutory scheme." *UARG*, 573 U.S. at 319-20. There, as here, that "rigid insistence" on an interpretation that was "incompatible" with the pertinent program's "regulatory structure" was "mistaken." *Id.* at 320-321.

EPA's blinkered reliance on the "lack of a reference to the compliance date" in the major source definition is especially misplaced because section 112 expressly includes a separate section—helpfully titled "[c]ompliance schedule," 42 U.S.C. § 7412(i)(3)(A). 85 Fed. Reg. at 73,859. *See Pileggi*, 146 F.4th at 1232 (the "heading of a section" can be a "useful clue" to a statute's meaning). EPA makes no effort to reconcile the Reclassification Rule with the text of that provision. By deploying the word "after," paragraph 112(i)(3)(A) "specifically addresses [section 112's] temporal effect"—and "trumps any general inferences that might be drawn" from other provisions, including those EPA would draw from "the absence of any temporal dimension" in the major source definition, 85 Fed. Reg. 73,860. *Lockheed Corp. v. Spink*, 517 U.S. 882, 897 (1996).

EPA claims that section 112's compliance provision has "the same meaning" as provisions elsewhere in the Clean Air Act "such as" 42 U.S.C. § 7411(e), under which post-compliance changes may terminate a source's compliance obligations. 85 Fed. Reg. at 73,860. But subsection 111(e) of the Act is textually distinct. Like paragraph 112(i)(3)(A) it includes two parts—the first addressing timing ("After the effective date of standards …"), and the second addressing compliance ("it shall be unlawful …"). But the phrase "applicable to such source" appears in the second clause, modifying source-owners' *ongoing* compliance obligations ("it shall be unlawful … to operate such source in violation of any standard … applicable to such source"). 42 U.S.C. § 7411(e).

In contrast, "applicable to a source" appears only in paragraph 112(i)(3)(A)'s first, temporal phrase—"[a]fter the effective date of any emissions standard … applicable to a source"—and works only to identify the standard "after" whose effective date compliance is mandatory. *See United States v. Yermian*, 468 U.S. 63, 68 (1984) (effect of terms located in separate phrase are limited to that phrase). Unlike paragraph 111(e), paragraph 112(i)(3)(A) consequently does not create an ongoing inquiry into whether a particular standard *remains*

applicable—that is, whether compliance has altered a source's emissions such that EPA might have listed it in a different category and subjected it to a lesser standard. 42 U.S.C. § 7412(c)(1) & (d)(5). It provides instead (with enumerated exceptions) that a source must comply with a standard "*after*" that standard has become effective and applicable to that source—even if compliance later brings its emissions below the major source threshold. *Id.* § 7412(i)(3)(A) (emphasis added). *See Henson v. Santander Consumer USA,* 582 U.S. 79, 86 (2017) (When "interpreting statutes" courts "presume differences in language … convey differences in meaning."); *Russello v. United States*, 464 U.S. 16, 23 (1983) (rejecting claim that "differing language" in separate statutory "subsections has the same meaning in each").

This distinction reflects Congress' decision to design section 112 to operate differently from the Act's other programs. *See* Leg. Hist. 869 (Sen. Debate) (section 112 "specifically disapprove[s]" of practice "under section [7411]" that would prevent "all facilities within a category" from being "controlled by the MACT standard"), 8490-91 (S. Rep. 101-228 at 150) (section 112's "concept of 'major source' …. should not be confused with other meanings" elsewhere in statute), 8507 (S. Rep. 101-228 at

167) (section 112 is more stringent than other programs, because it "is for the control of extremely harmful air pollutants").

The provisions whose text EPA would superimpose onto paragraph 112(i)(3)(A) also serve different purposes—42 U.S.C. § 7411(e) only governs compliance for "new" sources. There is consequently no basis to replace the text of paragraph 112(i)(3)(A) with "meaning" from provisions borrowed from other regulatory programs. 85 Fed. Reg. at 73,860. *See also Env't Def. v. Duke Energy*, 549 U.S. 561, 574 (2007) (statutory terms "take on distinct characters from association with distinct statutory objects calling for different implementation strategies").

EPA meanwhile offers no plausible explanation for the Rule's disabling of subsection 112(d)(2)'s demand for "maximum" emissions reductions, including "a prohibition on such emissions, where achievable." 42 U.S.C. § 7412(d)(2). *See Garland v. Cargill,* 602 U.S. 406, 427 (2024) ("Congress presumably does not enact useless laws."). The Agency responds only that "how the EPA sets MACT standards for major sources" cannot "logically" inform its understanding of how the major source threshold operates within section 112. 85 Fed. Reg. at

73,861. But that contradicts "the cardinal rule that a statute is to be read as a whole" because "the meaning of statutory language, plain or not, depends on context." *King v. St. Vincent's Hosp.*, 502 U.S. 215, 221 (1991).

