NOT YET SCHEDULED FOR ORAL ARGUMENT

No. 21-1024 (consolidated with No. 21-1034)

---

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

CALIFORNIA COMMUNITIES AGAINST TOXICS, et al.,
*Petitioners*,

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY, et al.,
*Respondents*.

---

Petition for Review of Action of the U.S. Environmental Protection Agency

---

**PROOF BRIEF FOR U.S. ENVIRONMENTAL PROTECTION AGENCY**

---

ADAM R.F. GUSTAFSON
*Principal Deputy Assistant Attorney General*
ROBERT N. STANDER
*Deputy Assistant Attorney General*
LAURA J. GLICKMAN
*Senior Attorney*
Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7411
Washington, D.C. 20044
(202) 598-3056
laura.glickman@usdoj.gov

Of Counsel:

HOWARD J. HOFFMAN
*Attorney*
U.S. Environmental Protection Agency

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### A. Parties and Amici

All parties, intervenors, and amici appearing in this case are listed in the briefs for Petitioners.

### B. Ruling Under Review

References to the ruling at issue appear in the Briefs for Petitioners.

### C. Related Cases

The Court severed and held in abeyance issues related to the challenged rule's revision of the regulatory definition of "potential to emit." *Cal. Comm. Against Toxics v. EPA*, No. 25-1259 (D.C. Cir.).

/s/ *Laura J. Glickman*
LAURA J. GLICKMAN

Counsel for Respondents

## TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ..... i

TABLE OF AUTHORITIES ..... iv

GLOSSARY ..... viii

INTRODUCTION ..... 1

STATEMENT OF JURISDICTION ..... 2

STATEMENT OF THE ISSUES ..... 2

PERTINENT STATUTES AND REGULATIONS ..... 3

STATEMENT OF THE CASE ..... 3

A. Statutory and Regulatory Background ..... 3

B. Agency Proceedings ..... 7

SUMMARY OF ARGUMENT ..... 11

STANDARD OF REVIEW ..... 13

ARGUMENT ..... 13

I. Petitioners Do Not Have Standing. ..... 13

A. State Petitioners Do Not Have Standing. ..... 15

B. Environmental Petitioners Do Not Have Standing. ..... 17

II. The Court Should Uphold the Rule. ..... 18

A. The Rule Reflects the Best Reading of Section 112(a). ..... 18

B. The Rule Aligns With Other Provisions of Section 112. ..... 25

C. The Rule Does Not Exempt Reclassified Sources from MACT Standards. 32

CONCLUSION 34

CERTIFICATE OF COMPLIANCE 35

**TABLE OF AUTHORITIES**

**Cases**

*Alfred L. Snapp & Sons, Inc. v. Puerto Rico ex rel Barez*,
458 U.S. 592 (1982) ........................................................................ 15

*Bostock v. Clayton Cnty.*,
590 U.S. 644 (2020) ........................................................................ 21

*Cal. Cmtys. Against Toxics v. EPA*,
934 F.3d 627 (D.C. Cir. 2019) ........................................................ 7, 8

*Clapper v. Amnesty Int'l U.S.A.*,
568 U.S. 398 (2013) ........................................................................ 14

*Collins v. Yellen*,
594 U.S. 220 (2021) ........................................................................ 27

*Competitive Enter. Inst. v. FCC*,
970 F.3d 372 (D.C. Cir. 2020) ........................................................ 15

*Ctr. for Biological Diversity v. U.S. Dep't of Interior*,
563 F.3d 466 (D.C. Cir. 2009) ........................................................ 17

*Fla. Audubon Soc'y v. Bentsen*,
94 F.3d 658 (D.C. Cir. 1996) .......................................................... 14

*Food & Water Watch, Inc. v. Vilsack*,
808 F.3d 905 (D.C. Cir. 2015) ........................................................ 14

*Friends of Animals v. Jewell*,
828 F.3d 989 (D.C. Cir. 2016) ........................................................ 16

*Gov't of Manitoba v. Bernhardt*,
923 F.3d 173 (D.C. Cir. 2019) ........................................................ 15

*Little Sisters of the Poor Saints Peter and Paul Home v. Pennsylvania*,
591 U.S. 657 (2020) ........................................................................ 20

*Lomax v. Ortiz-Marquez*,
140 S. Ct. 1721 (2020) .......... 20

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) .......... 13

*Lora v. United States*,
599 U.S. 453 (2023) .......... 25

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) .......... 14, 17

*New Jersey v. EPA*,
989 F.3d 1038 (D.C. Cir. 2021) .......... 15

*Salinas v. United States R.R. Ret. Bd.*,
592 U.S. 188 (2021) .......... 21

*Sierra Club v. EPA*,
292 F.3d 895 (D.C. Cir. 2002) .......... 18

*Sierra Club v. EPA*,
161 F.4th 934 (6th Cir. 2025) .......... 19

*SSM Litig. Grp. v. EPA*,
150 F.4th 593 (D.C. Cir. 2025) .......... 14

*Summers v. Earth Island Inst.*,
555 U.S. 488 (2009) .......... 14

*U.S. Sugar Corp. v. EPA*,
113 F.4th 984 (D.C. Cir. 2024) .......... 13

*United States v. Wilson*,
503 U.S. 329 (1992) .......... 19

*Warth v. Seldin*,
422 U.S. 490 (1975) .......... 13

**Statutes**

5 U.S.C. § 801(f) .......... 20

42 U.S.C. § 7411(e) .......... 29, 30

42 U.S.C. § 7412 .......... 1, 3

42 U.S.C. § 7412(a)(1) .......... 4, 18, 19, 21

42 U.S.C. § 7412(a)(2) .......... 4, 18, 21

42 U.S.C. § 7412(a)(4) .......... 21

42 U.S.C. § 7412(b)(1) .......... 3

42 U.S.C. § 7412(c)(1) .......... 5, 22

42 U.S.C. § 7412(c)(3) .......... 5, 22

42 U.S.C. § 7412(c)(6) .......... 6, 25, 31

42 U.S.C. § 7412(c)(9) .......... 5, 27

42 U.S.C. § 7412(d)(2) .......... 5, 19, 22, 26, 33

42 U.S.C. § 7412(d)(3) .......... 6, 19, 22, 33

42 U.S.C. § 7412(d)(5) .......... 6, 19, 22, 33

42 U.S.C. § 7412(d)(6) .......... 6

42 U.S.C. § 7412(f)(2) .......... 6, 22, 23

42 U.S.C. § 7412(i) .......... 6

42 U.S.C. § 7412(i)(3)(A) .......... 7, 22, 25, 28

42 U.S.C. § 7607(b)(1) .......... 2

42 U.S.C. § 7661b(e) ....................................................................................16

42 U.S.C. § 7661c(a)......................................................................................16

42 U.S.C. § 7661c(c)......................................................................................16

42 U.S.C. §§ 7661–7661c ...............................................................................16

Pub. L. No. 110-161 (2007) ...............................................................................8

