**ORAL ARGUMENT NOT YET SCHEDULED**

Case No. 21-1024 (consolidated with No. 21-1034)

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

CALIFORNIA COMMUNITIES AGAINST TOXICS, *et al.*,

*Petitioners*,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, *et al.*,

*Respondents*.

# STATE PETITIONERS' FINAL OPENING BRIEF


ROB BONTA
Attorney General of California
DEBORAH M. SMITH
ANNADEL A. ALMENDRAS
Senior Assistant Attorneys General
ABIGAIL BLODGETT
MYUNG J. PARK
Supervising Deputy Attorneys General

RYAN HOFFMAN
*KAVITA P. LESSER
JONATHAN A. WIENER
Deputy Attorneys General
300 South Spring Street
Los Angeles, CA 90013
Telephone: (213) 269-6605
Email: Kavita.Lesser@doj.ca.gov
*Attorneys for the State of California*


*(Counsel for Additional Petitioners Listed on Signature Pages)*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), the undersigned counsel of record certifies as follows:

### A. Parties

Petitioners

The following parties appear in these consolidated cases as petitioners:

In case no. 21-1024, filed January 15, 2021: California Communities Against Toxics, Downwinders at Risk, Environmental Defense Fund, Environmental Integrity Project, Hoosier Environmental Council, Louisiana Bucket Brigade, Natural Resources Defense Council, Ohio Citizen Action, Sierra Club, and Texas Environmental Justice Advocacy Services (together, "Environmental Petitioners").

In case no. 21-1034, filed January 19, 2021: State of California (by and through Attorney General Rob Bonta and the California Air Resources Board), the States of Delaware, Illinois, Maryland, New Jersey, New York, Oregon, Rhode Island, Washington, and Wisconsin; the Commonwealths of Massachusetts, Pennsylvania, and Virginia; the Cities of Chicago and New York (together, "State Petitioners").

Respondents

The following parties appear as respondents in all the above-captioned cases: the United States Environmental Protection Agency and Lee M. Zeldin, in his official capacity as Administrator of the U.S. Environmental Protection Agency (together, "EPA").

Intervenors

The following parties have intervened on the side of respondents: The Air Permitting Forum, American Chemistry Council, American Wood Council, Auto Industry Forum, Brick Industry Association, and Portland Cement Association. On December 10, 2025, the National Lime Association moved for leave to intervene on behalf of respondents, and the court has yet to rule on that motion.

Amici

None at present.

## B. Ruling Under Review

The State and Environmental Petitioners seek review of the final agency action by EPA entitled: "Reclassification of Major Sources as Area Sources Under Section 112 of the Clean Air Act," published at 85 Fed. Reg. 73,854 (Nov. 19, 2020) ("Reclassification Rule").

## C. Related Cases

The final agency action at issue in this proceeding has not been previously reviewed in this or any other court. There are no related cases within the meaning of D.C. Circuit Rule 28(a)(1)(C).

*/s/ Kavita Lesser*
Kavita Lesser
Deputy Attorney General
California Department of Justice
300 South Spring Street
Los Angeles, CA 90013
(213) 269-6605
Kavita.Lesser@doj.ca.gov

*Counsel of record for State Petitioners*

**TABLE OF CONTENTS**

**Page**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............ i

A. Parties ............ i

B. Ruling Under Review ............ ii

C. Related Cases ............ iii

INTRODUCTION ............ 1

JURISDICTIONAL STATEMENT ............ 4

ISSUES PRESENTED ............ 5

STATUTES AND REGULATIONS ............ 6

STATEMENT OF THE CASE ............ 6

I. Legal Framework for Regulating Hazardous Air Pollutants under the Clean Air Act ............ 6

II. Regulatory History and Litigation Background ............ 11

STANDARD OF REVIEW ............ 17

SUMMARY OF ARGUMENT ............ 17

STANDING ............ 20

ARGUMENT ............ 23

I. The Reclassification Rule Conflicts with the Best Reading of the Statute ............ 23

A. EPA's Reliance on Section 112(a)'s Definitional Terms Alone Cannot Support the Rule. ............ 23

B. The Rule Nullifies Section 112(d)'s Mandate that EPA Prohibit Emissions Where Achievable. ............ 25

**TABLE OF CONTENTS**

**Page**


C. The Rule Undermines EPA's Duty to Review and Potentially Tighten MACT Standards.......................................................... 28

II. EPA Failed to Reconcile the Rule and the Agency's Implementation of Section 112(c)(6) ........... 30

CONCLUSION......................................................................... 35

## TABLE OF AUTHORITIES

**Page**

**CASES**

*California Communities Against Toxics v. EPA*
934 F.3d 627 (D.C. Cir. 2019).................................................. 13

*Cement Kiln Recycling Coal. v. EPA*
255 F.3d 855 (D.C. Cir. 2001).................................................... 6

*Cyan, Inc. v. Beaver Cty. Emp. Ret. Fund.*
583 U.S. 416 (2016) ................................................................ 24

*Diamond Alt. Energy, LLC v. EPA*
606 U.S. 100 (2025) ................................................................ 20

*Encino Motorcars, LLC v. Navarro*
579 U.S. 211 (2016) ................................................................ 35

*Finnbin, LLC v. CPSC*
45 F.4th 127 (D.C. Cir. 2022) .................................................. 27

*Loper Bright Enters. v. Raimondo*
603 U.S. 369 .......................................................................... 17

*Motor Vehicle Mfrs. Ass'n, Inc. v. State Farm Mut. Auto. Ins. Co.*
463 U.S. 29 (1983) .................................................................. 35

*Nat'l Ass'n for Surface Finishing v. EPA*
795 F.3d 1 (D.C. Cir. 2015) .................................................. 8, 9

*Nat'l Lime Ass'n v. EPA*
233 F.3d 625 (D.C. Cir. 2000).................................................... 7

* Authorities chiefly relied on are marked with an asterisk.