EPA claims that section 112's "new source" definition "demonstrates" the correctness of the Reclassification Rule, because that definition includes a "timing-based distinction" (that construction commence after EPA "first proposes" an applicable standard), 85 Fed. Reg. at 73,859-60 (citing 42 U.S.C. § 7412(a)(4)). But that comparison bypasses the decisive question: Why must section 112's compliance requirements appear in the major source definition? Statutes address those matters in their operative provisions—not via elaborate inferences hidden within their definitional subsection. Such inferences are especially inapt because the term "new" *requires* temporal definition. Merriam-Webster's Dictionary 834 (11th ed. 2003) (new means "having recently come into existence"). No transformative implications can consequently be drawn from Congress' mention of timing when defining a "new source."

*2. EPA's Interpretation Conflicts with Section 112's Structure.*

EPA claims that the "structure" of section 112 requires the Reclassification Rule, because the statute "treats major sources and area sources differently in fundamental ways," 85 Fed. Reg. at 73,861, such that requiring "a reclassified area source" to comply with MACT standards would be "contrary" to that structure. *id.* at 73,862.

As an initial matter, EPA's assertion that section 112 requires lesser standards for area sources than major sources is flatly incorrect. *Id.* Section 112 imposes MACT standards on major and area sources alike, providing EPA only discretion to subject *some* area sources to lesser emissions requirements. 42 U.S.C. § 7412(d)(1) & (5). Section 112's text thus contradicts EPA's essential claim: that the "distinction" between "major source and area sources," of itself, compels differing emissions standards. 85 Fed. Reg. at 73,861; *infra* Argument II.

Moreover, that section 112's operative provisions treat major and area sources differently *before* MACT standards are promulgated does not mean that it exempts sources whose emissions fall below the major source threshold *after* compliance with those standards. *See* 85 Fed. Reg. at 73,861 (listing places in which section 112 uses major/area

source distinction). EPA's contrary claim is belied by section 112's sequential structure, which Congress crafted to operate in functionally distinct chronological stages.

First, EPA identifies and lists by category the major sources that Congress wished to subject to technology-based standards. 42 U.S.C. § 7412(c)(1). Then, on a defined schedule, EPA "promulgate[s] regulations establishing" technology-based emissions standards for "each" listed category and subcategory. *Id.* § 7412(d)(1) & (e)(1). Eight years later, EPA assesses residual risks remaining after imposition of technology-based standards. *Id.* § 7412(f)(2).

Congress constrained EPA's ability to backtrack as it moved along this regulatory pathway. *Id.* § 7412(c)(9) (limiting EPA's ability to avoid regulating sources, once it has listed them); *New Jersey*, 517 F.3d at 583. Section 112 thus prescribes a linear, chronological sequence aimed at a defined result: reducing emissions from large industrial facilities to the maximum extent technologically achievable, 42 U.S.C. § 7412(d)(2), and such that no such facility creates a "lifetime excess cancer risk" greater than "one in one million" for the "most exposed" member of the public, *id.* § 7412(f)(2).

Given that structure—its discrete stages, and purposive chronology—that section 112 specifies the consequences of the major source definition at *some* early stages of the statutory sequence does not, as EPA claims, mean that the major source threshold operates to exempt sources from compliance at *all* later stages. 85 Fed. Reg. at 73,861. *Genus Med. Techs v. FDA*, 994 F.3d 631, 639 (D.C. Cir. 2021) ("[S]tatutory definitions are meaningful only insofar as they carry concrete regulatory consequences."). On the contrary, the term "major source" functions: (1) to identify the large industrial sources that EPA is to "list" into "categories" for (2) mandatory technology-based standards and residual-risk review. 42 U.S.C. § 7412(c)(1), (d)(5) & (f)(5). The statute provides no role for the major source threshold after those standards are promulgated; the provisions addressing compliance do not mention "major sources." *Id.* § 7412(i)(3).

The Reclassification Rule repurposes the major source definition away from its operative role—identifying at the outset the large industrial facilities whose emissions Congress sought to reduce—into a recurring, cross-cutting exemption throughout the regulatory process. By employing the major source definition in that acontextual fashion

EPA replaces the statute's endpoint—maximally effective technological controls, with limited residual risks—with its starting-point—emissions at levels which Congress specified as "amount[ing] to a health threat" such that "standards should be imposed." Leg. Hist. at 8,515 (S. Rep. No. 101-228 at 175). Section 112's structure offers no support for that result.