Pub. L. No. 119-20 (2025) ........................................................... 11, 20, 32

**Federal Registers**

72 Fed. Reg. 69 (Jan. 3, 2007) ....................................................................7, 8

77 Fed. Reg. 9304 (Feb. 16, 2012) ..................................................................30

83 Fed. Reg. 5543 (Feb. 8, 2018) ......................................................................8

84 Fed. Reg. 36304 (July 26, 2019)............................................................ 9, 10

85 Fed. Reg. 73854 (Nov. 19, 2020) ....................... 9, 10, 21, 24, 26, 27, 29, 31, 32

89 Fed. Reg. 73293 (Sept. 10, 2024) ........................................................ 10, 32

91 Fed. Reg. 58 (Jan. 2, 2026) .........................................................................11

91 Fed. Reg. 9088 (Feb. 24, 2026) ..................................................................29

91 Fed. Reg. 12700 (Mar. 17, 2026)................................................................29

**Rules**

D.C. Cir. R. 28(a)(7) .......................................................................................18

## GLOSSARY

| | |
|---|---|
| EPA | Environmental Protection Agency |
| MACT | Maximum Achievable Control Technology |
| Rule | Reclassification of Major Sources as Area Sources Under Section 112 of the Clean Air Act, 85 Fed. Reg. 73854 (Nov. 19, 2020) (Major MACT to Area Rule) |
| Section 112 | 42 U.S.C. § 7412 |

## INTRODUCTION

Section 112 of the Clean Air Act, 42 U.S.C. § 7412, regulates emissions of hazardous air pollutants from two categories of stationary sources: major sources and area sources. The only difference between a major source and an area source is the quantity of actual and potential emissions. In 2020, EPA issued a Rule providing that, if a source's actual and potential emissions fall below the major source threshold, that source may reclassify as an area source. And if an area source increases its potential emissions to above the major source threshold, it becomes a major source. Contrary to Petitioners' arguments, that framework is simple, logical, and consistent with the text, structure, and purpose of the statute.

Congress defined "major source" based on a source's current—not past—emissions. No language in the definitions of major source and area source suggests that a source's status is forever fixed to its initial emission level. And this makes sense. Once a source no longer emits as a major source, it need not be subject to major source standards. Congress reasonably did not subject sources to major source regulations after the source lowered its actual and potential emissions below the major source threshold. And Congress recently affirmed EPA's position here.

The Rule reflects not just the plain meaning of the definitions of major source and area source but also the purpose and structure of other provisions of Section 112. The threshold question in determining how a source is regulated is

whether that source is a major source or an area source. Flowing from that determination, Section 112 establishes a process for regulating major and area sources. Petitioners—who have not even met their burden to show standing—argue that whether a source is a major or area source should depend on how the source is regulated. This misconstrues the regulatory process and puts the cart before the horse.

The limited practical impact of the Rule further confirms that the Rule is consistent with the structure of Section 112. Specifically, the Rule provides the option to reclassify to sources that account for only five percent of major source emissions of hazardous air pollutants.

At bottom, EPA is coloring inside the lines. Petitioners do not like where those lines are drawn, but their discontent lies with Congress—not EPA.

## STATEMENT OF JURISDICTION

This Court has no jurisdiction because State and Environmental Petitioners lack standing. *See infra* Argument § I. If the Court were to disagree, it would otherwise have jurisdiction under 42 U.S.C. § 7607(b)(1).

## STATEMENT OF THE ISSUES

1. Petitioners bear the burden of showing Article III standing.

    a. State Petitioners claim standing as *parens patriae*. They have not demonstrated that any source operating in their boundaries has

reclassified due to the Rule or that the Rule has deprived them of any information about reclassified sources. Do State Petitioners have standing?

b. Environmental Petitioners have not shown how vacatur of the Rule would redress their alleged harms. Do Environmental Petitioners have standing?

2. Section 112(a) defines "major source" as a stationary source or group of stationary sources that, among other things, "emits or has the potential to emit" certain levels of hazardous air pollutants. Once a source's emissions and potential to emit falls below that level, is that source still a major source?

## PERTINENT STATUTES AND REGULATIONS

All pertinent statutes and regulations appear in addenda to the parties' briefs.

## STATEMENT OF THE CASE

### A. Statutory and Regulatory Background

Congress designed Section 112 of the Clean Air Act to reduce emissions of hazardous air pollutants. 42 U.S.C. § 7412. It does so by including a list of 189 hazardous air pollutants, *id.* § 7412(b)(1), and directing EPA to regulate emissions of those pollutants.

As detailed below, Section 112 begins by defining major sources and area sources. It then establishes different requirements based on how a source is classified.

### 1. Major and Area Sources

Whether a source is a "major source" or an "area source" depends on the amount of hazardous air pollutants emitted by the source based on its actual and potential emissions. *Id.* § 7412(a)(1). Congress defined "major source" as a stationary source that emits or has the potential to emit at or above either 10 tons per year of any one hazardous air pollutant or 25 tons per year of total hazardous air pollutants.[1] *Id.* EPA may establish a lower threshold due to an air pollutant's potency, persistence, potential for bioaccumulation, or other characteristics, or other relevant factors. *Id.* An "area source" is any stationary source of hazardous air pollutants that is not a major source. *Id.* § 7412(a)(2). The statutory definitions of "major source" and "area source" do not contain any language that lock a source forever into one status or the other based on its initial actual or potential emissions.

---

[1] For simplicity, when we describe what qualifies a source as major, we will use "emits" to refer to both emissions and potential to emit. And we will refer to 10 tons per year of any hazardous to mean both that amount and 25 tons per year of any combination of such pollutants.