## TABLE OF AUTHORITIES

**Page**

*NextEra Energy Res., LLC v. FERC*
118 F.4th 361 (D.C. Cir. 2024) ........................................... 29

*Pulsifer v. U.S.*
601 U.S. 124 (2024) ........................................................ 27

*Sierra Club v. EPA*
353 F.3d 976 (D.C. Cir. 2004)............................................. 9

*Sierra Club v. EPA*
863 F.3d 834 (D.C. Cir. 2017)...........................................11, 31

*U.S. Sugar Corp. v. EPA*
830 F.3d 579 (D.C. Cir. 2016)............................................. 1

**STATUTES**

United States Code, Title 42

§ 7412(a) ................................................................................ 5
§ 7412(a)(1)......................................................................... 7, 24
§ 7412(a)(2)......................................................................... 7, 24
§ 7412(b)(1)........................................................................... 1, 6
§ 7412(b)(2)............................................................................. 1
§ 7412(c)(1) ............................................................................. 7
§ 7412(c)(3) ......................................................................... 7, 10
§ 7412(c)(6) ...................... 5, 7, 10, 11, 16, 19, 30, 31, 32, 33, 34, 35
§ 7412(d)(1) ........................................................................... 1, 7
§ 7412(d)(1)-(5) ........................................................................ 7
* § 7412(d)(2).......................................................1, 5, 8, 18, 26

* Authorities chiefly relied on are marked with an asterisk.

# TABLE OF AUTHORITIES

**Page**


United States Code, Title 42 (cont.)

§ 7412(d)(3) ........ 8
§ 7412(d)(5) ........ 10
* § 7412(d)(6) ........ 1, 9, 18, 27
§ 7412(e) ........ 7
§ 7412(f) ........ 2, 9, 19, 25
* § 7412(f)(2) ........ 9, 18, 19, 28
§ 7412(f)(5) ........ 10, 28, 39
§ 7412(g)(2)(B) ........ 34
§ 7412(i)(1) ........ 34
§ 7412(i)(3) ........ 25
§ 7607(b)(1) ........ 4, 5
§ 7607(d)(9)(A) ........ 17
§ 7607(d)(9)(C) ........ 17
§ 7661a(a) ........ 22
§ 7661b(e) ........ 22

Consolidated Appropriations Act, Pub. L. No. 110-161, § 432, 121 Stat. 1844, 2152 (2007) ........ 13

Pub. L. No. 119-20 (2025) ........ 16, 32

**FEDERAL REGISTER NOTICES**

63 Fed. Reg. 17,838 (Apr. 10, 1998) ........ 3

68 Fed. Reg. 70,904 (Dec. 19, 2003) ........ 34

72 Fed. Reg. 53,814 (Sept. 20, 2007) ........ 31

72 Fed. Reg. 69 (Jan. 3, 2007) ........ 12


* Authorities chiefly relied on are marked with an asterisk.

## TABLE OF AUTHORITIES

**Page**

79 Fed. Reg. 37,850 (July 2, 2014)........................................................ 3

80 Fed. Reg. 31,470 (June 3, 2015)...................................................... 31

84 Fed. Reg. 36,304 (July 26, 2019)..................................................... 14

85 Fed. Reg. 73,854 (Nov. 19, 2020) ......... 2, 4, 14, 15, 20, 23, 29, 33

89 Fed. Reg. 73,293 (Sept. 10, 2024) .......................................15, 32

89 Fed. Reg. 5543 (Feb. 8, 2018)......................................................... 13

91 Fed. Reg. 58 (Jan. 2, 2026) ............................................................ 16

**LEGISLATIVE HISTORY**

136 Cong. Rec. S36087 (daily ed. Oct. 27, 1990)........................... 28

H.R. Rep. No. 101-490 (1990) ............................................................ 6

S. Rep. No. 101-228 (1989) ................................................................ 6

* Authorities chiefly relied on are marked with an asterisk.

## GLOSSARY

| | |
|---|---|
| EPA | Environmental Protection Agency |
| JA | Joint Appendix |
| MACT | Maximum Achievable Control Technology |
| Once In, Always In Policy | Memorandum from John S. Seitz, Director, Office of Air Quality Planning and Standards, Environmental Protection Agency, "Potential to Emit for MACT Standards – Guidance on Timing Issues" (May 16, 1995). |
| Reclassification Rule | 85 Fed. Reg. 73,854 (Nov. 19, 2020) |
| Section 112 | 42 U.S.C. § 7412 |
| 2018 Guidance | Memorandum from William L. Wehrum, Assistant Administrator for Air and Radiation, Environmental Protection Agency, "Reclassification of Major Sources as Area Sources Under Section 112 of the Clean Air Act" (January 25, 2018). |

## INTRODUCTION

In the Clean Air Act Amendments of 1990, Congress took extraordinary steps to protect public health and the environment from "hazardous air pollutants." *See* 42 U.S.C. § 7412(b)(1). These pollutants include substances like mercury, benzene, and dioxins that present "a threat of adverse human health effects," including those that "are acutely or chronically toxic." *Id.* § 7412(b)(2). To protect public health and the environment, Congress required EPA to first identify categories of "major sources" (i.e., large industrial facilities that emit hazardous air pollutants above a specific quantitative threshold) and then to promulgate "maximum achievable control technology" ("MACT") standards that reflect the "maximum degree of reduction" in hazardous air pollution, "including a prohibition on such emissions, where achievable." *Id.* § 7412(d)(1), (2); *See U.S. Sugar Corp. v. EPA*, 830 F.3d 579, 594 (D.C. Cir. 2016). EPA must periodically evaluate whether to tighten those standards in response to technological developments. 42 U.S.C. § 7412(d)(6). And, regardless of any technological developments, EPA must assess the remaining health and environmental risks from

the regulated sources and, if necessary, promulgate standards addressing such residual risks. 42 U.S.C. § 7412(f).

This statutory scheme is undermined by the EPA Rule challenged here. *See* “Reclassification of Major Sources as Area Sources Under Section 112 of the Clean Air Act,” 85 Fed. Reg. 73,854 (Nov. 19, 2020) (the “Reclassification Rule”). The Reclassification Rule exempts sources covered by “major source” MACT standards from continued compliance with those standards if those sources reduce emissions below the quantitative threshold for identifying “major sources.” Thus, by reclassifying as an “area source,” a large industrial facility may now obtain a new permit limiting its emissions to just below the major-source threshold instead of the “maximum degree of reductions” achieved by a MACT standard. Rather than achieving the “maximum” reductions mandated by Congress, the Reclassification Rule allows sources to meet just the “minimal” enough reductions.