*3. Section 112's Effective Date Cutoff Produces No Absurd Results.*

EPA complains that if paragraph 112(i)(3)(A) requires sources to comply "after the effective date" of a standard "applicable" to a source, "an area source would continue to be subject to area source requirements even if that source increased its potential to emit above" the major source threshold. 85 Fed. Reg. at 73,860. But that sources increasing their emissions must comply with MACT standards does not mean that sources can escape standards when, after compliance, their emissions fall. *See Michigan*, 576 U.S. at 757 (EPA's "preference for symmetry cannot trump an asymmetrical statute." (citation omitted)).

Paragraph 112(i)(3)(A) requires sources to comply with a standard if: (a) it has been "promulgated"; and (b) "applicable" to that source. 42 U.S.C. § 7412(i)(3)(A). A source that increases its emissions sufficiently

to move into a major source category would consequently have to satisfy any previously promulgated MACT standard applicable to that category—that standard would be "applicable" to the source "after [its] effective date." *Id. See* Leg. Hist. at 8,491 (S. Rep. No. 101-228 at 151) ("If the operating conditions" at an area source "change" so that "the source exceeds the specified thresholds, the source would then" be "subject to" MACT).

But a source whose emissions fall after complying with a MACT standard is still bound by paragraph 112(i)(3)(A)'s prohibition. The MACT standard was both "promulgated" and "applicable" to the source—so after its effective date "no person may operate" that source in violation of that MACT standard. 42 U.S.C. § 7412(i)(3)(A). Those compliance requirements may be asymmetrical. But such asymmetry—favoring compliance over non-compliance—is fully consistent with section 112's overall structure, which favors the imposition of standards on listed sources. *See New Jersey,* 517 F.3d at 583 (holding that statute "unambiguously limit[s] EPA's discretion to remove sources" from categories listed for regulation "once they have been added to it").

Some sources could, as a result, be subject to both major- and area-source standards. But EPA's "generally available" standards for area-source categories are far less stringent than MACT; sources should be able to readily comply with both standards. *See, e.g., U.S. Sugar*, 830 F.3d at 613, 653-54 (addressing generally available standards requiring "one-time energy assessment," boiler "tune-up," and based on "uncontrolled" emissions). That leniency is consistent with the statutory design; Congress gave EPA discretion to issue generally available standards only to "encourage control of area sources" that could not feasibly meet MACT. Leg. Hist. at 8,511 (S. Rep. No. 101-228 at 171).

*4. EPA's Past Interpretation Does Not Support Its Rule.*

EPA also notes that in a memorandum that preceded the Reclassification Rule, the Agency stated that sources were required to comply with standards "after the first substantive compliance date" rather than the "effective date." 85 Fed. Reg. at 73,860. But EPA adopted that "compliance date" regime based on its view that it was "reasonable," and because the statute was sufficiently "flexible" to give EPA interpretive discretion to "reach different results through rulemaking" reflecting its policy preferences. JA__-__ (EPA-HQ-OAR-

2019-0282-0448 at 4-5). The Supreme Court has since eliminated that discretion. *Loper Bright*, 603 U.S. at 402-3.

EPA's longstanding—albeit atextual—approach to compliance before the Reclassification Rule may be relevant at the remedy stage, to the extent that EPA may need limited time to address sources that relied on that approach. *See Marin Audubon Soc'y v. FAA*, 129 F.4th 869, 872-73 (2025) (discussing time-limited stay of mandate to avoid inequitable results). But it does not alter the best reading of the statute. *New Jersey*, 517 F.3d at 583 ("[M]erely applying an unreasonable statutory interpretation for several years" does not make it reasonable).

## II. EPA Has Not Explained Its Decision to Exempt "Reclassified" Sources from MACT.

The Reclassification Rule does not just move sources from major-source to area-source categories—it also relieves those reclassified sources of their MACT obligations. 85 Fed. Reg at 73,855-56 (amending general regulations so that reclassified sources are only "subject to any applicable area source … requirements," and revising some standards to relieve reclassified sources of MACT obligations). Even if the statute permitted EPA to reclassify sources into area-source categories after compliance, that would not of itself permit EPA to thusly alter their

emissions standards. Section 112(d)(5) gives EPA *discretion* to govern area-source categories with lesser, "generally available" control standards. 42 U.S.C. § 7412(d)(5). But the Agency must explain that exercise of discretion—and here it has not. *U.S. Sugar,* 830 F.3d at 652–53.[2]

Section 112 requires, as a default, that EPA subject all sources—both "major sources and area sources"—to MACT standards. 42 U.S.C. § 7412(d)(1)-(2). EPA "may, in lieu of" those standards, "elect to promulgate standards or requirements applicable to sources in [area-source] categories" based on "generally available control technologies." 42 U.S.C. § 7412(d)(5). But if EPA chooses to exempt particular area sources from MACT, the Agency must—as always—"cogently explain why it has exercised its discretion in [that] manner." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 48-49 (1983) (citations omitted).