### 2. Source Categories

As the first step of the regulatory process, Section 112(c) directs EPA to list categories and subcategories of major and area sources of hazardous air pollutants. *Id.* § 7412(c)(1). While this provision directs EPA to list *all* categories and subcategories of major sources of all hazardous air pollutants, it is less prescriptive for area sources. Specifically, the Agency must list categories or subcategories of area sources that EPA finds present a threat of adverse effects to human health or the environment, and must list sufficient categories or subcategories to ensure that area sources representing 90 percent of the area source emissions of the 30 hazardous air pollutants that present the greatest threat to public health in the largest number of urban areas are subject to regulation. Compare *id.* § 7412(c)(1) with *id.* § 7412(c)(3). Section 112(c)(9) permits EPA to remove a listed source category in certain, narrow circumstances. *Id.* § 7412(c)(9).

### 3. Regulation of Emissions

Next, Section 112 requires EPA to regulate emissions from each category or subcategory of major and area sources of listed hazardous air pollutants. For major sources, Section 112(d)(2) directs EPA to establish MACT standards by requiring the maximum degree of reduction in emissions achievable, including prohibiting such emissions, taking into account the costs of that reduction and any non-air quality health and environmental impacts and energy requirements. 42 U.S.C. §

7412(d)(2). Section 112(d)(3) provides that, at a minimum, these standards must reflect the performance of the best controlled similar source (for new sources) or the average of the best performing 12 percent of sources (for existing sources). *Id.* § 7412(d)(3). For area source categories, Section 112(d)(5) gives EPA more flexibility: EPA may subject area sources to MACT, just as major sources are, or to a less stringent requirement to use generally available control technologies. *Id.* § 7412(d)(5).

For major sources, within eight years after promulgating MACT standards, Section 112(f)(2) requires EPA to consider whether residual health and environmental risks remain from sources that have implemented MACT standards and, if required in light of those risks, to promulgate more stringent standards for those sources. *Id.* § 7412(f)(2). Section 112(d)(6) requires EPA, for all major sources and for area sources that are subject to a standard under Section 112(d), to review and as necessary revise those standards every eight years, taking into account technological or other developments. *Id*. § 7412(d)(6).

For seven hazardous air pollutants, Section 112(c)(6) required EPA, by a date certain, to regulate sources that account for 90 percent of those emissions. *Id*. § 7412(c)(6).

Finally, Section 112(i) sets a compliance schedule. *Id.* § 7412(i). For existing major and area sources, "[a]fter the effective date of any emissions

standard, limitation or regulation promulgated under this section and applicable to a source, no person may operate such source in violation of such standard, limitation, or regulation." *Id.* § 7412(i)(3)(A).

**B. Agency Proceedings**

In 1995, five years after Congress enacted the current version of Section 112, EPA announced what became known as the "Once In, Always In" policy. *Cal. Cmtys. Against Toxics v. EPA*, 934 F.3d 627, 634 (D.C. Cir. 2019). Under that policy, for any given standard, a source's "major source" status was fixed on that standard's first substantive compliance date. *Id.* Thus, a source that met the definition of major source on the first compliance date would continue to be subject to major source requirements even if later the source reduced its emissions and potential to emit below the major source threshold. *Id.* Notably, the policy permitted sources to avoid major source requirements if they lowered their emissions and potential to emit to below the major source threshold *before* the applicable compliance deadline. *Id.*

In 2007, EPA issued a proposed rule to replace the Once In, Always In policy. National Emission Standards for Hazardous Air Pollutants: General Provisions, 72 Fed. Reg. 69 (Jan. 3, 2007). EPA proposed a statutory interpretation that a major source would no longer be subject to major source standards if the source were to become an area source through enforceable limitations on its

potential to emit hazardous air pollutants. *Id.* at 72–73. Under this proposed rule, major sources could take such limits on their potential to emit and obtain area source status at any time. *Id.* at 70. EPA did not take final action on the proposed rule.[2]

In January 2018, EPA issued a guidance memorandum, known as the Wehrum Memo, that withdrew the Once In, Always In policy. *See* Issuance of Guidance Memorandum, Reclassification of Major Sources as Area Sources Under Section 112 of the Clean Air Act, 83 Fed. Reg. 5543 (Feb. 8, 2018). The Wehrum Memo, like the 2007 proposed rule, interpreted Section 112 so that major sources may limit their potential to emit to below the major source thresholds and then obtain area source status at any time—not just before the first substantive compliance date. *Cal. Cmtys. Against Toxics*, 934 F.3d at 634. The memo explained that the Once In, Always In policy was contrary to the plain language of the definitions of major source and area source and announced the future publication of a proposed rule to correct the problem. *Id.*; 83 Fed. Reg. at 5543. Several of the same petitioners here challenged the Wehrum Memo, arguing that it was a final action issued in contravention of the Administrative Procedure Act's notice-and-comment provisions, and that it was inconsistent with Section 112. *Cal.*

---

[2] In 2007, a congressional appropriations rider prohibited EPA from taking final action on the proposed rule. Consolidated Appropriations Act, Pub. L. No. 110-161, § 432, 121 Stat. 1844, 2152 (2007).

*Cmtys. Against Toxics*, 934 F.3d at 634. The Court denied the petitions for lack of subject matter jurisdiction and did not address the merits. *Id*. at 641.

In July 2019, EPA issued the proposed Rule, with regulatory text to implement the interpretation set forth in the Wehrum Memo. *See* Reclassification of Major Sources as Area Sources Under Section 112 of the Clean Air Act, 84 Fed. Reg. 36304 (July 26, 2019). EPA also proposed to revise the regulatory definition of the term "potential to emit" by removing the requirement that potential to emit limits be federally enforceable and requiring instead that potential to emit limits be both legally and practicably enforceable. *Id.* at 36306.