EPA itself recognized that additional hazardous air pollutants will be emitted as a result of the Reclassification Rule. *See* 85 Fed. Reg. at 73,881. MACT standards often reduce emissions by 90% or more, *see,*

*e.g.,* 79 Fed. Reg. 37,850, 37,871 (July 2, 2014) (discussing standard based on technology with "control efficiency of 95 percent"), thus achieving emissions reductions well below the quantitative threshold for identifying "major sources." But under the Reclassification Rule, sources listed in major source categories may now increase emissions up to the major-source threshold and cease monitoring and reporting key emissions information. Even the smallest potential increase in hazardous air pollutants like mercury and dioxins will have a substantial impact on public health because of the acute toxicity of these pollutants, particularly in the already overburdened areas where reclassifying sources are likely to be located. *See, e.g.*, 63 Fed. Reg. 17,838, 17,847-48 (Apr. 10, 1998). Allowing this additional pollution would subvert the maximum achievable emissions reductions mandated by Congress. And, because reclassifying sources will be able to escape previously applicable MACT standards, those sources' emissions will not be controlled by subsequent standards promulgated in response to EPA's required technology and risk reviews.

EPA claims that the Reclassification Rule is supported by a plain reading of the Clean Air Act. However, the agency's interpretation conflicts with the statutory text and structure of Section 112, relying on silence in a definitional provision to render key language in operative provisions obsolete and vitiating the statutory command that emissions from major sources be controlled to the maximum extent feasible. It also creates a conflict with EPA's implementation of the statute—including Section 112(c)'s command to ensure ongoing regulation of sources of certain particularly dangerous hazardous air pollutants—a conflict EPA makes no attempt to resolve. This Court should grant the petitions for review and hold that the Reclassification Rule is unlawful and arbitrary.

## JURISDICTIONAL STATEMENT

The Court has exclusive jurisdiction to review the Reclassification Rule, a final action taken by EPA under the Clean Air Act. 42 U.S.C. § 7607(b)(1). EPA published the Reclassification Rule on November 19, 2020. 85 Fed. Reg. 73,854 (November 19, 2020). The undersigned States

and local governments[1] ("State Petitioners") timely petitioned for review on January 19, 2021. *See* 42 U.S.C. § 7607(b)(1). These consolidated cases have been in abeyance since March 2021. On November 11, 2025, the Court granted the unopposed motion by all Petitioners to return these cases to the Court's active docket.

## ISSUES PRESENTED

1. Whether the Reclassification Rule violates Section 112 of the Clean Air Act by exempting major sources of hazardous air pollutants from continued compliance with congressionally mandated MACT standards under 42 U.S.C. § 7412(d)(2) if their emissions fall below the emission threshold for "major source" in 42 U.S.C. § 7412(a).

2. Whether EPA acted arbitrarily and capriciously by failing to reconcile the Reclassification Rule with the agency's implementation of Section 112, including 112(c)(6), of the Clean Air Act.

[1] The Commonwealth of Pennsylvania also joined the petition but has not joined this brief.

## STATUTES AND REGULATIONS

Applicable statutes and regulations are set forth in the Addendum to this brief and in the Addendum to the Environmental Petitioners' Opening Brief.

## STATEMENT OF THE CASE

### I. LEGAL FRAMEWORK FOR REGULATING HAZARDOUS AIR POLLUTANTS UNDER THE CLEAN AIR ACT

The statutory structure of Section 112 reflects both Congress's keen awareness of the threat posed by these hazardous air pollutants as well as its frustration with EPA's lack of progress to address that threat. The Clean Air Act Amendments of 1990 required EPA "to set the most stringent standards achievable," *Cement Kiln Recycling Coal. v. EPA*, 255 F.3d 855, 857 (D.C. Cir. 2001), "based on the maximum reduction in emissions which can be achieved by application of best available control technology." S. Rep. No. 101-228, at 133 (1989); *accord* H.R. Rep. No. 101-490, at 327 (1990). To achieve that goal, Congress provided in the statute an initial list of 189 hazardous air pollutants. 42 U.S.C. § 7412(b)(1). Congress then required EPA to identify ("list") categories of sources of these pollutants, and to divide these source

categories into "major sources" and "area sources," 42 U.S.C. § 7412(c)(1), (c)(3), (c)(6). A "major source" is defined as a stationary source that emits or has the "potential to emit" either (i) 10 tons per year of any single hazardous air pollutant or (ii) 25 tons per year of any combination of hazardous air pollutants. *Id.* § 7412(a)(1). An "area source" is defined as "any stationary source of hazardous air pollutants that is not a major source." *Id.* § 7412(a)(2). Thus, for example, a petroleum refinery would likely be a major source, while a dry cleaner would be an area source.

Once EPA lists source categories, it must generally then set standards for each source category in accordance with the substantive mandates of Section 112(d) and the schedule established in Section 112(e). 42 U.S.C. §§ 7412(d)(1)-(5), 7412(e). Congress imposed these substantive requirements on EPA and constrained the agency's discretion "precisely because it believed EPA had failed to regulate enough hazardous air pollutants under the previous air toxics provisions." *Nat'l Lime Ass'n v. EPA*, 233 F.3d 625, 634 (D.C. Cir. 2000).

For major sources, EPA's standard-setting process consists of "two basic regulatory tasks"—first, promulgating initial standards, and second, reviewing and potentially revising those standards. *Nat'l Ass'n for Surface Finishing v. EPA*, 795 F.3d 1, 4 (D.C. Cir. 2015).

When promulgating initial standards for major sources, EPA must require technology-based MACT standards that "require the maximum degree of reduction in emissions of the hazardous air pollutants"—up to and including "a prohibition on such emissions"—that EPA determines is "achievable" for that source category, considering costs and other factors. *See* 42 U.S.C. § 7412(d)(2). At a minimum, irrespective of cost and the factors enumerated in Section 112(d)(2), each MACT standard must reflect the "emission control that is achieved in practice" by the best-performing sources in the category. 42 U.S.C. § 7412(d)(3).[2]

[2] For the MACT standards applicable to new source categories, the standards must require at least the level of control achieved by the single "best controlled similar source," reflecting Congress's intent that any new major sources be constructed using, at minimum, state-of-the-art control technology. For the MACT standards applicable to existing-source categories, MACT standards require at least the level of control achieved by the "best performing 12 percent" of sources, or, for smaller categories, the "best performing 5 sources." 42 U.S.C. § 7412(d)(3).

After setting MACT standards, EPA must periodically review and, if appropriate, revise them. The statutory review requirement "entails two distinct, parallel analyses"—a periodic "technology review" and a one-time "risk review." *Nat'l Ass'n for Surface Finishing*, 795 F.3d at 5 (citing 42 U.S.C. § 7412(d)(6), (f)(2)). Technology review requires EPA to, every eight years, determine whether developments in technologies and practices make it appropriate to tighten the standards, thereby achieving still further emissions reductions. 42 U.S.C. § 7412(d)(6). Risk review requires EPA to conduct a one-time assessment of health risks that remain after the MACT standard has been implemented by all major sources nationwide. 42 U.S.C. § 7412(f). If necessary, EPA then sets additional standards under Section 112(f) for each category of major sources to protect public health or prevent adverse environmental effects. *Sierra Club v. EPA*, 353 F.3d 976, 990 (D.C. Cir. 2004).