---

[2] In some cases the Rule removes reclassified sources from *any* category subject to regulation, because no area-source standard exists; in those instances it violates section 112(c)(9)'s restrictions on EPA's ability to "delete any source category" from its lists. 42 U.S.C. § 7412(c)(9); *New Jersey*, 517 F.3d at 580.

EPA provided no such explanation here, saying only that its discretion to exempt reclassified standards from MACT standards is a "separate issue." JA___ (EPA-HQ-OAR-2019-0282-0606 at 30). Indeed. But the Reclassification Rule fails to address that issue, even as it releases reclassified sources from MACT standards. 85 Fed. Reg. at 73,885 (amending 40 C.F.R. § 636 (c)(1) to except reclassified sources from MACT standards). EPA never explained why reclassified sources should be subject to less stringent requirements, when they are demonstrably capable of meeting MACT standards. That failure renders its decision arbitrary and capricious. *Int'l Ladies Garment Workers Union v. Donovan*, 722 F.2d 795, 815 n.35 (D.C. Cir. 1983).

EPA has, in the past, acknowledged that to reasonably exercise its discretion under paragraph 112(d)(5), it must identify "differences between area and major sources" that warrant lesser standards. 77 Fed. Reg. 9,304, 9,404 (2012). *See White Stallion v. EPA*, 748 F.3d 1222, 1247 (D.C. Cir. 2014) (upholding decision), *rev'd on other grounds by Michigan*, 576 U.S. 743. There can be no such differences for reclassified sources—they have all been complying with MACT standards, and so cannot be incapable of compliance.

The emissions standards that EPA promulgated before the Reclassification Rule for major- and area-source categories do not provide the necessary explanation. When EPA issued those standards, it followed its then-governing interpretation so that every source that had taken the steps necessary to comply with MACT standards remained subject to those standards—even if, after compliance, their emissions dropped below the major source threshold. *See, e.g.,* JA___, ___ & ___ (EPA-HQ-OAR-2019-0282-0344 att. 1 at 48, att. 2 at 45, & att. 4 at 17). In many cases, EPA's rules expressly applied MACT standards to all sources that had complied with those standards, regardless of their post-compliance emissions. *See* 85 Fed. Reg. at 73,887-73,920 (amending these standards). Consequently, EPA's past rules contain no reasoning that might support EPA's decision to exempt "area" sources that have already complied with MACT standards.

If EPA lists a source for regulation under section 112(c), the statute requires EPA to subject that source to MACT unless it *both* places that source in an area-source category *and* explains why the category—including those sources—warrants lesser standards. 42 U.S.C. § 7412(d)(1) & (5). The Agency's failure to provide the latter explanation

renders the Reclassification Rule unlawful; at a minimum, EPA has "fail[ed] to consider an important aspect of the problem" in deciding to deregulate reclassified sources. *Michigan*, 576 U.S. at 752 (citation omitted).

## CONCLUSION

For the reasons above, this Court should vacate the Reclassification Rule.

Respectfully submitted,

/s
______________________________

James Samuel Pew
Earthjustice
1001 G. St., NW
Washington D.C. 20001
(202) 667-4500
jpew@earthjustice.org

*Counsel for California Communities Against Air Toxics, Downwinders at Risk, Environmental Integrity Project, Hoosier Environmental Council, Louisiana Bucket Brigade, Ohio Citizen Action, and Texas Environmental Justice Advocacy Services*

Sanjay Narayan
Sierra Club Environmental Law Program
2101 Webster St., Ste. 1300
Oakland, CA 94612
(415) 977-5769
sanjay.narayan@sierrclub.org

*Counsel for Sierra Club*

Vickie L. Patton
Noha Haggag
Environmental Defense Fund
2060 Broadway, Ste. 300
Boulder CO 80302
(303) 447-7214
vpatton@edf.org
nhaggag@edf.org

*Counsel for Environmental Defense Fund*

John Walke
Emily Davis
Natural Resources Defense Council
1152 15th St., NW, Ste. 300
Washington D.C. 20005
(202) 289-6868
jwalke@nrdc.org
edavis@nrdc.org

*Counsel for Natural Resources Defense Council*

January 23, 2026

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32 and this Court's order dated November 12, 2025, because it contains 6,885 words, excluding the parts of the filing exempted by Rule 32(f), so that the combined petitioners' briefs do not exceed 13,000 words. This brief also complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) and 32(a)(6), respectively, because this document has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook 14-point font.

*/s/James Samuel Pew*
James Samuel Pew

## Certificate of Service

I hereby certify that on January 23, 2025, I served the foregoing Environmental Petitioners' Opening Brief on all registered counsel through the Court's electronic filing system (CM/ECF).

*/s/James Samuel Pew*
James Samuel Pew