In November 2020, EPA promulgated the Rule challenged here. 85 Fed. Reg. 73854 (Nov. 19, 2020). The Rule explained that it implemented the plain language reading of Section 112's definitions of "major source" and "area source" by providing major sources the option to reclassify to area source status if they reduce their potential to emit hazardous air pollutants to below the major source threshold, regardless of timing. *Id.* at 73859. As EPA explained, the definitions of major source and area source do not contain any language that fixes a source's status as a major source or an area source at any particular point in time. *Id.* Nor do the definitions contain language suggesting that a source's status cannot change. *Id.* Thus, the natural reading of the major source definition is that once a source's potential emissions fall below the major source threshold, that source is no longer a

major source and instead may reclassify as an area source, *id.*, so long as its potential emissions are limited as a practical matter (*e.g.*, by removing emitting equipment) or a legal matter (*e.g.*, by adopting an enforceable limit to run pollution controls, operate fewer hours, or restrict fuel). *See generally* 84 Fed. Reg. at 36313–14 (discussing physical and operational limits on capacity of a source to emit a pollutant, as well as legally enforceable limits). Although the basis for the Rule is the plain language of the definitions of major source and area source, as EPA explained, the Rule is consistent with other provisions of Section 112. 85 Fed. Reg. at 73860–62.

The Rule did not finalize the proposed changes to the definition of "potential to emit" and instead made an interim ministerial revision that is not in dispute here. *Id.* at 73875–76.

Petitioners subsequently filed petitions for review of the Rule in this Court. The Court held the petitions for review in abeyance while EPA reviewed the Rule. ECF No. 1892504.

In September 2024, following notice and comment, EPA promulgated a final rule that required sources in source categories listed under Section 112(c)(6) that reclassified as area sources under the Rule to remain subject to MACT standards even after they reclassified. Review of Final Rule Reclassification of Major Sources as Area Sources Under Section 112 of the Clean Air Act, 89 Fed. Reg.

73293 (Sept. 10, 2024) ("2024 Rule"). Congress subsequently disapproved the 2024 Rule by a joint resolution under the Congressional Review Act. *See* Pub. L. No. 119-20 (2025); 91 Fed. Reg. 58 (Jan. 2, 2026) (EPA ministerial rule removing 2024 Rule from Code of Federal Regulations due to disapproval by joint resolution).

In late 2025, the Court lifted the abeyance. ECF No. 2144911. The Court also severed and held in abeyance issues related to the Rule's ministerial amendment to the regulatory definition of "potential to emit." *Id.*

## SUMMARY OF ARGUMENT

Petitioners have not shown standing to challenge the Rule, so the Court lacks jurisdiction to review their petitions. State Petitioners lack standing as *parens patriae*. Any injury they allege based on increased emissions is too speculative: They have pointed to no source that has reclassified from a major source to an area source and is still operating. Nor have they shown any deprivation of information to support informational standing. Environmental Petitioners lack standing because they have not shown how vacatur of the Rule would redress their alleged harms.

On the merits, the Rule reflects the best interpretation of the definitions of "major source" and "area source." Nothing in Section 112 preserves, for all time, a source's status based on its initial emissions. To the contrary, the definition of "major source"—by using the *present tense* "emits or has the potential to emit"—

reflects a source's *current* emissions level. And nothing precludes sources classified as major from lowering their actual and potential emissions and then reclassifying as area sources, or limits sources' ability to reclassify at certain times but not others.

The Rule also is consistent with Section 112's structure. Whether a source is a major source or an area source is the threshold question, and what requirements apply to the source flow from how the source is classified. Petitioners misread the statute by injecting language into the major source definition from provisions governing *how* major sources are regulated.

The limited practical impact of the Rule further confirms that it is consistent with the goals of Section 112. That is, the record shows that the only sources that, as a practical matter, could reclassify and increase their emissions, emit a small percentage of total hazardous air pollutants. And there is little indication that the relatively few sources that have reclassified have sought to relax their emission controls.

Finally, while the Rule allows major sources to reclassify as area sources if their emissions and potential to emit fall below the major source thresholds, it does not necessarily exempt reclassified sources from MACT standards. That is because, under Section 112, sources that reclassify from major to area source status are no longer subject to major source requirements and instead are subject to area

source requirements, which may be MACT or generally available control technology.

## STANDARD OF REVIEW

The Court reviews questions of statutory interpretation de novo. *U.S. Sugar Corp. v. EPA*, 113 F.4th 984, 991 (D.C. Cir. 2024) (citing *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 392 n.4 (2024)). In determining the "best" reading of a statute, "[c]ourts must exercise their independent judgment," but "[c]areful attention to the judgment of the Executive Branch may help inform that inquiry." *Loper Bright*, 603 U.S. at 409–10, 412–13. To resolve the meaning of disputed statutory language, a court shall adopt the interpretation that, "after applying all relevant interpretive tools, [it] concludes is best." *Id.* at 400. "[W]hen a particular statute delegates authority to an agency consistent with constitutional limits, courts must respect the delegation, while ensuring that the agency acts within it." *Id.* at 413.

## ARGUMENT

### I. Petitioners Do Not Have Standing.

Standing requires that Petitioners have "a personal stake in the outcome of the controversy [so] as to warrant [their] invocation of federal-court jurisdiction." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). Petitioners must establish the three elements constituting the "irreducible constitutional minimum" of Article III

standing, including injury in fact. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Petitioners have the burden of showing that they have "suffered a concrete and particularized injury that is: (1) actual or imminent; (2) caused by, or fairly traceable to, an act that the litigant challenges in the instant litigation; and (3) redressable by the court." *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 663 (D.C. Cir. 1996) (internal quotation and citation omitted).

Injury "must be actual and imminent, not conjectural or hypothetical." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009). The Supreme Court has stressed that "[a]llegations of *possible* future injury are not sufficient." *Clapper v. Amnesty Int'l U.S.A.*, 568 U.S. 398, 409 (2013) (internal quotations and citation omitted). Where Petitioners assert merely an increased risk of harm, they must demonstrate both a "substantially increased risk of harm" and a "substantial probability of harm with that increase taken into account." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 914 (D.C. Cir. 2015) (internal quotations and citation omitted).

D.C. Circuit Rule 28(a)(7) requires Petitioners to include any supporting evidence for their standing claim in an addendum to their opening brief. *See also SSM Litig. Grp. v. EPA*, 150 F.4th 593, 596 n.1 (D.C. Cir. 2025).

### A. State Petitioners Do Not Have Standing.

State Petitioners allege standing based on two types of injuries: (1) harm to the public and (2) informational injury. State Br. at 20–23. Neither establishes standing here.