For area sources, Section 112 provides a more forgiving standard-setting process. Unlike major sources, Section 112 does not require EPA to list all categories of area sources, but rather only those representing "90 percent of the area source emissions of the 30 hazardous air

pollutants that present the greatest threat to public health in the largest number of urban areas." 42 U.S.C. § 7412(c)(3). When EPA does list an area source category, the agency need not subject the listed area source category to MACT standards. Instead, EPA can choose to promulgate standards that "provide for the use of generally available control technologies or management practices." *Id.* § 7412(d)(5). The categories of area sources subject to those less-protective "generally available" standards are also exempt from the residual-risk review or any further standard-setting based on those risks. *Id.* § 7412(f)(5).

The different standard-setting processes for major and area sources do not apply universally. Under Section 112(c)(6), Congress made an exception to this regulatory scheme to address the especially pernicious effects of seven hazardous air pollutants, including mercury, lead, dioxin, and polychlorinated biphenyls (PCBs). 42 U.S.C. § 7412(c)(6). Those pollutants break down slowly in the environment (are "persistent") and accumulate over time in humans and other species (are "bioaccumulative"), making them especially hazardous. Section 112(c)(6) thus requires EPA to subject Section 112(c)(6) source

categories to MACT standards, regardless of whether they are major or area sources, stating: EPA "shall" list source categories "assuring that sources accounting for not less than 90 per centum of the aggregate emissions of each such pollutant are subject to standards under subsections (d)(2) or (d)(4)." *Id.* § 7412(c)(6). Congress thus required EPA "to establish and subject these listed sources to MACT standards … even if it would have otherwise had discretion to apply a less-stringent standard to any area sources on the list." *Sierra Club v. EPA*, 863 F.3d 834, 835 (D.C. Cir. 2017).

## II. REGULATORY HISTORY AND LITIGATION BACKGROUND

EPA has long attempted to clarify when sources should be classified as major or area sources. EPA first addressed the issue in a 1995 guidance memorandum that became known as the Once In, Always In Policy." JA0246 [R-0448]. Under that policy, "facilities [could] switch to area source status at any time until the 'first compliance date' of the standard."[3] *Id.* 5. But once "major sources" were subject to MACT

[3] For existing sources, the "first compliance date" is the first date a source must comply with any substantive regulatory requirement in the (continued…)

standards, they were "required to comply permanently with the MACT standard to ensure that maximum achievable reductions in toxic emissions are achieved and maintained." *Id*. 9. As the policy explained: "In many cases, application of MACT will reduce a major emitter's emissions to levels substantially below the major thresholds." *Id*. If major sources were subsequently allowed to escape the maximum achievable standard and thereby permitted to increase emissions up to the major-source threshold, then in practice "the maximum achievable emissions reductions that Congress mandated for major sources would not be achieved." *Id*.

In 2007, EPA proposed a rulemaking to withdraw and effectively reverse the Once In, Always In Policy to allow major sources to reclassify as area sources by obtaining enforceable limits at any time. 72 Fed. Reg. 69 (Jan. 3, 2007). EPA received comments but had not yet finalized the proposal when a congressional appropriations rider prohibited EPA from taking action to "promulgate or implement" it. *See*

---

MACT standard (e.g., leak detection). *Id.* 9. For new sources, the "first compliance date" is the date of promulgation of the MACT standard or the date of the startup of the source, whichever was later. *Id.* 7.

Consolidated Appropriations Act, Pub. L. No. 110-161, § 432, 121 Stat. 1844, 2152 (2007).

EPA tried a different tack a decade later, issuing a 2018 guidance memorandum (the “2018 Guidance”) that expressly withdrew the Once In, Always In Policy guidance. *See* 89 Fed. Reg. 5543 (Feb. 8, 2018). The 2018 Guidance explained that a major source “becomes an area source at such time that the source takes an enforceable limit on its potential to emit” hazardous air pollutants that is below major-source thresholds. *Id*. The State of California and several environmental organizations filed petitions for review, arguing that EPA’s issuance of the 2018 Guidance violated the Administrative Procedure Act’s notice and comment provisions, and that the guidance substantively contravened the requirements of Section 112 of the Clean Air Act. *California Communities Against Toxics v. EPA*, 934 F.3d 627 (D.C. Cir. 2019). The Court denied the petitions for lack of subject matter jurisdiction and expressed “no opinion” on the merits. *Id*. at 631.

In July 2019, EPA proposed a rule to codify the interpretation of the statute set forth in the 2018 Guidance to allow a major source to

reclassify to area source status at any time by limiting its potential to emit hazardous air pollutants to below the major source thresholds. 84 Fed. Reg. 36,304 (July 26, 2019), JA0001. The proposed rule also would have amended the definition of "potential to emit" by removing the requirement that any limit on the potential to emit be federally enforceable and requiring instead that limits be only "legally and practically enforceable." *Id.* at 36,306. Many of the State Petitioners submitted comments opposing the proposed rule. JA0178 [R-0339].

In November 2020, EPA issued the Reclassification Rule, finalizing its proposal to allow major sources to reclassify as area sources any time their emissions and potential to emit hazardous air pollutants fall below the Section 112 major-source thresholds, thereby exempting those sources from compliance with MACT standards. 85 Fed. Reg. 73,854 (Nov. 19, 2020), JA0069. EPA said it was not finalizing its proposed changes to the definition of "potential to emit," but instead issuing an "interim ministerial revision" to remain in place while "EPA continues to "consider the comments." *Id.* at 73,875-76.

These consolidated petitions for review followed. The cases have remained in abeyance since March 31, 2021, with the Court granting multiple unopposed motions by EPA to extend the abeyance during that period. State Petitioners and Environmental Petitioners also filed petitions for reconsideration of the Reclassification Rule with EPA. JA0792, 0819 [R-0658, R-0659]. EPA has not yet ruled on the pending reconsideration petitions.