First, "a State does not have standing as *parens patriae* to bring an action against the Federal Government." *Alfred L. Snapp & Sons, Inc. v. Puerto Rico ex rel Barez*, 458 U.S. 592, 610 n.16 (1982); *see also Gov't of Manitoba v. Bernhardt*, 923 F.3d 173, 181 (D.C. Cir. 2019) (States lack standing to sue the federal government in the name of "protect[ing] [their] citizens from the operation of federal statutes."). State Petitioners therefore cannot establish standing on account of the Rule's alleged harm to public health. *Contra* State Br. at 21.

In any event, the injury State Petitioners allege from a potential increase in emissions is too speculative. *See Food & Water Watch, Inc.*, 808 F.3d at 914. Although State Petitioners claim that 15 California facilities *could* reclassify, State Br. at 22, California has not established that it is "reasonably predictable" that they will reclassify, or, if they did, that there is substantial risk that their emissions of hazardous air pollutants—and therefore California's regulatory burdens—would increase. *See New Jersey v. EPA*, 989 F.3d 1038, 1049 (D.C. Cir. 2021) (quoting *Competitive Enter. Inst. v. FCC*, 970 F.3d 372, 384 (D.C. Cir. 2020)); *see also infra* at 24 (few sources reclassified prior to the Rule). That those facilities have

not reclassified in the seven years since EPA rescinded the Once In, Always In policy and in the five years since EPA promulgated the Rule suggests that their reclassification is, at best, speculative. Although California points to a single facility that has reclassified, *see* Decl. of Thomas Andrews (Doc. No. 2155885) ¶ 21, that facility ceased operations as of December 3, 2025. Add. at 14–23. California thus cannot show an actual or imminent injury. And no other State Petitioner has provided a standing declaration.

Second, State Petitioners have failed to demonstrate an informational injury. Such an injury requires them to show deprivation of information, which causes them to suffer the type of harm Congress sought to prevent by requiring disclosure. *Friends of Animals v. Jewell*, 828 F.3d 989, 992 (D.C. Cir. 2016). All major sources of any air pollutant must obtain what is known as a Title V operating permit, which, among other things, requires sources to report certain emissions. 42 U.S.C. §§ 7661–7661c. It is true that if a source reclassifies from a major source to an area source, it would no longer be covered by the Title V program and thus would not be subject to those emission-reporting requirements. 42 U.S.C. §§ 7661b(e), 7661c(a), (c). But there has been no change to the information California sources report in accordance with Title V. State Petitioners point only to 15 California facilities that theoretically could reclassify, but have not, and a single facility that reclassified but has since ceased operations. State Br. at 22; Decl. of

Thomas Andrews ¶ 31. Because State Petitioners cannot point to any information they lack, they have not shown an actual or imminent informational injury.

### B. Environmental Petitioners Do Not Have Standing.

Like California, Environmental Petitioners cannot show any actual or imminent injury for sources that have not reclassified. *See supra* at 15–16. As to the facilities that have reclassified, Environmental Petitioners have not explained how vacatur will redress their alleged injury. They merely offer a drive-by, conclusory statement that vacatur "would redress those injuries by reinstating the requirements eliminated by the Rule." Env. Br. at 16. But how would that reinstatement come about? What is the reclassified facilities' relationship to the Rule? And what is the mechanism that would translate vacatur into altered conduct by these facilities? Environmental Petitioners' brief does not say.

Where, as here, redressability "hinge[s] on the response of the regulated (or regulable) third party to the government action or inaction," *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992), "the petitioner bears the burden of adducing facts showing that those third-party choices have been or will be made in such manner as to produce causation and permit redressability of injury," *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d 466, 478 (D.C. Cir. 2009) (cleaned up). Environmental Petitioners have failed to connect the dots showing that subsequent third-party actions will reduce emissions or require additional

information about emissions. Their brief, in short, does not include "arguments and cite evidence establishing by a 'substantial probability' the claim of standing." D.C. Cir. R. 28(a)(7) (quoting *Sierra Club v. EPA*, 292 F.3d 895, 898 (D.C. Cir. 2002)).

## II. The Court Should Uphold the Rule.

Given the text and structure of Section 112, the Rule reflects the best interpretation of the key terms "major source" and "area source." The Rule also aligns with Section 112's other provisions highlighted by Petitioners. And while the Rule allows major sources to reclassify to area sources if their actual and potential emissions fall below the major source threshold, it does not necessarily exempt reclassified sources from MACT standards.

### A. The Rule Reflects the Best Reading of Section 112(a).

Section 112, by its plain language, defines major sources and area sources based solely on the quantity of their actual and potential emissions. A major source is any stationary source "that emits or has the potential to emit considering controls, in the aggregate, 10 tons per year or more of any hazardous air pollutant or 25 tons per year or more of any combination of hazardous air pollutants." 42 U.S.C. § 7412(a)(1). By contrast, an area source is any stationary source "that is not a major source." *Id.* § 7412(a)(2).

The Rule reflects the plain language of Section 112, which contains nothing that preserves, for all eternity, a source's status based on its initial emissions. To the contrary, the definition of "major source"—by using the *present tense* "emits or has the potential to emit"—reflects a source's *current* emissions level. *Id.* § 7412(a)(1). *See United States v. Wilson*, 503 U.S. 329, 333 (1992) ("Congress' use of a verb tense is significant in construing statutes."); *Sierra Club v. EPA*, 161 F.4th 934, 948 (6th Cir. 2025) (holding that Congress' use of the present tense bars EPA from approving certain state requests unless applicable requirements continue to be met). So once a major source stops emitting above 10 tons per year—or a lower threshold set by EPA—it is, by the plain terms of the "major source" definition, no longer a major source. 42 U.S.C. § 7412(a)(1). And once a major source reclassifies as an area source, it is no longer subject to major source requirements. *Id.* § 7412(d)(2)–(3). Instead, it becomes subject to area source requirements, which may include MACT standards or generally available control technology standards. *Id.* § 7412(d)(2)–(3), (5).

The concept works in both directions: as Environmental Petitioners acknowledge, Env. Br. at 31–32, an area source could *increase* its emissions above the major source threshold. At that point, the source "emits"—present tense—at a level to qualify as a major source. 42 U.S.C. § 7412(a)(1). So it becomes a major source, which in turn subjects it to MACT standards. The Court should reject

Petitioners' invitation, State Br. at 23–25; Env. Br. at 22–27, to read into the statute words—like "used to emit"—that Congress chose to exclude. *See Lomax v. Ortiz-Marquez*, 140 S. Ct. 1721, 1725 (2020); *Little Sisters of the Poor Saints Peter and Paul Home v. Pennsylvania*, 591 U.S. 657, 677 (2020) ("It is a fundamental principle of statutory interpretation that 'absent provision[s] cannot be supplied by the courts.'") (citation omitted).