While the reconsideration petitions were pending and this litigation remained in abeyance, EPA reviewed the Reclassification Rule and published a new rule governing the effect of reclassification on certain sources. *See* "Review of Final Rule Reclassification of Major Sources as Area Sources Under Section 112 of the Clean Air Act," 89 Fed. Reg. 73,293 (Sept. 10, 2024) ("2024 Rule"), JA1113. The 2024 Rule did not change whether and when sources could reclassify under the Reclassification Rule. To the contrary, EPA recognized that those issues were "not implicated." *Id*. at 73,304. Instead, the 2024 Rule required that certain reclassifying sources—namely, those in source categories listed under Section 112(c)(6) for persistent and bioaccumulative

pollutants— remain subject to MACT standards and certain other health-based standards, even after reclassifying to area sources. According to EPA, given the Reclassification Rule, the 2024 Rule was "the best way to achieve Congress's direction to, 'assur[e] that sources accounting for not less than 90 per centum of the aggregate emissions of each such pollutant are subject to standards under subsection (d)(2) or (d)(4).'" *Id.* at 73,302 (quoting 42 U.S.C. § 7412(c)(6)). The 2024 Rule was subsequently disapproved by a resolution under the Congressional Review Act. *See* Pub. L. No. 119-20 (2025); 91 Fed. Reg. 58 (Jan. 2, 2026) (EPA rule removing 2024 Rule from Code of Federal Regulations).

On November 11, 2025, the Court granted Petitioners' unopposed joint motion to return these consolidated cases to the Court's active docket. ECF No. 2144911. The Court granted Petitioners' request to sever and hold in abeyance issues related to the regulatory definition of "potential to emit" and to establish a briefing schedule for the remaining issues. *Id.*

## STANDARD OF REVIEW

Under the Clean Air Act, this Court reviews EPA action to determine whether it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 42 U.S.C. § 7607(d)(9)(A), (C). EPA's actions must reflect the "best" interpretation of the statute, "applying all relevant interpretive tools." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024).

## SUMMARY OF ARGUMENT

Section 112 of the Clean Air Act establishes a regulatory scheme that binds major sources of hazardous air pollution to emissions standards designed to achieve the "maximum degree of reduction" through stringent technology-based standards. The Reclassification Rule subverts the regulatory scheme with a new scheme that enables major sources to escape these technology-based standards by "reclassifying" as area sources and then increasing emissions up to the major-source thresholds. That new scheme—which EPA rests entirely

on silence in the definition of “major source”—is unsupported by Section 112’s text, structure and purpose.

First, the Reclassification Rule conflicts with the plain language of the statute by effectively erasing the explicitly textual command in Section 112(d)(2) that MACT standards entirely “prohibit[]” and thereby “eliminate” emissions from major sources where zero-emission standards are achievable. 42 U.S.C. § 7412(d)(2). Such a prohibition would be logically impossible if the sources subject to that standard could avoid that standard simply by reducing their potential to emit to a number just under the major-source thresholds.

The Reclassification Rule also cannot be squared with EPA’s duty to require further reductions from sources subject to MACT standards, whether in response to technological developments or to address residual risks. Section 112(d)(6) requires EPA to periodically evaluate whether to tighten MACT standards in response to technological developments. 42 U.S.C. § 7412(d)(6). And Section 112(f)(2) requires EPA to assess the health and environmental risks that remain after implementation of the MACT standards. 42 U.S.C. § 7412(f)(2). Indeed,

Section 112(f)(2)'s residual-risk framework depends on a two-phase process: first, EPA must impose technology-based standards on major sources under Section 112(d), and second, it must evaluate and address any remaining health and environmental risks under Section 112(f). The Rule breaks this structure by allowing some sources to escape residual-risk review even as they discard maximal technological controls.

EPA has also arbitrarily and capriciously adopted the Reclassification Rule without offering any explanation of how it can maintain is continuing obligation to subject Section 112(c)(6) pollutants to MACT standards. That provision requires EPA to list source categories necessary to "assur[e]" that emissions sources accounting for 90 percent of certain hazardous air emissions "are subject to regulation under this section." 42 U.S.C. § 7412(c)(6). EPA's implementation of that provision has largely depended on listing categories of major sources and setting standards for those categories. But far from assuring sources remain subject to those standards, the Reclassification Rule allows sources to escape them, and the level of regulation Congress

determined was necessary to protect public health and the environment from these pernicious toxins. And EPA makes no attempt to resolve this conflict let alone explain its reversal in policy.

## STANDING

The Reclassification Rule enables sources of toxic air pollution in and upwind of State Petitioners' borders to escape maximum achievable controls for their emissions and pollute even more than they already were, all while reporting less information about it. State Petitioners will suffer the consequences.

Though State Petitioners are not the direct objects of the Rule, regulated sources "will likely react" to the Rule "in predictable ways"—taking advantage of the new rights it provides them—and harming State Petitioners in the process. *Diamond Alt. Energy, LLC v. EPA,* 606 U.S. 100, 112 (2025). Indeed, EPA itself recognized the likelihood that the Rule would lead to increased emissions, estimating that—under certain assumptions—reclassifying sources will emit nearly one thousand additional tons of hazardous air pollutants each year. *See* 85 Fed. Reg. at 73,881. For example, EPA noted that sources that could

save money by adjusting their emissions-control technologies to less effective levels by reclassifying would do so, resulting in corresponding increases in emissions. *See* JA0256_20-25 [R-0642_20-25] (estimating over 100 additional tons per year from refineries and 500 additional tons per year from non-gasoline distribution facilities). EPA also noted that reclassifying sources in the coatings sector, and others that use coatings in their processes, could switch from no-emission to low-emission coatings, and that doing so could increase emissions by an average of 11 tons per year *per source*. JA0256_18-19 [R-0642_18-19]. Moreover, reclassifying sources will avoid further reductions that would have been required by future reviews of MACT standards. *See infra* Argument I.C.

These anticipated increases and forgone reductions are significant, because even tiny increments of hazardous air pollution can adversely affect public health, particularly in the already overburdened areas where reclassifying sources like refineries, distribution terminals, and coating facilities are likely to be located. Decl. of Thomas Andrews ¶ 26, 31. State Petitioners will be less able to rely on federal regulatory

scrutiny to protect against the harms caused by these sources' emissions, and will instead find themselves left to pick up the regulatory slack created by the Rule and to undertake costly state rulemaking proceedings to address newly unregulated toxic air pollution. Andrews Decl. ¶¶ 34-39; Decl. of Rory Davis ¶¶ 7-9.

Those injuries will be compounded by a corresponding loss of vital information—information the statute requires to be made public—about when, where, and from whom our jurisdictions are facing toxic air pollution. Andrews Decl. ¶¶ 27-32. The Reclassification Rule will deprive State Petitioners of that information by allowing some sources to cease their Clean Air Act monitoring and reporting obligations altogether. *See* 42 U.S.C. §§ 7661a(a) & 7661b(e) (requiring monitoring and reporting from major sources). California alone has identified at least 15 major sources that could reclassify and be relieved from *any* Clean Air Act permitting requirements. Andrews Decl. ¶ 28. Any changes in those sources' operations or emissions could therefore go unreported. *Id*. Indeed, major sources reclassifying as area sources need

not even inform relevant State Petitioners of their reclassification. *Id.* ¶ 31.