Congress ratified the view that a major source reclassified as an area source need not comply with major source requirements when it disapproved the 2024 Rule under the Congressional Review Act. *See* Pub. L. No. 119-20 (2025). The 2024 Rule rewrote part of the 2020 Rule to require certain major sources reclassified as area sources to continue to comply with MACT standards. By disapproving the 2024 Rule, Congress restored the 2020 Rule—the rule under review—to its original form. *See* 5 U.S.C. § 801(f) (any rule disapproved under the Congressional Review Act "shall be treated as though such rule had never taken effect"). In doing so, Congress implicitly rejected Petitioners' view that a major source can never change its legal status. Instead, it affirmed EPA's position here that a major source can be treated as an area source after it stops emitting at major source levels.

By contrast, elsewhere in Section 112, Congress showed that sometimes, it does want to fix a source's legal status to what that source did at a particular

moment in the past. In those cases, Congress specified the relevant moment: A "new source" means a stationary source that is constructed or reconstructed "after the Administrator first proposes" emission regulations under Section 112. 42 U.S.C. § 7412(a)(4). That, of course, was not what Congress chose to do when it defined major sources. 85 Fed. Reg. at 73860; *see Salinas v. United States R.R. Ret. Bd.*, 592 U.S. 188, 196 (2021) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (citation omitted). Indeed, nothing in Section 112 explicitly provides that major sources are permanently stuck with that classification. Here, "the meaning of the statute's terms is plain," so the Court's "job is at an end." *Bostock v. Clayton Cnty.*, 590 U.S. 644, 674 (2020).

And as a logical matter, the question of *what* standard is applicable to major sources—whether MACT or otherwise—cannot determine *which* sources are major sources. 85 Fed. Reg. at 73861. Petitioners' arguments to the contrary put the cart before the horse. *See* State Br. at 25–35; Env. Br. at 28–31. The text and structure of Section 112 demonstrate that a source's classification—whether major or area—is the threshold question. Indeed, the very first provisions in Section 112 are the major and area source definitions. 42 U.S.C. § 7412(a)(1), (a)(2). And Section 112(i)(A)(3)'s reference to an emissions standard that is "applicable to a

source" means that which standards apply turns on whether the source is a major or area source. *Id.* § 7412(i)(3)(A).

Section 112 established a bifurcated scheme that differentiates what requirements apply to a source depending on how the source is classified. For example:

- While EPA must list *all* categories and subcategories of major sources of all hazardous air pollutants, *id.* § 7412(c)(1), the listing requirements for area sources depend on an enumerated set of conditions, *id.* § 7412(c)(3). For example, EPA must list categories or subcategories of area sources representing 90 percent of area source emissions of the 30 hazardous air pollutants that present the greatest threat to public health in the largest number of urban areas. *Id*.
- Major sources are subject to MACT standards, *id.* § 7412(d)(2), (3), but area sources may be subject to generally available control technology *or* MACT standards, *id.* § 7412(d)(5).
- Area sources categories that are not subject to MACT standards, *id.* § 7412(d)(5), are not subject to residual risk review under Section 112(f)(2), *id.* § 7412(f)(2).

None of these provisions suggest that their applicability determines a source's classification as major or area. *Contra* State Br. at 25–30; Env. Br. at 28–33.

More broadly, the Rule is expected to have limited effect on overall emissions. So the highest emitters are still subject to the MACT standards. *Contra* State Br. at 25–27. After all, a source that can take advantage of the Rule would need to have reduced its emissions to below 10 tons per year, the major source threshold. Sources that reduce their emissions below that level—and therefore could potentially reclassify—account for a small fraction of total hazardous air pollutant emissions from major sources: barely *5 percent*.[3] *Contra* State Br. at 26–27; Env. Br. at 26. Sources accounting for all other major source emissions—*at least* 95 percent of total emissions—are subject to Section 112(f)(2)'s residual risk provision, which requires EPA to tighten MACT standards for each source category if those standards do not currently reduce lifetime cancer risks to less than one in a million. 42 U.S.C. §§ 7412(f)(2); *contra* Env. Br. at 29.

---

[3] EPA calculated that major sources across the 72 representative source categories evaluated in the Rule emitted a total of 214,681 tons per year of hazardous air pollutants. *See* MM2A Revised Database Summary 8/13/2020, EPA-HQ-OAR-2019-0282-0657, JA0596–791. Sources that emitted up to 125% of the major source threshold emitted a total of 11,704 tons per year of hazardous air pollutants, or 5.45 percent of all emissions of hazardous air pollutants in those source categories. *Id.*

Moreover, EPA's analyses in the record of past reclassifications to area source status concluded that few major sources reclassified when it was an option earlier. 85 Fed. Reg. at 73879. Specifically, EPA analyzed sources that reclassified after the Wehrum Memo. Of the 7,183 major sources in existence when EPA promulgated the Rule, just 69 sources—representing just 0.96 percent of all sources—reclassified as a result of the Wehrum Memo. *Id.* at 73878 (tbl. 2), 73879. For 68 of those reclassified sources, revised operating permits required them to achieve and maintain area source status by continuing the operation of the emissions controls or practices they had used to comply with major source requirements. *Id.* at 73862, 73880–81. EPA identified just one reclassified source that will not continue to employ the same compliance method that it used to meet the applicable MACT standard, and thus *may* increase its emissions. *Id.* at 73862, 73880. In fact, EPA determined that several sources that were emitting above the major source threshold prior to reclassification reduced their emissions in order to reclassify. *Id.* at 73880 (reclassification of three combustion/boiler sources resulted in total yearly reduction of 78.8 tons of hazardous air pollutants).

Thus, the record indicates that the dire scenario Petitioners predict—that major sources would reclassify to area source status and then increase their emissions to just below the major source threshold—has not played out in reality.