These twin effects of the Reclassification Rule—more pollution and less information about it—thus seriously threaten State Petitioners' interests, and are redressable by a Court order setting the Rule aside.

## ARGUMENT

### I. THE RECLASSIFICATION RULE CONFLICTS WITH THE BEST READING OF THE STATUTE

#### A. EPA's Reliance on Section 112(a)'s Definitional Terms Alone Cannot Support the Rule.

EPA attempts to justify the Reclassification Rule as an implementation of Section 112's "plain language." 85 Fed. Reg. at 73,860. EPA's primary basis for its plain-language assertion is that the definitions of "major source" and "area source" in Section 112(a) lack any deadline or other language specifying whether—and, if so, when—a major source can reclassify as an area source. *Id.* EPA asserts that this silence shows that "Congress did not intend to place a temporal

limitation on a source's ability to be classified as an area source." *Id*. at 73,859.

That argument misses the mark for two reasons. First, the definitions say nothing about reclassification *at all*. *See* 42 U.S.C. § 7412(a)(1), (2). Accordingly, there is no reason to expect that the definitions would contain "a temporal limitation on a source's ability" to reclassify, much less any reason to require a court to accord significant weight to that congressional silence.

Second, Section 112(a)'s definitional provision cannot be read in isolation, without regard to the operative provisions of Section 112. Particularly so here, as the definition of "major source" does not specify when or how a source may avoid compliance with a MACT standard. Indeed, because such specificity is rarely found within statutory definitions themselves, courts have distinguished between "operative provision[s] that could limit a rule," and "mere definition[s] of a statutory term." *Cyan, Inc. v. Beaver Cty. Emp. Ret. Fund.*, 583 U.S. 416, 429 (2016).

Here, EPA's reliance on silence in definitional terms is particularly misplaced given Section 112's express inclusion of a separate provision entitled "Compliance schedule for existing sources." 42 U.S.C. § 7412(i)(3) (requiring continued compliance with MACT standards "after the effective date" of those standards); *see also* Environmental Petitioners' Br. 17-19. EPA's interpretation of the definitional provisions in Section 112(a) conflicts with that provision and renders meaningless the statutory terms of Section 112(d)(2) (specifying that MACT standards entirely "prohibit[]" and thereby "eliminate" emissions from major sources where achievable) and Section 112(f) (providing for a residual-risk framework that depends on EPA first imposing MACT standards on major sources under Section 112(d)).

### B. The Rule Nullifies Section 112(d)'s Mandate that EPA Prohibit Emissions Where Achievable.

The Reclassification Rule allows sources of hazardous air pollutants to escape otherwise-applicable, more stringent, technology-based emissions standards. So long as reclassified sources can keep their emissions below the major-source thresholds (10 tons per year of any individual hazardous air pollutant or 25 tons per year of any

combination of hazardous air pollutants), they no longer must comply with MACT standards that may well have required lower emissions. The Rule thus effectively nullifies key portions of the text of Section 112(d)(2) governing those standards.

Specifically, Section 112(d)(2) calls for EPA to set MACT standards that "require the maximum degree of reduction in emissions of the hazardous air pollutants subject to this section (*including a prohibition* on such emissions, where achievable) that the [EPA] Administrator … … determines is achievable." 42 U.S.C. § 7412(d)(2) (emphasis added). The provision thus contemplates that, for major sources, a MACT standard may have the effect of altogether eliminating emissions of hazardous air pollutants; it expressly states that, in determining the degree of reduction achievable, the Administrator must consider what can be accomplished through, among other things, "measures which (A) reduce the volume of, or *eliminate* emissions of, such pollutants through process changes, substitution of materials or other modification…." *Id.* (emphasis added).

EPA's interpretation erases that prohibition and elimination language from Section 112(d)(2). Under EPA's reading, a MACT standard would never actually "prohibit[]" emissions of hazardous air pollutants, because any source to which a prohibition on emissions under Section 112(d)(2) might apply would have the legal right to increase its emissions up to the major-source threshold. And it would make no sense to require EPA to consider emissions reductions achievable through measures that "eliminate emissions" of those pollutants, if sources could so readily evade the standards that might actually succeed in eliminating such emissions.

For these reasons, under EPA's interpretation set forth in the Reclassification Rule, this portion of Section 112(d)(2)'s command is "impossible for [the agency] to carry out"—a result courts "strongly disfavor." *Finnbin, LLC v. CPSC*, 45 F.4th 127, 133-134 (D.C. Cir. 2022); *see also Pulsifer v. U.S.,* 601 U.S. 124, 143 (2024) (refusing interpretation making statutory text "meaningless").

### C. The Rule Undermines EPA's Duty to Review and Potentially Tighten MACT Standards.

EPA's interpretation also runs counter to the agency's duty to review and, if necessary, tighten MACT standards. As explained *supra,* at 9, after EPA initially promulgates "technology-based" MACT standards, Section 112(d)(6) requires the agency to periodically evaluate whether to tighten those standards in response to technological developments. And, regardless of any technological developments, Section 112(f)(2) requires EPA to assess the health and environmental risks that remain after implementation of the MACT standards. 42 U.S.C. § 7412(f)(2). If additional risk reductions are "required in order to provide an ample margin of safety to protect public health" or "to prevent … an adverse environmental effect," EPA must develop an additional standard to address these remaining risks. 42 U.S.C. § 7412(f)(2); *see also* 136 Cong. Rec. S36087 (daily ed. Oct. 27, 1990) (statement of Sen. Chafee, recognizing that technology-based standards "may not provide enough public health protection."). That additional standard applies only to the "category or subcategory of sources"

covered by the relevant MACT standard. *Id.*; *see also id.* § 7412(f)(5) (exempting area sources not covered by MACT standards).

These review requirements are rendered far less effective under the Reclassification Rule, because many major sources subject to the initial MACT standards EPA reviews will be able to simply reclassify and evade further standards. Even those reclassifying sources that do not increase their emissions above what the initial MACT standard would allow, will avoid the need for any further reductions to comply with revisions to that standard. The Rule thus hamstrings EPA's ability to require further reductions from those sources, whether in response to technological developments or to address residual risks. There is no reason to think Congress intended silence in Section 112's definitional provision to so undermine the same section's review process. *See NextEra Energy Res., LLC v. FERC*, 118 F.4th 361, 371 (D.C. Cir. 2024) ("bedrock principle[] of statutory construction" that "courts should prefer textually permissible readings that would advance statutory or regulatory goals over ones that would frustrate them.")