*     *     *

To the extent that major sources reclassify as area sources by bringing their emissions to below the major source threshold, that is not a "loophole" or an "end-run" around the major source requirements. It is simply the result of the plain language of Section 112, which draws a bright line between major and area sources. And Congress decided to treat sources differently based on how much they currently emit. Petitioners simply object to how and where that line is drawn. And though "Congress could certainly have designed . . . the scheme here at issue differently," like basing classification on past emissions, it "did not do any of these things. And [the Court] must implement the design Congress chose." *Lora v. United States*, 599 U.S. 453, 463–64 (2023).

### B. The Rule Aligns With Other Provisions of Section 112.

The Rule aligns with Section 112's other provisions highlighted by Petitioners. First, it adheres to Section 112's regulatory framework. Second, the Rule is consistent with Section 112(i)(3)(A), 42 U.S.C. § 7412(i)(3)(A), which does not require sources to continue to comply with MACT standards regardless of that source's current emissions. Third, the Rule does not conflict with the Section 112(c)(6), 42 U.S.C. § 7412(c)(6), requirement to list categories of sources for certain hazardous air pollutants so that at least 90 percent of emissions of each of those pollutants are subject to major and area source standards.

### 1. The Rule Reflects Section 112's Process for Regulating Sources of Hazardous Air Pollutants.

Petitioners incorrectly argue that the Rule conflicts with various provisions of Section 112. *See* State Br. at 25–30; Env. Br. at 17–21, 28–33. Each of those arguments misreads the statute.

First, State Petitioners argue that the Rule "erases" the Section 112(d)(2), 42 U.S.C. § 7412(d)(2), instruction that MACT standards "require the maximum degree of reduction in emissions," including "a prohibition on such emissions, where achievable." State Br. at 26–27; Env. Br. at 26. But Section 112 has never been implemented in the strict fashion Petitioners suggest. For example, a new source could, before it starts operating, restrict its emissions to just below the major source threshold. That would allow it to avoid any MACT standards applicable only to major sources. And even under the Once In, Always In policy, EPA permitted existing major sources to reclassify to area sources so long as they reclassified before the MACT standard's first compliance date—which could be years after EPA proposed a new or revised standard. 85 Fed. Reg. at 73861. Environmental Petitioners argue this approach violated the text of Section 112. Env. Br. at 33–34. However, nobody challenged that interpretation in the 25 years it was in effect. As EPA explained in the Rule, nothing in Section 112 states—and there is no textual or logical reason why—that a major source that could reclassify to area source status on the day before its first compliance date cannot do so on the

day after its first compliance date. 85 Fed. Reg. at 73861; *see also supra* Argument Section II.A.

Second, State Petitioners incorrectly contend that the Rule runs counter to EPA's "duty" under Section 112's residual risk and technology review provisions. State Br. at 27–30; *see also* Env. Br. at 20–21. These provisions simply direct EPA to review and, as appropriate, revise, the standards. They do not alter Section 112's definitions of major and area sources or allow EPA to ignore the definitions' plain text. *See supra* at 18–20. Nor does the Rule create the type of conflict State Petitioners claim: EPA still must revise MACT standards to the extent required by Sections 112(f)(2) and (d)(6), and those standards will apply to at least 95 percent of emissions of hazardous air pollutants. *See supra* at 23. Thus, the vast majority of emissions from major sources will continue to be subject to any tightened requirements.

Third, contrary to Environmental Petitioners' argument, Env. Br. at 29, nothing in Section 112(c)(9), 42 U.S.C. § 7412(c)(9)—which restricts deletion of listed source categories—bars reclassification. Moreover, by restricting the deletion of listed source categories, Congress showed that it knows how to prevent regulatory backsliding. Yet Congress never said that major sources cannot reclassify to area sources. That silence further confirms that Section 112 does not preclude reclassification. *See Collins v. Yellen*, 594 U.S. 220, 248 (2021) ("[W]hen

Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (quotation omitted).

Thus, the Rule aligns with Section 112's process for regulating hazardous air pollutants.

### 2. The Rule Is Consistent With Section 112(i)(3)(A).

Next, Environmental Petitioners misread Section 112(i)(3)(A), 42 U.S.C. § 7412(i)(3)(A). *See* Env. Br. at 17–21, 31–33. Under that provision, "After the effective date of any emissions standard . . . promulgated under this section and applicable to a source, no person may operate such source in violation of such standard . . . ."

In other words, once an "emissions standard" is no longer "applicable to a source," that source need not comply with that standard. Environmental Petitioners incorrectly read Section 112(i)(3)(A) to require that, once a standard is "applicable to a source," then, "after" the standard's "effective date," the source must comply with the standard *regardless of* any changes in that source's emissions or whether the standard still otherwise applies to the source. *Id.* at 18, 32.

But Section 112(i)(3)(A)'s inclusion of the word "after" simply means that a source needs to comply with a standard only after its effective date. Once a

standard is no longer "applicable to a source," then that source need not comply with the standard. For example, if an area source increased its emissions so as to become a major source, then that source no longer would be subject to an area source standard. 85 Fed. Reg. at 73862–63. Or EPA may rescind a standard after its effective date. *See, e.g.,* National Emission Standards for Hazardous Air Pollutants: Coal- and Oil-Fired Electric Utility Steam Generating Units: Final Repeal, 91 Fed. Reg. 9088 (Feb. 24, 2026) (repealing Section 112(d)(6) standards promulgated in 2024, thereby reinstating the MACT standards established in 2012).[4] EPA also could revise a MACT standard pursuant to Section 112(f)(2) or Section 112(d)(6). But under Petitioners' interpretation of Section 112(i)(3)(A), even after a standard is no more, sources would still be required to comply with it because it does not matter if the standard is still applicable to those sources. Section 112(i)(3)(A) is not best interpreted to create zombie emissions standards.

Environmental Petitioners support their misreading of Section 112(i)(3)(A) by emphasizing an inconsequential difference between Section 112(i)(3)(A) and Section 111(e), 42 U.S.C. § 7411(e). *See* Env. Br. at 24–26. Section 111(e)

---

[4] *See generally* National Emission Standards for Hazardous Air Pollutants: Ethylene Oxide Emissions Standards for Sterilization Facilities Residual Risk and Technology Review Reconsideration, Proposed Rule, 91 Fed. Reg. 12700 (Mar. 17, 2026) (proposal to amend Commercial Sterilization Facilities requirements to, among other things, rescind Section 112(f)(2) risk-based standards and revise Section 112(d)(6) technology review standard).

provides: "After the effective date of [Section 111] standards of performance . . . , it shall be unlawful for any . . . new source to operate . . . in violation of any standard of performance applicable to such source." 42 U.S.C. § 7411(e). The difference between Section 112(i)(3)(A) and Section 111(e) is that the phrase "applicable to a source" appears in the first part of Section 112(i)(3)(A) and in the second part of Section 111(e).