EPA argues in the Rule that its interpretation is consistent with the statute's risk-review requirement because the statute exempts area sources from the risk review without regard to whether they were previously major sources. 85 Fed. Reg. at 73,861 (citing 42 U.S.C. § 7412(f)(5)). But that exemption is irrelevant. First, it does not exempt all area sources, but instead only those not subject to MACT standards. Second, it in no way suggests Congress was concerned only with risks remaining from sources continuing to emit above the major-source threshold after application of the initial MACT standard. Rather, Congress wanted EPA to consider whether MACT standards had sufficiently reduced emissions to an acceptable level to protect human health, without regard to the major-source thresholds.

## II. EPA FAILED TO RECONCILE THE RULE AND THE AGENCY'S IMPLEMENTATION OF SECTION 112(C)(6)

The Reclassification Rule also cannot be reconciled with EPA's approach to regulating the seven persistent and bioaccumulative pollutants under Section 112(c)(6) and EPA's failure to explain how it will now be able to comply with that obligation is arbitrary and capricious.

EPA's statutory mandate under Section 112(c)(6) is to "assur[e] that source categories accounting for not less than 90 per centum of the aggregate emissions of each" of seven named pollutants, such as mercury and PCBs, "are subject to [emissions] standards under subsection (d)(2) or (d)(4)." 42 U.S.C. § 7412(c)(6). This Court has held that Section 112(c)(6) "require[s] [EPA] to establish and subject these listed sources to MACT standards … *even if it would have otherwise had discretion* to apply a less-stringent standard to any area sources on the list." *Sierra Club*, 863 F.3d at 835 (emphasis added).

EPA currently satisfies Section 112(c)(6) by requiring source categories of these seven pollutants to comply with MACT standards for major sources. *See* 80 Fed. Reg. 31,470 (June 3, 2015) (EPA's final action memorializing and providing notice of EPA's list of source categories to fulfill its Section 112(c)(6) obligations) (the "2015 Determination"). EPA *has* set MACT standards for a few categories of area sources that emit these pollutants. *See e.g.*, 72 Fed. Reg. 53,814 (Sept. 20, 2007) (adding Electric Arc Furnace Steelmaking Facility area source category). But for most of the relevant source categories, EPA

has set standards that apply only to major sources. 80 Fed. Reg. at 31,472-76. And EPA has counted those standards as satisfying its listing obligation under Section 112(c)(6). *Id.*

But if major sources in those categories can reclassify to escape MACT standards, it is not at all clear how EPA can plausibly claim to "assur[e]" that the sources identified in the 2015 Determination remain subject to those standards, as required by Section 112(c)(6). *See* Webster's 3d New Int'l Dictionary (1966) (defining "assure" as "to make sure or certain"). And if EPA cannot satisfy that obligation, then the Reclassification Rule cannot be reconciled with EPA's implementation of Section 112(c)(6) pursuant to the 2015 Determination.[4]

In the Reclassification Rule, EPA made little attempt at addressing this conflict with the 2015 Determination and, in response to comments,

---

[4] EPA previously recognized that the Reclassification Rule "interfered" with its fulfillment of its obligation under Section 112(c)(6). 89 Fed. Reg. at 73,302. EPA's preferred solution to that problem was to promulgate the 2024 Rule "to assure that even if [those] sources reclassify, they remain subject to [MACT] standards." *Id.* And while Congress subsequently disapproved the 2024 Rule, *see* Pub. Law No. 119-20 (2025), it did not resolve the tension between the Reclassification Rule's interpretation of the statute's definitions and EPA's implementation of Section 112(c)(6)'s textually explicit mandate.

invented two concerns that were unmoored from both the statute and the agency's approach to it.

First, EPA claimed that it would not be "reasonable" to interpret Section 112(c)(6) as requiring sources to remain subject to MACT standards. According to EPA, doing so would result in emissions from listed source categories falling below the 90 percent threshold, and thus triggering a need to list additional source categories. 85 Fed. Reg. at 73,861.

Of course, the same would be true any time regulation caused sources to reduce emissions of Section 112(c)(6) pollutants, regardless of reclassification. EPA has never suggested it must continually inventory emissions of those pollutants, constantly revise the listed source categories and subcategories, and iteratively promulgate entirely new slates of emissions standards for the new categories. Rather, under Section 112, EPA was required to assess emissions percentages from source categories *prior* to regulation (specifically, "not later than 5 years after November 15, 1990"), on the premise that the sources of those

emissions would remain "subject to" regulation. 42 U.S.C. § 7412(c)(6). That approach makes far less sense if sources can escape regulation.

Second, EPA claimed that if MACT standards apply continuously to the "individual sources" making up 90 percent of aggregate emissions under Section 112(c)(6), then "new sources within the listed source categories would not be regulated." 85 Fed. Reg. 73,861. But to the extent Section 112(c)(6) calls for EPA to regulate individual sources, it does so only by requiring EPA to list and regulate source *categories*. And standards for those categories extend to new sources as well as existing ones. *See* 68 Fed. Reg. 70,904, 70,906 (Dec. 19, 2003) (discussing application of MACT standard to "new and existing" mercury cell chlor-alkali plants, regulated under Section 112(c)(6)). Indeed, other provisions of the statute *expressly* require regulations of new individual sources in Section 112(c)(6)'s categories. For instance, Section 112(g)(2)(B) prohibits the construction or reconstruction of "any major source of hazardous air pollutants" unless "the maximum achievable control technology emission limitation under this section for new sources will be met." 42 U.S.C. § 7412(g)(2)(B). Similarly, Section

112(i)(1) provides that "[a]fter the effective date of any emission standard, limitation, or regulation under subsection (d), (f) or (h), no person may construct any new major source or reconstruct any existing major source subject to such emission standard" unless the EPA determines the source "will comply with the standard, regulation or limitation." 42 U.S.C. § 7412(i)(1).

In short, EPA's newfound concerns are misplaced, and they do nothing to resolve the conflict between the Reclassification Rule and EPA's implementation of Section 112(c)(6). By failing to address that conflict, EPA ignored an "important aspect of the problem," *Motor Vehicle Mfrs. Ass'n, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), and failed to provide "a reasoned explanation" for "disregarding facts and circumstances that underlay or were engendered by the prior policy." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016) (citation omitted).