Environmental Petitioners argue that the placement of the term "applicable to a source" in Section 111(e) modifies a source's ongoing compliance obligations, whereas its placement in Section 112(i)(3)(A) creates continuing compliance obligations, regardless of post-compliance emissions. Env. Br. at 24–26. But Section 112(i)(3)(A) and Section 111(e) have the same plain meaning, and the different placement of the phrase "applicable to a source" is immaterial. Indeed, Environmental Petitioners' interpretation would yield anomalous results. If, for example, EPA promulgated standards simultaneously under Section 111 and 112 for the same source category, and then later revised both those standards simultaneously, then a given source would remain subject to the original Section 112 standard but be subject to the revised Section 111 standard.[5] Such absurd

---

[5] *See, e.g.,* National Emission Standards for Hazardous Air Pollutants from Coal- and Oil-Fired Electric Utility Steam Generating Units and Standards of Performance for Fossil-Fuel-Fired Electric Utility, Industrial-Commercial-Institutional, and Small Industrial-Commercial-Institutional Steam Generating Units, 77 Fed. Reg. 9304 (Feb. 16, 2012) (promulgating revisions to Section 111

results illustrate that the textual difference between Section 112(i)(3)(A) and Section 111(e) that Environmental Petitioners emphasize is meaningless.

Moreover, Environmental Petitioners again seek to use requirements regarding the regulation of emissions to determine what is and is not a major source. *See* Env. Br. at 18. But the effective date of an emissions standard does not determine whether a source is a major source; instead, it is a source's status that determines whether it is subject to that emissions standard.

### 3. The Rule Does Not Impair the Implementation of Section 112(c)(6).

Section 112(c)(6) required EPA, by a date certain, to regulate sources that account for 90 percent of emissions of seven specific hazardous air pollutants. 42 U.S.C. § 7412(c)(6). The Rule is consistent with this mandate. State Petitioners' argument to the contrary fails for two reasons. *See* State Br. at 30–35.

First, as EPA explained in the Rule, Section 112(c)(6) created only a one-time requirement for listing and a subsequent one-time requirement for completing regulation. 85 Fed. Reg. at 73860. The fact that these requirements each had to be completed by a particular date makes it clear that they were one-time requirements and that EPA need not ensure that 90 percent of emissions are subject to regulation on an ongoing basis. *Id*. at 73860–61. Moreover, as a factual matter, once EPA set

---

standards, including for new sources, simultaneously with the Mercury and Air Toxics Standards, which applied to new and existing sources under Section 112).

standards for the listed source categories, their emissions decreased and fell below the 90-percent threshold. *Id.* at 73861. If State Petitioners' interpretation were correct, then Section 112(c)(6) would create a never-ending cycle of listing and regulation in order to achieve an unattainable goal of ensuring that 90 percent of emissions are regulated. *Id.*

Second, Congress's disapproval of the 2024 Rule is strong evidence that it did not view the Rule as being in conflict with Section 112(c)(6) (or any other provision in Section 112). In the 2024 Rule, EPA explained at that time that the 2024 Rule "addresses the EPA's obligation" under Section 112(c)(6) "to assure sources from the listed source categories are subject" to Section 112(d)(2) or (d)(4) controls. 89 Fed. Reg. at 73298. But by disapproving the rule, Congress disagreed with EPA's earlier position and thus State Petitioners' view that the 2024 Rule and Section 112(c)(6) "cannot be reconciled." *Contra* Env. Br. at 30; *see* Pub. L. No. 119-20 (2025).

### C. The Rule Does Not Exempt Reclassified Sources from MACT Standards.

While the Rule allows major sources to reclassify to area sources if their emissions fall below the major source thresholds, it does not necessarily exempt reclassified sources from MACT standards. Environmental Petitioners' contrary argument ignores how Section 112 works. *See* Env. Br. at 34–38.

The Rule does not automatically reclassify major sources if their emissions fall below the major source threshold—it simply gives them the *option* to reclassify by adopting enforceable limits on their potential to emit. If and when a source reclassifies, any change in the applicable standard is due to separately promulgated standards for area sources—not the Rule itself.

When sources change their classification, their applicable requirements change too, by operation of law. That is, when a source reclassifies from a major source to an area source, that source becomes subject to area source standards. Section 112 applies MACT requirements to major sources, 42 U.S.C. § 7412(d)(2)–(3), but grants EPA broad authority to promulgate area source requirements. Those area source requirements may be MACT standards or generally available control technology standards. *Id*. §7412(d)(5); *see* Env. Br. at 28 ("Section 112. . . provid[es] EPA only discretion to subject *some* area sources to lesser emissions requirements").

EPA must explain any decision to *promulgate* generally available control technology standards instead of MACT standards for an area source in a particular source category. *See* 42 U.S.C. § 7412(d)(5). The Rule operates independently of this requirement because EPA has already promulgated MACT standards for major sources, and, in some cases, area sources. The Rule simply applies the statute to recognize that some sources may reclassify. Again, the source category dictates the

applicable standard, not the reverse. *See supra* at 21–23. Thus, when sources reclassify, by operation of statute, different regulatory requirements—which, again, EPA has already promulgated or may promulgate in the future—apply.

## CONCLUSION

The Court should dismiss the petitions for lack of jurisdiction, or, at the very least, deny them.

Respectfully submitted,

ADAM R.F. GUSTAFSON
*Principal Deputy Assistant Attorney General*
ROBERT N. STANDER
*Deputy Assistant Attorney General*

/s/ *Laura J. Glickman*
LAURA J. GLICKMAN
*Senior Attorney*
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, DC 20044
(202) 598-3056
laura.glickman@usdoj.gov

Of Counsel:

HOWARD J. HOFFMAN
*Attorney*
U.S. Environmental Protection Agency

June 18, 2026
DJ 90-5-2-3-22857

## CERTIFICATE OF COMPLIANCE

1. This document complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f) this document contains 7,715 words.

2. This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman font.

/s/ *Laura J. Glickman*
LAURA J. GLICKMAN

Counsel for Respondents