## CONCLUSION

The Court should grant the petitions.

Dated: June 18, 2026

Respectfully submitted,

STATE OF CALIFORNIA

ROB BONTA
Attorney General

_/s/ Kavita Lesser_
Kavita Lesser
Jonathan A. Wiener
Ryan Hoffman
Deputy Attorneys General
California Department of Justice
300 South Spring Street
Los Angeles, CA 90013
(213) 269-6605
Kavita.Lesser@doj.ca.gov
*Attorneys for Petitioner State of California*

FOR THE STATE OF DELAWARE

KATHLEEN JENNINGS
Attorney General

_/s/ Vanessa L. Kassab_
Ian R. Liston
Director of Impact Litigation
Vanessa L. Kassab
Deputy Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
Tel: (302) 683-8899
Vanessa.Kassab@delaware.gov
*Attorneys for Petitioner State of Delaware*

FOR THE STATE OF MARYLAND

ANTHONY G. BROWN
Attorney General

_/s/ Steven J. Goldstein_
Steven J. Goldstein
Assistant Attorney General
Office of the Attorney General
200 St. Paul Place
Baltimore, MD 21202
Tel: (410) 576-6414
sgoldstein@oag.state.md.us
*Attorney for Petitioner State of Maryland*

FOR THE STATE OF ILLINOIS

KWAME RAOUL
Attorney General

_/s/ Jason E. James_
Jason E. James
Assistant Attorney General
Illinois Attorney General's Office
201 W. Pointe Drive, Suite 7
Belleville, IL 62226
Tel: (217) 843-0322
jason.james@ilag.gov
*Attorney for Petitioner State of Illinois*

FOR THE COMMONWEALTH OF MASSACHUSETTS

ANDREA CAMPBELL
Attorney General

_/s/ Tracy Leigh Triplett_
Tracy Leigh Triplett
Assistant Attorney General
Office of the Attorney General
One Ashburton Place
Boston, MA 02108
Tel: (617) 727-9665
Tracy.Triplett@state.ma.gov
*Attorney for Petitioner Commonwealth of Massachusetts*

FOR THE STATE OF NEW JERSEY

JENNIFER DAVENPORT
Attorney General

*/s/ Lisa Morelli*
Lisa Morelli
Deputy Attorney General
New Jersey Division of Law
25 Market St., PO Box 093
Trenton, NJ 08625-093
Tel: (609) 900-0782
Lisa.Morelli@law.njoag.gov
*Attorney for Petitioner State of New Jersey*

FOR THE STATE OF NEW YORK

LETITIA JAMES
Attorney General

*/s/ Ashley M. Gregor*
Ashley M. Gregor
Assistant Attorney General
Elizabeth A. Brody
Assistant Solicitor General
28 Liberty Street
New York, NY 10005
Tel: (212) 416-8454
Ashley.Gregor@ag.ny.gov
*Attorneys for Petitioner State of New York*

FOR THE STATE OF OREGON

DAN RAYFIELD
Attorney General

*/s/ Paul Garrahan*
Paul Garrahan
Attorney-in-Charge
Natural Resources Section
Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
Tel: (503) 947-4540
Paul.Garrahan@doj.state.or.us
*Attorney for Petitioner State of Oregon*

FOR THE STATE OF RHODE ISLAND

PETER F. NERONHA
Attorney General

*/s/ Nicholas M. Vaz*
Nicholas M. Vaz
Special Assistant Attorney General
Rhode Island Office of Attorney General
150 South Main Street
Providence, RI 02903
Tel: (401) 274-4400
nvaz@riag.ri.gov
*Attorney for Petitioner State of Rhode Island*

FOR THE STATE OF
WASHINGTON

NICHOLAS W. BROWN
Attorney General

<u>*/s/ Jennifer Slocum*</u>
Jennifer Slocum
Assistant Attorney General
Office of the Attorney General
P.O. Box 40117
Olympia, WA 98504-0117
Tel: (360) 586-6741
jenna.slocum@atg.wa.gov
*Attorney for Petitioner State of Washington*

FOR THE STATE OF
WISCONSIN

JOSHUA L. KAUL
Attorney General

<u>*/s/ Bradley Motl*</u>
Bradley J. Motl
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, WI 53707-7857
(608) 266-9945
bradley.motl@wisdoj.gov
*Attorney for Petitioner State of Wisconsin*

FOR THE COMMONWEALTH
OF VIRGINIA

JAY JONES
Attorney General

<u>*/s/ Tillman J. Breckenridge*</u>
Tillman J. Breckenridge
Solicitor General
Mikaela A. Phillips
Assistant Solicitor General
Office of the Attorney General
202 N. 9th Street
Richmond, Virginia 23219
(804) 786-7704
solicitorgeneral@oag.state.va.us
mphillips@oag.state.va.us
*Attorneys for Petitioner Commonwealth of Virginia*

FOR THE CITY OF CHICAGO

MARY B. RICHARDSON-LOWRY
Corporation Counsel

_/s/ Myriam Z. Kasper_
Myriam Z. Kasper
Deputy Corporation Counsel
City of Chicago Department of Law
2 N. LaSalle Street, S. 580
Chicago, IL 60602
Tel: (312) 744-3564
Myriam.Kasper@cityofchicago.org
*Attorney for Petitioner City of Chicago*

FOR THE CITY OF NEW YORK

STEVEN BANKS
New York City Corporation Counsel

_/s/Alice R. Baker_
Alice R. Baker
New York City Law Department
100 Church Street
New York, NY 10007
(212) 356-2314
abaker@law.nyc.gov
*Attorney for Petitioner City of New York*

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT**

I hereby certify that:

1. This document complies with the type-volume limitations of Rule 32(a)(7)(B)(i) of the Federal Rules of Appellate Procedure and this Court's briefing format order dated November 12, 2025 (ECF No. 2144911). According to the word processing system used in this office, this document, not including the sections excluded by Rule 32(f) and Circuit Rule 32(e)(1), contains 6,055 words, which, when added to the words of the Environmental Petitioners' brief, does not exceed the 13,000-word limit in the Court's order.

2. This document complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this document has been prepared in a proportionally spaced typeface in 14-point Century Schoolbook.

*<u>/s/ Kavita Lesser</u>*
Kavita Lesser

## CERTIFICATE OF SERVICE

I hereby certify that on this June 18, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the D.C. Circuit using the appellate CM/ECF system. Counsel for all parties to the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

*/s/ Kavita Lesser*
KAVITA LESSER